# ATAH-SAFOH
# TRANSCRIPT

```
 1                    JAMS ARBITRATION

 2     - - - - - - - - - - - - -    X

 3     STEVEN BRANNUM,                   :

 4          Claimant,                    :

 5              v.                       :   Reference No.

 6     FEDERAL NATIONAL MORTGAGE         :   1410005474

 7     ASSOCIATION (FANNIE MAE),         :

 8          Respondent.                  :

 9     - - - - - - - - - - - - - -   X

10                          Washington, D.C.

11                          Tuesday, October 25, 2011

12              Arbitration before ARBITRATOR JERRY ROSCOE

13     in the above-entitled matter, the witnesses being

14     duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15     in and for the District of Columbia, taken at the

16     offices of JAMS, 555 13th Street, N.W., Washington,

17     D.C., at 9:30 a.m., Tuesday, October 25, 2011, and

18     the proceedings being taken down by Stenotype by MARY

19     GRACE CASTLEBERRY, RPR, and transcribed under her

20     direction.

21

22
```

Page 476

1  making sure that the purchasers went to closing and
2  then also, you know, doing the due diligence behind
3  that.
4      Q.   So you said you were in the PE loan team
5  or the PE team at that time?
6      A.   Yes.
7      Q.   And was that under Carl Riedy when you
8  first started?
9      A.   No, that was under Wayne Curtis.
10     Q.   And after that position, what position did
11 you have next?
12     A.   Then I was an asset manager.
13     Q.   And what were your responsibilities in
14 that position?
15     A.   Still sort of similar to what the
16 investment analyst did, but as an investment analyst,
17 I only closed bond deals.  As an asset manager, I now
18 did the variety of deals in which, you know, our
19 whole group did, so that also included loans as well.
20     Q.   And did you work with the PE loan team at
21 that time?
22     A.   Yes, I did.

Page 477

1      Q.   And what did you do with them?
2      A.   With them -- so any deals that they would
3  originally source and get subsequent credit approval,
4  then it would be my responsibility to make sure that
5  the deals were ready to close, meaning that both
6  parties had all of their documentation needed to
7  close the deal.  And then after we closed the deal,
8  would fund on the deal, and then also just complete
9  the due diligence that was stated in the sort of like
10 the collateral agreements that were agreed upon by
11 both parties.
12     Q.   Did there come a time when you started
13 working as an official member of the PE loan team?
14     A.   Yes.  Officially, I joined the PE team the
15 fourth quarter of '06, so about October/November.
16     Q.   And did you have to apply for that
17 position?
18     A.   Yes, I did.
19     Q.   And who interviewed you?
20     A.   I was interviewed by Eileen Neely, Nicole
21 Lester, and I don't know if I interviewed with Lisa.
22 I can't remember.

Page 478

1      Q.   When you joined the PE loan team, who was
2  your direct supervisor?
3      A.   Eileen Neely.
4      Q.   And do you remember who your second line
5  supervisor was?
6      A.   There really wasn't a second line
7  supervisor.
8      Q.   Was that within -- had Carl Riedy --
9      A.   Oh, Carl Riedy was the director and under
10 Carl was Eileen.
11     Q.   And who were the other members of the PE
12 loan team at that time?
13     A.   At that time, it was Steve, Lisa, Nicole
14 Lester and Maria Day-Marshall.  And that was on the
15 public entities loan team.  Then also we had the HFA
16 team as well, and that included Jim Peffley -- I'm
17 sorry, I keep forgetting Lisa's last name.  And I
18 think that was it at that time.
19     Q.   When you joined the PE loan team, do you
20 remember your job title?
21     A.   Yes.  I was a business manager.
22     Q.   And what were your job responsibilities as

Page 479

1  a business manager?
2      A.   Well, as a business manager -- well,
3  initially the public loan team had sourced a lot of
4  deals so they were all in the pipeline.  All of the
5  deals had a considerable lead time before they went
6  from, you know, marketing to closing.
7          So what I did was I just managed all the
8  deals that were in the pipeline and then, you know,
9  as I joined the team and worked on other deals, I
10 also began to source and structure deals as the rest
11 of the team members.
12     Q.   Do you know what position Mr. Brannum and
13 Ms. Day-Marshall held when you joined the team?
14     A.   Yes.  They were all senior business
15 managers.
16     Q.   And do you know if they had more financial
17 analysis responsibilities than you did at that time?
18     A.   Yes.  Initially, yes.
19     Q.   Can you turn to tab 170 in that binder?
20     A.   Okay.
21     Q.   Do you recognize this?
22     A.   I want to say yes, but it looks like what

Arbitration Day 2                                                    October 25, 2011
Washington, DC

Page 500

1    A.   Yes.
2    Q.   Now, where was your office in conjunction
3 to Mr. Riedy's office?
4    A.   My office was around the corner from his.
5    Q.   So in the same building on the same floor?
6    A.   Same building, same floor.
7    Q.   Now, was Mr. Hayward on that floor as
8 well?
9    A.   Yes.
10    Q.   And did you have occasion to see Mr. Riedy
11 interact with Mr. Hayward?
12    A.   In meetings, in the hallways, you know,
13 yes, they would interact a little bit.
14    Q.   Did you have occasion to see Mr. Riedy
15 interact with Ken Bacon?
16    A.   If they had all-hands, yes.
17    Q.   Did you ever see Mr. Riedy in Mr. Bacon's
18 office?
19    A.   Mr. Bacon wasn't on our floor.
20    Q.   He wasn't on your floor?
21    A.   And wasn't even -- at that time, he was in
22 Bethesda.  So I can't say if, you know, they

Page 501

1 interacted, you know.
2    Q.   What about Todd Lee.  Are you familiar
3 with Mr. Lee?
4    A.   Yes.
5    Q.   Where was Mr. Lee sitting?
6    A.   Todd Lee at the time was actually sitting
7 on the -- a little bit down from where my cube was.
8    Q.   And did you have occasion to see Mr. Riedy
9 interact with Mr. Lee?
10    A.   Not as much.  Probably in the hallways,
11 you know, they would talk.  Now, Todd used to be
12 under Mr. Riedy, but outside of that, I didn't see
13 them interacting.
14    Q.   What about Katrina Yancey?
15    A.   Yes.  That's admin that sits outside of
16 his office.
17    Q.   Did Mr. Riedy interact with Ms. Yancey?
18    A.   You mean outside of work-related things or
19 just interact?
20    Q.   Just interact with her.
21    A.   Then yes.
22    Q.   And what is Ms. Yancey's race?

Page 502

1    A.   She's black.
2    Q.   And Mr. Lee's race?
3    A.   Black.
4    Q.   And Mr. Bacon's race?
5    A.   Black.
6    Q.   You discussed something called the pricing
7 index on direct.  Do you recall that?
8    A.   Yes.
9    Q.   What is the pricing index?
10    A.   The pricing index is an index that we use
11 which is tied to the municipal bond rating to give
12 indicative pricing to our potential borrowers based
13 upon what we determine their credit level to be at.
14        Now, PHAs, they don't directly get rated
15 by the rating agencies, so we would have to do our
16 analysis and then come up to see at which level they
17 fell in and that's how we were able to let them know
18 which target range that they came in, in terms of
19 pricing.
20    Q.   So this is analysis that the public
21 entities loan team would do to accord a risk factor
22 to potential customers which were PHAs?

Page 503

1    A.   Yes.
2    Q.   Because there is no rating agency for the
3 PHAs, correct?
4    A.   Exactly.
5    Q.   This is for community express deals or
6 also for modernization express deals?
7    A.   Just community express.
8    Q.   You testified that Mr. Brannum had trained
9 you on this?
10    A.   Yes.
11    Q.   And at some point, did you take over that
12 function to create the pricing index?
13    A.   Yes.
14    Q.   And do you remember when that was?
15    A.   No, I couldn't tell you specifically.
16    Q.   Was it in '08 or '07?
17    A.   Probably, maybe later, '07.
18    Q.   '07?
19    A.   If I had to say, yes.
20    Q.   And you testified that they were related
21 for a given period.  Is that for a month?  Is that
22 approximately how long these pricing sheets were for?

59 (Pages 500 to 503)

Page 504

1     A.   You know what?  When it came to that, I
2  would say maybe a month is probably a good time.
3     Q.   And so you --
4     A.   No, go ahead.
5     Q.   No, I'm sorry, finish your answer.
6     A.   I was going to say, we didn't really have
7  a set standard on where we said, okay, you always
8  need to run it.  No, generally, I'll take that back.
9  I think we did it really quarterly.
10    Q.   Quarterly?
11    A.   Unless we saw a lot of fluctuations in the
12 market, then we'll say, if we had a potential rate
13 lock, we would say, all right, run it again.
14    Q.   And how were these pricing indices used by
15 the members of the public entities loan team?
16    A.   Well, we used that in terms of marketing
17 just to be able to show the potential borrowers how
18 low the rates were if they were to choose us as a
19 product.
20    Q.   So did you give them a sort of a sheet for
21 each of the members of the public entity loan team,
22 what they could use for the visits that you would

Page 505

1  make to the potential borrowers?
2     A.   Yes.
3     Q.   You testified on direct that the members
4  of the community development team would -- their role
5  was to introduce you to the potential borrowers, is
6  that correct?
7     A.   In most cases, yes.
8     Q.   They made the introductions?
9     A.   Yes.
10    Q.   And these borrowers -- strike that.  And
11 you testified that you worked with Ralph Perrey?
12    A.   Yes.
13    Q.   And initially he was not strong in the
14 structuring of the deals, is that accurate?
15    A.   Yes.
16    Q.   And how long did you work with Mr. Perrey?
17    A.   Ralph was really the first person I was
18 paired up with when I first joined the team
19 officially, so I can say, you know, from when I
20 officially joined the team, which was
21 October/November of --
22    Q.   Of '07?

Page 506

1     A.   '06.
2     Q.   And do you recall in January of 2008 when
3  a sort of more formalized system of assignment and
4  pairing off of members of the public entity loan team
5  with the community development team?  Do you recall
6  that?
7     A.   The meeting when it happened?
8     Q.   Yes.
9     A.   Was it in January?  I thought it might
10 have been later on, but yes, I do recall --
11    Q.   Early '08?
12    A.   Yes.
13    Q.   And do you recall any discussion with
14 Ms. Neely or anyone else about the assignments of
15 people with -- people on the public entity loan team
16 to people on the community development team?
17    A.   When you say do I recall the discussions,
18 like if anyone had any preferences?
19    Q.   Yes.
20    A.   No, I can't say if anyone had any
21 preferences.  You know, really the pairing, it
22 followed who everyone that was really based in D.C.

Page 507

1  had been working with in the past.
2     Q.   And so you were assigned with Mr. Perrey
3  and you had been working with him?
4     A.   Yes.  We already had the relationship so
5  just kind of to keep that same track going.
6     Q.   And as you continued to work with
7  Mr. Perrey, did you get a sense that he was picking
8  up on how to structure deals?
9     A.   He didn't get -- Mr. Perrey -- when we did
10 the initial analysis, I mean, the initial
11 introduction and marketing, normally that's when it
12 ended.  Then Ralph will go on and do something else.
13 Or unless he would come back and he followed up with
14 a potential borrower that said, all right, now we
15 want to do it.
16        But now, and back in '08 after the market
17 fallout and then to reduce costs, Carl had said,
18 okay, now we want to have more of the CBCs do more of
19 the structuring, that's when Ralph really came to me
20 and said, okay, you know, show me how to do this.
21    Q.   And after that time when Carl had come to
22 you and put more of an emphasis on the CBC team or CD

Page 508

1  team learning the structuring process, did you get a
2  sense that he was picking up on how to do this work?
3       A.   Yes, he was getting better.
4       Q.   Would you turn to Exhibit 2 in the first
5  volume? I want to direct you to what's labeled FM
6  417. It's the bottom right, little letters on the
7  bottom right.
8       A.   Yes.
9       Q.   Do you see that, FM 417?
10      A.   Yes.
11      Q.   Now, May 14th-May 15 indicates that you,
12  Nicole Lester and Lisa Zukoff had gone on a marketing
13  trip, is that correct?
14      A.   Yes.
15      Q.   And who is Ms. Lester?
16      A.   She was our other colleague at the time.
17      Q.   She was on the public entity loan team?
18      A.   Yes.
19      Q.   And do you recall taking this trip with
20  Ms. Lester and Ms. Zukoff?
21      A.   Yes, I do.
22      Q.   What is the GAHRA conference?

Page 509

1       A.   That was the Georgia Housing and -- sorry.
2  The R, was it redevelopment? Yes, I think it was
3  Georgia Housing Redevelopment Authority. There it is
4  right there.
5       Q.   Do you recall receiving some training and
6  coaching from Ms. Zukoff and Ms. Lester on the
7  modernization express product prior to taking this
8  trip?
9       A.   No, I can't say I did. No, I can't say I
10  did.
11      Q.   You testified on direct that you received
12  some instruction from your management chain to be
13  more selective on the trips that you were taking?
14      A.   Yes.
15      Q.   Do you recall when that was?
16      A.   That was sometime in '08.
17      Q.   Now, there was no prohibition on taking
18  trips, was there?
19      A.   I believe there was.
20      Q.   Someone told you, don't take any more
21  trips?
22      A.   No, no. No one said, don't take any more

Page 510

1  trips, but, you know, the way the message came, it
2  was like, look, if -- you know, if there isn't a big
3  potential deal there, don't do it.
4       Q.   Do you recall when in 2008 that message
5  came to you?
6       A.   I can't recall offhand.
7       Q.   Was it in the summer or in the spring?
8       A.   I probably would say spring/summer, around
9  that time.
10      Q.   Of 2008?
11      A.   Yes.
12      Q.   Now, the message was to be more judicious
13  in taking trips, right, to take trips and schedule
14  them so that you meet with multiple customers on one
15  trip?
16      A.   This message?
17      Q.   Yes.
18      A.   No.  The message was, if you're going to
19  go to meet with people, it's got to be a pretty big
20  deal.  You know, seeing that our revenue came off the
21  interest on the loan size, so that automatically
22  really sort of eliminated a lot of the potential

Page 511

1  deals that Ralph and I could generate because his
2  market had very small PHAs but, you know, Jessie and
3  I, we still had a lot of potential deals there
4  because the customer size was larger.
5           MR. STEWART:  No further questions.
6           ARBITRATOR ROSCOE:  Thank you.  Any
7  redirect?
8           EXAMINATION BY COUNSEL FOR CLAIMANT
9           BY MS. LOVELESS:
10      Q.   I would like to just clarify one point
11  that you were just talking about.
12      A.   Sure.
13      Q.   When you were referring to big deals,
14  you're talking about high dollar volume loans?
15      A.   Yes.
16      Q.   Not big deal in the way we use it
17  commonly?
18      A.   No.  I meant high dollar loans so, you
19  know, a $10 million loan would generate more revenue
20  than, you know, $100,000 loan or a $1 million loan.
21           So we had a lot of -- we already had a lot
22  of $100,000 deals in the pipeline.  It wasn't

# BRANNUM TRANSCRIPT

```
  1                    JAMS ARBITRATION

  2    - - - - - - - - - - - - - - - X

  3    STEVEN BRANNUM,                 :

  4        Claimant,                   :

  5            v.                      :   Reference No.

  6    FEDERAL NATIONAL MORTGAGE       :   1410005474

  7    ASSOCIATION (FANNIE MAE),       :

  8        Respondent.                 :

  9    - - - - - - - - - - - - - - - X

 10                          Washington, D.C.

 11                          Monday, October 24, 2011

 12            Arbitration before ARBITRATOR JERRY ROSCOE

 13    in the above-entitled matter, the witnesses being

 14    duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

 15    in and for the District of Columbia, taken at the

 16    offices of JAMS, 555 13th Street, N.W., Washington,

 17    D.C., at 9:47 a.m., Monday, October 24, 2011, and the

 18    proceedings being taken down by Stenotype by MARY

 19    GRACE CASTLEBERRY, RPR, and transcribed under her

 20    direction.

 21

 22
```

Arbitration Day 1                                                    October 24, 2011

Washington, DC

Page 26

1  index.  And the index might be replicated for
2  duration, for maturities, for sectors, for different
3  things and it's a very analytical type of atmosphere.
4        Q.   When you're using the word index that way,
5  what do you mean?
6        A.   An index is basically what something else
7  is referring to.  In our case, we were matched up
8  again the Lehman aggregate total index.  So we had
9  bonds.  We had a portfolio, and at the end of the
10  day, our portfolio was matched against that index to
11  see how well we performed against it.  And our goal
12  was to perform as good or maybe just a little bit
13  better than that index.
14        Q.   How long did you work at Vanguard?
15        A.   I worked at Vanguard for about two years,
16  a little over two years, I believe.
17        Q.   What did you do after Vanguard?
18        A.   After Vanguard, I went to work for Fannie
19  Mae.
20        Q.   And how did you get the position at Fannie
21  Mae?
22        A.   A friend of mine told me about a position

Page 27

1  there and I applied for it.  And I also had another
2  friend that was working there and the ACF group at
3  the time, which was called American Communities Fund,
4  it was a group within Fannie Mae, and I applied and I
5  was subsequently interviewed by Eileen Neely, Laura
6  Glennon and Wayne Curtis.
7        ARBITRATOR ROSCOE:  I'm sorry, I missed
8  the second name. Eileen Neely and --
9        THE WITNESS:  Laura Glennon, and Wayne
10  Curtis.  And I eventually got the position.
11        BY MR. WACHTEL:
12        Q.   And what was American Communities Fund set
13  up to do?
14        A.   American Communities Fund was basically
15  like the window for Fannie Mae.  They did a lot of
16  community development all across the country.  So our
17  goal was really helping to develop communities.
18        Q.   And did you stay with American Communities
19  Fund your whole career at Fannie Mae?
20        A.   Yes.
21        Q.   Did it keep the name American Communities
22  Fund?

Page 28

1        A.   No.
2        Q.   What was the new name or new names?
3        A.   It went from American Communities Fund to
4  American Communities Group to another name and then
5  eventually I guess it ended up being the Community
6  Lending Group.
7        Q.   And was it Community Lending Group at the
8  time you left Fannie Mae?
9        A.   Yes.
10        Q.   So when did you actually start working for
11  Fannie Mae?
12        A.   I started working for Fannie Mae, I
13  believe, July 2002.
14        Q.   And what was the first position you held
15  there?
16        A.   The first position I held there was on the
17  Public Entities team under Wayne Curtis and -- yeah,
18  under Wayne Curtis.  And Monica Gardner was my
19  director at that time.
20        Q.   And what work did you do on the Public
21  Entities team at that time?
22        A.   At that time I was working on -- at the

Page 29

1  time it was called QuickHit.  It was another name but
2  it was basically Community Express.  I was working on
3  bond transactions.  We were doing a lot of purchases
4  of bonds for multifamily, single family housing.  I
5  was doing pricing for some of the bond transactions,
6  working with the capital market groups.
7        I was doing underwriting on the Community
8  Express deals, kind of being a layer between the guys
9  in the field and our credit department, because we
10  didn't want the guys in the field just sending a
11  bunch of deals to our credit department.  So there
12  had to be some sort of filter or somebody that could
13  understand the deals and prepare them for a credit
14  discussion.  And that was my role.
15        Q.   There is a lot there and I want to ask you
16  questions about pieces of it.  You referred to
17  something you worked in as QuickHit and said it was
18  basically Community Express?
19        A.   Yes.
20        Q.   Was it a loan product called QuickHit at
21  that time?
22        A.   It was a loan product called QuickHit.  I

8  (Pages 26 to 29)

---

**Page 30**

1  think at that time it was kind of on that barrier
2  between being QuickHit and being Community Express,
3  but they're one and the tame.
4      Q.   Well, let's call it Community Express,
5  then, just for clarity.  What in particular were you
6  doing with the Community Express product when you
7  first started at Fannie Mae?
8      A.   I was analyzing deals for credit risk.
9      Q.   You mentioned that the group was buying
10  bonds.  Who was the group buying bonds from?
11      A.   The group was buying bonds from HFAs,
12  housing finance agencies.  I'm trying to think if
13  there were any community -- there were some local
14  agencies that were buying bonds.
15      Q.   And for the Community Express loans you
16  worked on, who were the borrowers typically?
17      A.   The borrowers were public entities, which
18  means that they are municipalities such as cities,
19  states.  There were also public housing authorities.
20  There was also housing finance agencies and I think
21  at that time, we were trying to do deals with
22  nonprofits as well but that kind of petered out.  We

---

**Page 31**

1  stopped doing that.
2      So we had municipalities, public housing
3  authorities, housing finance agencies, redevelopment
4  authorities, just basically public entities.
5      Q.   What kind of skills were you drawing on to
6  do the work in your first position at Fannie Mae?
7      A.   My analytical, my accounting skills, my
8  statistics skills, my marketing skills, my computer
9  skills, presentation skills.
10      Q.   What do you mean by you were drawing on
11  your marketing skills for that first job at Fannie
12  Mae?
13      A.   Well, at my first job at Fannie Mae, we
14  had to put together what we called -- these things
15  called stripers at the time, and they were marketing
16  pieces that the people out in the field could use and
17  give to potential borrowers to let them know a little
18  bit about the product.  So one of my tasks was to
19  create these stripers for the different entities.
20      At first it was for all of them together
21  and then we started to break them out to kind of make
22  them -- what's the word I'm looking for?  Tailor made

---

**Page 32**

1  for the different borrowers that we were using.  And
2  I remember that we decided to make them for three
3  borrowers, municipalities, public housing authorities
4  and housing finance agencies.
5      Q.   You mentioned teams out in the field.  Did
6  you do any work out in the field yourself in your
7  first assignment at Fannie Mae?
8      A.   Yes.  I did a rotation out in the
9  southwest in the field.
10      ARBITRATOR ROSCOE:  Not southwest D.C.?
11      THE WITNESS:  No, southwest United States,
12  the southwest regional office.  It was in Dallas, if
13  I'm not mistaken.
14      BY MR. WACHTEL:
15      Q.   So how long did you work directly for
16  Monica Gardner with Wayne Curtis as her boss?
17      A.   I want to say one to two years maybe.
18      Q.   And who did you work for after that?
19      A.   After that I worked for Mike Riley.
20      Q.   And when you started working for Mike
21  Riley, was that a different job or a different boss
22  in the same job?

---

**Page 33**

1      A.   It was definitely a different boss.  My
2  job was the same.  I was still working with Community
3  Express but I was also doing a lot of the bond
4  resets.  I was the person that was responsible for
5  putting together the pipeline reports for the single
6  family/multifamily businesses that actually Wayne was
7  running.
8      Mike Rylant, I can't remember if he was
9  running single family or multifamily but it was two
10  people.  It was Mike Rylant and Jim Beachler.  They
11  both ran the single family/multifamily bond business
12  that we had.  And I was working for them doing the
13  reports, doing the bond resets, if necessary doing
14  the pricing, if necessary reading over OS's and
15  POS's.  OS's is official statement.  A POS is a
16  preliminary official statement.
17      Q.   And who issued the bonds that you're
18  talking about?
19      A.   These bonds were issued by HFAs and local,
20  state housing finance authority.
21      Q.   Just for clarity, what's the difference
22  between a housing finance agency and a public housing

Arbitration Day 1                                                                                   October 24, 2011

Washington, DC

Page 38

1    Q.   And objective 2, provide pricing
2  guidelines and monitor pricing for the Community
3  Express products, did that relate to the bond side of
4  the business?
5    A.   No, that was Community Express as well.
6    Q.   Objective 3, create new product sheets for
7  Community Express products?
8    A.   Yes.
9    Q.   Objective 4, communicate and work more
10 effectively with the field and CD teams.  What was
11 that objective?  Objective 4, page FM 101.
12   A.   That was with Community Express too.  That
13 was the rotation I was telling you about in the
14 Southwest regional office.
15   Q.   And at that point in your career, what
16 were you communicating to the field and CD teams
17 about?
18   A.   What was I communicating?
19   Q.   Right.  What were you working with them
20 on?
21   A.   I was working with them on Community
22 Express, on structuring Community Express, trying to

Page 39

1  teach them about the pricing, how to evaluate
2  Community Express, some of the questions to ask.
3    Q.   What were the field teams as referenced
4  here?
5    A.   The field teams were the individual groups
6  that were all across the country.  At the time, we
7  had five field teams that I believe actually at the
8  time Carl was running.  There was one in the
9  Southwest, one in the East, one in the West, one in
10 the South, I believe, and then one in the Midwest.
11 So there were five teams.  And I was working with
12 them to get Community Express deals done.
13   Q.   And does field and CD team refer to two
14 different groups of people or is that the same group
15 of people?
16   A.   It's essentially the same group.  It is
17 the same group of people.
18   Q.   And is the CD and CD team standing for
19 community development?
20   A.   Yes.
21   Q.   Can you turn to the next exhibit?  Oh,
22 I'll move Exhibit 120 into evidence.

Page 40

1    MR. STEWART:  No objection.
2    ARBITRATOR ROSCOE:  Off the record for a
3  second.
4    (Discussion off the record.)
5    ARBITRATOR ROSCOE:  Counsel for claimant
6  has submitted for evidence what has been marked for
7  identification purposes as Claimant's Exhibit 120
8  which corresponds with document numbered 120 in the
9  binders provided by counsel in this matter.  There
10 being no objection, Exhibit 120 is admitted.
11   (Claimant's Exhibit No. 120
12   was received in evidence.)
13   ARBITRATOR ROSCOE:  Just for the record,
14 the marked exhibits will be retained by the
15 arbitrator in the arbitrator's set of documents.  And
16 counsel have agreed to keep track of what is or is
17 not admitted on their own, verifying at the end of
18 each day what has or hasn't been admitted with the
19 court reporter, whose record for what has or hasn't
20 been admitted will be the final record of what is or
21 isn't admitted.
22   MR. WACHTEL:  Yes.

Page 41

1    ARBITRATOR ROSCOE:  Okay.  Now having done
2  that, proceed.
3    BY MR. WACHTEL:
4    Q.   Mr. Brannum, you should have Exhibit 121
5  open in your binder.
6    A.   Yes.
7    Q.   Did you recognize that document?
8    A.   Yes.
9    Q.   What is it?
10   A.   It's my year end performance review.
11   Q.   For which year?
12   A.   This is for 2004.
13   Q.   And who was your boss during 2004?
14   A.   Mike Rylant.
15   Q.   And did the kind of work you did for
16 Mr. Rylant in that year, was it different from the
17 work you had done before?
18   A.   It was, but it was a little bit different.
19 I would say I was doing a little bit more work with
20 the bonds.
21   Q.   What were you doing more with the bonds
22 that you hadn't been doing before?

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                October 24, 2011
Washington, DC

Page 50

1   of collateral that we accepted were cash and letters
2   of credit.
3        The other thing you had to do was analyze
4   balance sheets, three years of history to get a sense
5   of the financial capacity for the borrower.  In order
6   to structure a deal, you had to know the five Cs of
7   credit or you had to use another system that's used
8   in banking called CAMELS.
9   Q.   What are the five Cs of credit?
10  A.   You're testing my memory now.  It's
11  capacity, condition, collateral, character and -- I'm
12  just drawing a brain freeze right now.
13  Q.   And you mentioned that you would have to
14  look at the repayment, how the repayment would be
15  done.  What are the different examples of options
16  that you could be looking at there?
17  A.   Well, in some cases, the repayment source
18  might come from grants that, let's say a public
19  housing authority knew that they were going to get in
20  future years.  So what we would do was look at those
21  grants and say, okay, you're getting these grants
22  pretty consistently each year.  What you can do is

Page 51

1   look at your future grants and we'll give you all the
2   money upfront and you'll just repay us with the
3   grants that you get in the subsequent years.
4        Other times it might have been, okay,
5   you're looking to do some single family developments.
6   You can repay us once you complete those single
7   family developments.  Once you sell the homes, then
8   you can repay us.
9        And other times, it might have been from
10  looking at multifamily developments where you have
11  rent rolls, which I would say is slightly a bit more
12  difficult because you're looking at performance and a
13  lot more information in addition to the financials
14  that you're looking at for the different borrowers.
15  Do you want me to continue?
16  Q.   No.  Is that the kind of -- so did you do
17  that kind of work while you were working for
18  Mr. Rylant?
19  A.   Yes.
20  Q.   And had you done that kind of work while
21  you were working for Ms. Gardner?
22  A.   Yes.

Page 52

1        MR. WACHTEL:  I would like to move Exhibit
2   121 into evidence.
3        ARBITRATOR ROSCOE:  Any objection?
4        MR. STEWART:  No, sir.
5        ARBITRATOR ROSCOE:  So moved.
6        (Claimant's Exhibit No. 121 was
7        marked for identification.)
8   BY MR. WACHTEL:
9   Q.   Who did you work for after Mr. Rylant?
10  A.   After Mr. Rylant, I worked for Joseph
11  Firshein, I believe.
12  Q.   And was it in a different area?
13  A.   Yes.
14  Q.   How did you get to the different area?
15  Did you apply for it?
16  A.   No.  It was kind of a -- this was when
17  Jeff Hayward took over the group and he divided our
18  group into a bunch of different channels and the
19  community channel was one of them.  Public Entities
20  was another.  And I believe there was an A, B and C
21  channel and there might have been an intermediate --
22  I'm not sure of all the channels but I ended up in

Page 53

1   the community channel because of -- I believe because
2   of Community Express because Community Express
3   actually went to that channel as well.  It was one of
4   the products that they were going to be using.
5   Q.   And Mr. Firshein, was he the head of the
6   community channel?
7   A.   He was my director.  He reported to June
8   Gould who was the vice president of the community
9   channel.
10  Q.   So did you continue to do work on
11  Community Express for Mr. Firshein?
12  A.   Yes.
13  Q.   Was the kind of work you did at Community
14  Express any different from the Community Express work
15  you had already been doing?
16  A.   No.
17  Q.   And how long were you working for
18  Mr. Firshein and ultimately Ms. Gould?
19  A.   I'm not sure.  I think it might have been
20  either around a year or it might have been less than
21  a year because at one point, I was switched over to
22  Jonathan Parrish out in L.A., Los Angeles.

14  (Pages 50 to 53)

**Page 54**

1   Q.   Before we get to L.A., did you handle a
2   one-off project for Mr. Hayward at around the time he
3   came in?
4   A.   Yes.
5   Q.   And what was that project?
6   A.   It was serving municipalities better or --
7   yeah, it was serving municipalities better.
8   Q.   What was your role in the project?
9   A.   I was the leader of the project.
10   Q.   And who were you leading?  Did you have a
11   group around you?
12   A.   Yes, I had a group of about six, seven
13   people that were working on this particular project
14   with me.
15   Q.   And what was the end product of your
16   group's work?
17   A.   The end product was we presented
18   information to Jeff on ways we thought we could
19   better serve municipalities, and one way was we
20   instituted this sliding scale for collateral because
21   we -- and in doing research and in doing some
22   surveys, we showed that municipalities had a lower

**Page 55**

1   risk than comparable other entities.
2           So if you compared a municipal to a
3   corporate, if they had the same, let's say, bond
4   rating, if you look at a double A municipality versus
5   a double A corporate, the double A municipality has
6   lower risk.  It has a lower default rate, a lower
7   risk.  So we did a lot of analysis to determine that
8   and decided that because their risk was much lower,
9   that we could get them better collateral terms.
10   Q.   What do you mean by better collateral
11   terms?
12   A.   Before our collateral was 25 percent
13   across the board, and with the municipalities, what
14   we did was if you were rated, let's say, a AAA or you
15   were giving us a general obligation, then you could
16   do the deal without putting up any collateral.  And
17   if you had, let's say, a AA rating, you could do the
18   deal with putting up a 10 percent collateral as
19   opposed to a 25 percent.  And it just kind of slid
20   all the way through I guess like triple B.
21   Q.   How long did it take your team to do that
22   work?

**Page 56**

1   A.   I would say it took a couple of months.
2   I'm not sure the exact time.
3   Q.   How was your work received?
4   A.   It was received well.  I mean, they
5   initiated it.  It was something that was instituted.
6   We started to use the sliding scale for
7   municipalities.  I think that everyone started to
8   understand municipalities better and just the risk
9   profile of municipalities.
10   Q.   And once the recommendation was made, did
11   you have any further work on that project?
12   A.   No.
13   Q.   So you mentioned that you worked for
14   Jonathan Parrish.  When did you do that?
15   A.   I went out to L.A. to help them with -- to
16   help the team out in L.A.  I was initially --
17   Joseph's team was on the East Coast.  In the
18   community lending, we had three different teams.  One
19   was on the West, one was the mid and then we had an
20   East Coast team.  I was on the East Coast team with
21   Joseph and at some point, I was sent out to help with
22   the West Coast team on the West Coast.

**Page 57**

1   Q.   And was that something you volunteered for
2   or something you were told to do?
3   A.   I was asked if I was interested in helping
4   out the West Coast team.
5   Q.   And was your move presented to you as --
6   I'm sorry, temporary or permanent?
7   A.   It was told to me as basically a
8   temporary, just go out there and help them out.
9   Q.   Who told you that?
10   A.   Julie Gould.
11   Q.   Once you got out to -- is it Pasadena or
12   Los Angeles?
13   A.   It was Pasadena.
14   Q.   After you got to Pasadena, was there any
15   discussion of making your transition there permanent?
16   A.   Yes.
17   Q.   Who did you discuss that with?
18   A.   With Jonathan Parrish.
19   Q.   And was he your boss there?
20   A.   Yes.
21   Q.   And what did he say about possibly making
22   it permanent?

Page 58

1      A.   He asked me if I wanted to stay out there
2   permanently.
3      Q.   And what did you say?
4      A.   I said I would think about it.
5      Q.   So how did you come back to the East
6   Coast?
7      A.   I was asked by Eileen Neely if I wanted to
8   come back and work in the Public Entities group with
9   her.
10      Q.   So was that switching channels?
11      A.   Yes.
12      Q.   Was Eileen Neely someone you already knew
13   besides the interview you already had?
14      A.   Yes.
15      Q.   How did you know her?
16      A.   I worked with Eileen in a public entities
17   group.  At the time, she was working on either new
18   products or something in that group and I was working
19   on Community Express and bond information, but we had
20   worked together for a couple of years in the same
21   group.
22      Q.   What was her job at the point at which she

Page 59

1   asked you to come back?
2      A.   I believe she had just been made director
3   of the Public Entities group.
4      Q.   And who was her boss at that point?
5      A.   It was Carl Riedy.
6      Q.   Were you on any teams that were either
7   directly Mr. Riedy's or just below him before that?
8      A.   No.
9      Q.   Did you have any discussions with
10   Mr. Riedy about whether you should return to
11   Washington or planned to return?
12      A.   No.
13      Q.   Did you have any discussion with Eileen
14   about Mr. Riedy and the return?
15      A.   Yes.
16      Q.   What did she say to you?
17      A.   She pretty much was like --
18      MR. STEWART:  Objection, calls for
19   hearsay.
20      ARBITRATOR ROSCOE:  Is she going to be a
21   witness?
22      MR. WACHTEL:  She is going to be a

Page 60

1   witness, yes.  I believe they're calling her as a
2   witness.
3      ARBITRATOR ROSCOE:  And was he an employee
4   or a manager?
5      MR. STEWART:  A former manager for
6   Mr. Brannum.
7      ARBITRATOR ROSCOE:  I'll let it in.  You
8   can cross-examine her when she comes in.  Go ahead.
9      BY MR. WACHTEL:
10      Q.   What did she say to you concerning
11   Mr. Riedy and your return?
12      A.   She said she didn't think Mr. Riedy wanted
13   me to be on the team.
14      Q.   Did she explain that at all?
15      A.   Not really.
16      Q.   So when you returned to Washington, who
17   was on Eileen's team at that point?
18      A.   It was Eileen, Maria and Nicole Lester, I
19   believe.
20      Q.   So you were the fourth person on the team,
21   is that right?
22      A.   Yes.

Page 61

1      Q.   And do you remember, when did you get back
2   to Washington to work on that?
3      A.   It was either May or June of 2006, if I'm
4   not mistaken.
5      Q.   And just for clarity, Mr. Riedy's race is?
6      A.   White.
7      Q.   Ms. Neely's?
8      A.   White.
9      Q.   Ms. Day-Marshall?
10      A.   Black.
11      Q.   Ms. Lester?
12      A.   Black.
13      Q.   Did anyone else join the team, the PE
14   team, after you joined?
15      ARBITRATOR ROSCOE:  And Day-Marshall, is
16   that Maria?  Are they the same person?
17      MR. WACHTEL:  Yes.
18      THE WITNESS:  Subsequently after that,
19   Lisa joined the team and I believe that Russell
20   became a member of the team.
21      BY MR. WACHTEL:
22      Q.   And just for clarity, Lisa is Lisa Zukoff?

16  (Pages 58 to 61)

Arbitration Day 1                                          October 24, 2011
Washington, DC

---

Page 62

1    A.   Lisa Zukoff, yes.
2    Q.   And Russell is Russell Atta-Safoh?
3    A.   Russell Atta-Safoh.
4    Q.   And do you remember how long after you
5    joined did Ms. Zukoff join?
6    A.   I think it was a couple of months after I
7    was part of the team.
8    Q.   And do you remember when Mr. Atta-Safoh
9    joined?
10   A.   Mr. Atta-Safoh was with our team for a
11   while and then it became official.  You actually had
12   to interview for a position but he was always doing
13   work with our team, but I'm not sure exactly when.
14   Q.   When you say always, was he doing some
15   work with the team?
16   A.   He was doing some work, yes.
17   Q.   Even when you started with the team?
18   A.   Yes.
19   Q.   What kind of work were you doing for the
20   Public Entities team when you first joined under
21   Eileen's leadership?
22   A.   I was working with Community Express

---

Page 63

1    products.
2    Q.   What were you doing with Community Express
3    products?
4    A.   I was structuring them, I was trying to
5    find better ways to promote them, I was trying to
6    find better ways -- improve on the pricing of the
7    product.
8         And when I say structuring, that means I
9    was reviewing financials and going through, again,
10   with the five Cs and trying to figure out whether or
11   not the deal was of good credit.
12   Q.   What about sourcing deals at that point?
13   Were you doing any of that when you joined
14   Ms. Neely's team?
15   A.   Not too much.  Not too much.
16   Q.   Why were you not doing much of that when
17   you first joined her team?
18   A.   Because I was primarily the person that
19   was doing a lot of the structuring of the
20   transactions, of the Community Express transactions.
21   So as far as the sourcing, it wasn't something that I
22   was out there traveling all the time sourcing deals.

---

Page 64

1    Q.   Was it your choice to be the structurer or
2    the sourcer or was that something somebody told you
3    to do?
4    A.   Eileen said I was going to be responsible
5    for Community Express transactions.
6    Q.   By the way, was Community Express the only
7    product that PE had?
8    A.   No, they had another one called
9    Modernization Express.
10   Q.   What's the difference between
11   Modernization Express and Community Express?
12   A.   Modernization Express was a product that
13   actually Eileen created and it was primarily for one
14   particular borrower and the structuring was the same
15   for every deal.  It was for PHAs, to do
16   modernization.  And what they did was they were
17   securing capital funds that the PHAs would get.
18        ARBITRATOR ROSCOE:  Mr. Wachtel, if the
19   timing is good for you, we'll take a break.
20        MR. WACHTEL:  Just a couple of more
21   questions on this line to finish what the nature of
22   the work was.

---

Page 65

1         ARBITRATOR ROSCOE:  That will be fine.
2         BY MR. WACHTEL:
3    Q.   You mentioned that Eileen said that you
4    were going to be the one for the Community Express
5    product.  When did she say that?
6    A.   She said it to me in her office one time.
7    It was like, you're going to focus on Community
8    Express.
9    Q.   When is that relative to your return from
10   Pasadena to D.C.?
11   A.   This was within, I would say, a couple of
12   months.
13   Q.   So how was the work that Eileen's group
14   was doing on the Community Express product different
15   from the work that you had done on Community Express
16   for Mr. Rylant?
17   A.   I didn't see much of a difference.  It was
18   just that the groups changed.  When I say the groups,
19   it's just the field was changing but we were still
20   getting our deals from the field.
21   Q.   What do you mean by the field was
22   changing?

17 (Pages 62 to 65)

Alderson Reporting Company
1-800-FOR-DEPO

Page 66

1    A.   The field had been kind of put into the CD
2    offices now.  They were called community development
3    offices when before they were called partnership
4    investment offices.  And then they became community
5    investment offices.  They were still the guys that
6    were in the different offices all across the
7    United States.
8    Q.   Were nationwide offices a part of -- let
9    me ask it this way.  Did you coordinate with offices
10   around the country for Community Express work
11   throughout the time you worked on the project?
12   A.   Yes.
13   Q.   In addition to your work structuring
14   Community Express deals, what other work did you do
15   for the PE loan team?
16   A.   I would work on anything that Eileen
17   wanted me to do.  Special projects.  I was working on
18   creating an actual pricing methodology for Community
19   Express.  That was definitely one project that I was
20   working on.
21        I was working to figure out a
22   profitability model for Community Express.  I was

Page 67

1    working with a lot of modelers to figure that out.  I
2    was doing -- at some point I was working with legal
3    to create form documents for Community Express.
4         I was working with credit to create risk
5    rating and underwriting guidelines for Community
6    Express.  I was working with portfolio management to
7    create procedures for the -- closing of Community
8    Express.  I was working on strategies for our group.
9    So it was a lot of different projects.
10   Q.   Does that cover the whole roughly
11   three-year period that you worked for the PE loan
12   team under Eileen Neely?
13   A.   Pretty much.
14   Q.   During that period, what work if any did
15   you do for sourcing deals?
16   A.   I did a little bit of sourcing of the
17   deals but mainly I had a heavy reliance on the people
18   that were in the different offices across the
19   country.
20   Q.   Did your role on the PE loan team change
21   at all from the time you started until your last day
22   of work there?

Page 68

1    A.   Not really, no.
2         ARBITRATOR ROSCOE:  When you say time you
3    started, you mean that team?
4         MR. WACHTEL:  Yes, the time he started
5    with that team.  I think this would be a good time
6    for a break.
7         ARBITRATOR ROSCOE:  15 minutes.  And then
8    it looks like lunch will be around 12:30, 12:40, so
9    you can start planning.  I have 11:06.  So 15
10   minutes, Counsel.
11        (Recess.)
12        BY MR. WACHTEL:
13   Q.   Mr. Brannum, before the break you
14   mentioned a couple of projects that you did as part
15   of the PE loan team.  One of them was pricing.  What
16   was that project?
17   A.   That project was twofold.  One was I
18   created the pricing matrix that we used on all
19   Community Express deals and that matrix divided out
20   the deals into different tiers and the tiers were
21   based on the credit rating of those deals.
22        And the interesting thing about our

Page 69

1    product was it was a variable rate deal, and most of
2    the comparables that I could use were fixed rate, so
3    I had to do a lot of analysis on the swap market to
4    swap fixed into variable.
5         Also, we needed to find an index that we
6    would use on all our deals.  So I had to do a
7    regression analysis to figure out an index that
8    mirrored what I thought was the index that Fannie Mae
9    used on its variable rate deals very closely, that
10   everybody knew about, because we couldn't just say
11   use Fannie Mae's index because they wouldn't know
12   where to get the information.  So I looked at several
13   different indices and the one that I found that
14   closely resembled that index was the three-month
15   LIBOR.  So I did that work.
16        I then gathered a bunch of information on
17   Bloomberg and put it together so that we had a
18   pricing matrix that people could use when they were
19   pricing the deals.  They had a guideline to use.
20   Q.   I have a couple of questions about that.
21   Community Express had been a product for a while
22   before you rejoined Eileen Neely's team.

## Page 74

1  adjusted risk return that we're getting on these
2  deals.
3      Q.   So who asked you to work on the
4  profitability project?  Do you remember?
5      A.   Well, the profitability project, that
6  was -- again, I really can't remember who it was.
7      Q.   Were you responsible -- in terms of
8  contact with borrowers, were you responsible for a
9  particular region while you were on Ms. Neely's PE
10 loan team?
11     A.   No.
12     Q.   What areas of the country did you work
13 with while on the PE loan team?
14     A.   Everybody.  All over.  All over the
15 country, all over the United States, from the West
16 Coast to the East Coast, the Midwest.  Wherever there
17 was a deal that needed analysis, I would do it.
18     Q.   Let's talk about some of the other people
19 on the PE loan team.  Where was Ms. Neely located?
20     A.   She was located in Washington, D.C.
21     Q.   The same office floor you were in?
22     A.   Yes, same floor, same office.

## Page 75

1      Q.   And what were her responsibilities
2  generally?
3      A.   Eileen was essentially responsible for the
4  Public Entities team under Carl Riedy and her
5  responsibilities were really those two products, the
6  Community Express and the Modernization Express.
7      Q.   And Ms. Zukoff, where was Ms. Zukoff
8  located while you were both on the PE loan team?
9      A.   She was located in West Virginia.
10     Q.   Did she come to D.C. very much?
11     A.   She came to D.C., yes, she came to D.C.
12     Q.   And did she have a particular role or
13 niche on the team at that time, the whole time that
14 you were part of the team?
15     A.   She was sourcing deals.
16     Q.   Was she responsible for a particular
17 geographic area?
18     A.   I don't think at that time, no.
19     Q.   At any time while you were both on the
20 team?
21     A.   When we started to put together the buddy
22 system or that buddy system that we had, it was kind

## Page 76

1  of assumed that you're working with a buddy in
2  different areas, but I don't think that anybody had a
3  direct responsibility for any particular part of the
4  country.  It was all over.  You could do deals all
5  over.
6      Q.   I guess we'll get to the buddy system or
7  the mentoring system in a minute.  And when you say
8  Ms. Zukoff was working on deals for those, sourcing
9  deals, do you mean express deals or Modernization
10 Express deals?
11     A.   I would say that in the very beginning,
12 she was probably sourcing more Modernization Express
13 and then eventually she started to source a lot with
14 the Community Express.  Both of them together, I'm
15 sorry.
16     Q.   In addition to sourcing, was she
17 responsible for structuring the deals that she
18 sourced?
19     A.   She was starting to get to the -- well, on
20 the Modernization Express, the structuring was
21 different.  It was pretty much just filling out
22 boxes.  On the Community Express, the structuring was

## Page 77

1  a little different for each deal.  And she was
2  starting to do that a little bit with Community
3  Express at some point.  And I can't remember when but
4  I know that at some point, we would have discussions
5  on structuring of a deal.
6      Q.   Where did Maria Day-Marshall work?
7      A.   She worked in D.C.
8      Q.   The same office you did?
9      A.   Yes.
10     Q.   And did she have a particular niche or
11 role on the team?
12     A.   At one point, she was doing a lot of work
13 with infrastructure bonds and with, I want to say TIF
14 financing, but she was also doing sourcing for
15 Modernization Express and Community Express as well.
16     Q.   When you say she did a lot of work with
17 infrastructure bonds, was that work in either
18 Community Express or Modernization Express?
19     A.   Yes.
20     Q.   Why was that a part of the work load of
21 the Public Entities team?
22     A.   It was a special project that I think she

Arbitration Day 1                                                October 24, 2011
Washington, DC

Page 78

1    was working on.  I don't know too many details about
2    it but I do remember her working on some special
3    project for infrastructure.
4        Q.   Nicole Lester, where did she work?
5        A.   She worked in Washington, D.C.
6        Q.   And did she have a particular niche or
7    role in the team?
8        A.   Again, she was doing a lot of
9    Modernization Express and some Community Express.
10       Q.   Is that throughout the time that you and
11   she were both part of the team?
12       A.   Yes.
13       Q.   And do you know what level she was at?
14       A.   She was a level 4.
15       Q.   I don't know if we have this in the record
16   yet.  What level were you?
17       A.   Level 5.
18       Q.   Were you a 5 your whole time at Fannie
19   Mae?
20       A.   Yes.
21       Q.   Russell Atta-Safoh, did he have a
22   particular niche or role in the team?

Page 79

1        A.   He was sourcing and doing Community
2    Express and Modernization Express as well.  And
3    Russell would usually -- I was training Russell
4    actually to help out with a lot of the pricing, the
5    pricing matrices and things like that.
6        Q.   When you say he was doing Community
7    Express and Modernization Express, do you mean
8    sourcing or structuring or both?
9        A.   He was sourcing.  He was doing a little
10   bit of structuring.  I think he was learning how to
11   structure deals correctly.
12       Q.   So just for clarity, did Ms. Zukoff
13   supervise the team at all while you were part of the
14   PE loan team?
15       A.   No.
16       Q.   What about working as an acting manager if
17   Ms. Neely was unavailable.  Did she do that?
18       A.   Not to my knowledge, no.
19       Q.   Did you ever do that?
20       A.   If Eileen was on vacation, I was usually
21   the go-to person in the office.
22       Q.   And the go-to person, what did people go

Page 80

1    to you for?
2        A.   For anything that they would go to Eileen
3    for.  Obviously if she wasn't there, they would come
4    to me.
5        Q.   Can you be a little more specific?  What
6    kinds of work did you do as the go-to?
7        A.   Well, if there were issues with any of the
8    deals, if there was issues with something in
9    portfolio management, if somebody had a question
10   about the pricing of a deal.  At one point, I
11   remember having to help Maureen Rude put together a
12   budget when Eileen wasn't there.  I remember having
13   to put together a massive report when Eileen wasn't
14   there.
15       Q.   Was she gone for prolonged periods or are
16   you just talking about vacation and things like that?
17       A.   Vacation and one time she did take a very
18   long vacation.  I think it was either two or -- it
19   might have been two weeks.
20       Q.   Did anybody else ever cover for -- serve
21   as the acting when Eileen was out, such as Maria
22   Day-Marshall, someone else?

Page 81

1        A.   She might have said, okay, go -- if you
2    have any questions, go to Maria Day-Marshall.  But
3    I'm not sure.
4        Q.   Did the PE loan team meet as a group at
5    all?
6        A.   Yes.
7        Q.   And how often?
8        A.   We met weekly.
9        Q.   And what was the purpose of the weekly
10   meetings?
11       A.   The purpose of the weekly meeting was to
12   go over the pipelines.
13       Q.   Going over the pipelines, would you hear
14   any information about what the other team members
15   were working on?
16       A.   Yes.
17       Q.   What would you learn about what other
18   members of the team were doing during the pipeline?
19       A.   Just the deals they were working on, where
20   they were, the amounts, the issues that anybody was
21   having with the deal.
22       Q.   Were special projects such as the ones you

Arbitration Day 1                                    October 24, 2011
Washington, DC

---

**Page 110**

1   Public Entities Loan work before this?
2      A.   I'm not sure about Byron.
3      Q.   What about Pattye Green.  Had she done
4   Public Entities Loan work before this?
5      A.   I'm not sure about Pattye Green.
6      Q.   What about Richard Staples.  Had he done
7   public entity work before this?
8      A.   I believe he might have done -- his name
9   definitely was being thrown around.
10     Q.   And Lisa Tarter, had she done Public
11  Entities Loan work before this meeting?
12     A.   Yes.
13     Q.   What about Evett Francis?
14     A.   I believe so.
15     Q.   Which of those seven people had you done
16  Public Entities loan work with before?
17     A.   I believe I had worked with Zeeda Daniele
18  on some things and I probably worked with Evett on a
19  couple of things and I might have worked with
20  Richard.  I'm not sure if -- I'm not sure about
21  Richard.  I'm not sure about Richard and Ralph.
22     Q.   Up to this point when you worked with

---

**Page 111**

1   Zeeda, what aspects of -- what did she do on the
2   project or projects you worked with her on?
3      A.   Well, Zeeda was a person who was bringing
4   a lot of deals on the West Coast.  Particularly in
5   Los Angeles, there were some deals that she had a
6   good hold in.
7      Q.   So you're using the terminology of
8   sourcing and structuring.  Was she sourcing or
9   structuring?
10     A.   She was primarily sourcing deals.
11     Q.   And Evett Francis.  What kind of work was
12  Evett doing before this --
13     A.   I believe she was --
14     Q.   Let me withdraw that and rephrase it.
15  Cleaner.  What kind of work had Evett Francis done
16  with you on public entity loans before this time?
17     A.   What's the date on this document?
18     Q.   The first page.  Read it out.
19     A.   March 10th, 2008.  I'm not sure.  I
20  believe we might have talked a couple of times on the
21  phone about a deal.
22     Q.   So after this meeting, this March 10th,

---

**Page 112**

1   2008 meeting, how was your work different?
2      A.   It really wasn't.
3      Q.   You were supposed to be the mentor to
4   Zeeda Daniele.  You're CD account mentee.  So what
5   did you do as part of that mentor/mentee
6   relationship?
7      A.   I helped Zeeda with learning how to
8   structure deals, with learning what questions to ask,
9   some of the things that credit was interested in,
10  when we were looking at deals.
11     Q.   When you say learning what questions to
12  ask, who was Zeeda going to question?
13     A.   She would question the potential borrower.
14     Q.   Can you give me an example of the kinds of
15  questions you would tell her to ask?
16     A.   Who is actually going to be borrowing the
17  money.  Is it going to be you or is it going to be
18  someone else?  How do you expect to repay us?  If
19  that form of repayment doesn't come through, then how
20  do you expect to repay us?  And if that one doesn't
21  come through, how do you expect to repay us?
22         What's going to be the collateral on the

---

**Page 113**

1   deal?  What were the funds going to be used for?  How
2   long did you want the loans to be?  Just basic
3   questions you would ask to try to structure a deal
4   and put the basic framework of the deal together.
5      Q.   The process of questioning the borrowers,
6   is that what you call part of sourcing or part of
7   structuring?
8      A.   It's a part of -- I would say it's a part
9   of structuring.  Yes, it's a part of structuring.
10     Q.   And prior to formation of this CD account
11  team, who was supposed to do the questioning of the
12  borrowers?
13     A.   Well, a lot of times it was these
14  individuals.  When you're sourcing, you want to try
15  to get an idea of what they're interested in, if
16  they're interested in doing something.  And if they
17  say they're interested, then that's when you start to
18  go through the process of actually structuring the
19  deal.
20     Q.   Before this CD account team mentees were
21  named, were there other field people who worked with
22  you on deals?

## Page 114

1   A.   Yes. I don't remember their names,
2   though. I can't recall all their names off the top
3   of my head.
4   Q.   Was Zeeda the only person you mentored in
5   2008?
6   A.   I think at some point Evett Francis became
7   a backup or I became a backup to Lisa on Evett
8   Francis.
9   Q.   And what about Nicole Lester. When did
10  Nicole Lester leave the organization?
11  A.   I'm not sure when she left.
12  Q.   Why did she leave?
13  A.   She left to go to law school.
14  Q.   Did she leave around the time school
15  started?
16  A.   I would imagine so.
17  Q.   What happened to the mentor relationships
18  for Pattye Green and Richard Staples when Nicole
19  left?
20  A.   They were given to other individuals.
21  Q.   But you didn't -- not you?
22  A.   Not to my knowledge. I don't remember. I

## Page 115

1   don't think so.
2   Q.   Did the CD account team become part of the
3   pipeline meetings for your group?
4   A.   Yes. Eventually, they did.
5   Q.   Right after this or later on? Right after
6   this March 10th meeting?
7   A.   I want to say it was a little -- it was
8   either close to this date or a little later on. I
9   don't remember the exact dates.
10  Q.   Other than Zeeda, possibly Evett, did you
11  speak with any other members of the CD account team
12  about how to structure deals?
13  A.   I think at some point I spoke to everybody
14  on this list, with maybe the exception of Pattye.
15  I'm not sure if I ever really spoke to her but I
16  definitely probably spoke to everybody on this list
17  at some point.
18  Q.   And did you initiate contact with the
19  other people on the list or did they always initiate
20  contact with you?
21  A.   It was usually them initiating contact
22  with me.

## Page 116

1   MR. WACHTEL: I'm going to move Exhibit 10
2   into evidence.
3   MR. STEWART: No objection.
4   ARBITRATOR ROSCOE: Exhibit 10 is so moved
5   into evidence.
6       (Claimant's Exhibit No. 10 was
7       marked for identification.)
8   BY MR. WACHTEL:
9   Q.   Mr. Brannum, can you turn to Exhibit 25,
10  please, and look at page FM 1116, please?
11  A.   Yes.
12  Q.   This document says Public Entity Loan
13  Team, Lisa Zukoff, Director. Do you see that there
14  are three people named on the left side?
15  A.   Yes.
16  Q.   Are those people part of the -- are any of
17  those people part of the CD account team that
18  attended the March 10th meeting?
19  A.   No.
20  Q.   Did you work with Bill Picotte,
21  P-i-c-o-t-t-e, at all?
22  A.   No.

## Page 117

1   Q.   Did you work with Jessie Smith at all?
2   A.   No.
3   Q.   Did you work with Warren Harris at all?
4   A.   No.
5   Q.   This says that Warren Harris is based in
6   Southern California. Did you have any work in
7   Southern California during 2008?
8   A.   Yes.
9   Q.   What did you have going on in Southern
10  California in 2008?
11  A.   There was an L.A. deal. There was a San
12  Bernardino deal and a couple of other deals.
13  Q.   When you say a deal, what was the L.A.
14  deal?
15  A.   It was a big deal to the Los Angeles
16  housing department.
17  Q.   When you say big, how big is big?
18  A.   30 million. I think it was 35 initially
19  and then it went down to 35 -- I mean, 30 million.
20  And I think at the end, it was at 20 million. So it
21  was a pretty big deal.
22  Q.   And while we're on the subject of that

30 (Pages 114 to 117)

## Page 122

1  And then under that, 3/3/2008, Sound Community
2  Ventures.
3        And then if you skip the City of St.
4  Gabriel, the Byron Turner one, and you look again
5  where it says Eileen Neely, Patrick Murcia and Zeeda
6  Daniele, Tacoma Housing Authority, under that, Kitsap
7  County Housing. Under that, Fresno City Housing.
8        And under that one, if you skip the Ralph
9  Perrey one for the City of Ashland, the San
10 Bernardino housing authority, I was a part of all
11 those meetings. I was there with those guys.
12    Q.   What about March 7th, 2008 where
13 Ms. Neely, Mr. Murcia and Ms. Daniele are all listed?
14 Did you attend that one too?
15    A.   Yes.
16    Q.   Any idea why your name is not on that?
17    A.   No.
18        MR. WACHTEL: I'm going to move Exhibit 2
19 into evidence.
20        MR. STEWART: No objection.
21        ARBITRATOR ROSCOE: It's admitted.
22        (Claimant's Exhibit No. 2

## Page 123

1        was received in evidence.)
2        BY MR. WACHTEL:
3    Q.   During 2008, did you have a particular
4  strategy concerning your customer visits?
5    A.   Yes.
6    Q.   What was your strategy?
7    A.   Well, my strategy was to just go out and
8  visit customers when it made sense for me to do that.
9  And when I say that, when it was a big deal. If it
10 was, say, 10 million or 20 million deal, then that
11 warranted me to actually going out to visit someone.
12    Q.   And did Eileen Neely know that was your
13 strategy?
14    A.   Yes.
15    Q.   And did you discuss it with her?
16    A.   Yes.
17    Q.   What was her reaction to that strategy?
18    A.   At first she wanted me to get out more but
19 at the end, she kind of got back and said that we
20 need to cut back the travel and really choose more
21 wisely when we go out and visit our customers.
22    Q.   Let's try to see if we can get the time

## Page 124

1  any closer. What period of time are you talking
2  about when you say at first she wanted you to go out
3  more?
4    A.   I think probably towards when I first
5  started, might have been maybe several months after
6  that, maybe even on into 2007, and then I think later
7  in probably early/mid-2008, she started to really
8  think about this whole traveling and said we need to
9  think more about the traveling that we're doing.
10    Q.   And was that just a one-on-one
11 conversation with you, or was that something she said
12 to you and others?
13    A.   She said that to me and others.
14    Q.   Who were the others?
15    A.   Everybody that was on our team. And that
16 would have been Maria, that would have been Russell,
17 that would have been Lisa.
18    Q.   So was that during a pipeline meeting?
19    A.   It was during a meeting. I'm not sure if
20 it was a pipeline meeting or if it was just a one-off
21 meeting.
22        MR. WACHTEL: This is a good stopping

## Page 125

1  point. Is it about time for a lunch break?
2        ARBITRATOR ROSCOE: It's fine with me.
3  Whatever you want to do.
4        (Whereupon, at 12:30 p.m., the arbitration
5  in the above-entitled matter was recessed, to
6  reconvene at 1:39 p.m., this same day.)

Page 126

1    AFTERNOON SESSION
2         (1:39 p.m.)
3  Whereupon,
4         STEVE BRANNUM,
5  the witness testifying at the time of recess, having
6  been previously duly sworn, was further examined and
7  testified further as follows:
8         EXAMINATION BY COUNSEL
9         FOR CLAIMANT (RESUMED)
10       BY MR. WACHTEL:
11  Q.   Mr. Brannum, I want to ask you about
12  something that happened -- something earlier in the
13  case, not at the point which we broke off.  Did you
14  ever have a discussion with Carl Riedy about the
15  possibility of your reporting directly to him?
16  A.   Yes.
17  Q.   Was that once, more than once?
18  A.   It was once.
19  Q.   When was that?
20  A.   It was shortly after I had arrived in D.C.
21  from Pasadena to work for -- to work in the group, to
22  work in the Public Entities group.

Page 127

1  Q.   And did you tell him a reason that you
2  wanted to report to him?
3  A.   I believe I said, is it possible that I
4  can report directly to you?  And I'm trying to figure
5  out -- yeah, I asked him if I could report directly
6  to him and I'm not sure if I went into any type of --
7  yeah, I just remember asking him if I could report
8  directly to him.
9  Q.   Why did you want to report directly to
10  him?
11  A.   Because I wasn't sure if it was a good
12  idea if I reported directly to Eileen.
13  Q.   Why did you think it might not be a good
14  idea to report to Eileen?
15  A.   Because Eileen and I had been peers and
16  Eileen kind of had a reputation of being a bit harsh
17  sometimes.
18  Q.   What kind of response did you get from
19  Mr. Riedy?
20  A.   He said no.
21  Q.   Was there any further discussion or did he
22  just say no?

Page 128

1  A.   No, no further discussion.
2  Q.   And before the break, we talked somewhat
3  about pipeline meetings and I'm going to get into
4  some more specific questions later but I neglected to
5  ask you, did Mr. Hayward attend pipeline meetings?
6  A.   No.
7  Q.   Other than the credit calls that you
8  talked about, what involvement did Mr. Hayward have
9  in the work that you were doing?
10  A.   Mr. Hayward had his own weekly meetings
11  that all of his groups attended, all the employees in
12  the community lending were on, either in person or on
13  the phone.
14  Q.   And what happened at those weekly
15  meetings?
16  A.   We talked about what was going on in the
17  group as a whole, things that might come down that
18  are coming down from corporate.  Every once and a
19  while, we would talk about a particular deal that
20  someone was working on.  We definitely talked about
21  housekeeping matters.
22  Q.   Can you turn to Exhibit 1 for a moment?

Page 129

1  Look at the second page of it, FM 61.
2         ARBITRATOR ROSCOE:  What is the exhibit
3  number?
4         MR. WACHTEL:  FM 61, Exhibit 1.  It's the
5  second page.
6         BY MR. WACHTEL:
7  Q.   The meetings you're describing that
8  Mr. Hayward held, were they for all the people
9  reflected in this chart and for the people who worked
10  for them as well?
11  A.   Yes.
12  Q.   And how long would these meetings last?
13  A.   I would say an hour.
14  Q.   And were those meetings the principal
15  contact that you had with Ms. Hayward while you were
16  working in the PE loan team under Eileen Neely?
17  A.   Yes.
18  Q.   And was that the principal involvement he
19  had with your group that you know of?
20  A.   Yes.
21  Q.   Back to the pipeline meetings, was there a
22  document that was used during those meetings?

33 (Pages 126 to 129)

Arbitration Day 1                                                      October 24, 2011

Washington, DC

Page 174

1     Q.   And where is your family?

2     A.   I have family here, I have family in

3  Atlanta.  I missed my nephew's graduation.  I really

4  don't want to even see my sisters and my brothers

5  here because I know they're just going to always ask

6  me about my job situation and for the longest time, I

7  couldn't even tell my mom.

8     Q.   When did you tell your mom?

9     A.   Sometime this summer.

10     MR. WACHTEL:  We'll leave it at that.  No

11  further questions.

12     ARBITRATOR ROSCOE:  Do you want to take a

13  break between direct and cross?

14     MR. STEWART:  Yes, if we could.

15     (Recess.)

16     EXAMINATION BY COUNSEL FOR RESPONDENT

17     BY MR. STEWART:

18     Q.   Good afternoon, Mr. Brannum.  My name is

19  Damien Stewart.  I'm counsel for Fannie Mae.  In your

20  direct testimony, you identified a number of

21  companies that you had worked for prior to joining

22  Fannie Mae.  Do you recall that?

Page 175

1     A.   Yes.

2     Q.   I just want to go through them really

3  quickly.  One was BF Saul.  You were a loan officer

4  there, is that correct?

5     A.   Yes.

6     Q.   Did you have any supervisory

7  responsibilities while you were a loan officer at BF

8  Saul?

9     A.   No.

10     Q.   Cornell University.  Did you have any

11  supervisory responsibility while you were working at

12  Cornell University?

13     A.   No.

14     Q.   And what was your position at Cornell?

15     A.   I believe I was an analyst.

16     Q.   You were an analyst?

17     A.   I believe so.

18     Q.   You worked somewhere designated as IMA?

19     A.   Yes.

20     Q.   What does IMA stand for?

21     A.   It's the International Mortgage

22  Association.

Page 176

1     Q.   And what was your position at the

2  International Mortgage Association?

3     A.   I was a loan officer.

4     Q.   And did you have any supervisory

5  responsibility as a loan officer for IMA?

6     A.   No.

7     Q.   You also worked for Barclay's, is that

8  right?

9     A.   Yes, Barclay's Capital.

10     Q.   And what was your position at Barclay's

11  Capital?

12     A.   I was a derivatives trader on the

13  derivatives desk.  I was an associate on the

14  derivatives desk.

15     Q.   Did you have any supervisory

16  responsibilities at Barclay's?

17     A.   No.

18     Q.   You also worked at Vanguard, is that

19  right?

20     A.   Yes.

21     Q.   What was your position at Vanguard?

22     A.   I was a trader at Vanguard.

Page 177

1     Q.   Did you have any supervisory

2  responsibilities at Vanguard?

3     A.   No.

4     Q.   And following Vanguard, you joined Fannie

5  Mae, is that correct?

6     A.   Yes.

7     Q.   And what was your position title at Fannie

8  Mae?

9     A.   I was a senior business manager.

10     Q.   And at any point while you were senior

11  business manager at Fannie Mae, did you have any

12  supervisory responsibilities?

13     A.   No.  Can I get some clarification, please?

14  When you say supervisor, you mean over individuals?

15     Q.   Over other employees.

16     A.   All right.  Thank you.

17     Q.   Did you have any --

18     A.   No.

19     Q.   As of January 23rd, 2009, had you been a

20  member of the board of directors of any company or

21  other organization?

22     A.   No.

45 (Pages 174 to 177)

Page 178

1    Q.   Had you served in an executive capacity as
2  an officer with any company or other organization as
3  of January 23rd, 2009?
4    A.   No.
5    Q.   Turn to Exhibit 165 which is in the volume
6  2. It's one of the last documents we looked at.  Do
7  you see that?
8    A.   Yes.
9    Q.   I believe on direct you testified the
10 first time you saw what is at Exhibit 165 was in
11 connection with this case, is that correct?
12   A.   That is correct.
13   Q.   You didn't see it at any time --
14   A.   Not to my knowledge.
15   Q.   Do you know on or about the approximate
16 time it was, or day, you saw this document?
17   A.   No.
18   Q.   Month, year?
19   A.   No.
20   Q.   And just so we are clear, can you explain
21 to me what this document refers to?
22   A.   It is a document for senior national

Page 179

1  account manager.
2    Q.   And so that we cut to the chase, this is a
3  position on the HFA team under Mr. Riedy?
4    A.   Yes.
5    Q.   And is this the position that had been
6  vacated by Mr. Lohmeier, is your understanding?
7    A.   Yes.
8    Q.   And I take it that it's your position that
9  you would have been qualified for this position?
10   A.   Yes.
11   Q.   Did you apply for this position?
12   A.   No.
13   Q.   And if you look on the first page at FM
14 001008, under the title Senior National Account
15 Manager, do you follow me, where I am?
16   A.   Yes.
17   Q.   The first line says status.  Do you see
18 that?
19   A.   Yes.
20   Q.   And there is a designation next to that.
21 Do you see what that is?
22   A.   Yes.

Page 180

1    Q.   Can you read that for the record?
2    A.   It says open.
3    Q.   And next to the status as being open,
4  there is a place for recruiter.  Do you see that?
5    A.   Yes.
6    Q.   And there is a person designated there, an
7  L. Putt?
8    A.   Yes.
9    Q.   Do you know who L. Putt is?
10   A.   No.
11   Q.   And under the status, there is a status
12 details.  Do you see that?
13   A.   Yes.
14   Q.   And next to that, how does that read?
15   A.   Posted.
16   Q.   Do you have an understanding of what that
17 means?
18   A.   No.
19   Q.   Now, on direct, you discussed your
20 qualifications against a number of the bullet points
21 that are listed for some of the activities that would
22 be necessary to perform this position?

Page 181

1    A.   Yes.
2    Q.   Is that accurate?
3    A.   That's correct.
4    Q.   The first bullet point, still on FM 1008,
5  is process transactions in a timely manner.  Do you
6  see that?
7    A.   Yes.
8    Q.   And if you turn the page to the second
9  page of the document, and the fourth bullet point
10 from the bottom, do you see that?
11   A.   Yes.
12   Q.   States, "Demonstrated ability to close
13 transactions and follow through on assignments."  Do
14 you see that?
15   A.   Yes.
16   Q.   And the last bullet point discusses
17 excellent communications, both written and verbal,
18 project management, credit and financial analysis,
19 organizational and interpersonal skills.  Did I read
20 that accurately?
21   A.   Yes.
22   Q.   So from this job description, it was clear

## Page 182

1  that project management and interpersonal skills are
2  requirements for this position, correct?
3      A.  Say that one more, again?
4      Q.  Project management and interpersonal
5  skills are requirements, they're activities that
6  would be necessary to perform the senior national
7  account manager position, correct?
8      A.  Yes.
9      Q.  And you've been reviewed on those skills
10 during your period at Fannie Mae, is that right?
11     A.  That is correct.
12     Q.  If you would turn to Exhibit 119.  And
13 would you identify what Exhibit 119 is for the
14 record?
15     A.  It is employee contribution review form.
16     Q.  And who is the supervisor at the time?
17     A.  Supervisor is --
18     Q.  I direct you to the Bates label FM 000109.
19 It's the second to the last page.
20     A.  Monica Gardner.
21     Q.  Now, if you turn to the third page in to
22 the document, FM 000107, do you see that?

## Page 183

1      A.  Yes.
2      Q.  There is an objective which actually
3  starts out on the previous page at FM 000106.  And
4  for the record, the objective is, "Responsible for
5  public entity debt structures and delivering clear,
6  concise, timely communications with regional CD
7  directors and managers on the status and issues
8  around all transactions and delivering on execution
9  elements through closing for all public entity debt
10 proposals submitted."  Do you see that?
11     A.  Which page are you on again?  I'm sorry.
12     Q.  It's at FM 106, objective number 4.
13 Should be right at the bottom.
14     A.  FM 00104, objective number 4, okay.  Can
15 you just repeat it?
16     Q.  Just read it to yourself.
17     A.  Okay.  Yes.
18     Q.  And on the following page at FM 107,
19 Ms. Gardner is rating you on several of the skills
20 that we've talked about with respect to Exhibit 165.
21     A.  Yes.
22     Q.  And that is interpersonal and influencing

## Page 184

1  skills, project management.
2      A.  Yes.
3      Q.  Do you see that?
4      A.  Yes.
5      Q.  And you have a minus marking beside those
6  two skills.
7      A.  Yes.
8      Q.  Which indicates from this table, needs
9  development.  Is that accurate?
10     A.  That's correct.
11     Q.  And for success qualities marked minus or
12 needs development, Ms. Gardner is giving you sort of
13 a development plan, for lack of a better way of
14 speaking, on how to improve on these qualities.  Do
15 you see that?
16     A.  Yes.
17     Q.  And it states, "A development plan for
18 Steven will be to attend both a customer service and
19 communication course offered by AMA or Fannie Mae in
20 the first quarter of 2003 and a project management or
21 transaction course within the first half of 2003.  In
22 additional" -- I think that's mistaken -- "Steven

## Page 185

1  will continue to build product knowledge to support
2  the national underwriting and PI team."  Do you see
3  that?
4      A.  Yes.
5      Q.  So to be clear on the record, I just want
6  to get some of these acronyms straight.  On the
7  previous page at FM 106, it talks about the timely
8  communications with the regional CD directors and
9  manager.  Is that CD for community development?
10     A.  Yes.
11     Q.  So that's people in the team -- in the
12 field, I'm sorry?
13     A.  Yes.
14     Q.  And where she talks about a communication
15 course offered by AMA, what is AMA?
16     A.  I'm not sure what that stands for.
17     Q.  Did you take any of the courses that
18 Ms. Gardner had suggested that you take for 2003?
19     A.  To the best of my knowledge, I did.
20     Q.  If you look at the next objective,
21 objective number 5, it states, "Maintain strong
22 synergy with five regional field CD field teams to

47 (Pages 182 to 185)

Page 186

1   assure meeting national as well as regional community
2   development goals." Do you see that?
3       A.   Yes.
4       Q.   And under the results achieved, again,
5   under the table, you've received a needs development
6   rating under customer focus and interpersonal and
7   influencing skills.  Do you see that?
8       A.   Yes.
9       Q.   Now, under the suggestions for
10  development, which is the next section, Ms. Gardner
11  identifies 16 different things for you to work on
12  into 2003.  Do you see that?
13      A.   Yes.
14      Q.   The first one discusses developing
15  customer service and communication skills to enhance
16  the working relationships with internal and external
17  partners.  She talks about the courses that she
18  suggested that you take in 2003, right?
19      A.   Yes.
20      Q.   The second suggestion for development
21  discusses develop transaction management/project
22  management skills to assist the field teams with

Page 187

1   processing transactions, is that right?
2       A.   Yes.
3       Q.   The fourth one, this is on the following
4   page, develop sales/marketing skills, attend
5   marketing/sales course and attend marketing meetings
6   with two of the five field teams in the first half of
7   2003.  Do you see that?
8       A.   Yes.
9       Q.   And if you go to the bottom of the page,
10  under the overall performance summary.
11      A.   Yes.
12      Q.   Would you read that second sentence?
13      A.   "His transaction management and customer
14  service skills will be part of his developmental
15  goals to assist him as the product manager for the
16  national underwriting team."
17      Q.   And did you have a conversation with
18  Ms. Gardner about how she was giving you the ratings
19  for 2002?
20      A.   Yes.
21      Q.   And what took place in that conversation?
22           MR. STEWART:  I'm going to object to the

Page 188

1   extent it calls for the hearsay statement of Monica
2   Gardner, who is not a witness.
3           ARBITRATOR ROSCOE:  So she won't be
4   available for cross?
5           MR. STEWART:  She won't, no.
6           MR. WACHTEL:  I don't believe so, no.
7           ARBITRATOR ROSCOE:  But she was an
8   employee at the time.
9           MR. STEWART:  She was his manager at the
10  time.
11          ARBITRATOR ROSCOE:  I just want to make
12  sure it's the right person.  I let it in earlier.  I
13  did mention that as to Ms. Neely, I believe, and part
14  of my consideration was that she's available for
15  cross.  Technically in arbitration, there is no such
16  thing as hearsay so it's admissible.  So if you want
17  to get this witness's understanding, go ahead.
18          MR. STEWART:  I withdraw the question.
19          ARBITRATOR ROSCOE:  All right.
20          BY MR. STEWART:
21      Q.   Would you turn to Exhibit 120?
22          MR. STEWART:  I should move to admit

Page 189

1   Exhibit 119.
2           ARBITRATOR ROSCOE:  Any objection?
3           MR. WACHTEL:  I object on the grounds that
4   it's the hearsay opinion of Monica Gardner who is not
5   available to testify.
6           ARBITRATOR ROSCOE:  Is there any dispute
7   that it's a company record?
8           MR. WACHTEL:  No.
9           MR. STEWART:  I don't think so.
10          ARBITRATOR ROSCOE:  It's in.
11          (Claimant's Exhibit No. 119
12          was received in evidence.)
13          BY MR. STEWART:
14      Q.   Would you turn to Exhibit 120?  Exhibit
15  120 is your 2003 performance evaluation, is that
16  correct?
17      A.   Yes.
18      Q.   And the supervisor is indicated on the
19  last page of Exhibit 120 as Mike Rylant?
20      A.   Yes.
21      Q.   And under the first objective, which is to
22  support the execution and closing of $30 million in

48  (Pages 186 to 189)

Arbitration Day 1                                    October 24, 2011

Washington, DC

## Page 190

1  Community Express deals, under the project management
2  dimension, you received a "needs development" rating,
3  is that correct?
4      A.  Yes.
5      Q.  If you turn the page to objective 3.
6          ARBITRATOR ROSCOE:  Turn the page to 101?
7          MR. STEWART:  Yes, FM 101.
8          BY MR. STEWART:
9      Q.  Are you with us?
10     A.  Yes.
11     Q.  Under objective 3, which is create new
12 product sheets for the Community Express products,
13 you received a needs development rating for
14 delivering results, is that accurate?
15     A.  Yes.
16     Q.  And with the success qualities marked,
17 where there is an explanation for the needs
18 development rating, Mr. Rylant purports to state that
19 Steve was late in delivering the product sheets and
20 needs to keep all deliverable dates in mind when
21 working on projects.  Do you see that?
22     A.  Yes.

## Page 191

1      Q.  You don't disagree that you were late in
2  delivering those product sheets, do you?
3      A.  To be honest, I don't remember.
4      Q.  Do you recall me taking your deposition on
5  or about July 11, 2010?
6      A.  Yes.
7      Q.  Let me hand you a copy of your deposition.
8  If you would turn to page 135.
9      A.  There are pages at the bottom of the page
10 and in the document.
11     Q.  Okay.  Page 135.
12     A.  Of this part or -- okay.  All right.
13     Q.  Do you see it?
14     A.  Yes.
15     Q.  And I'm going to direct you to line 5.
16 There is a question and answer between us about this
17 particular comment.  The question was:
18         "Question:  Did you have a discussion with
19 Mr. Rylant about his comment?
20         "Answer:  Yes.
21         "Question:  What do you recall of that
22 discussion?

## Page 192

1          "Answer:  I recall telling him that I had
2  an aggressive date for getting this done and that at
3  that time, I didn't realize that I had to go through
4  some of these other groups so it took me a little bit
5  longer than expected."
6          Do you see that?
7      A.  Yes.
8      Q.  Does that accurately reflect what your
9  testimony was --
10     A.  Yes.
11     Q.  -- in your deposition?
12     A.  Yes.
13     Q.  Does that refresh your recollection that
14 you had in fact been late in delivering the product
15 sheets?
16     A.  Yes.
17     Q.  Still in Exhibit 120, would you turn to
18 the next page which is at FM 102?  And under
19 objective 4, communicate and work more effectively
20 with the field and CD teams.  And CD means community
21 development teams, correct?  It's at the bottom of
22 the page.  I'm sorry, FM 101 is where the objective

## Page 193

1  is. Objective 4.
2      A.  Yes.
3      Q.  Right at the bottom, objective 4,
4  communicate and work more effectively with the field
5  and community development teams, right?
6      A.  Yes.
7      Q.  You received a needs development rating
8  under project management, is that accurate?
9      A.  Yes.
10     Q.  And for the success qualities marked needs
11 improvement, Mr. Rylant states, "Steve needs to do a
12 better job keeping his managers informed especially
13 when he's off site."  Do you see that?
14     A.  Yes.
15     Q.  Do you recall having a discussion with
16 Mr. Rylant about this comment?
17     A.  Again, it's foggy.
18     Q.  Do you recall Mr. Rylant telling you that
19 you needed to keep him more and better informed about
20 the status of your projects?
21     A.  Again, it's foggy.
22     Q.  You have no recollection of Mr. Rylant

49 (Pages 190 to 193)

Arbitration Day 1                                                    October 24, 2011
Washington, DC

<table>
<tr><td>

**Page 194**

1   telling you that you needed to keep him better
2   informed of the status of your projects?
3        A.   It's foggy.
4        Q.   What do you recall, in general?  You don't
5   recall anything about that conversation, is that
6   right?
7        A.   Nope.
8        Q.   If you would turn to the page now marked
9   FM 103.  There is a box for suggestions for
10  development.  Do you see that?
11       A.   Yes.
12       Q.   The first one states, "Steve needs to
13  continue his development in project management,
14  especially keeping managers informed and keeping on
15  track of deliverables."  Do you see that?
16       A.   Yes.
17       Q.   You received this rating at the end of
18  2003, even though you had already completed project
19  management courses in the first half of 2003, is that
20  right?
21       A.   To my knowledge, I believe so.
22       Q.   This is an area that your new manager is

</td><td>

**Page 196**

1   Mr. Rylant's race?
2        A.   He's white.
3        Q.   You have no reason to believe that
4   Mr. Rylant was biased against you in how he rated you
5   for your 2003 performance, do you?
6        A.   Biased in what way?  I'm sorry.
7        Q.   In any way.
8        A.   No.
9        Q.   You don't think that your 2003 performance
10  review was unfair, do you?
11       A.   No.  Can you elaborate what you mean by
12  fair?  I'm just trying -- I'm having a difficult time
13  understanding the question, when you say fair.
14       Q.   You have no reason to believe it wasn't an
15  objective measure of your performance for 2003, do
16  you?
17       A.   That it was an objective measure?
18       Q.   That it was not an objective measure of
19  your performance for 2003.
20       A.   I'm sorry, I'm still trying to --
21            ARBITRATOR ROSCOE:  Can we take all the
22  negatives out?

</td></tr>
<tr><td>

**Page 195**

1   still saying needs development, is that fair?
2        A.   That's fair.
3        Q.   The next suggestion for development
4   states, "A goal for Steve for 2004 is to increase the
5   quantity and quality of his work.  He appears to be
6   underutilized and perhaps get him out on the road to
7   force him to use his skill set and great attitude to
8   become more productive."  Do you see that?
9        A.   Yes.
10       Q.   And under the overall performance summary,
11  which is the next box, Mr. Rylant is stating that
12  Steve met expectations for 2003 but as noted above,
13  the bar will be raised for him in 2004.  Do you see
14  that?
15       A.   Yes.
16       Q.   Do you recall having a discussion with
17  Mr. Rylant about his suggestions for development or
18  his overall summary of your performance for 2003?
19  You have to give a verbal response.
20       A.   Nothing is coming to mind.
21       Q.   You have no reason to believe that
22  Mr. Rylant -- let me ask you this.  What is

</td><td>

**Page 197**

1            THE WITNESS:  Yes.  That's what's throwing
2   me off, thank you.
3            BY MR. STEWART:
4        Q.   Let me ask you as basic as I can.  Do you
5   think the 2003 review was unfair?
6        A.   Again, I don't understand what you mean by
7   unfair.
8        Q.   Why don't you turn to your deposition.
9   It's right here on the corner.  At page 147.
10       A.   Okay.
11       Q.   And at line 11 -- are you with me?
12       A.   Yes.
13       Q.   The question is, "Did you have any
14  objection or did you think that the performance
15  review was somehow unfair or Mr. Rylant was biased
16  against you in how he rated you for your 2003
17  performance?
18            "Answer:  Not to my knowledge.  I don't
19  think so."
20       A.   Right.
21       Q.   Is there any reason why your answer today
22  is different than it was back in July of 2010?

</td></tr>
</table>

50 (Pages 194 to 197)

Page 198

1       MR. WACHTEL:  I'm going to object in that
2   the question here is different than the question you
3   were just asking now.
4       ARBITRATOR ROSCOE:  I can pick up the
5   difference.  I understand the characterization and
6   what your objection is, but we can continue.
7       THE WITNESS:  Could you ask the question
8   again?
9       THE REPORTER:  "Question: Is there any
10  reason why your answer today is different than it was
11  back in July of 2010?"
12      ARBITRATOR ROSCOE:  And I understand the
13  objection.
14      THE WITNESS:  Again, I don't know what
15  you're asking.  You're asking me about my answer.
16  I'm not sure if I gave an answer.
17      BY MR. STEWART:
18      Q.  Let me ask you a different question.  Did
19  you write a rebuttal to your 2003 performance review?
20      A.  Not to my knowledge.
21      Q.  Did you dispute your 2003 performance
22  review in any way?

Page 199

1       A.  Not to my knowledge, no.
2       Q.  Would you turn to Exhibit 122?  Can you
3   identify this document for the record?
4       A.  This is the 2005 performance plan for
5   2005.
6       Q.  So this is a performance review for 2005,
7   is that fair to say?
8       A.  Yes.
9       Q.  The manager here is Jonathan Parrish and I
10  believe you testified that you worked under
11  Mr. Parish when you were on your rotation to
12  Pasadena, is that correct?
13      A.  That is correct.
14      Q.  In the bottom table, and this is under
15  success qualities, critical thinking, the first box
16  states, provide continuous feedback with regards to
17  the development of the CC.  Do you see that?
18      A.  Yes.
19      Q.  What is the CC?
20      A.  The community channel.
21      Q.  And under the year end success qualities
22  rating, you received an S minus.  Do you see that?

Page 200

1       A.  Yes.
2       Q.  What does that S minus mean?  What was
3   your understanding of what that indicated?
4       A.  I don't remember what it meant.
5       Q.  And was that a high or a low rating for
6   this factor?
7       A.  It appears to be a low rating.
8       Q.  And under the year end summary, there is
9   some text in that next box to the left.  It states,
10  "Very capable and can offer a lot to the management
11  team of the CC," community channel, "and ACF,"
12  American Communities Fund?
13      A.  Yes.
14      Q.  "However, needs to learn better people
15  skills to be able to transfer those abilities to the
16  team.  Often the connection from abilities to
17  implementation are not there."  Do you see that?
18      A.  Yes.
19      Q.  The next page, at FM 000096, under
20  customer focus and the success measure is to include
21  that all customer needs are being met in transaction
22  discussions and negotiations, you received an S minus

Page 201

1   rating.
2       A.  Yes.
3       Q.  And the text to the left states, "When
4   working with internal and external customers, the
5   first answer is often no.  Needs to learn how to use
6   a customer ask and turn it around into something that
7   is a 'here is what we can do?'"
8       A.  Yes.
9       Q.  Under the accelerating change box which is
10  the next one under it, the success measure is to
11  assist the team in the development of community
12  channel policies, processes and business practices,
13  you received an S minus or low rating on that success
14  measure, is that accurate?
15      A.  That's correct.
16      Q.  And the text next to it states, "Again,
17  abilities are there but does not utilize those to
18  implement change."  Is that right?
19      A.  Yes.
20      Q.  And the next success measure of teamwork
21  states, "Build beneficial relationships within ACF
22  and HCD."  What is HCD?

51 (Pages 198 to 201)

Page 202

1    A.   Housing and Community Development.
2    Q.   And that was a division within Fannie Mae?
3    A.   Yes.
4    Q.   That the community channel was a part of?
5    A.   Yes.
6    Q.   "And externally to advance business goals;
7    coordinate community channel goals with others in
8    ACF; and balance the needs of multiple stakeholders."
9    Do you see that?
10   A.   Yes.
11   Q.   You got a middle there on the success
12   measure for S rating, satisfactory, I take it?
13   A.   Yes.
14   Q.   And in the text next to it, it states,
15   "Personally, great team member. Professionally,
16   needs to step up more and bring value to team." Do
17   you see that?
18   A.   Yes.
19   Q.   Did you have a conversation with
20   Mr. Parish about the evaluation that you received for
21   2005?
22   A.   Yes.

Page 203

1    Q.   And do you recall what took place in that
2    conversation?
3    A.   I didn't understand why I was getting low
4    balled on a lot of these evaluations.
5    Q.   And the comments that you received on this
6    2005 evaluation are similar with respect to project
7    management, interpersonal skills and influencing
8    skills that we had seen in 2004 and 2003, is that
9    fair to say?
10   A.   I don't think you can compare them.
11   Q.   You don't think so?
12   A.   I don't think they're comparable.
13   Q.   So you had the conversation with
14   Mr. Parish about the 2005 evaluation?
15   A.   Right.
16   Q.   And I believe you testified you didn't
17   understand where these comments were coming from, is
18   that right?
19   A.   That's correct.
20   Q.   And how did Mr. Parish respond?
21   A.   He -- I don't think -- I can't recall the
22   exact conversation that we had back then.  It was too

Page 204

1    long ago.
2    Q.   Did you write a rebuttal to your 2005
3    rebuttal performance evaluation?
4    A.   No, I didn't.
5    Q.   Did you dispute it in any way?
6    A.   I disputed it.
7    Q.   How so?
8    A.   By saying I didn't understand why I was
9    getting these marks.
10   Q.   You said that to Mr. Parish?
11   A.   Yes.
12   Q.   Did you dispute it in any other way?
13   A.   No.
14   Q.   And you don't recall how Mr. Parish
15   responded to you, is that right?
16   A.   I can't remember what was said.
17        MR. STEWART:  I move for admission of
18   Exhibit 122.
19        ARBITRATOR ROSCOE:  122?
20        MR. STEWART:  Yes.
21        MR. WACHTEL:  I'll just preserve the same
22   objection, that it's hearsay.

Page 205

1        ARBITRATOR ROSCOE:  I'm going to admit it.
2    122 is admitted.
3        (Respondent's Exhibit No. 122
4           was received in evidence.)
5    BY MR. STEWART:
6    Q.   Turn to Exhibit 123.  This purports to be
7    your 2006 performance review, is that right?
8    A.   That's correct.
9    Q.   The manager for this review period is
10   Eileen Neely?
11   A.   Yes.
12   Q.   Now, would you turn to the second page of
13   the document at FM 112?
14   A.   I see that.
15   Q.   And I direct your attention to the
16   description at the bottom of the page and it is to
17   provide justification for the continuation or
18   continuation of the CDFI/CDARS program.  Do you see
19   that?
20   A.   Yes.
21   Q.   What are those acronyms, CDFI and CDARS?
22   A.   I don't remember.

52 (Pages 202 to 205)

Arbitration Day 1                                              October 24, 2011

Washington, DC

Page 210

1  conclusion and offer a recommendation or make a
2  decision. Weighing the level of required precision
3  with the level of risk is essential in completing
4  projects in a timely manner."
5       Do you recall having a discussion with
6  Ms. Neely about your performance against this goal?
7       A.  Yes.
8       Q.  And do you recall her telling you her
9  belief that you needed to work more on drawing to a
10 conclusion on your projects? Do you recall that
11 being the subject of the discussion?
12      A.  I recall that the discussion really was
13 centering on this particular project. It didn't
14 really center on the whole closing, the -- what you
15 were saying. It was really about this particular
16 project.
17      Q.  You had a professional disagreement with
18 Ms. Neely?
19      A.  Yes.
20      Q.  And you felt that your analysis was
21 complete?
22      A.  Yes.

Page 211

1       Q.  That you had done everything you could do
2  with respect to this project?
3       A.  Yes. And you can see that because I think
4  that Eileen would read it one way and somebody else
5  would come along and read it another way. And she
6  kind of mentions in here that -- yes, it says the
7  team appeared to take the path of least resistance,
8  passing the buck to upper management to fight out.
9       There were a lot of people looking at this
10 and no one could really come to any true conclusions.
11 Some people were saying, you know, this definitely
12 shows and other people would like to show the total
13 opposite. I don't remember the details of the
14 analysis I did, but it was truly inconclusive.
15      Q.  In your view?
16      A.  Yes.
17      Q.  Not in Ms. Neely's view?
18      A.  Yes.
19      Q.  Ms. Neely's view was that you could draw a
20 conclusion, right?
21      A.  It says -- yes.
22      Q.  If you skip down to the middle of the

Page 212

1  page, there is another goal and it states, "Work with
2  the community channel to create a business plan for
3  the community express project." And you received an
4  R minus rating against that goal. Do you see that?
5       A.  Yes.
6       Q.  And Ms. Neely's comment was that you
7  didn't get very engaged in the team's work on the
8  community express business plan. She states further,
9  "He sat back and let others on the team take the
10 lead."
11      A.  Yes.
12      Q.  She states, "To be fair, Steve was highly
13 engaged in other aspects of the community express
14 remediation activities" and then "without Steve's
15 input, the team spent a lot of time going down paths
16 that proved to be dead ends."
17      A.  Yes.
18      Q.  "Steve's increased input, based on his
19 experience in the product, may have helped the team
20 avoid these missteps?"
21      A.  Yes.
22      Q.  Do you see that?

Page 213

1       A.  Yes.
2       Q.  In the next paragraph, she states, "Since
3  the community express product is 'his product,' I
4  would like to see him take more ownership of all
5  aspects of the product, including the business plan,
6  marketing materials, marketing activities as well as
7  the more technical aspects like structuring, pricing,
8  risk rating, underwriting, et cetera"?
9       A.  Right.
10      Q.  Do you see that?
11      A.  Yes.
12      Q.  Do you recall having a discussion with
13 Ms. Neely about her comments for you against this
14 particular view?
15      A.  Again, vaguely.
16      Q.  What if anything do you recall of that
17 conversation?
18      A.  I'm foggy. I don't know.
19         ARBITRATOR ROSCOE:  I have to ask a
20 question. Are you foggy to your recollection or are
21 you unable to testify today given exhaustion or some
22 other condition?

54 (Pages 210 to 213)

Page 214

1    THE WITNESS: No, I'm foggy as to my
2 recollection.
3    ARBITRATOR ROSCOE: Thank you. You may
4 proceed.
5 BY MR. STEWART:
6    Q. If you turn the page to FM 114, and this
7 is under the next goal which under the description,
8 it states, "My cultural objective is to be positive
9 about the work we do." Do you see that?
10    A. Yes.
11    Q. Is that an objective that you created or
12 one that you worked on in conjunction with your
13 managers or just your managers gave to you?
14    A. I believe that was something that I
15 created.
16    Q. So those are your words?
17    A. Yes.
18    Q. Ms. Neely provides some comments for you
19 there. Do you see that?
20    A. Yes.
21    Q. And she states, "I have seen a more
22 positive attitude from Steve. I appreciate Steve's

Page 215

1 healthy cynicism. Steve's analytical mind is his
2 greatest asset, but it is also a large potential
3 derailer. Steve is slow to accept decisions that he
4 does not agree with, especially when he views the
5 decision was reached with faulty analysis. He should
6 save his fight for the most important matters and on
7 matters that he may be able to influence. On matters
8 that are simply not that important or are done deals,
9 Steve needs to just move on." Do you see that?
10    A. Yes.
11    Q. Do you recall having conversations with
12 Ms. Neely about her comments to you about your
13 cultural goal?
14    A. I'm not sure. This is something that I
15 guess you have to ask Eileen about.
16    Q. You don't have any specific recollection
17 about your discussion with Ms. Neely on this goal?
18    A. Not really, no. Very vague.
19    MR. STEWART: We move for admission of
20 Exhibit 123.
21    MR. WACHTEL: No objection.
22    ARBITRATOR ROSCOE: No objection?

Page 216

1    MR. WACHTEL: Right.
2    ARBITRATOR ROSCOE: It's admitted. Thank
3 you.
4    (Respondent's Exhibit No. 123
5    was received in evidence.)
6 BY MR. STEWART:
7    Q. Mr. Brannum, your responsibilities as a
8 senior business manager in the public entities team,
9 if I understand your testimony, your responsibilities
10 didn't change from the time you joined the
11 organization until the time you left, sometime in
12 2002 through 2009 when you left Fannie Mae, is that
13 correct?
14    A. I would say that's somewhat of a correct
15 comment. I had worked with that project, with
16 community express, from the time I started there
17 until the time I left.
18    Q. And sourcing deals was always one of your
19 responsibilities, is that right?
20    A. One of my responsibilities.
21    Q. From the moment you got into the group,
22 one of your responsibilities was to go out and source

Page 217

1 new deals, is that right?
2    A. I'm not sure if that's correct. When I
3 first got into the group, we had other people that
4 were primarily sourcing the deals. My job was really
5 to do the analysis and structure the deals and
6 prepare them for underwriting and to go to Freddie.
7    Q. So you're responsible more on the back
8 room and not to go out meeting with the customers,
9 acquiring new deals to bring in, bringing in new
10 business? That wasn't one of your responsibilities?
11    A. As necessary.
12    Q. As necessary?
13    A. Yes.
14    ARBITRATOR ROSCOE: I know it's late in
15 the day but if everyone could keep their voices up
16 and crisp for the court reporter, it will make for a
17 better record for everyone, including me, I should
18 say.
19 BY MR. STEWART:
20    Q. Would you turn to page 244 of your
21 deposition? We're going to start at line 5 and the
22 question is, "The buddy system, where members of the

55 (Pages 214 to 217)

Page 218

1  public entities team would be" --
2      A.  You said 244?
3      Q.  Yes, page 244.
4      A.  I'm sorry, I thought you said 224.
5      Q.  244, line 5.  Let me know when you're
6  there.
7      A.  Yes.
8      Q.  The question is, "The buddy system, where
9  members of the public entities team would be paired
10  with members of the --" and the answer is, "Okay.  I
11  didn't understand your question.
12      "Question:  Perfectly fine.
13      "Answer:  My understanding was that we
14  were going to work with these individuals on bringing
15  in deals.
16      "Question:  Does that include now sourcing
17  the deals?
18      "Answer:  Yes.
19      "Question:  And prior to that time, that
20  was not one of your responsibilities, sourcing the
21  deals.
22      "Answer:  No, I wouldn't say it wasn't one

Page 219

1  of my responsibilities.
2      "Question:  When was that one of your
3  responsibilities?
4      "Answer:  It's always been, from day one."
5  Did I read that accurately?
6      A.  Yes.
7      Q.  So sourcing the deals was one of your
8  responsibilities when you joined the team in the
9  public entities group, is that correct?
10      A.  Not the way I was doing it now.  Back
11  then, I was sourcing the deals through the different
12  community centers that were -- I mean, community
13  partnership offices back in the day.
14      Q.  So the folks in the field were out there
15  sourcing deals?
16      A.  Yes.
17      Q.  And do you have an understanding of how
18  they were doing that?
19      A.  Well, they had stripers, they had
20  marketing material that they would pass out and give
21  to people when they went on visits.
22      Q.  Do you have an understanding of how they

Page 220

1  identified their customers?
2      A.  Well, they knew that the public entities
3  customers were municipalities, public housing
4  authorities and housing finance agencies.
5      Q.  So how did they find out if any of those
6  public agencies were interested in Fannie Mae
7  products?
8      A.  They would go out and travel and see what
9  types of projects were going on in the different
10  communities.
11      Q.  So they would meet with the customers?
12      A.  I would assume so.
13      Q.  Let's talk for a moment about your
14  assignment out to Pasadena.  Was that a position you
15  applied for, to work in Pasadena?
16      A.  No.
17      Q.  How did you wind up in Pasadena?
18      A.  I was asked if I wanted to go out to
19  Pasadena and help out Jonathan.
20      Q.  Who asked you to do that?
21      A.  Julie Gould.
22      Q.  And you stayed there for approximately 10

Page 221

1  months, is that right?
2      A.  Yes.
3      Q.  And I believe you testified on direct that
4  there had been discussions with you as to whether you
5  wanted to make that a permanent assignment, is that
6  right?
7      A.  Yes.
8      Q.  And you discussed that with whom?
9      A.  With Jonathan Parrish.
10      Q.  And did Mr. Parish offer to make that a
11  permanent assignment for you?
12      A.  It was an opportunity that was there if I
13  wanted it, correct.
14      Q.  And you did not?
15      A.  No.
16      Q.  Ultimately, you did not want to stay out
17  in Pasadena, is that correct?
18      A.  I decided to come back to D.C.
19      Q.  And did you apply for the position in
20  D.C.?
21      A.  I was asked to come back to D.C. by Eileen
22  to join a group.

56 (Pages 218 to 221)

Arbitration Day 1
Washington, DC
October 24, 2011

Page 222

1    Q.  So you didn't apply for the position in
2  D.C., did you?
3    A.  Not to my knowledge, no.
4    Q.  You didn't post for any vacancy on the
5  Public Entities Loan Team under Eileen Neely?
6    A.  No, because the community express product
7  was going back to her and I was a part of the
8  community express product.
9    Q.  So if you had stayed in Pasadena, you
10  wouldn't be working on the community express product
11  anymore, is that right?
12    A.  Not so far if I would go and say that.  I
13  don't know.  I wouldn't know.
14    Q.  So in your conversations with Mr. Parish
15  about staying in Pasadena, did you discuss what type
16  of role you would play in Pasadena?
17    A.  I really don't recall the conversations
18  that we had.
19    Q.  Do you recall anything about the position
20  that he was offering?
21    A.  It was going to be on his team, working
22  for him.

Page 223

1    Q.  Would you be doing pricing?  Would you be
2  doing -- working on deals?  In what capacity would
3  you be working?
4    A.  It would probably mostly be working on
5  deals.
6    Q.  Do you know what type of deals were being
7  done in Pasadena?
8    A.  I have no idea.  So many different things.
9  I have no idea.
10    Q.  What channel was Mr. Parish on?
11    A.  Community channel.
12    Q.  And that reported up to Julie Gould?
13    A.  Yes.
14    Q.  And Ms. Gould reported to Mr. Hayward, is
15  that right?
16    A.  Yes.
17    Q.  So when you had these conversations with
18  Mr. Parish about staying in Pasadena, you understood
19  at that time that the community express product was
20  going to be moved back under public entities under
21  Eileen Neely who was under a different channel, is
22  that right?

Page 224

1    A.  That was my impression.
2    Q.  So your choice then was to work with
3  Mr. Parish on some other role or go back to the
4  public entities -- under the public entities team
5  under Eileen Neely, is that right?
6    A.  Yes.
7    Q.  And you elected to join Ms. Neely's team,
8  is that right?
9    A.  Yes.
10    Q.  And if I understood you, you said
11  Ms. Neely asked you to come back to D.C.?
12    A.  Yes.
13    Q.  What do you recall of that conversation
14  with Ms. Neely?
15    A.  It was very quick.  Do you want to come
16  back and be on my team?
17    Q.  Did she call you?  Was this a
18  face-to-face?
19    A.  I don't remember.  I'm not sure.
20    Q.  Were you in D.C. at the time or were you
21  in Pasadena when the conversation took place?
22    A.  I believe I was still in Pasadena, but I

Page 225

1  don't remember.
2    Q.  You don't remember?
3    A.  I don't remember when we exactly had the
4  conversation.
5    Q.  How long was the conversation?
6    A.  I'm sure I was in Pasadena.  I'm sorry?
7    Q.  How long was the conversation?
8    A.  I don't think it was long at all.
9    Q.  Like five minutes, 10 minutes?
10    A.  Probably so.  I don't think it was long.
11    Q.  Half an hour, an hour?
12    A.  I don't think it was that long.
13    Q.  Did you discuss anything else other than
14  moving from Pasadena to D.C. under the Public
15  Entities Loan Team?
16    A.  No, I don't think so.
17    Q.  Did she discuss with you that there was
18  another product, the Modernization Express product,
19  that you would have responsibilities with that
20  product as well?
21    A.  I don't think we had that conversation.
22    Q.  Did you know that the Public Entities Loan

Alderson Reporting Company
1-800-FOR-DEPO

Page 226

1  Team would be using the Modernization Express
2  product?
3      A.  I did.
4      Q.  And was there anything in your
5  conversation with Ms. Neely about whether you would
6  be working on Modernization Express loans as well as
7  community express?
8      A.  When I finally was back in D.C., after I
9  was already in a group, Eileen said that I was going
10  to focus on community express.
11      Q.  Did she say anything else in this
12  conversation?
13      A.  I really don't remember these
14  conversations in detail.
15      Q.  So you understood when you returned to
16  D.C. that your focus was going to be on community
17  express?
18      A.  Yes.
19      Q.  And did that include sourcing the deals?
20      A.  I think that was going to be a part of it.
21      Q.  That means going out to where the
22  customers were and bringing in new deals?

Page 227

1      A.  I believe that was going to be a part of
2  it, yes.
3      Q.  And that was Ms. Neely's expectations of
4  you when you joined the public entities team?
5      A.  I would say that was part of her
6  expectations.
7      Q.  And what time was this time frame?  Was
8  this May of '06 or some other time?
9      A.  Again, I returned back to D.C. in June,
10  May or June of '06.  So it had to have been close to
11  that time or a couple of months after that.  I'm not
12  sure.
13      Q.  And when she told you or you developed the
14  understanding that sourcing the deals would be one of
15  your responsibilities with respect to community
16  express, you understood that that included going on
17  customer visits?
18      A.  Yes.
19      Q.  And marketing the product?
20      A.  Yes.
21      Q.  Did you speak to Mr. Riedy about your move
22  from Pasadena to the Public Entities Loan Team?

Page 228

1      A.  No.
2      Q.  You testified on direct that you
3  understood that Mr. Riedy was not in favor of your
4  move from Pasadena to D.C., is that right?
5      A.  He was not in favor of me joining the
6  team.
7      Q.  And you understood that based on a
8  conversation that you had with Ms. Neely?
9      A.  With Ms. Neely.
10      Q.  You don't have any other information as to
11  what Mr. Riedy's motivations or decisions or feelings
12  were at that time other than what Ms. Neely related
13  to you?
14      A.  Yes.
15      Q.  But you don't have a specific recollection
16  of what Ms. Neely actually said, do you?
17      A.  No.  I just remember the broad strokes.  I
18  remember that being said to me by Ms. Neely.
19      Q.  But you don't recall exactly what she
20  said?
21      A.  No.
22      Q.  And prior to your joining the public

Page 229

1  entity loan team in or around May of 2006, you only
2  worked sporadically with Mr. Riedy, is that accurate?
3      A.  I worked with the people in his group.
4  I'm not sure I can say I worked with Mr. Riedy.
5      Q.  Your interaction with Mr. Riedy was
6  providing him with reports or information?
7      A.  Most likely.
8      Q.  You didn't work on any projects directly
9  with Mr. Riedy, did you?
10      A.  Not to my knowledge.
11      Q.  Would you turn to Exhibit 2, which is in
12  the first binder?  Actually, before we get to Exhibit
13  2, this might be a good time to take a break?
14      ARBITRATOR ROSCOE:  All right.  Take a
15  break.
16      (Discussion off the record.)
17      (Recess.)
18  BY MR. STEWART:
19      Q.  We're back on the record, Mr. Brannum.  I
20  would like to direct you to Exhibit 2 in the first
21  volume.
22      A.  Okay.

Page 238

1  was doing what.
2      Q.   But your responsibilities were more than
3  just community express.  You also had
4  responsibilities for Modernization Express, is that
5  true?
6      A.   Some, but I would say my main
7  responsibilities were community express.  I think he
8  was doing pricing for Modernization Express, but I
9  don't think he was doing the pricing for community
10 express.
11     Q.   Just so I'm clear, your responsibilities
12 on the Public Entities Loan Team under Eileen Neely
13 also included Modernization Express, is that true?
14     A.   Yes.
15     Q.   No one ever told you that you were not
16 supposed to do any work on Modernization Express?
17     A.   I don't think so.
18     Q.   Do you know approximately when Mr. Losada
19 joined Mr. Hayward's organization?
20     A.   No.
21     Q.   Do you recall it being sometime in 2008?
22     A.   I'm not sure if it was 2008 or 2007.

Page 239

1      Q.   Do you know who held the pricing job
2  before Mr. Losada?
3      A.   David Burgess.
4      Q.   And do you recall if there was a seamless
5  transition from Mr. Burgess to Mr. Losada?
6      A.   Again, I can't speak on that.
7      Q.   Do you recall if there was any period of
8  time between Mr. Burgess being in the pricing role
9  and then Mr. Losada coming into the pricing role?
10     A.   Again, I'm not sure.
11     Q.   You just have no recollection?
12     A.   I'm not sure.  I can't, with any degree of
13 certainty, say whether it was or it wasn't.  I'm just
14 not sure.
15     Q.   Did you apply for the pricing position
16 that Mr. Losada occupied?
17     A.   I don't think so, no.  No, I did not.
18     Q.   Do you recall --
19     A.   Give me one second.  No.
20     Q.   You did not apply for that role?
21     A.   No.
22     Q.   Do you recall speaking with Mr. Riedy

Page 240

1  about whether you ought to apply for that role?
2      A.   I do not recall that.
3      Q.   Did you speak to Mr. Hayward about whether
4  you ought to apply for the pricing position that
5  ultimately was occupied by Diego Losada?
6      A.   I do not recall having that conversation.
7      Q.   Do you recall Mr. Riedy or Mr. Hayward
8  suggesting that you should apply for an open position
9  in the capital markets group?
10     A.   I do not recall that conversation, no.
11     Q.   Do you recall Mr. Riedy discussing with
12 you that you should apply for an open position that
13 fits your skill set?
14     A.   No, I do not recall that conversation.
15     Q.   Now, the second page of that document at
16 FM 62, and this is under the public entity channel, I
17 believe you testified that Nicole Lester would have
18 been on the left-hand side of this organizational
19 structure under Eileen Neely, is that correct?
20     A.   That is correct.
21     Q.   Now, Ms. Lester left the organization to
22 go back to law school.  Is that accurate?

Page 241

1      A.   Yes.
2      Q.   Now, did Mr. Riedy or Ms. Neely backfill
3  Ms. Lester's position?
4      A.   No.
5      Q.   The position was not replaced, was it?
6      A.   No, I don't think so.  No.  No.
7      Q.   Now, on the right side of that
8  organization, I believe you testified, was the HFA
9  team.
10     A.   Yes.
11     Q.   Under Mr. Peffley?
12     A.   Yes.
13     Q.   And that consisted of Mark Vanderlinden,
14 Michael Lohmeier and Adam Wesolowski, is that
15 correct?
16     A.   Yes.
17     Q.   And on direct, you identified the race of
18 each of these individuals as white, is that correct?
19     A.   Yes.
20     Q.   If you turn the page to FM 63, this
21 purports to be Mr. Riedy's organization as of August
22 31st, 2009.  Do you see that?

61 (Pages 238 to 241)

Page 246

1    Q.   Mr. Weber was an SVP?
2    A.   Yes.
3    Q.   And he was a peer to Mr. Hayward, is that
4    right?
5    A.   I believe so.
6    Q.   So you were not in Mr. Hayward's
7    organization at this time?
8    A.   No.
9    Q.   And you were not in Mr. Riedy's
10   organization at this time?
11   A.   When you say -- again, it gets confusing
12   because are you talking about Mr. Hayward's
13   organization at the time in 2008 or at the time in
14   2004?
15   Q.   2004.
16   A.   Yes, Mr. Hayward was not a part of my
17   organization that I was working in.  Mr. Riedy was a
18   part of that organization if you're including Phil
19   Weber at the top.
20   Q.   But you reported to Wayne Curtis, is that
21   right?
22   A.   That's correct.

Page 247

1    Q.   You didn't report under Mr. Riedy's
2    organizational structure?
3    A.   No.
4    Q.   When did you first start reporting under
5    Mr. Riedy's organizational structure?
6    A.   When I came back from Pasadena.
7    Q.   So this was in or around May of 2006,
8    May/June 2006?
9    A.   That's correct.
10   Q.   Now, at that time, you were still doing
11   work with HFAs, is that your testimony?
12   A.   At the --
13   Q.   After May of 2006?
14   A.   I was working on community express
15   transactions with HFAs.
16   Q.   With the HFAs?
17   A.   Yes.
18   Q.   Do you recall how many community express
19   transactions you worked on with the HFAs?
20   A.   I know that I worked on a big one with
21   Ohio that never got closed.  That's one that kind of
22   stands out to me.  I don't remember all the deals

Page 248

1    that I was working on.
2    Q.   Do you have any specific recollection of
3    any other deal you worked on with an HFA after 2006?
4    A.   After 2006?
5    Q.   Involving the community express product.
6    A.   I would have to look at the pipelines.
7    I've looked at so many deals, I can't recall.  The
8    only deals that really stick out to me when I think
9    back to that time is the L.A. deal -- yeah, the L.A.
10   deal is the one that really sticks out in my mind.
11   Q.   The L.A. deal was not an HFA, was it?
12   A.   No.
13   Q.   So post-2006 -- I just want to be clear,
14   sir.  Post-2006, May of 2006, your work with the HFAs
15   was to market the community express product to HFA
16   clients?
17   A.   That was one of my responsibilities, yes.
18   Q.   And HFAs were one of many clients?
19   A.   Yes.
20   Q.   You had PHAs?
21   A.   Yes.
22   Q.   Cities, municipalities?

Page 249

1    A.   Correct.
2    Q.   And that was the same for all the other,
3    your peers in the public entity loan team, correct?
4    A.   Yes.
5    Q.   Now, the work of the senior business
6    manager on the public entity loan team was a sales
7    job, wasn't it?
8    A.   I don't know if I would classify it as
9    that.  My title was senior business manager.  I
10   always thought that I was managing a business.
11   Q.   Ms. Neely and Mr. Riedy, in your
12   conversations with them, suggested to you that this
13   was a sales job, that the job was to go out, market
14   the products and get new business, is that correct?
15   A.   It was part of my job.
16   Q.   It was a part of your job?
17   A.   It was a part of my job.
18   Q.   It was a primary part of your job, wasn't
19   it?
20   A.   I would say it was one of many primary
21   parts of my job.
22        ARBITRATOR ROSCOE:  You said business

63  (Pages 246 to 249)

Page 258

1   be fair to you.
2          THE WITNESS: I actually think that would
3   be best.
4          ARBITRATOR ROSCOE: Let's continue the
5   questioning. I don't want you to feel that you're
6   under undue pressure.
7          MR. STEWART: I withdraw --
8          MR. WACHTEL: Does this mean the question,
9   are there any other places where you should have been
10  listed in exhibit 2, is tabled for now?
11         MR. STEWART: Is tabled for now.
12         BY MR. STEWART:
13     Q.   Let's go on with this question. Would you
14  turn to Exhibit 39?
15     A.   Yes.
16     Q.   In the middle of that page at FM 454,
17  there is a $35 million opportunity with Los Angeles
18  Housing Department, community express?
19     A.   Yes.
20     Q.   Is that the opportunity that is referenced
21  on Exhibit 2 at FM 416? This is the visit with Zeeda
22  Daniele.

Page 259

1      A.   Yes.
2      Q.   And that's the same deal?
3      A.   Yes.
4      Q.   And it's a community express deal?
5      A.   Yes.
6      Q.   When was the first time you and/or Ms.
7   Daniele had approached the Los Angeles Housing
8   Department about a deal for a community express loan?
9      A.   I do not know. I don't know.
10     Q.   Sometime before late April of 2007, is
11  that correct? Or was this the first time you visited
12  them?
13     A.   April 2007 might have been the first time
14  but I don't know.
15     Q.   If you go back to Exhibit 39, still
16  referencing this particular deal.
17     A.   Okay. The pipe --
18     Q.   The pipeline report, yes. It says sale
19  stage initial review?
20     A.   Yes.
21     Q.   Account type, government? Do you see
22  that?

Page 260

1      A.   Yes.
2      Q.   Note type, community express. That's the
3   type of loan?
4      A.   Yes.
5      Q.   And it has a closed date of 8/16/2007.
6   What is the closed date?
7      A.   The closed date means that we expected
8   this deal to close at that time at 8/16/2007.
9      Q.   So in late April, you're projecting to
10  close this deal on or around mid-August 2007, is that
11  correct?
12     A.   No. This is saying in early June --
13  actually, no. Yes, they're saying in early June,
14  June 6th, 2007, that we're expecting to close this on
15  8/16/2007.
16     Q.   So in early June of 2007, you're expecting
17  to close this deal with Los Angeles County on or
18  around mid-August 2007?
19     A.   Yes.
20         MR. STEWART: We move for admission of
21  Exhibit 39.
22         MR. WACHTEL: No objection.

Page 261

1          ARBITRATOR ROSCOE: Okay. 39 is in.
2          (Respondent's Exhibit No. 39
3          was received in evidence.)
4          BY MR. STEWART:
5      Q.   Would you turn to Exhibit 89? I'm on the
6   third page in at FM 679. Would you turn to that
7   page, please?
8      A.   Yes.
9      Q.   And about a third of the way down under
10  the opportunity names, community express deals.
11     A.   Yes.
12     Q.   There is an entry for the City of Los
13  Angeles community express.
14     A.   Right.
15     Q.   And the deal is at 30 million, is that
16  right?
17     A.   Yes.
18     Q.   Is that the same deal we were just looking
19  at on Exhibit 39?
20     A.   I'm pretty sure it is.
21     Q.   So now we are at September 8th, 2008, over
22  a year later.

66 (Pages 258 to 261)

Arbitration Day 1                                                    October 24, 2011
                              Washington, DC

Page 262

1   A.   Yes.
2   Q.   That deal is still not closed?
3   A.   Yes.
4   Q.   Now, do you recall having, in your direct
5   testimony, discussions about having weekly meetings
6   with Mr. Hayward where he would talk about deals?
7   A.   Yes.
8   Q.   And sometimes he would talk about specific
9   deals?
10  A.   Yes.
11  Q.   Do you recall any instances where
12  Mr. Hayward asked you about the status of this City
13  of Los Angeles deal?
14  A.   Yes.
15  Q.   And do you recall him asking you when
16  would this deal close?
17  A.   No.
18  Q.   You don't recall that ever happening?
19  A.   I don't think he ever said when would this
20  deal close.  He was just asking me what the status of
21  it was.
22  Q.   What do you recall him asking you?

Page 263

1   A.   What's going on with the deal.
2   Q.   Anything else?
3   A.   That's -- he usually just had to ask that
4   question.
5   Q.   Do you recall him ever expressing any
6   displeasure that the deal hadn't been closed?
7   A.   I wouldn't say it was -- I wouldn't call
8   it displeasure, but he definitely used to give me a
9   hard time about it.
10  Q.   He expressed that he was frustrated that
11  the deal wasn't closed?
12  A.   Again, I'm not sure if I would say
13  frustrated.  He would just give me a hard time.
14  Q.   How would he give you a hard time about
15  this deal --
16  A.   Just, you know, Steve, okay, what's going
17  on with the City of Los Angeles?
18  Q.   Do you remember how you responded?
19  A.   Yes.  I responded and told him exactly
20  what was going on at the time.
21  Q.   How often did Mr. Hayward ask you about
22  the status of this deal?

Page 264

1   A.   He asked me a few times.  Definitely a few
2   times.
3   Q.   Was it about five times, more than five?
4   A.   It was a few times because I remember him
5   asking about this and the other deal that we were
6   working on with it.  So it was another deal that was
7   kind of linked to this deal so he would ask about
8   those deals.  So I really can't recall how many
9   times.  I know it definitely had to have been more
10  than twice because if it wasn't, then I wouldn't
11  really have recalled it, but I don't remember exactly
12  how many times he asked me about it.
13  Q.   Now, you testified earlier that one of the
14  reasons that the City of Los Angeles deal didn't
15  close was because of a recourse issue?
16  A.   Yes.
17  Q.   Can you explain what you mean by that?
18  A.   On this particular deal, we were
19  structuring it -- because -- on any deal, what we do
20  is we give full recourse to our borrower's balance
21  sheet.  So whatever you have there that's available
22  to pay, we want full recourse to it.  If it's

Page 265

1   unrestricted, we want full recourse to it.
2        In the case of the City of Los Angeles
3   Housing Department, they are structured in a way that
4   a lot of their funds are restricted.  It's a very
5   sophisticated -- probably one of the most
6   sophisticated cities in the country when it comes to
7   that.
8        So we really had to identify specific
9   funds that they could use to repay us.  And once
10  those funds were identified, they had to in turn go
11  back and get approval from the city council or
12  sometimes it might have -- I don't know if it was a
13  voter -- but they had to get approval to use those
14  funds as recourse to repay us.
15       So that was the issue.  It was trying to
16  figure out what funds they could use in this -- I
17  couldn't tell you how many different funds they had.
18  We had to cherry pick certain different funds.  It
19  was a good 10 or so, 12 funds that we had to piece
20  together to get them to like a $35 million mark.
21       And then that mark dropped down to 30
22  million and then it dropped down to 20 million and

Alderson Reporting Company
1-800-FOR-DEPO

```
 1                       JAMS ARBITRATION

 2     - - - - - - - - - - - - -    X

 3     STEVEN BRANNUM,                 :

 4         Claimant,                   :

 5             v.                      :   Reference No.

 6     FEDERAL NATIONAL MORTGAGE       :   1410005474

 7     ASSOCIATION (FANNIE MAE),       :

 8         Respondent.                 :

 9     - - - - - - - - - - - - - -    X

10                          Washington, D.C.

11                          Tuesday, October 25, 2011

12             Arbitration before ARBITRATOR JERRY ROSCOE

13     in the above-entitled matter, the witnesses being

14     duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15     in and for the District of Columbia, taken at the

16     offices of JAMS, 555 13th Street, N.W., Washington,

17     D.C., at 9:30 a.m., Tuesday, October 25, 2011, and

18     the proceedings being taken down by Stenotype by MARY

19     GRACE CASTLEBERRY, RPR, and transcribed under her

20     direction.

21

22
```

Arbitration Day 2
Washington, DC
October 25, 2011

**Page 524**

1  Ms. Zukoff.
2      A.   That's correct.
3      Q.   And for the same period of time, she had
4  eight community express deals in the pipeline,
5  correct?
6      A.   Yes.
7      Q.   And the volume of the eight transactions
8  that she had in the pipeline amounted to 51,300,000
9  and some change, is that correct?
10     A.   That's correct.
11     Q.   If we go across for both you and
12 Ms. Zukoff, we see that as of September 8th, 2008,
13 you had closed $8 million worth of community express
14 deals, is that correct?
15     A.   That's correct.
16     Q.   And as of that same time frame, Ms. Zukoff
17 had closed $16.4 million in community express deals,
18 is that accurate?
19     A.   That's accurate.
20     Q.   Now, if we turn the page, and we'll do the
21 same for the modernization express product, you had
22 one modernization express deal in the pipeline as of

**Page 525**

1  September 8th, 2008 and I'm looking at, for sake of
2  the record, FM 680.  So one modernization express
3  deal in the pipeline as of September 8th, 2008?
4      A.   That's correct.
5      Q.   And the volume of that deal was $408,890,
6  is that accurate?
7      A.   That is accurate.
8      Q.   And over that same period of time,
9  Ms. Zukoff had seven transactions, modernization
10 express transactions in the pipeline, is that
11 accurate?
12     A.   That's correct.
13     Q.   And the volume of those modernization
14 express transactions amounted to 22,260,000 as of
15 September 8th, 2008, is that accurate?
16     A.   That is correct.
17     Q.   Would you turn to Exhibit 90, which is the
18 next exhibit?  This is for September 15th, 2008?
19     A.   Yes.
20     Q.   I'll direct you to the second page in at
21 FM 682.
22     A.   Yes.

**Page 526**

1      Q.   And this refers to the last table there on
2  the bottom of the page, upcoming deals to be closed.
3  Do you see that?
4      A.   Yes.
5      Q.   We'll run through the same exercise here.
6  Turning to FM 684.
7      A.   Okay.
8      Q.   The number of community express deals that
9  Ms. Zukoff has in the pipeline is nine.  The number
10 of community express deals in the pipeline you have
11 as of September 15, 2008 is eight, correct?
12     A.   That's correct.
13     Q.   And if you look at the volume of those
14 deals that are in the pipeline between you, she has
15 $61.3 million of community express deals in the
16 pipeline and you had $58.75 million in community
17 express deals in the pipeline as of September 15th,
18 2008, is that correct?
19     A.   That's correct.
20     Q.   Let's take a look at Exhibit 105.  This is
21 the December 22nd, 2008 pipeline report.
22     A.   105?

**Page 527**

1      Q.   Yes, Exhibit 105, which is in the second
2  volume.
3      A.   Right.
4      Q.   This is the December 22nd, 2008 pipeline
5  report.  If you turn to the -- I guess it's the third
6  page in, FM 000753.
7      A.   Yes.
8      Q.   And we're looking at the volume
9  highlights.  And you can see that the goal for
10 community express was not met.  The goal was 214
11 million and the group had brought in, according to
12 the document, 47,300,000.  Is that accurate?
13     A.   That is accurate.
14     Q.   And according to the document, the
15 modernization express goal was 111 million and only
16 15,079,501 had been brought in for the year?
17     A.   Yes.
18     Q.   So the goal on either product was not met,
19 correct?
20     A.   That's correct.
21     Q.   Now, if you would turn then to the next
22 page, this is at FM 000754, looking again at the

65 (Pages 524 to 527)

Page 528

1   first table at the top, for the year of 2008,
2   according to this document, you had brought in three
3   community express deals.  The volume of deals that
4   you had in the pipeline was 11,750,000, correct?
5       A.   Yes.
6       Q.   And what had closed for 2008 was 8 million
7   as of December 22nd, 2008, is that correct?
8       A.   Yes.
9       Q.   And if we look at Ms. Zukoff, she had
10  brought in five deals over the course of 2008, is
11  that correct?
12      A.   That is correct.
13      Q.   The volume of deals in her pipeline is
14  $33.3 million in community express deals, correct?
15      A.   That is correct.
16      Q.   And if we look at the far right, as of
17  December 22nd, 2008, she had closed $33.3 million, is
18  that correct?
19      A.   That's correct.
20      Q.   If we look at, for Ms. Neely, in terms of
21  staying in that closed column, Ms. Neely does not
22  have any deals closed assigned to her, is that

Page 529

1   accurate?
2       A.   That is accurate.
3       Q.   According to the document?
4       A.   Yes.
5       Q.   The same with Ms. Lester.  No deals,
6   according to the document, had been assigned to her?
7       A.   Right.
8       Q.   And for Maria Day-Marshall, she had closed
9   $2 million worth of community express deals as of
10  December 22nd, 2008, correct?
11      A.   That's correct.
12      Q.   We covered you at 8 million.  And so then
13  Russell Atta-Safoh had closed $4 million of community
14  express deals, is that accurate?
15      A.   That is accurate.
16      Q.   And that's as of December 22nd, 2008?
17      A.   That's correct.
18      Q.   Now, you don't have a calculator there but
19  I would just -- since everybody seems to understand
20  that you're very good with math, if you would add the
21  volume of community express deals that had been
22  closed as of December 22nd, 2008 for

Page 530

1   Ms. Day-Marshall, yourself, and Mr. Atta-Safoh, that
2   would equal 14 million?
3       A.   That's correct.
4       Q.   Now, let's look at the modernization
5   express table which is the next page at FM 000755.
6   Are you with me?
7       A.   Yes.
8       Q.   Now, for you and Ms. Zukoff, neither one
9   of you had closed any modernization express deals as
10  of December 22nd, 2008, according to this document,
11  is that accurate?
12      A.   Yes, according to this document, that's
13  correct.
14      Q.   Now, Ms. Neely, it looks like she had
15  closed 8,166,000 and some change in mod express
16  product for 2008?  December 22nd, 2008, is that
17  accurate?
18      A.   Yes.
19      Q.   Ms. Day-Marshall had closed $661,475 of
20  modernization express product as of December 22nd,
21  2008, is that correct?
22      A.   That's correct.

Page 531

1       Q.   And Mr. Atta-Safoh had closed $6,251,837
2   worth of modernization express product as of December
3   22nd, 2008, correct?
4       A.   Yes, that's correct.
5       Q.   Now, if we were to add the closed figures
6   for Ms. Neely, Ms. Day-Marshall and Mr. Atta-Safoh,
7   that would be reflected on the third page of the
8   document, FM 753, which is $15,079,501?
9       A.   753?
10      Q.   Yes, 753.  I'm sorry, the modernization
11  express closed figure at the top.
12      A.   Right, okay.
13      Q.   The number you helped me out with.
14      A.   Yes.
15      Q.   And that number is reflective of adding
16  Eileen Neely, Maria Day-Marshall and Russell
17  Atta-Safoh from FM 755, correct?
18      A.   That is correct.
19      Q.   Now, if you take the 14 million that we
20  had done for community express for everyone but
21  Ms. Zukoff for community express deals, and adding
22  that to the 15,079,000, we come to a figure of 29

Page 532

1  million and some change.
2      A.  Uh-huh.
3      Q.  And that's less than -- so that's everyone
4  else, Ms. Day-Marshall, Mr. Atta-Safoh, yourself,
5  Ms. Neely, everyone else for both products, community
6  express and modernization express, had closed less
7  than Ms. Zukoff had closed solely on community
8  express, is that accurate?
9      A.  That is correct.
10         MR. STEWART:  Can I just have two minutes,
11  Your Honor?
12         BY MR. STEWART:
13     Q.  Mr. Brannum, you testified that you
14  suffered from a number of symptoms, sleeplessness and
15  some other symptoms, following your separation from Fannie
16  Mae, correct?
17     A.  That's correct.
18     Q.  Are you taking any medications for any of
19  these symptoms?
20     A.  No.
21     Q.  And you testified on direct that you
22  hadn't visited any doctors since leaving Fannie Mae

Page 533

1  because you couldn't afford it, is that correct?
2      A.  That's correct.
3      Q.  Would you turn to Exhibit 130?  You've got
4  130?
5      A.  Yes.
6      Q.  And this is your 2009 tax return, is that
7  correct?
8      A.  Yes.
9      Q.  And it looks like you had someone prepare
10  the document.  Sakyi & Associates?
11     A.  Yes.
12     Q.  And who or what is Sakyi & Associates?
13     A.  The accountant that I used.
14     Q.  Your accountant?
15     A.  Accountants, yes.
16     Q.  You had to pay for their services,
17  correct?
18     A.  Yes.
19     Q.  And why did you have an accountant prepare
20  your tax return as opposed to doing it yourself?
21     A.  As somebody that does finance for a
22  living, I think it's a good idea for everybody to get

Page 534

1  their tax returns prepared by an accountant.
2      Q.  Now, if you would turn to the third page
3  in at SB 203.
4      A.  Yes.
5      Q.  At line 16, there appears to be an entry
6  of $3,300 that you had given a gift to charity.  Is
7  that accurate?
8      A.  That is correct.
9      Q.  So you gave away $3,300 in 2009 to charity
10  and you didn't want to see any doctors following your
11  separation from Fannie Mae because you couldn't
12  afford it?  How could you afford to give away $3,300
13  to charity?
14     A.  Because I noticed -- I don't think that a
15  doctor is only going to be $3,300.  I mean, I have no
16  idea how much a doctor's visit would run me.  I know
17  that in the past, I've had doctor's bills that were
18  close to $80,000 when I ruptured my patella tendon so
19  I have no idea what a doctor's bill is going to be.
20  And to be quite honest, right now, I would rather not
21  know.  I would rather not know.  I would rather not
22  go to the doctor.

Page 535

1      Q.  And you haven't had any income since you
2  left Fannie Mae?  You haven't been working for
3  anyone?
4      A.  No.
5      Q.  Not working on a contract basis or
6  otherwise?
7      A.  No.
8      Q.  And it looks from the first page of
9  Exhibit 130 that you had $20,554 in wages, salaries,
10  tips, et cetera.
11     A.  Where is this from?
12     Q.  First page, SB 201.
13     A.  Okay.
14     Q.  And this is at line 7.  And you had had
15  $20,554 in wages, salaries, tips, et cetera.
16     A.  Right.
17     Q.  You also had at line 19, $13,728 in
18  unemployment compensation, is that correct?
19     A.  That's correct.
20     Q.  And yet you gave $3,300 away to charity.
21  I'm just trying to understand why would you give --
22  if you didn't have any income from any source and you

67 (Pages 532 to 535)

# DAY-MARSHALL TRANSCRIPT

```
 1                        JAMS ARBITRATION

 2      - - - - - - - - - - - - -    X

 3    STEVEN BRANNUM,                :

 4         Claimant,                 :

 5              v.                   :   Reference No.

 6    FEDERAL NATIONAL MORTGAGE       :   1410005474

 7    ASSOCIATION (FANNIE MAE),      :

 8         Respondent.               :

 9      - - - - - - - - - - - - - -  X

10                         Washington, D.C.

11                         Wednesday, October 26, 2011

12              Arbitration before ARBITRATOR JERRY ROSCOE

13    in the above-entitled matter, the witnesses being

14    duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15    in and for the District of Columbia, taken at the

16    offices of JAMS, 555 13th Street, N.W., Washington,

17    D.C., at 8:52 a.m., Wednesday, October 26, 2011, and

18    the proceedings being taken down by Stenotype by MARY

19    GRACE CASTLEBERRY, RPR, and transcribed under her

20    direction.

21

22
```

Page 564

1 government and I held several positions there. I was
2 a tax examiner, an attorney, debt manager, Assistant
3 Treasurer and then Treasurer of the District of
4 Columbia.
5    Q.   And just really briefly, what were your
6 responsibilities as Assistant Treasurer and
7 Treasurer?
8    A.   I managed all of the city's cash. I
9 managed the city's debt. We issued bonds to finance
10 operations and capital projects for the city,
11 collected revenue for the city.
12    Q.   And did you have any management
13 responsibilities in that capacity?
14    A.   I did.
15    Q.   And how many people did you manage?
16    A.   As Assistant Treasurer, about 50 people
17 and as Treasurer, about 100.
18    Q.   And when did you join Fannie Mae?
19    A.   I joined Fannie Mae in November of 2004.
20    Q.   And what was your position when you
21 joined?
22    A.   Senior development manager.

Page 565

1    Q.   Is that part of the Public Entities
2 channel?
3    A.   Yes.
4    Q.   Is that on the PE Loan team?
5    A.   I was not initially on the PE Loan team.
6    Q.   What was your initial position?
7    A.   I was brought on to create an
8 infrastructure financing product for the company.
9    Q.   And at some point, did you join the PE
10 Loan team?
11    A.   I did.
12    Q.   Just going back real quick, what product
13 were you developing?
14    A.   It was a product to finance infrastructure
15 for housing projects. Infrastructure meaning
16 sidewalks, streets, water and sewer connections, et
17 cetera.
18    Q.   And when you joined the PE Loan team, who
19 was your supervisor?
20    A.   Eileen Neely.
21    Q.   And do you remember who the director of
22 the PE channel was at that time?

Page 566

1    A.   The PE channel, I think it was Eileen.
2       MR. STEWART: Who was that?
3       THE WITNESS: Eileen Neely.
4    BY MS. LOVELESS:
5    Q.   And what were your responsibilities when
6 you joined the PE Loan team?
7    A.   To source transactions, to do marketing,
8 business development. I traveled the country
9 speaking at conferences and meeting with governmental
10 officials. I did training of governmental officials.
11 Initially I underwrote transactions and closed them.
12    Q.   And what's involved in the underwriting
13 process, just briefly?
14    A.   Just determining whether or not the
15 borrower has the financial wherewithal to pay the
16 debt, to pay the loan back.
17    Q.   And what types of facts do you look at in
18 determining that?
19    A.   Audited financial statements, current
20 financial status, that kind of stuff.
21    Q.   And who was on the PE Loan team when you
22 joined?

Page 567

1    A.   Steve Brannum, Russell Atta-Safoh I think
2 was there at that time. I don't know if he joined
3 before me or after me. Nicole Lester. I think she
4 joined after me. And then eventually Lisa Zukoff
5 joined the team.
6    Q.   And how closely did you work with your
7 colleagues in the PE Loan team?
8    A.   Very closely. It was a small unit.
9    Q.   And you, Steve, Mr. Brannum,
10 Mr. Atta-Safoh and Ms. Lester, were you all in the
11 same office?
12    A.   Yes.
13    Q.   And when about, to the best of your
14 recollection, did Lisa Zukoff join the team?
15    A.   I don't remember. I don't remember
16 exactly.
17    Q.   When she joined the team, did you do any
18 training with her?
19    A.   Did I train her?
20    Q.   Yes.
21    A.   Is that your question? Yes. I assisted
22 her in learning the business.

3  (Pages 564 to 567)

## Page 568

1     Q.   And do you remember the particular types
2  of the business that you assisted her with?
3     A.   Helping her to learn how to source
4  transactions, how to do the writeups, the
5  underwriting writeups, how to close transactions.
6     Q.   Is underwriting -- we've been using source
7  and structure deals as the terminology.  Is
8  underwriting similar to structuring a deal?
9     A.   Yes.
10     Q.   And did you attend pipeline meetings?
11     A.   I did.
12     Q.   And who was at the pipeline meetings?
13     A.   Those folks that I just named as well as
14  the HFA team.
15     Q.   And how often were these meetings?
16     A.   Weekly.
17     Q.   And from these meetings, did you learn
18  what other people in the group were working on?
19     A.   Yes.
20     Q.   And what did you understand that Lisa was
21  working on based on these meetings?
22     A.   Modernization express transactions and

## Page 569

1  community express transactions.
2     Q.   And were those the same transactions you
3  were working on?
4     A.   Yes.
5     Q.   And that Mr. Brannum was working on?
6     A.   Yes.
7     Q.   And that Mr. Atta-Safoh was working on?
8     A.   Yes.
9     Q.   Based on your conversations with
10  Ms. Zukoff, how well did you understand -- how well
11  do you think she understood structuring deals?
12     MR. STEWART:  Objection.
13     ARBITRATOR ROSCOE:  It's within her frame
14  of reference.  Go ahead.
15     THE WITNESS:  Initially?  I think there
16  was a learning curve.
17     BY MS. LOVELESS:
18     Q.   And even towards the end of working with
19  her, did you think that she understood how to
20  structure deals as well as you did?
21     A.   I don't know.  I mean, that's kind of a
22  subjective question.

## Page 570

1     Q.   Right.  I understand.
2     A.   I have definitely had more experience in
3  doing it than she did, but I can't say definitively
4  what her level of competency was at that point.
5     Q.   And based on your experience working with
6  Mr. Brannum, what did you understand was his level of
7  skill as a financial analyst?
8     A.   I thought he was very good.  He was
9  competent.
10     Q.   And did you work with CBC employees?
11     A.   Yes.
12     Q.   And what was their role in working with
13  you?
14     A.   Initially they were sort of our eyes and
15  ears on the ground in the regions where they were
16  located.  We often flew in to meet with government
17  officials or speak at conferences and they were
18  helpful in sourcing transactions because they may
19  have introduced us to some of those people and driven
20  us around the state where we were doing business or
21  wanted to do business.  They were more relationship
22  people.

## Page 571

1     Q.   And did you have conversations with them
2  about structuring deals?
3     A.   Did I have conversations?  Yes, probably.
4     Q.   And based on those conversations, how well
5  did you think they understood how to structure deals?
6     A.   Certainly initially, probably not at all
7  or very little.
8     Q.   And which CBC employees did you work with
9  the most?
10     A.   Byron Johnson.  He was located in
11  Louisiana.  Marcella Roberts in Alabama and Ralph
12  Perrey in Tennessee.
13     Q.   And those were the people that you had
14  conversations with about structuring deals?
15     A.   Yes.
16     Q.   Did you ever work with a CD account team
17  member named Jessie Smith?
18     A.   No.
19     Q.   What about a CD account team member named
20  Warren Harris?
21     A.   No.
22     Q.   Have you ever heard of those names?

4 (Pages 568 to 571)

Page 576

1    EXAMINATION BY COUNSEL FOR RESPONDENT
2       BY MR. STEWART:
3       Q.  Good morning, Ms. Day-Marshall.  I'm
4    Damien Stewart, counsel for Fannie Mae.
5       A.  Good morning.
6       Q.  I just have a few questions for you.
7    Where are you currently employed?
8       A.  The D.C. Housing Finance Agency.
9       Q.  In what capacity?
10      A.  General counsel.
11      Q.  And how long have you had that position?
12      A.  Since November of '09, 2009.
13      Q.  Is that the first position you took after
14   you left Fannie Mae?
15      A.  Yes.
16      Q.  Now, on direct you went through and gave
17   your summary of your employment history after your
18   education.
19      A.  Not all of it.
20      Q.  Oh, not all of it?  There were some other
21   positions as well?
22      A.  Uh-huh.

Page 577

1       Q.  What other positions?  I had a number of
2    positions in the D.C. government as a tax examiner,
3    an attorney, a debt manager, Assistant Treasurer and
4    Treasurer at the District of Columbia.  Were there
5    other positions that you held?
6       A.  Yes.  I was senior vice president, chief
7    financial officer of the health maintenance
8    organization for a couple of years.
9       Q.  Health maintenance?
10      A.  Yes.  And then I was senior vice president
11   at Columbia Equity Financial Corp.  It's a financial
12   advisory firm that advises governmental entities on
13   the issuance of debt and other financings.
14      Q.  Anything else?
15      A.  No.
16      ARBITRATOR ROSCOE:  Health maintenance,
17   you mean otherwise known as an HMO?
18      THE WITNESS:  Yes.
19      ARBITRATOR ROSCOE:  Thank you.
20      BY MR. STEWART:
21      Q.  In any of the positions, whether at the
22   health maintenance organization or at Columbia Equity

Page 578

1    Financial --
2       A.  Wait, one more.
3       Q.  All right.
4       A.  I was asked by the District government,
5    shortly after I left, to come back and to consult to
6    the D.C. Water and Sewer Authority.
7       Q.  WASA?
8       A.  Yes.
9       Q.  And in what capacity would that consulting
10   relationship have been?
11      A.  The water and sewer authority was being
12   split off from the D.C. government and made a
13   regional authority, and I was asked to come back and
14   to help to separate their financial activities from
15   the District government.
16      Q.  And were any of these jobs, whether at
17   D.C. or at WASA or the HMO or Columbia Equity
18   Finance, were any of these sales capacity jobs?
19      A.  I would say Columbia Equity.
20      Q.  Columbia Equity was?
21      A.  Yes.  I had to sell my services to the
22   governmental entities.

Page 579

1       Q.  Now, you testified that you worked with
2    Byron -- what was the last name?
3       A.  I think it was Johnson.
4       Q.  Was it Johnson?  Okay.  Ralph Perrey and
5    Marcella Roberts.  And then initially there was a
6    learning curve for them to understand how to
7    structure transactions, is that accurate?
8       A.  Yes.
9       Q.  And over time, did you observe whether or
10   not they had become more proficient in their ability
11   to structure transactions?
12      A.  Somewhat.
13      ARBITRATOR ROSCOE:  Was the question
14   proficient or more proficient?
15      MR. STEWART:  Proficient, more.
16      MS. LOVELESS:  Can you read the question
17   back?  I thought it was more proficient.
18      THE REPORTER:  "Question:  And over time,
19   did you observe whether or not they had become more
20   proficient in their ability to structure
21   transactions?"
22      ARBITRATOR ROSCOE:  Thank you.  You may

6 (Pages 576 to 579)

Page 580

1   proceed.
2          BY MR. STEWART:
3      Q.   Can you answer that question?
4      A.   You want me to answer that question?
5      Q.   That question.
6      A.   Well, they weren't proficient when I first
7   started working with them.  They didn't know much
8   about the business at all.  Over time, they did
9   become more proficient.
10         ARBITRATOR ROSCOE:  Thank you.
11         BY MR. STEWART:
12     Q.   Now, can you explain or did you have an
13  understanding of the role of this underwriting and
14  the structuring of the transaction?  Did you work
15  with any of the groups within Fannie Mae before the
16  deals got approved before -- well, in terms of
17  underwriting structuring.  Let me just start over.
18  Bad question.
19         ARBITRATOR ROSCOE:  And in view of the
20  fact that this witness has been kind enough to come
21  down here this morning and I know she has to get out
22  of here soon, I'm going to let everyone be very

Page 581

1   flexible with the form of their questions.  Go ahead
2   and ask what you want, how you want it so you can get
3   all the information this witness has.  You can lead
4   on redirect if you like.  Let's just get everything
5   she knows.  Go ahead and do it.
6          BY MR. STEWART:
7      Q.   Were there other groups within Fannie Mae
8   to do underwriting prior to a deal getting approved?
9      A.   I should just make it clear that when I
10  first started working with the PE Loan team, the loan
11  team was very small and I did pretty much all of the
12  underwriting for the modernization express
13  transactions.
14     Q.   Let's focus --
15     A.   And --
16     Q.   Sorry.  Let's focus towards the end of
17  your tenure at Fannie Mae.
18         ARBITRATOR ROSCOE:  We have to let her
19  finish her sentence.  And so you --
20         THE WITNESS:  And so there was no one else
21  at that point underwriting those transactions and so
22  I did them -- pretty much all of them.  I think

Page 582

1   Eileen had done some but she didn't have a lot of
2   help and so I did most if not all of the underwriting
3   at that time.
4          BY MR. STEWART:
5      Q.   Let's focus towards the end of your tenure
6   at Fannie Mae.  Did the credit division also do the
7   underwriting as well?
8      A.   At some point, the credit division took
9   over the underwriting of the transactions.  But I
10  think Ms. Loveless's question earlier about
11  structuring is a good one because even though they
12  took over -- the credit people took over the
13  underwriting of the transactions, we still had to
14  structure them.
15     Q.   And your group still structured the
16  transactions but before the deals could get approved,
17  they had to go and be approved through the credit
18  division as well?
19     A.   Yes.
20     Q.   Now, you testified that the CBCs were, I
21  believe you said the eyes and ears on the ground.
22  Can you explain what you meant by that?

Page 583

1      A.   Well, they knew the people to whom we were
2   trying to source transactions and so they were the
3   relationship people.  They introduced us to those
4   people and gave us opportunities to source
5   transactions.
6      Q.   How important, if at all, was it for you,
7   in order to source transactions and to get deals
8   done, to travel to meet with the customers?
9      A.   How important was it?  It was important.
10     Q.   And was that a point of emphasis made --
11  was the point of emphasis made clear to you that you
12  needed to travel to meet with these customers in
13  order to source deals?
14     A.   I don't think anyone ever told me that but
15  I knew.
16     Q.   You knew that?
17     A.   Yes.
18     Q.   While you were employed on the Public
19  Entities Loan team, did Ms. Neely, in any meetings
20  with you, did Ms. Neely say to the group, the members
21  of the group, that you needed to travel in order to
22  source deals?

7 (Pages 580 to 583)

# HAYWARD

# TRANSCRIPT

Page 280

1    Philadelphia?
2        A.   Another couple of years.
3        Q.   And what did you do after that?
4        A.   After that, I came to Washington to work
5    on -- in the beginning, REO and servicing.
6        Q.   What is REO?
7        A.   Real estate owned.
8        Q.   Real estate owned by Fannie Mae?
9        A.   Yes.
10       Q.   And how long did you stay in that
11   position?
12       A.   Oh, my God.  Again, my memory is kind of
13   fuzzy on this because I've done so many things but a
14   couple of years.
15       Q.   And was the REO position also at the vice
16   president level?
17       A.   Yes.  All these jobs were at the vice
18   president level.  It was REO, it was servicing, it
19   was a lot of other special duties that the senior
20   executives wanted me to do.
21       Q.   Was Housing and Community Development your
22   first SVP position?

Page 281

1        A.   No.
2        Q.   Where did you move to after REO servicing?
3        A.   I ran small and mid-sized customer
4    relationships for Fannie Mae and I ran the Chicago
5    office.
6        Q.   How long did you stay in that job?
7        A.   From the end of 1999 until I came to
8    Housing and Community Development in 2004.
9        Q.   So was the Chicago position at the SVP
10   level?
11       A.   Yes, it was.
12       Q.   When you came to Housing and Community
13   Development in 2004, what subpart of HCD were you
14   heading?
15       A.   It was then called the American
16   Communities Fund and in those days, we had a
17   multifamily division, we had the American Communities
18   Fund and a few other things.
19       Q.   So somebody else, one of your peers,
20   headed the multifamily division in HCD?
21       A.   Exactly.
22       Q.   What's the difference between American

Page 282

1    Communities Fund and what became Community Lending
2    and Community Development?
3        A.   The essential elements are really the
4    same.  I think the equity business came in and out.
5    So community lending for a while, the equity business
6    was split by itself, and at one point it came back.
7    So the activities, equity investing, lending, all
8    those things were essentially the same, although
9    equity moved in and out over time.
10       Q.   You should have three binders in front of
11   you.  Volume 1, Exhibit 1, I would like you to open
12   that to this second page which is FM 61.
13       A.   Okay.
14       Q.   Is this an accurate depiction of the
15   organization you led as it existed September 30,
16   2008?
17       A.   I'm assuming it is, yes.
18       Q.   You referred to the equity piece of the
19   business coming in and out over time.  Is equity part
20   of this picture, part of this organization at that
21   time?
22       A.   So Todd Lee, who is on this picture, ran

Page 283

1    equity and so, yes, equity would be part of the
2    picture at this time.
3        Q.   It doesn't actually say equity next to his
4    name.  It says CI.  What does that stand for?
5        A.   Community Investments.  Investments are --
6    is equity.
7        Q.   How many people were in Ms. Wilbourn's
8    organization at this time?
9        A.   I'm going to say -- I'll give you a range.
10   Somewhere between 35 and 45.  I don't exactly recall.
11       Q.   Were they spread out around the country?
12       A.   Yes.  She had all the urban efforts that
13   we had in the community.
14       Q.   And Mr. Simpson there on the right had the
15   rural?
16       A.   Rural and Native-American and Gulf Coast.
17       Q.   How many people were in this organization?
18       A.   My guess would be 20-something.  Again, I
19   don't recall exactly.
20       Q.   Did either Mr. Simpson or Ms. Wilbourn
21   have any Washington, D.C. staff?
22       A.   I'm sure a few of their people were in

4  (Pages 280 to 283)

Page 284

1   Washington.  I just don't know how many.
2        Q.   A few each in D.C.?
3        A.   Probably.  More administrative than
4   functional, I would say.
5        Q.   Susan Frank, how large an organization did
6   she lead at that time?
7        A.   My guess is she had five or six people at
8   the time.
9        Q.   And Carl Riedy, it's on the next page, he
10  had about 11 people in his organization at that time?
11       A.   That's what it looks like.  That's what it
12  looks like.  That's about right.
13       Q.   You're looking at page FM 62?
14       A.   I am.
15       Q.   Ms. Kilroy, did she have people working
16  for her?
17       A.   Yes.
18       Q.   And about how many?
19       A.   Probably five or six for her as well.
20  Again, I'm just guessing.
21       Q.   Mr. Losada, did he have people working for
22  him?

Page 285

1        A.   Yes.  He probably had three or four people
2   working for him as well.
3        Q.   Mr. Lee?
4        A.   Same thing.  He probably had three or four
5   people working for him.
6        Q.   Ms. Huebscher?
7        A.   She was actually an individual
8   contributor.  She was working on an assignment that
9   the CEO asked me to work on related to REO.  The
10  crisis was beginning and she was working with me on
11  REO strategies.
12       Q.   So individual contributor means she didn't
13  have staff?
14       A.   She didn't have staff.
15       Q.   Joseph Firschein, how many people working
16  for him at this time?
17       A.   Joseph was in the same position.  He was
18  working with me on the REO work that the CEO had
19  asked me to work on, and he didn't have any staff.
20       Q.   So did you have about 100 people in the
21  organization below you at that point?
22       A.   Plus or minus.  Yes, I guess that's about

Page 286

1   it.
2        ARBITRATOR ROSCOE:  Mr. Hayward, I'm
3   taking your language as guessing, as really meaning
4   estimating, is that correct?
5        THE WITNESS:  Exactly.  What I don't want
6   to say is I know it was precisely five, and I don't
7   know it's five.
8        ARBITRATOR ROSCOE:  Just so the record
9   reflects they're really not guesses, they're your
10  best estimates.
11       THE WITNESS:  Exactly.
12       ARBITRATOR ROSCOE:  Thank you.
13       BY MR. WACHTEL:
14       Q.   The reduction in force took place January
15  23rd, 2008.  How many of those people in the
16  organization --
17       MR. STEWART:  Objection.  The date, I
18  believe, is 2009.
19       MR. WACHTEL:  You're right.  Thanks.
20       BY MR. WACHTEL:
21       Q.   In the reduction in force January 23rd,
22  2009, how many of those people were separated from

Page 287

1   Fannie Mae?
2        A.   There were -- I would actually have to get
3   HR to go back and look.  Certainly in the Public
4   Entities space, there were three, and there might
5   have been more.  And I know across the company, that
6   day there were several people across the company that
7   were let go as part of the whole effort that the
8   company was doing to reduce force.
9        But my recollection is at the least there
10  were three, and there were probably more in my area
11  and I'm just -- again, it's been a long time for me
12  to remember who else.
13       Q.   When you say three, you mean Mr. Brannum,
14  Maria Day-Marshall and Russell Atta-Safoh?
15       A.   Correct.
16       Q.   And at this moment, you don't remember
17  anybody else in Community Lending and Community
18  Development?
19       A.   At this second, yes.  I mean, we can get
20  to that.  I'm sure we can -- Fannie Mae can tell you
21  that.
22       Q.   Do you recall conversations with Beverly

Page 288

1    Wilbourn about separating people from her
2    organization at that time?
3        A.   I'm sure we had conversations about it.  I
4    don't recall specifically what we've talked about,
5    but sure.
6        Q.   Do you recall whether those conversations
7    resulted in anybody leaving the organization?
8        A.   I don't recall.  That's not to say it
9    didn't happen.  I just don't recall.
10       Q.   I'm going to focus on the people with the
11   larger organizations at the top line.  Do you recall
12   talking with Bob Simpson about separating people from
13   his organization as part of the early 2009 RIF?
14       A.   Well, let's go back.  Any time there were
15   inefficiencies in the whole business, I had
16   conversations with everybody about are there ways we
17   can get to be more efficient.
18           As I recall, one of the starkest places
19   for inefficiency had to do with Carl's area because
20   we had kind of this duplicity.  We had some of Bev's
21   people had really gotten to be very good at doing the
22   same work that we had people in Carl's area doing,

Page 289

1    and so the most obvious inefficiency was there.
2    Because you had people who had a customer contact and
3    actually could bring in the business and they had
4    learned all the structuring work that they needed
5    with the aid of a consultant.
6            So I would say this isn't really about the
7    reduction in force more than it is the way to run
8    that business changed, and made it easier for us to
9    get efficient because we had people doing the same
10   work, and I always had a bent towards having people
11   do the work outside of Washington and that actually
12   persists even today, where a lot of the people who
13   used to be in Bev's organization or used to be in
14   other organizations still work for us and they're
15   doing foreclosure prevention and REO stuff.
16           So that's one of our strategies.  So from
17   an efficiency standpoint, that was probably the
18   starkest.
19       MR. WACHTEL:  Could you read my question
20   back?
21       THE REPORTER:  "Question:  Do you recall
22   talking with Bob Simpson about separating people from

Page 290

1    his organization as part of the early 2009 RIF?"
2        THE WITNESS:  Again, I talked to everybody
3    about inefficiencies.  So Bob would have been
4    included.  Bob, Beverly, everyone on our staff would
5    have known we were doing that.
6        BY MR. WACHTEL:
7        Q.   Did anybody other than Carl Riedy among
8    your subordinates point out to you any inefficiencies
9    on your staff?
10       A.   Not that I can recall.  At least not as
11   stark as in Carl's case.
12       Q.   Were you involved at all in the decision
13   to set up this CD account team in early 2008?
14       A.   So we -- yes is the answer.  And we
15   reorganized the community business centers and, as
16   part of that reorganization, we came up with a
17   concept called account team where essentially we lent
18   the expertise of these field folks to different
19   businesses in the company and that was across the
20   company.  It was single family in some cases, it was
21   multifamily in some cases.  It was all kinds of
22   businesses.

Page 291

1        Q.   What particular involvement did you have
2    in the decision to have an account team before the
3    Public Entities Loan Group?
4        A.   So in consultation with Beverly, and Bob
5    to a lesser extent, who was running community
6    development, that was their strategy.  I knew from
7    Carl that he needed a field presence.  It was a way
8    to boost the business that we were doing.  So that
9    concept certainly I was familiar with, and the
10   details of it and the execution of it I was familiar
11   with as well.
12       Q.   So was there discussion at the time that
13   the CD account team was formed, concerning this would
14   create inefficiency, duplication of the work of the
15   Washington Public Entities team?
16       A.   At the time of the set-up -- just go back
17   for a second.  We had come from -- we had these field
18   offices, their accountabilities to businesses we were
19   really getting up and running.  We changed our
20   strategy from being this outward-focused, doing more
21   community development work, to how can we be a
22   utility for the businesses.

6  (Pages 288 to 291)

Arbitration Day 2

Washington, DC

October 25, 2011

---

Page 292

1    So I think in the beginning, it was just
2  take this very valuable field force and figure out
3  how to optimize the work they did.  It didn't have
4  necessarily -- although we had lots of people who
5  were smart and they had a lot of skills, they had not
6  necessarily worked in every one of these businesses,
7  so it was really get them up to speed and then
8  capitalize on the fact that they were out there and
9  they had contacts and they could talk to people and
10  they could bring in business.  So we really tried to
11  do that.
12    ARBITRATOR ROSCOE:  Off the record for a
13  second.
14    (Discussion off the record.)
15    BY MR. WACHTEL:
16    Q.  So back to my specific question, at the
17  time the CD account teams were set up, did you have
18  discussions with Beverly Hayward and Carl Riedy about
19  whether this would create a redundancy with the
20  Washington team?
21    A.  One, I'm not married to Bev, so her name
22  is actually not Hayward.

---

Page 293

1    Q.  I keep doing that.  I'm sorry.
2    A.  I don't want to start any scandal.  I do
3  not recall having discussions with Beverly about
4  redundancies at the time we set the account teams up.
5  It was really more how can we use this resource to
6  boost productivity.  So it was really that.  We
7  weren't looking at whether it was redundant or not
8  redundant.  That was not the case, no.
9    Q.  You testified earlier that some of Bev's
10  people had gotten very good, meaning very good with
11  the Public Entities loan products.
12    A.  That's correct.
13    Q.  Which of Bev's people?
14    A.  I would say, for instance, Francis, who
15  was in Florida, fabulous, really good, and really
16  developed not only a skill set in the Public Entities
17  stuff but all the other businesses we had.
18    So I would say Evett Francis.  I would say
19  Ralph Perrey who was on the board at the Tennessee
20  HFA had gotten very good at this.
21    Those two come right to mind and I'm sure
22  there are others but yes, they had developed pretty

---

Page 294

1  good skill sets there.
2    Q.  Specifically Evett Francis, how did you
3  know that she had gotten very good with the Public
4  Entities loan product?
5    A.  Well, I had the occasion with Evett of
6  actually being in Florida, traveling with her a
7  couple of times and hearing kind of how she
8  understood this business and I could tell from
9  talking to her she really got it.
10    Q.  And specifically regarding Ralph Perrey,
11  how did you know that Ralph Perrey had gotten good
12  with the product?
13    A.  Again, Ralph -- kind of the situation of
14  if you work at an HFA or you're the board member in
15  HFA, understanding how public finance works is
16  probably one of the things you have to have, to be
17  there.  That's one of the reasons you're directed
18  there and you're picked.  So I would say that's a
19  predominant reason.
20    Q.  Did you know how familiar Mr. Perrey was
21  with Community Express and Modernization Express
22  products?

---

Page 295

1    A.  I didn't specifically go and give
2  Mr. Perrey a test to see if he was, but certainly he
3  was capable of bringing in business and that's
4  something that had been expressed to me by Carl and
5  the management staff.
6    ARBITRATOR ROSCOE:  Carl and --
7    THE WITNESS:  And the management staff.
8  So that would have been Eileen Neely, who was there
9  for a while.
10    BY MR. WACHTEL:
11    Q.  Did you conduct something in 2007 called
12  credit calls?
13    A.  In 2007, at the beginning of the crisis,
14  we began every morning for 15 minutes to have a call
15  where we just talked about what was going on in the
16  markets, how that affected us, those kinds of things,
17  yes.
18    Q.  And who participated in those calls?
19    A.  It was everybody who worked for me and
20  some other departments would sometimes join that.
21    Q.  So potentially all 100 people in your
22  organization?

---

7 (Pages 292 to 295)

Page 296

1      A.    In my organization and people in the
2  credit organization used to join this.  There were
3  quite a few people who would join in.
4      Q.    And was there a presentation as part of
5  those calls?
6      A.    So every morning -- it started with David
7  Burgess and later on migrated to Steve.  Every
8  morning, the first part of the call was really kind
9  of the market roundup from the day before.  So we
10 would talk about just what happened with credit
11 default swaps, any failures that banks had or
12 mortgage insurance companies or whatever, but it
13 would be a market roundup.
14     Q.    And David Burgess, who you mentioned, he
15 was working for you in pricing, is that right?
16     A.    David did all the pricing for our
17 business.
18     Q.    And did he leave the organization?
19     A.    David did leave the organization.
20     Q.    So did you select Mr. Brannum to take his
21 place, take his role in the credit calls?
22     A.    I did pick Steve to take his place in the

Page 297

1  credit calls.
2      Q.    And why did you pick Mr. Brannum for the
3  credit calls?
4      A.    One of Steve's talents is Steve
5  understands the financial markets.  He has an MBA
6  from Wharton.  He studied all this and he was
7  somebody who I was giving an opportunity to be able
8  to be part of these calls.
9      Q.    And how did he do?  Did he perform his
10 role on the credit calls well?
11     A.    I would say mixed results for Steven.  I
12 would say his preparation sometimes left a lot to be
13 desired, meaning he wasn't as on things as David used
14 to be.  And certainly his communication to people, at
15 times he struggled a little bit but I would still --
16 you know, he did the best job he could but that
17 doesn't mean it was a terrific job.  I would not say
18 that.
19     Q.    Did you make any kind of recommendation to
20 Eileen Neely concerning compensation for Mr. Brannum
21 related to the credit calls?
22     A.    I don't recall making any direct

Page 298

1  recommendation to Eileen about Steven and the credit
2  calls.  I don't remember doing that, no.
3      Q.    Did you suggest to her that he should get
4  an additional bonus or something like that for that
5  work?
6      A.    I don't remember suggesting that to her.
7      Q.    Did the calls stop at some point?
8      A.    The calls did stop at some point.
9      Q.    Why did they stop?
10     A.    Why did they stop or when did they stop?
11     Q.    I'll ask both.  Why did they stop?
12     A.    Well, why they stopped is everybody became
13 so in tune with the market, I didn't have to do it
14 anymore.  I started it because people really weren't
15 paying attention and as a way to get everyone
16 focused on -- ^ we've left what used to be, it's not
17 common anymore, the markets are really roiled and I
18 think once we started this call and got going, people
19 realized, I need to keep up with this.  So eventually
20 I could drop the call because people were reading
21 stuff on their own.  They didn't really need to do it
22 anymore.

Page 299

1      Q.    Do you remember when you stopped the call?
2      A.    No, I don't remember when I stopped the
3  call.
4      Q.    Did you start the calls up again at some
5  point?
6      A.    No, I don't remember starting the calls up
7  again.  When I took over REO, I did a similar thing
8  for the REO folks but it had nothing to do with the
9  market.  It was just more or less how well or not
10 well we were selling houses.
11     Q.    Was Mr. Brannum involved then?
12     A.    No, he was not involved.
13     Q.    So was Mr. Brannum the last person that
14 you had working with you in that role, providing
15 market roundup with the credit calls?
16     A.    If I can recall, yes, I think that's true.
17     Q.    Was there a point at which the
18 responsibility to do Mr. Brannum's work rotated among
19 different people within the housing community
20 development organization?
21     A.    I think if I had continued on the calls, I
22 would have rotated it to somebody else.  I just

Arbitration Day 2                                    October 25, 2011
Washington, DC

Page 300

1  didn't, though.
2      Q.   You don't recall Michael Lohmeier ever
3  filling that role of giving the market roundup?
4      A.   No, although Mike really could.  I mean,
5  Mike could -- tremendous skills in that way and could
6  have but no, I don't remember Mike.  He may -- I
7  don't remember specifically so I don't want to say.
8      MR. WACHTEL:  I need a moment.  Something
9  is not where I thought it was.
10     ARBITRATOR ROSCOE:  Take your time.
11     BY MR. WACHTEL:
12     Q.   Mr. Hayward, I would like to focus you for
13 a minute on September 7th, 2008.  Did you ever read
14 the statement the conservator made concerning Fannie
15 Mae on that day?
16     A.   I'm sure I read the statement.  It's not
17 committed to memory but I'm sure I read the
18 statement.
19     Q.   Do you recall the conservator said that
20 the new CEOs, meaning the CEOs of Fannie Mae/Freddie
21 Mac, had agreed to work with current management
22 teams' employees to encourage them to stay and to

Page 301

1  continue to make important improvements to the
2  enterprises?  Do you remember hearing that statement
3  at the time?
4      A.   Yes, I remember.
5      Q.   At your level, what did that look like,
6  September 7, 2008 and for the weeks forward?  What
7  happened in the way of encouragement for employees at
8  your level to stay?
9      A.   So the new CEO, Herb Allison, came in and
10 I think Herb had a bunch of principles and maxims.
11 And one of his principles was for the people who he
12 really felt were vital to the organization, they were
13 offered retention awards.  So the way that the
14 statement that you read there manifested itself is
15 the company offered retention awards to some of the
16 more senior folks who they thought were necessary and
17 vital for running the institution.
18     Q.   And was there any effort made to have
19 retention for people below that senior level where
20 retention bonuses were --
21     A.   There were retention bonuses below the
22 senior level.

Page 302

1      Q.   How far down into the organization did the
2  retention bonuses go?
3      MR. STEWART:  Objection, foundation.  The
4  witness is here as an SVP.  I don't know that he
5  necessarily has that knowledge.
6      ARBITRATOR ROSCOE:  It's an adverse
7  witness.  I'll let it go.
8      THE WITNESS:  So there were people below
9  the level of senior who got -- senior vice president
10 who got retention bonuses, and those retention
11 bonuses might have gone down as low as what I'll call
12 level 5 or level 4.  It's been a while but I do
13 remember there was a retention program.
14     BY MR. WACHTEL:
15     Q.   Other than the retention bonus program,
16 the awards, was there anything else that Fannie Mae
17 was doing at that time to try to retain employees?
18     A.   It's an interesting 6 economy here.  I
19 think on the one hand, retained employees means all
20 employees.  I don't think when Herb came, that was
21 his thought process.  His thought process was, retain
22 the right employees, employees that were key and

Page 303

1  critical for the future of the company.
2      So I think it wasn't all employees as
3  interpreted in that statement.  I think more of when
4  Herb got there, it was there are people who
5  absolutely are critical in running this company, I
6  want them here.  There are others who maybe aren't as
7  critical and he had a different thought about that.
8      Q.   Are you telling me something that you
9  heard Mr. Allison say, or read that he said, or are
10 you just telling me what you believe Mr. Allison
11 thought?
12     A.   I'm telling you, from the meetings that I
13 attended where Herb was there that I heard him talk
14 about these issues, this is what I remember hearing
15 him say.
16     Q.   Let's talk about the other side of the
17 pin.  What direction if any did Mr. Allison give
18 regarding laying off employees?
19     A.   Let me go back to the same period, kind of
20 end of 2008.  One of the discussions we had was our
21 expenses were much higher than Freddie Mac's.  We
22 needed to be more efficient and more lean.  And they

9 (Pages 300 to 303)

Page 304

1  had -- and their expenses frankly were a half of what
2  ours were.  So one of his things was get more
3  efficient than what you are.
4        So that would be kind of the general
5  direction that we were going in and everyone was
6  asked in the company to look at this, and that's --
7  you know, when you had the big reduction in force in
8  January, that was really, the inertia for that began
9  with Herb saying there are places where we need to
10  get more efficient and get more lean.
11     Q.  Fannie Mae is a bigger organization than
12  Freddie Mac, correct?
13     A.  Fannie Mae is a larger organization than
14  Freddie Mac.
15     Q.  So when you say their expenses were
16  half -- Freddie Mac's expenses were half of Fannie
17  Mae's expenses, is that done on a per employee basis
18  or per size of the business or is that an absolute?
19     A.  It was an absolute.  Their number -- I
20  could guess.  Their number was about a billion.  Ours
21  was about 2 billion for expenses.  And if you looked
22  at the relative size of the two books, it wasn't as

Page 305

1  if the Freddie Mac book was that much smaller, that
2  they should have had that much fewer expenses.  So if
3  you looked at the two, we seemed to have more
4  expenses.
5     Q.  Let's talk about the direction from
6  Mr. Allison.  You said that he said to get more
7  efficient, is that right?
8     A.  Yes.  That is what I said.
9     Q.  And are you recalling that from verbal
10  statements he made or documents?
11     A.  I'm recalling that from verbal statements
12  he made and just management meetings that we have
13  that we talked about how we're running the company.
14     Q.  When he said to get -- the organization
15  needed to get more efficient, did he single
16  particular parts of the organization that should get
17  more efficient?
18     A.  I don't think he singled out parts of the
19  organization.  I think he said as managers, that's up
20  to us to figure out what parts.  So I don't think he
21  was prescriptive and said, go over here.  I think he
22  said, we need to reduce expenses and become more

Page 306

1  efficient.
2     Q.  Now, how many levels were between you and
3  Mr. Allison in the organization?
4     A.  I would say Mr. Allison's -- my boss was
5  an EVP and I was underneath him so --
6     Q.  So Ken Bacon, the EVP?
7     A.  Exactly.  So Ken Bacon was the EVP, he was
8  my boss and Ken reported to Herb.
9     Q.  What direction did you receive from Ken
10  Bacon regarding conducting reductions in force?
11     A.  Two things.  The first is, Ken and I had
12  discussions about I was going to look at the
13  efficiency in my group.  I identified a strategy.
14  Ken subsequently -- and I wanted to move quicker than
15  actually January, but we did not do that.
16        And Ken's direction for all of his direct
17  reports was, I know some of you are thinking about
18  what you might do.  I would like for you to wait
19  until the whole company does it, which is what we
20  ended up doing.
21     Q.  Can you turn in your binder to Exhibit 27,
22  please?

Page 307

1     A.  Which volume?
2     Q.  It should be volume 1.  Do you recognize
3  Exhibit 27?
4     A.  I sure do.
5     Q.  Is the bottom message there the message
6  from Mr. Bacon saying, as you summarized it, wait
7  until the whole company conducts reduction in force?
8     A.  Yes.
9        MR. WACHTEL:  I move Exhibit 27 into
10  evidence.
11        MR. STEWART:  No objection.
12        ARBITRATOR ROSCOE:  So moved.
13        (Claimant's Exhibit No. 27
14        was received in evidence.)
15     BY MR. WACHTEL:
16     Q.  Now, in this message, October 23rd, 2008,
17  Mr. Bacon says, "I'm asking you to hold off on those
18  until we have a greater understanding of our 2009
19  budget."  And by those, he's referring to reductions?
20     A.  Mr. Bacon is referring to reductions by
21  that statement, yes.
22     Q.  Did there come a point where Mr. Bacon

Arbitration Day 2                                    October 25, 2011
                        Washington, DC

Page 308

1   came back and said, now I have a greater
2   understanding of our 2009 budget and this is what I
3   want you to do?
4       A.   The question was, did Mr. Bacon at some
5   point, in writing or something, come back and say,
6   now I want you to do something? I think it was more
7   gradual than that as we were working through the
8   budget cycle and we were having these discussions. I
9   think it was more gradual, and we finally got to the
10  point of time -- time to move when the rest of the
11  company moves.
12      Q.   Let's step back in this gradual process
13  just a moment. What you're saying is even before
14  October 23rd, 2008, you had a strategy for what you
15  wanted to do to get more efficient, correct?
16      A.   Before October -- again, if you think
17  about September's conservatorship, you come in and
18  you're talking about expenses and everything. Before
19  October, I began to look at my business, my budget,
20  how things were going and I was already starting to
21  formulate that we needed to do something to get a
22  little bit leaner and a little bit more efficient.

Page 309

1       Q.   Did that process of looking at the
2   business start before September 7, 2008 or did it
3   start after?
4       A.   The process started after conservatorship.
5       Q.   And other than Public Entities, what
6   became the reductions in Public Entities, what else
7   was in your strategy to get more efficient?
8       A.   Well, I looked at what we were doing in
9   small multifamily. I looked at what we were doing --
10  because at that point, small multifamilies still
11  reported to me. I looked at where we were at with
12  acquisitions, development and construction lending.
13  Anything that was under my purview. I looked at
14  where we were at with the community business center.
15           So I was looking at the whole area and the
16  most glaring, as I said before, was really Public
17  Entities.
18      Q.   Could you say that last piece again?
19      A.   I said the most glaring, where we had
20  redundancy, was the Public Entities and the CBCs
21  together.
22      Q.   You mentioned that you looked at small

Page 310

1   multifamily. Who was leading small multifamily?
2       A.   So Susan -- when you see the affordable
3   channel, that would be Susan Frank and she had small
4   multifamily.
5       Q.   So you're saying you looked at Susan
6   Frank's organization, small multifamily, but
7   ultimately there were no reductions there?
8       A.   To answer your question, I don't remember
9   specifically if we had reductions there too. That's
10  something we would have to check on. I haven't
11  looked at that in a while so I don't know, but we
12  might have had some.
13      Q.   And you also looked at AD&C lending which
14  was led by Judith Kilroy at that point?
15      A.   That's correct.
16      Q.   And you don't remember whether there were
17  any reductions there either?
18      A.   There were not -- in AD&C, there were no
19  redundancies. The kind of skills we needed in that
20  group were not resident in large portions in the
21  CBCs. There were some, but I didn't think that we
22  needed to reduce there.

Page 311

1       Q.   So at the time you got this message from
2   Mr. Bacon, you were already contemplating a reduction
3   in the Public Entities area?
4       A.   We were beginning to think about
5   efficiencies in our budget before we got this message
6   from Ken, yes. And Ken and I had had, as indicated
7   in this memo, he and I had had discussions about
8   this.
9       Q.   He doesn't actually say he's had
10  discussions with you, correct?
11      A.   He says I know some of you are
12  contemplating actions. He was specifically talking
13  about me.
14      Q.   Because you had had conversations?
15      A.   Because he and I had had discussions, yes.
16      Q.   Before you got this message, who had you
17  been discussing reductions with in the Public
18  Entities area?
19      A.   If it was Public Entities, it was Carl who
20  ran that area and probably Beverly as well because of
21  the CBC overlap.
22      Q.   Beverly Wilbourn?

                                      11 (Pages 308 to 311)

Arbitration Day 2                                          October 25, 2011
Washington, DC

Page 312

1     A.  Beverly Wilbourn.
2     Q.  Had you had discussions with Eileen Neely
3  about reducing the number of people in Public
4  Entities?
5     A.  I had not had any discussions directly
6  with Eileen about that, not me personally.  I'm sure
7  her and Carl talked about this all the time but not
8  me.
9     Q.  Had you had discussions with Human
10  Resources about reduction in Public Entities?
11     A.  I'm sure I talked with Human Resources.
12  Any time we were about to contemplate any actions
13  like this, we would have a discussion as a normal
14  course with HR.
15     Q.  Who in Human Resources did you talk to, do
16  you remember?
17     A.  Either Cheryl Sember or Karen Van Breda
18  Kolff or both.
19     Q.  And do you remember speaking to one of
20  them before October 23rd, 2008 about a reduction in
21  Public Entities?
22     A.  I don't specifically recall having a

Page 313

1  conversation with them.  That doesn't mean I didn't.
2  It just means I don't remember if I did or not.
3     Q.  And had you spoken to anyone in the legal
4  department about a reduction in the Public Entities
5  area up to the time of Mr. Bacon's message?
6     A.  I don't believe I had talked to anyone in
7  the legal department.  The way the process works is
8  you identify the actions that the business wants to
9  take, and you don't really talk to the legal staff
10  until actually you're pretty much done and down the
11  road with what you decide to do.
12     Q.  So as of October 23rd, 2008, you said that
13  you had an action that you wanted to do, correct?
14     A.  We were contemplating an action.  We were
15  thinking about how to get more efficient as of that
16  point in time, yes, we were.
17     Q.  And is the "we," you and Carl Riedy?
18     A.  The "we" was me, Carl Riedy and, as I said
19  to you, I had discussions with all of the people who
20  worked for me.  It just so happens that that was the
21  place that there were some things that we could do.
22     Q.  And was the action that you and Mr. Riedy

Page 314

1  and the others were contemplating before October
2  23rd, 2008 laying off one, two, three, four or five
3  people from Public Entities?
4     A.  The action, it would have been looking at
5  who was expendable that we could move on and not be
6  redundant, so yes.
7     Q.  Had your discussions narrowed to a
8  discussion on how many were expendable before October
9  23rd, 2008?
10     A.  I don't think we had actually gotten to
11  exactly how many.  I think we were still in the
12  discussion phase as of October 23rd.  I think we knew
13  directionally what we wanted to do.  We just were not
14  at a point where we actually made up our minds.  I
15  think we made up our minds not too far after that but
16  we hadn't really -- at this point, I don't think we
17  decided.
18       And what I was trying to do with Ken is
19  tell him, this is kind of the direction we're
20  thinking on, here's where I think we're going, and so
21  that was the conversation I would have had with Ken.
22     Q.  And other than his statement there in the

Page 315

1  e-mail in front of you, Exhibit 27, was there any
2  other response from Mr. Bacon at that time concerning
3  your plan?
4     A.  No, I don't remember Ken saying anything
5  else to me other -- I mean, or having any other
6  discussion with me other than this e-mail message
7  right here.
8     Q.  So after October 23rd, 2008, did you table
9  the discussions for a time waiting for Mr. Bacon or
10  did you continue the discussions of possible
11  reduction?
12     A.  After October 23rd, I'm sure we continued
13  to have the discussions.  Certainly I know I
14  continued to have discussions with Carl,
15  particularly, about this.
16     Q.  And do you remember, when did you and
17  Mr. Riedy have these discussions?
18     A.  Carl and I talked all the time.  We had a
19  one-on-one almost weekly.  There was no interruption
20  in our communication.  We communicated, talked all
21  the time.
22     Q.  When was the decision reached on which

                                12 (Pages 312 to 315)

Arbitration Day 2                                                    October 25, 2011
                              Washington, DC

---

Page 316

1  Public Entities loan positions were eliminated?
2     A.  If you're asking for a specific day that
3  we reached a decision to do this, I don't recall what
4  day.  Certainly you're going to talk to Carl and he
5  might have a better memory of this than me, but I
6  don't remember exactly what day.
7     Q.  Just a couple of things I want to clarify
8  before I continue down that line.  Did you ever
9  receive a written direction to reduce the head count
10 in your organization in -- I shouldn't say ever
11 because that would be your whole career.
12        I mean in the fall 2008 leading into early
13 January 2009, did you receive any kind of written
14 direction to reduce your head count?
15    A.  No, I did not receive any written
16 direction to reduce head count.
17    Q.  And did you receive any verbal direction
18 to reduce head count?
19    A.  The verbal direction, as I said, was
20 really more of a company direction, as you will note
21 and can look at.  The whole company was looking to
22 get more efficient.  So if you're a senior manager,

---

Page 317

1  you didn't need much else.
2     Q.  Did the CEO discuss cutting certain areas
3  of the company?
4         MR. STEWART:  Objection, asked and
5  answered.
6         ARBITRATOR ROSCOE:  I'm sorry, what was
7  the objection?
8         MR. STEWART:  Asked and answered.  We
9  covered this earlier.
10        ARBITRATOR ROSCOE:  Go ahead.  You can ask
11 again.
12        BY MR. WACHTEL:
13    Q.  During this time frame, from the point at
14 which Mr. Allison became the CEO up until January
15 23rd, 2009, did he discuss cutting, in certain areas,
16 the company?
17    A.  Mr. Allison did not come out specifically
18 and say, go cut over here, go cut over there.  I
19 think he left it to us who were the managers of the
20 company to do what we thought was the right thing to
21 do.  I think that's how that went.
22        But in general, the statements about we

---

Page 318

1  had to cut costs and become more efficient, I think
2  those were his statements and then we were all
3  directed to do what we could.  So I don't think he
4  said, go cut in any specific area, unless there were
5  conversations I was not aware of.
6     Q.  There should be a copy of your deposition
7  next to you on your right.  Can you turn to page 119?
8  Now, Mr. Hayward, at page 119 starting at line 13,
9  you gave an answer to one of my questions.  Do you
10 see that?
11    A.  I see it.
12    Q.  And the first thing you said was, "So we
13 had weekly conference calls where we talked about
14 everything that was going on."  And was that a
15 reference to calls you had with your staff?
16    A.  Every week, every Tuesday at 11:30, we had
17 an all-staff conference call where everybody got an
18 opportunity to hear whatever was going on, so yes.
19    Q.  Then the next thing you said was, "I am
20 sure during that time whatever the message was for
21 the company, I was giving my staff I think as it
22 relates to cutting our belts."  You meant tightening

---

Page 319

1  your belts or cutting costs, is that right?
2     A.  Exactly.
3     Q.  And the next thing you said, "I think the
4  CEO was actually on Homesite."  What is Homesite?
5  "Which is the shared message across the company," is
6  that correct?
7     A.  Yes.
8     Q.  And then you said, "Talking about cutting
9  some areas and adding people to mostly in the Dallas
10 area because of foreclosures and what was going on in
11 the credit office."  So was the CEO at that time
12 actually talking about cutting some areas of the
13 company?
14    A.  Let me go back and make this distinction.
15 I think the message was we need to tighten our belts
16 and the only place we're not going to tighten our
17 belts is in Dallas because we had to add to the
18 operation.  If you think about what was going on
19 right then, our credit losses were mounting, the
20 amount of defaults that were going on were mounting,
21 and no matter where we were tightening, we could
22 tighten any place else in the company, in Dallas, we

13 (Pages 316 to 319)

Page 320

1   were going to be adding resources.  So I think he had
2   to make that clear.
3            So you tighten your belts every place else
4   but in Dallas, which is where we do all of our credit
5   default work, and where I frankly work at today, the
6   message was, you need to get -- bolster staff because
7   you're about to hit really bad credit losses.  If you
8   read the newspaper, you know about that.
9       Q.   So you're saying the CEO never identified
10  particular areas such as communications technology in
11  which there would be cuts?
12      A.   Not that I know, no.  He might have told
13  the communications staff or the technology staff and
14  me not be there, which would be natural.  He might
15  have told them anything but not that I know of.
16      Q.   But he didn't identify Community Lending
17  or Housing and Community Development as areas for
18  cuts or not for cuts, right?
19      A.   No.
20      Q.   Let's discuss the conversations you were
21  having with Carl Riedy concerning reduction.  Were
22  there any documents that you reviewed as part of

Page 321

1   those discussions?
2       A.   We probably, in the course of things, in
3   the discussions, talked about, okay, how are we
4   getting the business to come in today, are we
5   producing business every place, who do you feel is in
6   the best position to bring in business in the future?
7            So there was some strategy that we would
8   have been talking about.  And in those discussions,
9   that's where it became very clear to us that really
10  the place to do business is outside of Washington,
11  D.C., that really your best chance for originating
12  business would have been outside of the offices
13  there, where you have people who knew the customers.
14      Q.   Did you look at the customer visits
15  document at all as part of your discussions with
16  Mr. Riedy about reductions?
17      A.   I'm sure Carl looked at the customer
18  visits because that would have been part of his job
19  to do.  I don't specifically recall looking at that.
20      Q.   Can you take a look at -- it's tab 2 in
21  the binder there.  Exhibit 2.  I think that's the low
22  numbered binder, right, volume 1?

Page 322

1       A.   Yes, it's volume 1.
2       Q.   Look at tab 2.
3            ARBITRATOR ROSCOE:  Now that you're
4   reading the deposition, I need on the record the date
5   of the deposition, please.
6            MR. WACHTEL:  Oh, I'm sorry.  July 12th,
7   2011.
8            ARBITRATOR ROSCOE:  Thank you.
9   BY MR. WACHTEL:
10      Q.   Do you recall ever seeing that document
11  before?
12      A.   I don't recall seeing this specific
13  document but I've seen documents like this before,
14  yes.
15      Q.   When you say like that, you mean there
16  were lists of customer visits by --
17      A.   Exactly.  I remember -- this specific
18  document I don't remember seeing but this makes sense
19  to me.  I'm reading it and it makes sense.
20      Q.   Did you look at a version of that as part
21  of your discussions with Mr. Riedy about the
22  reductions in Public Entities?

Page 323

1       A.   I do not think Carl and I looked at this
2   document specifically as we had our discussions, but
3   our discussions wouldn't have been, he brings in the
4   document.  This is more -- I expect him to know all
5   this.  He would come in, we could have a discussion:
6   What's going on, what do you think makes sense for
7   the business going forward, what are you observing?
8            This is really more of a strategy because
9   the move that we did in 2009 ended up, it was a
10  strategy.  We made a distinct decision to move
11  towards selling from the offices as opposed to
12  selling from Washington.  That was the decision we
13  made.
14      Q.   So you didn't look at performance reviews
15  of the people who were under consideration for the
16  reduction in force as part of your discussion with
17  Mr. Riedy, did you?
18      A.   I don't recall talking about performance
19  as part of it.  I recall talking about the strategy.
20  As opposed to individual performance, it was really
21  more about we think we have -- we're better situated
22  to do business this way as opposed to that way.

14 (Pages 320 to 323)

Arbitration Day 2                                          October 25, 2011
Washington, DC

Page 324

1    Q.   So was there any discussion of individual
2  performance that you recall in the discussions with
3  Mr. Riedy?
4    A.   I don't recall any discussion of
5  individual performance as it relates to this.
6    Q.   And did you review any documents that
7  reflected the qualifications of the people under
8  consideration for reduction in force, like a resume
9  or job application or something like that?
10   A.   No.  Again, let me go back to what the
11 strategy was.  The strategy was, you had these people
12 who really, I thought, could adequately do the job or
13 do it better because they were placed in a place.
14 You had other people that were in D.C.
15       This was a very simple thing.  The best
16 utility for us was to have these people in the field
17 do the work.  That was the best utility for us.  That
18 utility also proved to be successful for us as we
19 moved those same people to do work for us in the
20 foreclosure prevention space.  Those same people who
21 are out in the field doing work on the REO space.
22       The strategy about using place-based

Page 325

1  people is the strategy that we chose.  So that would
2  not have been about what are the qualifications of
3  this set of people in Washington.  It was this set of
4  people in Washington sit in Washington and they're
5  not in the field.  It was just that clear.  You're
6  not in the field.  You're not as valuable as you are
7  if you -- you're more valuable in the field than you
8  are in Washington.  It's a really clear-cut case.
9    Q.   There is a lot in that answer.  Some
10 things I want to ask you about.  You said that the
11 people who were in the field for Public Entities Loan
12 that got involved in foreclosure prevention, is that
13 right?
14   A.   People we had in the field could be used
15 in a lot of ways, and the point I'm making is the
16 field presence, which is something to this day I hold
17 dear, is you could have these people doing just about
18 anything if you got them trained.  And that's
19 basically -- once they got trained on Public
20 Entities, it was pretty clear to me, you didn't need
21 people in Washington.  You could do it out there.
22   Q.   But in your last answer, didn't you say

Page 326

1  that the fact that these people worked in foreclosure
2  prevention proved that having people in the field
3  take work from Washington was a successful strategy?
4    A.   No, no.  Let me be clear.  Having people
5  in the field, no matter what the work was, in my view
6  as a leader, is a better desired outcome than having
7  people in Washington.
8        Yes, you occasionally need Washington
9  staff but you execute better when you're close to the
10 customer, no matter who the customer is.  Whether the
11 customer is a public entity, the customer is a
12 borrower who is in distress, the customer -- whoever,
13 whether it's a bank, whoever you're dealing with,
14 you're better if you're close or if you've got the
15 relationships.  That's just a strategy that I believe
16 is a good strategy.
17   Q.   Did the people who worked in the CD
18 account teams move into work on foreclosure
19 prevention before or after you made your decision in
20 reductions?
21   A.   The people in the field were doing -- they
22 had -- they allocated part of their time.  Some of

Page 327

1  them were doing Public Entities 75 percent of their
2  time.  Some of them were doing foreclosure prevention
3  25 percent of the time.
4        Some of them were doing -- so the people
5  in the field, we used them for a lot of work that we
6  had to do.  There wasn't a clear of, you're now
7  working in foreclosure prevention and then we're
8  flipping you to Public Entities.
9        You had people who had been working in
10 Public Entities all along.  Those were largely the
11 people who we switched off.  But the real strategy
12 is, no matter who it was in the location, the
13 location was a preferential thing, for me, over --
14 over Washington.
15   Q.   The CD account team to work in Public
16 Entities was formed and announced on a particular
17 day, right?
18   A.   The CD account teams as part of the
19 Community Business Center rollout, the Account
20 concept, who they were, all that stuff, that's right,
21 it was rolled out.  There were dates that was rolled
22 out.  I don't remember what the dates were but it was

15 (Pages 324 to 327)

Page 328

1    rolled out.
2        Q.   Was there a rollout for CBC people to get
3    involved in foreclosure prevention?
4        A.   If I remember what the account teams were,
5    and this would have been Bev and Bob, they would have
6    assigned people to spend a certain portion of their
7    time on different things.  As I said, some people had
8    multifamily they were assigned to.  Some were
9    assigned to single family.  Some foreclosure
10   prevention.  Some Public Entities.  That was
11   something that Bev and Bob would have been doing.
12       Q.   And some got a mixed set of assignments?
13       A.   And some got allocations of assignments.
14       Q.   And did that allocation happen before or
15   after the decision to terminate Washington staff in
16   the Public Entities loan team?
17       A.   Allocations of time were fluid so as Bev
18   and Bob decided what to do with their staff, it
19   depended on what the demand was, what needed to be
20   filled, so I'm sure there was change all along and
21   continuing change in what they were doing.
22       Q.   So when you say that they allocated staff,

Page 329

1    are you referring to a particular allocation that was
2    announced on a particular day?  Or are you saying
3    that allocations were going on at all times?
4        A.   There were -- for Public Entities, I think
5    they had a dedicated team that was allocated parts of
6    their time.  Parts of their time could have been 75
7    percent, it could have been 90 percent but there were
8    allocations.  And I believe those allocations
9    followed suit for other things that we were doing,
10   but there was a specific amount of staff that was
11   just working on Public Entities that were allocated a
12   large portion of their time.
13       Q.   Do you recall learning that Eileen Neely
14   was going to resign, was going to leave Fannie Mae?
15       A.   I do recall Eileen handing in her
16   resignation.
17       Q.   Do you remember when she handed in her
18   resignation?
19       A.   I don't have the exact date she handed it
20   in.  I'm sure we have it somewhere on record but I
21   don't remember exactly when she resigned, what the
22   date was.

Page 330

1        Q.   How did you learn or from whom did you
2    learn that Eileen was going to resign?
3        A.   I think she came and told me herself.
4        Q.   And before the moment at which she told
5    you that she was resigning, had you and Mr. Riedy
6    developed a plan as to which employees on the Public
7    Entities loan team were going to lose their jobs?
8        A.   You probably should talk to Carl.  When
9    Carl is in, you should ask him this specific.  I
10   don't want to get this wrong, in terms of I don't
11   remember exactly what that sequence of timing was,
12   and I think appropriately you should ask Carl this
13   when you get an opportunity to talk with him.
14       Q.   Okay.  In discussions with Mr. Riedy, were
15   there discussions of a reduction in force in which
16   both Lisa Zukoff and Eileen Neely would keep their
17   jobs, and Mr. Brannum, Ms. Day-Marshall and
18   Mr. Atta-Safoh would lose their jobs?
19       A.   In discussions with Mr. Riedy, we talked
20   about -- so let's talk about Lisa for a second.  We
21   talked about the fact that Lisa, who was domiciled in
22   West Virginia, who had run a housing authority, had

Page 331

1    customer contact, knew a lot of people in the
2    industry, could be value to us.  We did talk about
3    Lisa and the role that she would have.
4            I don't recall what we discussed about
5    Eileen but I do remember specifically talking about
6    Lisa because of her vast experience.  She had
7    testified before Congress before.  I mean, she really
8    was -- if we were going to stick to this outside
9    model, it was model of the kind of the person we
10   needed, contacts with the customers, knew the
11   business, all that stuff and really was the kind of
12   person who was not sitting in Washington who would be
13   ideal for us.
14       Q.   And she was sitting in West Virginia, is
15   that right?
16       A.   Lisa lives in West Virginia.
17       Q.   You said domiciled.  I said sitting.  But
18   when you said she had customer contacts, were those
19   customer contacts in West Virginia?
20       A.   Some of her customers were in West
21   Virginia.  But she also knew and talked to customers
22   all over the country and has relationships with

Page 332

1  housing authority folks and affordable housing people
2  around the country.  So she was kind of the kind of
3  person we needed and was, you know, quote, unquote,
4  "outside of Washington."
5      Q.    Back to Eileen for a second, though.  Do
6  you recall discussing the plan under which both
7  Eileen Neely and Lisa Zukoff would stay in Public
8  Entities Loan, and the other three employees there
9  would leave?
10     A.    I do not recall a discussion that we had
11 like that.
12     Q.    Do you recall any discussion with
13 Mr. Riedy over a plan in which Ms. Neely would stay
14 and the other four employees in Public Entities loan
15 would go?
16     A.    I don't recall a discussion in that
17 regard.
18     Q.    Do you recall any discussion with
19 Mr. Riedy of an alternative formulation of RIF other
20 than the one that actually happened?
21     A.    I do not recall any alternative.
22     Q.    As a manager, do you usually like the

Page 333

1  people who work for you to present you with
2  alternatives?
3      A.    As a manager, I prefer for people to
4  actually have their own thought process around the
5  businesses.  Remember, I had more than just Public
6  Entities.  I had a lot of businesses I was
7  responsible for.  I would prefer that if you're
8  leading something, you're really thinking about
9  what's best and bring it to me and I'll evaluate
10 whether or not I think it makes any sense.  And if I
11 think it makes sense, then we're going to do it.  And
12 in this case, I thought this made sense and I said,
13 yes, we should do it.  That was my decision.
14     Q.    So did Mr. Riedy bring to you the plan to
15 eliminate the jobs of Mr. Brannum, Ms. Day-Marshall
16 and Mr. Atta-Safoh as a plan for you to look at?
17     A.    We had discussed the strategy and we
18 arrived at the best strategy, it was exactly what we
19 ended up doing and, yes, Mr. Riedy bought that.
20     Q.    What I'm saying is, did your dealings with
21 Mr. Riedy fit the paradigm of what you say you like?
22 He brought to you the completed plan with the --

Page 334

1      A.    He brought to me my strategy.  The
2  strategy was -- and it completely concurs with my
3  strategy, which is you're much better off having
4  people away from Washington than you are -- this is
5  not specific to the three individuals; this is a
6  decision to change the way you work because the time
7  had arrived to do that.
8          So that's really the decision that
9  Mr. Riedy and I discussed, one that I wholeheartedly
10 agreed with and one in which I thought that decision
11 made sense, and I would -- I think that decision
12 today, I try to do that a lot.
13     Q.    Did you have any discussion about
14 encouraging the members of the public entity loan
15 team to relocate to areas around the United States?
16     A.    I don't recall having any discussions
17 about that and that never occurred to me.  We already
18 had people.  It wasn't necessary in my view.
19     Q.    Was there any discussion about asking
20 Ms. Neely to relocate to somewhere out in the field?
21     A.    Carl and I never had a discussion about
22 that.

Page 335

1      Q.    At some point, was there a document
2  prepared, a justification of the reduction in force?
3      A.    There was a memo prepared, that's correct.
4      Q.    Who did that?
5      A.    Carl actually wrote the memo but the memo
6  was from me, and this was typical.  I had people
7  write memos for me all the time, but the actual
8  sitting down to type the memo, Carl did.
9      Q.    And was the memo written because Fannie
10 Mae requires a memo like that?
11     A.    Any time -- and over the years, I've done
12 many changes and any time you are about to do such a
13 change, there is a process.  The process involves a
14 justification memo, it involves a review by Human
15 Resources, a review by our legal staff.  So yes, that
16 is part of what you do.
17     Q.    And when you said changes, changes other
18 than employee terminations, or is that just a rule
19 for employee terminations?
20     A.    When you're going to have a reduction in
21 force, yes, you have to do this kind of memo.
22     Q.    And is the process that first the managers

17 (Pages 332 to 335)

Page 336

1   in the area in which the reduction in force will take
2   place write a memo?
3       A.   The process is we agree what we're going
4   to do as a management team and then we codify it with
5   a memo and then we send it off.
6       Q.   And once it's sent off, what's the next
7   step in the process?
8       A.   Generally you'll get from feedback from HR
9   that says you're either -- it's okay or it's not okay
10  but generally you get some feedback.  And I think
11  around the company, probably every group that had a
12  similar situation had to do the same thing.
13      Q.   Do you recall what feedback if any did you
14  receive concerning the justification memo concerning
15  the Public Entities jobs?
16      MR. STEWART:  Objection to the extent that
17  the answer would require Mr. Hayward to give any
18  attorney-client privileged information.
19      MR. WACHTEL:  I want to withdraw that
20  question and ask it a different way.
21      ARBITRATOR ROSCOE:  Sure.
22      BY MR. WACHTEL:

Page 337

1       Q.   What feedback if any did you receive from
2   Human Resources concerning the justification memo for
3   the reduction in force?
4       A.   I don't recall any specific feedback from
5   Human Resources.  Generally, if there is an issue,
6   they would let you know.  They did not say anything
7   that they had an issue, so I'm assuming the review
8   was fine.
9       Q.   Can you turn to Exhibit 31 in that binder?
10  Is this document the justification memo?
11      A.   This is the justification memo.
12      Q.   And this is the one you describe as
13  written by Carl Riedy in your name?
14      A.   Yes.
15      MR. WACHTEL:  Move Exhibit 31 into
16  evidence.
17      MR. STEWART:  No objection.
18      ARBITRATOR ROSCOE:  So moved.
19      (Claimant's Exhibit No. 31
20      was received in evidence.)
21      BY MR. WACHTEL:
22      Q.   And since this was written by Mr. Riedy,

Page 338

1   not you, is there anything in memo that you don't
2   agree with?
3       A.   No.  I wouldn't have signed it if I
4   disagreed with it.  So no.
5       Q.   Now, in the third paragraph, Mr. Riedy
6   writes, "Many of the CBC PE Account members have
7   developed a level of expertise equivalent to the PE
8   team members."  Which CBC PE Account members does
9   that refer to?
10      A.   He doesn't specifically mention in here.
11  I think this is a more general statement saying, if
12  you looked at the people who were doing the work, in
13  his view, those people had developed sufficient
14  skills to be able to carry out the work.  So I think
15  that's really what this is getting at.
16      Q.   When he said many, he doesn't say all,
17  correct?
18      A.   He chose the word many.
19      Q.   So at the time of the reduction in force,
20  did you know which of the members of the CD Account
21  had level of expertise equivalent to the PE team and
22  which didn't?

Page 339

1       A.   I'll say this.  If Carl is running that
2   area, says to me, I think that the people that are in
3   the field have the requisite skills -- whether he
4   used many or all -- have the requisite skills to do
5   this work, my view of that is I have to believe his
6   judgment is correct.
7       So in this particular case, I would not go
8   and say, Carl, I need to test every one of these
9   people to see whether or not they have the requisite
10  skills.  That is a matter of judgment for the people
11  managing the business.  In his view, he believed that
12  they did.  That was sufficient enough for me and fine
13  with me.  And I would not have probed beyond that
14  because if I had to go deeper than that, then what do
15  I need Carl for?
16      Q.   This memorandum, the justification memo,
17  goes on to say, "The CBC team members have also taken
18  on a much larger role in identifying leads, making
19  marketing calls, following up with customers,
20  structuring deals and analyzing initial due
21  diligence."
22      I want to focus just on the last two items

18 (Pages 336 to 339)

Arbitration Day 2

October 25, 2011

Washington, DC

Page 352

1  Loan business development and asset management.
2      Q.   And is this a document that you've seen
3  before?
4      A.   I have seen this document before, yes.
5      Q.   Did you receive it on or around January
6  23rd?
7      A.   I'm not sure what date I got it but yes.
8      Q.   Can you turn to the second page and look
9  at FM 1011 and look at the paragraph that begins,
10 "The incumbent lead business manager" and just read
11 that to yourself?
12     A.   Where are you again?  Can you read that
13 again?
14     Q.   It's one paragraph up from the bottom of
15 1011 and it begins, "The incumbent lead business
16 manager."
17     A.   I see it.
18     Q.   Does reading that paragraph refresh your
19 recollection at all as to who received the position
20 of lead business manager?
21     A.   No, not one bit.
22     Q.   There is a reference to incumbent.  Was

Page 353

1  somebody in the position of lead business manager
2  before this, before the restructuring?
3      A.   See, I don't -- I'm reading this and
4  again, you have to remember this is a long time ago
5  and a lot has happened with me since then.  I
6  actually don't know.  If I had to refer who this was,
7  I don't know who this was.  This doesn't ring a bell.
8  My suggestion to you, though, is you're going to have
9  a chance to chat with Carl.  You probably need to ask
10 him that since he wrote the memo.
11     Q.   Do you know Lisa Tarter?
12     A.   I do know Lisa Tarter.
13     Q.   And we just saw her name on a list a
14 couple of minutes ago.  Was she the CBC person in
15 Cincinnati?
16     A.   She is the CBC person in Cincinnati.
17     Q.   Is she still with Fannie Mae?
18     A.   She is.
19     Q.   At your deposition you mentioned that you
20 believed that she had brought in a particular --
21 closed a deal with the City of Cincinnati or a
22 Cincinnati entity, is that right?

Page 354

1      A.   There was a Community Express deal, as I
2  remember, and it was about $20 million that she
3  brought in and made sure that closed.
4      Q.   And when did that close?
5      A.   Actually, it was put on and renewed a
6  bunch of times so I don't remember exactly what date
7  it was put on.  It was one of -- it was a very
8  profitable transaction but they kept renewing it so
9  when it would expire, they would renew it again.
10     Q.   And when you say she brought it in, do you
11 mean she brought in the renewal or she brought in --
12     A.   She brought it all.  As I recall, she
13 solely sourced this deal.
14     Q.   And did she bring it in before the
15 creation of the CD Account in February 2008?
16     A.   That I don't know.
17     Q.   Let me ask you this.  Are renewals annual?
18     A.   It depends on the structure of the deal.
19 The renewal could be every six months.  I mean, I
20 would have to look at what's in the deal itself to
21 know that.
22     Q.   Can the renewal be even less than six

Page 355

1  months?
2      A.   I mean, unless it's some sort of revolving
3  thing that you do on a monthly basis, the renewal
4  could be any term.  I would have to look at the
5  transaction to see what the renewal was.
6      Q.   I want to direct your attention to
7  Exhibit 1 and look at the very last page of Exhibit 1
8  which is FM 63.
9      A.   Got it.
10     Q.   Is this page, FM 63, an accurate depiction
11 of the organization Mr. Riedy led as of August 31,
12 2009?
13     A.   It looks like it, yes.
14     Q.   And Shelia Miller -- is it pronounced
15 Shelia?
16     A.   Shelia.
17     Q.   She is director of equity investments,
18 correct?
19     A.   Well, Shelia, even though she's depicted
20 as director of equity investments in this picture, we
21 were actually doing the HFA initiative and Shelia
22 basically was Carl's kind of go-to person on an

22  (Pages 352 to 355)

Page 356

1   administrative basis as we did that initiative.  So
2   even though her title was director of equity
3   investments, we actually had her performing in a
4   different role.
5       Q.   What was the HFA initiative that you're
6   talking about?
7       A.   So we did probably about $20 billion of
8   bond and single family and multifamily business at
9   the direction of the Treasury and FHFA, and Carl was
10  the leader on all that.  This is part of, again, the
11  array of businesses that we had but Carl was the
12  leader on that and we bolstered his staff to get that
13  done by adding Shelia to it.
14      Q.   Where did Ms. Miller come from?
15      A.   Again, she was in equity investments so
16  she used to work for Todd Lee.
17      Q.   So she was part of your organization
18  before she became part of Mr. Riedy's?
19      A.   Exactly.  She was under my body of
20  employees and we moved her from where she was at to
21  work for Carl.
22      Q.   And did the move change the work she was

Page 357

1   doing or did she take work she was doing and become a
2   part of Carl's --
3       A.   The move completely changed the work she
4   was doing.
5       Q.   When was the decision to move her made?
6       A.   At the initiation of this TARP initiative
7   and I think it started like in February of '09, I
8   think is when it started.
9       Q.   And what was the personnel device by which
10  she moved?  Was it simply a reassignment?
11      A.   Well, she actually had come to me and
12  asked, because we were not doing equity investments
13  anymore, and asked whether or not she could -- there
14  was something else that we could have her do.  And it
15  so happened that this need developed and Shelia, who
16  is very administrative and very good as an
17  administrator, we needed that skill over there so we
18  moved her.
19          She today is the chief of staff for Ken
20  Bacon so she does that same kind of work for Ken
21  today.
22      Q.   Once she told you that she was looking to

Page 358

1   change, what did you do to -- did you do something to
2   make that change happen?
3       A.   I moved her.
4       Q.   Can you look at Exhibit 60, please?  What
5   is Exhibit 60?
6       A.   Public Entities, AD&C and financial
7   intermediaries 2007 goals update - status as of
8   12/7/07.
9       Q.   And is this a document you would have
10  received in the normal course of business?
11      A.   This is a document I would have been able
12  to review had I chosen to do so, yes.
13      Q.   And did you normally review this kind of
14  document?
15      A.   We would, in our staff meetings on a
16  weekly basis when I got all my direct reports
17  together, we would go through this kind of report.
18      Q.   So if you look in the lower left, seven
19  lines up you'll see a reference to Cincinnati renewal
20  increase.  Do you see that?
21      A.   Yes.
22      Q.   Is that a reference to the transaction

Page 359

1   that Ms. Tarter worked on that you were referring to
2   a minute ago?
3       A.   Yes, it's one of those.  And again, I said
4   it kept renewing.
5       Q.   So that reflects that at the end of 2007,
6   there was a $10 million renewal event loan, is that
7   correct?
8       A.   That's what it looks like, yes.
9       Q.   And did it renew in 2008?
10      A.   To my recollection, yes, it did renew in
11  2008.  And I think it actually increased in 2008, if
12  I remember right.
13      Q.   Can we look at Exhibit 105, please?
14      A.   Is that in binder 2?
15      Q.   Yes, it's in binder 2.  Ms. Tarter's
16  transaction you're talking about, was that a
17  Modernization Express transaction or Community
18  Express transaction?
19      A.   What I don't remember is if it was
20  Community Express or Modernization Express.  It was
21  one of the two.  I just don't remember exactly which
22  one it was.  My sense is it probably was Community

23 (Pages 356 to 359)

Page 364

1      Q.   And that was a telephone interview?
2      A.   It was a telephone interview.
3      Q.   And did the investigator tell you that you
4  were under oath?
5      A.   The investigator -- you know something?  I
6  don't remember if the investigator said I was under
7  oath or not.
8      Q.   Did you tell the investigator that the
9  entire staff was reviewed in the layoff process?
10     A.   I would have to read what I -- again, that
11 was a long time ago.
12     Q.   Sure.
13     A.   I just don't remember what I said.  But
14 I'm sure you could find out from the investigator.
15     Q.   Can you look at Exhibit 186?  Wait.  Stop
16 what you're doing.  We'll introduce that through
17 another person.
18          Was it true that the entire staff of
19 Fannie Mae was reviewed as part of the layoff
20 process?
21     A.   Let me just repeat your question to make
22 sure I got it right.  What you're saying is were all

Page 365

1  of the people at Fannie Mae who were staff members
2  reviewed as part of the layoff process?
3      Q.   Right.
4      A.   Well, one, you've got to start with Herb's
5  direction was grow Dallas, not grow the rest, so
6  right away, the Dallas people would have not been
7  included because we were trying to grow staff there.
8          As it relates to the rest of the
9  departments, I think what the senior leaders were
10 told, go look for efficiencies.  So I don't know --
11 if that meant evaluate everybody, that meant evaluate
12 everybody, but I think that's what we were told.
13     Q.   And your organization looked for
14 efficiencies through its entire staff or just the
15 Public Entities Loan team?
16     A.   We looked throughout the entire staff.
17     Q.   And what extent was the HFA team reviewed
18 for efficiencies?
19     A.   I looked at the HFA team and it was one of
20 our best -- for housing goals, it was the place that
21 we delivered housing goals for the company, a very
22 important strategic thing for the company.

Page 366

1          In addition to the HFA team, we were
2  bringing in some of the best quality business that
3  the company had seen that was affordable housing
4  business.  So I looked at that business and I thought
5  frankly we probably could have used more people
6  there.  We didn't do that but we could have, because
7  of the value that it was bringing to the company.
8      Q.   Speaking of more people, Mr. Lohmeier left
9  that business, correct?
10     A.   Mr. Lohmeier left the company.
11     Q.   And did he leave right around the time
12 that the reduction in force was happening?
13     A.   I would have to go back.  I don't know
14 when he -- I know he left -- I thought he left while
15 we were doing the HFA initiative which would have
16 been in '09 but I'm just not sure.  I think he left
17 right in the middle of when we were doing the
18 initiative, which would have been in '09.
19     Q.   Can you turn to -- in the very back of the
20 third binder -- could we go off the record for a
21 second?
22          (Discussion off the record.)

Page 367

1          BY MR. WACHTEL:
2      Q.   I had asked you before the break whether
3  you had told the D.C. Office of Human Rights
4  investigator that the entire staff was reviewed for
5  purposes of the reduction in force.
6      A.   Right.
7      Q.   We talked about HFA.  I'll get back to HFA
8  in a second.  Were the other parts of the
9  organization besides the Public Entities channel
10 considered for purposes of the 2009 reduction?
11     A.   I had discussions with the leaders of each
12 one of those channels, so I would have talked to
13 Judith and Susan and Beverly and Bob about whether or
14 not they felt that they were as efficient as they
15 could be and whether there were other places that we
16 could have made changes.  So yes, I would have talked
17 to them about that.
18     Q.   So what you mean by the entire staff
19 reviewed is just that the SVP and the VPs spoke about
20 whether reductions were necessary?
21     A.   Again, this is your strategy.  Your
22 strategy is to become more efficient.  You talk with

Page 368

1  the people first who were charged with those
2  responsibilities, make sure they think they're
3  efficient, and Carl happened to raise his hand and
4  say, I think we can get more efficient and here's
5  how.
6     Q.   Anybody else raise their hand that you
7  remember?
8     A.   One of the things I need to go back and
9  look at is I think we did take some other actions
10  that day and I just don't remember specifically what
11  they were but they would have been from one of the
12  other people.
13        It wouldn't have been from AD&C but I'm
14  not sure what we did in Bev and Bob's group, if we
15  did anything there, or if we did anything in Susan's
16  group.  I'm just not sure of that.
17     Q.   And when you say he raised his hand, was
18  that just a metaphor or was that actually a meeting
19  where he put up his hand?
20     A.   No, it's a metaphor.
21     Q.   And you're saying you don't recall whether
22  anyone else metaphorically raised their hand?

Page 369

1     A.   Exactly.
2     Q.   But there may have been?
3     A.   There might have.
4     Q.   Remember to wait for my whole question
5  before you start answering even if you know what I'm
6  saying.
7     A.   Okay.
8     Q.   So back to HFA, the parties have
9  stipulated that Mr. Lohmeier informed Fannie Mae
10  December 22nd or 23rd that he was resigning.  Between
11  December 22nd and 23rd and January 23rd, 2009, do you
12  recall any discussion about whether to fill
13  Mr. Lohmeier's spot, whether to add a person in HFA?
14     A.   I don't have a specific memory of that,
15  no, I do not.
16     Q.   But would that month, between December
17  22nd and January 23rd, 2009, have been part of the
18  period where you believed HFA actually needed more
19  people?
20     A.   HFA really started to kick off when we did
21  the President's initiative but yes, I would have
22  thought we needed -- even for the President's

Page 370

1  initiative, we did a lot of very substantive work
2  there in terms of all the affordable housing single
3  family business that we were bringing in, so I would
4  have thought we needed more.  Didn't hire more but I
5  would have thought we needed more.
6     Q.   Did Mr. Riedy discuss with you the
7  possibility of moving somebody who was going to lose
8  a job in Public Entities Loan over to the HFA team?
9     A.   I don't remember that specific discussion.
10     Q.   Are you saying it might have happened; you
11  just don't remember?
12     A.   I don't remember.  I think you probably
13  should talk to Carl about it.
14     Q.   Now, Ms. Zukoff and Mr. Brannum both
15  reported to Eileen Neely up until January 23rd, 2009,
16  right?
17     A.   Yes.
18     Q.   But Ms. Zukoff had the title of director
19  and was in the grade of 6, right?
20     A.   Yes.
21     Q.   So was she doing duties that were normally
22  the duties of a senior business development manager?

Page 371

1     A.   So you have to go back for a second with
2  Lisa.  Lisa ran the Community Business Center in West
3  Virginia before she had come to that team.  She was
4  already a director and because all of the -- every
5  office there, the people who ran the office, not
6  necessarily the people who worked in it but who ran
7  the office, they were all directors.
8        So Lisa came over to that team as a
9  director.  We did not change her job title when she
10  took the job.  So she came there as a director and we
11  didn't make her a level 5.  We left her a director.
12     Q.   You left her with the title of director
13  but was she doing the work that was done by the other
14  people who reported to Ms. Neely?
15     A.   She was doing the work, she was selling,
16  like everybody else that was reporting to her, that
17  was reporting to Eileen.
18     Q.   So Lisa Zukoff was selling like everybody
19  else who was reporting to Eileen?
20     A.   Absolutely.
21     Q.   Did you tell the D.C. Office of Human
22  Rights investigator that Mr. Brannum was the

Page 372

1   salesperson and Ms. Zukoff was the manager?
2       A.   I don't recall saying that, so no.  As I
3   remember it, they both reported to Eileen so I don't
4   think I would have said that, but I don't remember
5   what I said to her.
6       Q.   Did you tell the D.C. Office of Human
7   Rights investigator that Mr. Brannum and Ms. Zukoff
8   did not have equal jobs, there's no comparison?
9       A.   Well, if you ask me whether or not there
10  is a comparison between their skills and abilities,
11  there is no comparison.  Lisa can sell and actually
12  knew this business much better than Steve knew it and
13  I think as it relates to trying to bring in business,
14  there was no comparison between the two of them.
15      Q.   I actually asked you a different question.
16  Did they have equal jobs?  They did, right, up until
17  Eileen Neely left the company?
18      A.   I would say that.  Again, when you asked
19  that question, how Eileen managed them and deployed
20  them on a daily basis, just about how you use
21  resources all the time, you probably ought to ask
22  Eileen that question, how she used them, because part

Page 373

1   of managing people is taking their unique skills and
2   seeing whether or not you can get even more out of
3   them and I don't know -- so you need to talk to
4   Eileen about that.
5       Q.   Ms. Neely had a particularly strong
6   quantitative skill set, didn't she?
7       A.   Eileen has a lot of talent, period.
8   Whether it was quantitative or qualitative, she has
9   really terrific people skills and she's blessed to
10  have terrific quantitative skills.
11      Q.   And did she put those quantitative skills
12  to use in the job that she did as director?
13      A.   For a while, between the period of time
14  when I would place David Burgess in my pricing space,
15  Eileen served as that role because she had those kind
16  of skills that she could do it.  So for a while, she
17  did that.
18      Q.   And is that just one example of her use of
19  quantitative skills or was that the only
20  demonstration of quantitative skill?
21      A.   I mean, if you have that skill, you use it
22  wherever it's appropriate and you use it all the

Page 374

1   time.  So I think she used it as much as she could.
2       Q.   And did Ms. Zukoff take over those
3   quantitative functions of Eileen Neely's job?
4       A.   Let's go back.  Your question, I think I
5   asked me is did Eileen in her daily work use
6   quantitative skills.
7       Q.   Yes.
8       A.   That's unique to how Eileen did the job
9   that she was doing, not necessarily how you think the
10  job should be done.  Everybody does the job
11  differently based on their skills, inclinations, et
12  cetera.  I think Eileen would have wanted to use all
13  her skills to do the job.
14          I don't know that Lisa did the job the
15  same way Eileen did it.  I don't know.  I've never
16  asked the two of them or compared and contrasted the
17  two of them.
18      Q.   Aren't there certain aspects of a job that
19  are indispensable if you can't do them and not do the
20  job right?
21      A.   Well, from a sales perspective, I would
22  say both of them could sell to customers all day

Page 375

1   long.  And that's an essential element of this job.
2       Q.   Is quantitative skill an essential element
3   of the --
4       A.   It's helpful.
5       Q.   Quantitative skill was only helpful in the
6   position of --
7       A.   It's helpful.  It's helpful.  I mean, in
8   the production business, you need to learn how to
9   structure, which involves quantitative skills but
10  it's not primary.  You need to be able to sell.  I
11  mean, that's really what the business is about,
12  trying to get people to take our product, whatever
13  our product is that we're trying to sell.
14      Q.   So it's your testimony that selling was
15  essential but the quantitative work that Ms. Neely
16  did was not essential?
17      A.   I didn't say that.  I said it was helpful.
18  Again, I think Eileen, because she is so smart,
19  probably used all of her skills.  Again, you need to
20  ask her how she did her job every day.  I was happy
21  to have her.  She's a great asset to have.
22      Q.   Do you know whether, as part of her job,

27 (Pages 372 to 375)

Page 376

1   Ms. Neely reviewed the structure of every deal
2   before -- every proposed deal before those deals were
3   submitted to Mr. Riedy?
4       A.   You should ask -- when you get a chance to
5   talk to Carl. I don't know how the two of them
6   interacted there and I don't want to pretend I do.
7       Q.   As of January 23rd, 2009, did you have a
8   view of Ms. Zukoff's quantitative skills?
9       A.   As of January 23rd, when we talked about
10  what role Ms. Zukoff was going to play, what I was
11  aware of, in terms of bringing in business and being
12  somebody who was a satellite to us, I was aware that
13  she could do that. So yes, I was aware that she
14  could do the job that she was being placed in, if
15  that's your question.
16      Q.   That's not my question. My question is,
17  as of January 23rd, 2009, were you aware of
18  Ms. Zukoff's quantitative financial analysis skills?
19      A.   I was not aware of her specific skills and
20  I am sure that her skills were not the same as
21  Eileen's but Eileen was particularly gifted in this.
22      Q.   Did you have discussion with Mr. Riedy

Page 377

1   before the restructuring about whether Ms. Zukoff had
2   the quantitative financial analysis skills that the
3   job of director of the PE team required?
4       A.   The discussion Carl and I had was could
5   Lisa do the job of the PE director, loan director,
6   and his answer to that was yes. And in that
7   calculation, I'm sure he looked at quantitative
8   skills but they were not primary. The primary skill
9   would have been can she bring business in, can she
10  structure the business that comes in. That involves
11  some quantitative skills but it's not overly weighted
12  in that way.
13      Q.   Let's unpack that answer. So when you say
14  that you had a discussion with Mr. Riedy about
15  whether Ms. Zukoff could do the job, are you saying
16  he did not respond concerning to particular aspects
17  of the job? He just said, yes, she could do the job?
18      A.   I think what he said to me, here is the
19  structure we want to go to. I think all the people
20  that are out there in the field can do this work and,
21  therefore, we're going to have them do it.
22      Q.   Did you have any discussion with Mr. Riedy

Page 378

1   about whether Ms. Zukoff could take over quantitative
2   financial analysis functions that Eileen Neely had
3   been doing?
4       A.   He and I had never had that discussion. I
5   do not remember that discussion.
6       Q.   Was Ms. Zukoff going to be selling in the
7   new structure or was it the members of the CBCs that
8   were in the field that were going to be selling?
9       A.   Ms. Zukoff would manage others and do some
10  selling herself, so all of the above. And by virtue
11  of the fact of all the contacts that she has, we
12  would be leveraging those.
13      Q.   You mentioned that there were some things
14  you didn't discuss with Mr. Riedy in your discussions
15  over the restructuring, such as old evaluations of
16  the people who were going to be affected or such as
17  replacing Ms. Neely's quantitative financial analysis
18  skills.
19          Did you have any discussion with him over
20  the fact that the reduction in force was going to
21  result in three African-Americans losing their jobs
22  and that the loan person, the PE loan team member who

Page 379

1   was continuing with the organization, actually moving
2   into a position of more responsibility, was white?
3   Was that discussed between you and Mr. Riedy at all?
4       A.   Carl and I never had a discussion about
5   the race of the three people who were going to be
6   displaced. We did not talk about that. It is
7   obvious that they're African-American. That goes
8   without mentioning but that is not a discussion that
9   we had. And my view of this is, this was about our
10  strategy and what we were trying to do.
11      Q.   Did you even think about the fact that the
12  three people that were affected at the time were all
13  African-American?
14      A.   That did not cross my mind. That is not
15  how I viewed it. This was purely a strategic
16  discussion and decision.
17      Q.   And did you have any discussion of that
18  fact, the fact that the three people affected were
19  African-American, with Ms. Sember and Van Breda
20  Kolff?
21      A.   So any time there was a displacement
22  throughout the company, there is always an analysis

28  (Pages 376 to 379)

Page 380

1    of the race composition of the people who were being
2    displaced.  So yes, I had a discussion at HR at that
3    point about the race of the people who would be
4    leaving.  That's a question they asked about and we
5    showed them the business rationale and they were
6    fine.
7        Q.   Who from HR asked about that?
8        A.   That would be probably Cheryl or Karen.
9    One of the HR people would have asked about that.
10   And they would have talked with legal about it.
11       Q.   They would have talked to who?
12       A.   Our legal staff about it.
13       Q.   Do you recall a specific conversation with
14   HR about the racial composition of this reduction in
15   force?
16       A.   I remember them noticing that there are
17   three African-Americans that are going to be
18   displaced and that's about as deep as that
19   conversation got.
20           ARBITRATOR ROSCOE:  While we're on the
21   record, Cheryl and Karen are the same people you just
22   referred to, Sember and --

Page 381

1            THE WITNESS:  Van Breda Kolff, that's
2    correct.
3            BY MR. WACHTEL:
4        Q.   We have been talking about whether
5    Ms. Neely's job had a quantitative analysis,
6    financial quantitative analysis component.  Did
7    Mr. Brannum's job require quantitative financial
8    analysis?
9        A.   Mr. Brannum's primary job was to sell so
10   that would have been -- and selling and structuring
11   would have been part of his job.  So quant analysis
12   to the point of being able to structure, that was
13   necessary.
14       Q.   Can you turn, please, to Exhibit 173?
15   What is this document?
16       A.   This document is a job description for a
17   senior business development manager and it looks like
18   it's for AD&C.
19       Q.   Right.  But senior business development
20   manager is the title that Mr. Brannum held, correct?
21       A.   That's correct.
22       Q.   And this position description requires

Page 382

1    that the person be able to analyze financial
2    statements, tax returns, builder projections, market
3    data and economic forecasts?  That's the fourth
4    bullet, right?
5            MR. STEWART:  Objection, relevance.
6            ARBITRATOR ROSCOE:  Of the document?
7            MR. STEWART:  The objection is the witness
8    has identified the document as relating to a business
9    development manager in AD&C.  Mr. Brannum was not on
10   the AD&C team.  He was on the Public Entities team.
11   So the question is what relationship does this
12   document have to Mr. Brannum and/or this case.
13           MR. WACHTEL:  Okay.  I would like to --
14   there is more I should get in the record to establish
15   that anyway.
16           ARBITRATOR ROSCOE:  If you could lay a
17   foundation.
18           BY MR. WACHTEL:
19       Q.   Can you turn to Exhibit 169, please?
20       A.   Okay.
21       Q.   And Exhibit 169 is a table with a list of
22   employees and former employees in the Public Entities

Page 383

1    channel, correct?
2        A.   That's correct.
3        Q.   And Mr. Brannum's on that list, is that
4    right?
5        A.   He is.
6        Q.   And he's listed as a senior business
7    development manager and then there is a code after
8    that title, BMN522?
9        A.   Yes.
10       Q.   Can you turn now back to Exhibit 173?
11       A.   Got it.
12       Q.   What's the code following that title,
13   senior business development manager?
14       A.   It's BMN522.
15       Q.   So the title is the same, the code's the
16   same, correct?
17       A.   The title's the same, the code's the same.
18   What is different about this is this is an AD&C job
19   description.  It is specific to the skills you need
20   to do acquisition, development and construction
21   lending.
22       Q.   Did Fannie Mae have different a job

Arbitration Day 2                                                          October 25, 2011
Washington, DC

Page 388

1    A.   That's correct.
2    Q.   So would you agree Fannie Mae has produced
3    in this case the senior business development manager
4    position for AD&C as if it were Mr. Brannum's
5    position?
6          MR. STEWART:  Objection.
7          ARBITRATOR ROSCOE:  I'm going to let it
8    in.  It really goes to weight and I'll note what
9    weight to accord once the hearing is over so you can
10   continue.  But I understand the objection.
11         THE WITNESS:  So it appears to me -- I
12   mean, I really can't answer -- I didn't give you this
13   document.  I don't know -- you know, no one asked me
14   to produce a -- no one asked me what I thought about
15   this job description.
16   BY MR. WACHTEL:
17   Q.   Did Mr. Brannum's job require, among other
18   things, the ability to analyze financial statements?
19         MR. STEWART:  Objection, asked and
20   answered.
21         ARBITRATOR ROSCOE:  He can do it one more
22   time.

Page 389

1          THE WITNESS:  Mr. Brannum's job required
2    that he could structure transactions.  As part of
3    that, you had to analyze occasional financial
4    statements.  Yes, it did require that as part of the
5    job.
6          I would not weight that as heavily as I
7    weighted the ability -- I would weight the ability to
8    do the selling, presentation, you know, those kinds
9    of things.  I would weight them all but I would say
10   the first thing is your job is to go get business.
11   That's your first job.  And your communication skills
12   and your business skills matter a whole lot.  I would
13   say your quantitative skills matter.  I would say
14   they don't matter as much as your interpersonal
15   skills.
16         BY MR. WACHTEL:
17   Q.   And I take it your view is the
18   quantitative skills was a strength of his?
19   A.   That's correct.
20         MR. WACHTEL:  I have nothing further.
21         ARBITRATOR ROSCOE:  Could we have 15
22   minutes?  Would you indulge the arbitrator?

Page 390

1          (Recess.)
2          EXAMINATION BY COUNSEL FOR RESPONDENT
3          BY MR. STEWART:
4    Q.   Good afternoon, Mr. Hayward.  I am Damien
5    Stewart, counsel for Fannie Mae.
6    A.   Good afternoon.
7    Q.   I would like to direct your attention
8    first to Exhibit 31.  You looked at it in your direct
9    testimony.  This is the January 9, 2009 justification
10   for termination document.
11   A.   Yes.  Got it.
12   Q.   Would you turn to the second page of the
13   document and it's at FM 66.
14   A.   Okay.
15   Q.   Do you see that?
16   A.   Yes, I see it.
17   Q.   And I'm going to direct your attention to
18   the second full paragraph under other strategic
19   issues, the second "in addition" paragraph.  Do you
20   see that?
21   A.   Yes.
22   Q.   Now, will you read this paragraph to

Page 391

1    yourself?  It starts out, "In addition, the PE loan
2    team has developed an excellent outsourcing model."
3    A.   Got it.
4    Q.   Just read that paragraph to yourself.
5    A.   Okay.
6    Q.   Do you recall having any discussions with
7    Mr. Riedy, as you discussed the reorganization plan
8    that resulted in the elimination of the three
9    individuals from the Public Entities Loan team, did
10   you discuss with Mr. Riedy the idea about expanding
11   the scope of what the consultants Public FA and
12   CENSEO were responsible for?
13   A.   I do recall having a discussion about that
14   and one of the things that was attractive about them
15   in the first place was, on a cost basis, they only
16   really got paid for what they did, so they weren't
17   fixed costs.  They were variable costs.  So as you
18   had transactions, if you were going to help them do
19   something -- if they were going to help us do
20   something if we got in a jam, it was great that they
21   were more variable than they were fixed costs.
22   Q.   And can you explain really briefly what

31 (Pages 388 to 391)

Arbitration Day 2                                                    October 25, 2011
Washington, DC

Page 392

1   you mean by more variable as opposed to a fixed cost?
2       A.   So if you have people doing a job, you
3   have to pay them whether you do business or not.  If
4   you have variable, if you have somebody who is a
5   consultant and you say, you only get paid if you
6   actually work on something, you may have a small
7   retainer but your real cost is that you get paid as
8   part of a deal they do.
9            That's a much better model because you
10  don't have the fixed costs that you have to worry
11  about.  You're really saying I got this amount of
12  business and I had to give them a little bit, but at
13  least it was on what they did and not a fixed cost
14  forever.
15      Q.   Now, in terms of the sort of fixed costs,
16  would that be the roles that were occupied by
17  Ms. Day-Marshall, Mr. Atta-Safoh and the claimant,
18  Mr. Brannum?
19      A.   Yes.
20      Q.   And what were the responsibilities, as you
21  recall, of Public FA and CENSEO?
22      A.   So Public FA did a couple of things for

Page 393

1   us.  The first thing is, in the Modernization Express
2   business, they really were kind of our back office.
3   So we hired them to do asset management for us.  So
4   that was one function that used to be in-house and we
5   basically, instead of having our own staff do it and
6   having a fixed cost, we outsourced it.  So that was
7   one role that they played.
8            The other role that they played in the
9   Modernization Express business was they were always
10  the structurer of the Modernization Express business.
11  They were in that business.  They know everybody
12  there including HUD.  They were really experts there.
13  They had lots of contacts.  So we had always used
14  them there.  But our arrangement with them was a
15  variable arrangement, not a fixed arrangement.
16      Q.   And did you have discussions with
17  Mr. Riedy about increasing the role these consultants
18  would play in addition to structuring of the Modern
19  Express deals but also with the Community Express
20  deals?
21      A.   What Carl talked about was if we ran into
22  an issue and we needed that extra structuring, they

Page 394

1   could do it.  So this was, this resource is available
2   to us, it's something we could use, don't know if
3   you'll use it or not but we have it there and we can
4   use it.
5       Q.   Will you turn to Exhibit 33?  Now, this is
6   a document from Mr. Riedy to yourself.  The date is
7   January 23rd, 2009 and the subject is business
8   justification for use of consultants for Community
9   Lending and Public Entities Loan business development
10  and asset management.
11      A.   Yes.
12      Q.   Do you recall receiving this document from
13  Mr. Riedy on or about January 23rd, 2009?
14      A.   I do recall receiving it.
15           MR. STEWART:  We move for admission of
16  Exhibit 33.
17           MR. WACHTEL:  No objection.
18           ARBITRATOR ROSCOE:  So admitted, number
19  33.
20           (Respondent's Exhibit No. 33
21           was received in evidence.)
22  BY MR. STEWART:

Page 395

1       Q.   Would you look at the last full paragraph
2   on the first page?  And it starts out, "One potential
3   downside to utilizing the CBCs as the primary
4   business development staff is the loss of centralized
5   loan structuring function."  Do you see that
6   sentence?
7       A.   Yes.
8       Q.   Do you have an understanding of what
9   Mr. Riedy was trying to convey in that sentence?
10      A.   What he was saying is, one of the pitfalls
11  of any decentralized strategy is that you lack
12  central focus.  So you're going to get once and a
13  while -- you have people who are selling and
14  structuring.  They're going to get in the point where
15  they might be conflicted.  So you kind of missed that
16  a little bit.  It's a risk you take.  We accepted
17  that risk but that is a risk you take.
18      Q.   And would you turn the page and under the
19  paragraph at the top that starts strategic issues,
20  there is a sentence midway down that starts,
21  "Outsourcing some of the responsibilities of the
22  Community Express product in a way similar to the

                                    32  (Pages 392 to 395)

## Page 396

1  Modernization Express product allows the PE loan team
2  to meet the ebbs and flows of the demand for the
3  product without taxing the company with high fixed
4  costs."
5      ARBITRATOR ROSCOE:  Could you give me a
6  Bates Number on that?
7      MR. STEWART:  Sure.  FM 1011.
8      ARBITRATOR ROSCOE:  Thank you.
9      BY MR. STEWART:
10  Q.   Do you see that?
11  A.   I see it.
12      ARBITRATOR ROSCOE:  I see a paragraph that
13  begins -- oh, the heading is Strategic Issues.
14      MR. STEWART:  I'm sorry, yes, the heading
15  is Strategic Issues.
16      ARBITRATOR ROSCOE:  I was being a little
17  literal.
18      THE WITNESS:  Yes, I see it.
19      BY MR. STEWART:
20  Q.   And can you explain briefly what Mr. Riedy
21  was trying to convey with that -- or what you
22  understood from this sentence that he was giving you

## Page 397

1  in this memo?
2  A.   So what Carl was saying here is, if you
3  really want to keep your costs low and once in a
4  while, when you have these kind of fits and starts, a
5  way to do that is to have somebody as a backup and
6  that's really what he's saying here is these guys can
7  be a backup without having fixed costs.  That's what
8  he's saying here.
9  Q.   And did you accept the recommendation then
10  to utilize these consultants to also do the
11  structuring and the asset management for the
12  Community Express product, as well as the
13  Modernization Express product?
14  A.   What I said to Carl is if these guys can
15  be helpful and we need them, yes, you should use
16  them.
17  Q.   And to your knowledge, were they utilized
18  for that purpose?
19  A.   I think they were on occasion, yes.
20  Q.   Now, at the time that you -- and I take it
21  you agreed with this recommendation?
22  A.   Yes, I did.

## Page 398

1  Q.   So at the time that you agreed with
2  Mr. Riedy's recommendation on or around January 23rd,
3  2009, given the utilization or the prospective
4  utilization of these consultants for the back office
5  function, the structuring and the of the asset
6  management, how important then was going to be the
7  role of the remaining of the PE loan team to do that
8  function, asset management and structuring of the
9  loans?
10  A.   So as it relates to asset management,
11  that's really more once the loan is on and booked,
12  and so the PE loan team was never involved with that.
13  That was always a credit function and it just so
14  happened that these guys could not only do that
15  credit function but could also do the upfront work
16  that's structuring.  So they could do both.
17      So I think having a resource available in
18  case our strategy turned out to need some work was a
19  great thing to have.  So I was surely confident that
20  I thought our folks in the field could do the
21  structuring but in the event that we couldn't, he
22  basically was saying, listen, here's something else

## Page 399

1  you can do and by the way, it will cost you less.
2  Q.   If you look at the first sentence in the
3  same paragraph under strategic issues at FM 1011, it
4  talks about the tightening of Fannie Mae's credit
5  standards has lessened the demand for the Community
6  Express product.  Do you have an understanding of
7  what Mr. Riedy meant by that?
8  A.   You can tie all of this together, so not
9  having high fixed costs, doing less business because
10  we tightened our credit belt.  So we were allowing
11  certain things, and then we went to, if I believe it
12  right, 100 percent collateral on every transaction.
13  When we went there, that meant that we weren't doing
14  as much business as we used to do.  And having fixed
15  costs when you really can't deal with much business
16  is really, from a P&L perspective, a problem.  So you
17  really want to be more variable in that environment.
18  Q.   Now, you talk about the 100 percent
19  collateral requirement.  Where did that come from?
20  A.   The 100 percent collateral requirement was
21  really a credit -- our credit staff's requirement.
22  Q.   And when you say our credit staff, who do

Page 400

1  you --
2      A.  Fannie Mae credit staff.
3      Q.  Is that within your organizational
4  structure or somewhere else?
5      A.  No, the collateral requirement is -- the
6  credit people are separate and apart from the
7  business, and they actually get to say yes or no for
8  the business we do.  So when they say, no, we're not
9  going to do this anymore --
10     Q.  What did the 100 percent collateral
11  requirement apply to?  Did it apply to Modernization
12  Express, Community Express, both?
13     A.  It was Community Express that was the
14  issue.  See, Modernization Express had the full faith
15  and credit of government, so you could do those
16  transactions and we never lost a nickel on the
17  Modernization Express deal.  On Community Express, we
18  were taking real risk, and to have collateral softens
19  the risk.
20     Q.  So let's just break that down really
21  quickly.  When we talk about collateral, can you just
22  in very basic terms, what do we mean when it comes to

Page 401

1  a Community Express loan transaction?  What is in
2  collateral requirement referring to?
3      A.  So in its purest sense, it is, I lend you
4  a dollar and you give me a security, a piece of real
5  estate, something that's worth a dollar.  So in the
6  purest sense, I lend you a dollar, you match it with
7  some collateral for a dollar.  It doesn't have to be
8  cash.  It can be anything but it basically is a match
9  one to one.
10     Q.  And when you say I -- you're going to lend
11  me the money.  I'm the public entity.
12     A.  Right.
13     Q.  I have to put up a dollar for the dollar
14  that you're going to lend me?
15     A.  That's exactly right.
16     Q.  Now, when I put up the dollar, what does
17  that mean?  Do I still have the dollar in my back
18  pocket?  What happens?
19     A.  When you put up the dollar, it's in an
20  account someplace or held in custody.  It can be
21  seized if you go into default.
22     Q.  Seized by whom?

Page 402

1      A.  Seized by Fannie Mae.  So let's say you
2  decide you're not going to make your payments anymore
3  and that's a piece of real estate that you have in
4  escrow, we probably have your deed and we now will
5  execute on that.
6      Q.  And how was this 100 percent collateral
7  requirement received by your customers of the public
8  entity loan team?
9      A.  Our customers weren't necessarily in love
10  with that change, let's put it that way.  It wasn't
11  like they were waving their hands saying, thank you
12  for helping me out, no.
13     Q.  Can you explain to the arbitrator what you
14  mean by they weren't in love with new development?
15     A.  Okay.  We had a revolt on in our hands.
16  So let me tell you what this was.
17         It was you used to have a 25 percent in
18  collateral.  We like that.  That's a 4 to 1 posting.
19  You went to 100 percent.  It means in essence I've
20  got to go and pledge collateral I could use for other
21  things.  I don't really like that a whole lot.
22  You're really making it difficult for me.

Page 403

1      Q.  And did you have an understanding at that
2  time, January of -- well, let me ask you this.  When
3  did the 100 percent collateral requirement, when did
4  that directive come down by the credit department?
5      A.  As I remember it -- this is all crashing
6  together -- probably in December of '08, because
7  again, if you remember what was going on in the
8  markets at that time, the credit markets were
9  crashing.  So all kinds of new credit standards in
10  every business that we had were being applied and
11  that was just in that space but it was all across the
12  company.
13     Q.  And so if you understand that -- did you
14  have an understanding that when this 100 percent
15  collateral front was going to come down, did you have
16  an understanding of how that would be received by the
17  market?  Could you predict that?
18     A.  So as a businessperson, you're always
19  optimistic.  So I was hoping our customers at least
20  wanted to keep doing business even if they grouched
21  and were mad.  As it turns out, it didn't help much
22  and we didn't do much, because it was overwhelming.

34  (Pages 400 to 403)

Page 404

1   But my hope when we introduced that was that some
2   people would still do business with us.
3      Q.   But you understood that it's likely you're
4   going to have less demand for the Community Express
5   product, is that right?
6      A.   I understood that.
7      Q.   And so given that you're going to have
8   less demand for the Community Express product, how
9   did that factor into the decision then to eliminate
10  three positions from the public entity loan team?
11     A.   If you go back to this idea of cost, so
12  you had people who could only really do what they
13  were doing in their office in Washington, D.C.,
14  That's public entity work.  You had other people who
15  were out in community business centers who could do
16  any number of things.
17         So even if they shut off the Community
18  Express product and we were doing less of that, I
19  could always redeploy the staff in the field to do
20  anything because they had that skill and they had all
21  the contacts.  So from my perspective, it just
22  bolstered the case that if you're really looking to

Page 405

1   cut costs and be efficient, you go where you have all
2   kinds of choices.
3          I couldn't put -- the Washington people we
4   had working on PE, I couldn't have them working on
5   foreclosure prevention.  They couldn't help us sell.
6   They didn't know anybody.
7      Q.   Now, how do you know that?
8      A.   In the foreclosure prevention case, there
9   are a lot of nonprofits who do counseling and other
10  things.  For the most part, the people who knew those
11  counseling agencies were people who were members of
12  their board in the local community, understood all
13  the networks that were there.  That's not how I
14  thought -- what I thought we had in Washington.
15     Q.   And when you talk about understood the
16  networks involved, does that mean people, you knew
17  who people were?
18     A.   Yes, networks means people.
19     Q.   And how important if at all was
20  relationships between the people who you had in the
21  field with people in the local communities?
22     A.   Those relationships were very important.

Page 406

1      Q.   Now, you talked about sort of your
2   awareness of the costs.  Was that a factor in the
3   decision then to eliminate the positions on the
4   public entity loan team in January of 2009?
5      A.   Cost was a factor.  We were paying
6   salaries for those three people.  We were paying the
7   salaries for others.  And if you had to match up who
8   was the most expendable, you asked yourself the
9   question, who would be the most useful in any
10  environment?
11     Q.   Now, we talked a little bit about these
12  community business centers and that the individuals
13  who were going to be in those community business
14  centers developed -- you started using them as
15  utility for different businesses that you had under
16  your purview.
17         Can you give the arbitrator a little bit
18  of history on what these community business centers
19  were, how they sort of originated and what your
20  vision was when you took over the group in 2004?
21     A.   The community business centers used to be
22  political and essentially what they did was, as

Page 407

1   Fannie Mae needed influence in different areas, they
2   were really good with political influence.  When I
3   took over the offices, I had them twice.  When I took
4   them over the second time, I reorganized, posted
5   every job, cut staff and got people in that could do
6   business and I changed the strategy.
7          The strategy was no longer what your
8   political contacts were.  Your strategy was, how can
9   you further the business of the company in that
10  particular jurisdiction?  So I changed the whole --
11  how we did that business to focus on helping Fannie
12  Mae do its business in the community or the territory
13  that you were covering.  So I changed the whole
14  thought process around that to focus on that.
15     Q.   So they were primarily lobbyists, is that
16  correct?
17     A.   In the old days, we had -- well, read in
18  The Washington Post.
19     Q.   The sordid history.
20     A.   We had a vaunted lobbyist machine.  We
21  were good.
22     Q.   And in the second stanza that you had with

Page 408

1  this group, you created more of a business model, is
2  that right?
3     A.  Yes, it is.  And when we interviewed all
4  these people, we did it based on what was your
5  business acumen, we looked at, you know, what you had
6  done before, were you flexible, could you do a lot of
7  things, could you learn a lot of different things.
8  So that was all part of the questioning.
9     Q.  Would you turn to Exhibit 16?
10    A.  Got it.
11    Q.  And I believe you identified this document
12  in direct and I believe you testified that this was a
13  document you may have seen in or around that time?
14    A.  Yes.
15    Q.  Would you turn to the fourth page in?
16  It's at FM 1105.
17    A.  I got it.
18    Q.  And if you look at that first full bullet
19  point, it talks about more efficient operations.  Do
20  you see that?
21    A.  I got it.
22    Q.  And then there is a sentence, "Reduced

Page 409

1  budget from" and you go from a $26 million in 2007 to
2  $13 million 2008 plan.  Do you see that?
3     A.  I see it.
4     Q.  And then the next bullet is a
5  $10.8 million 2008 management budget and an FTE
6  reduction from 161 in 2007 to 81 2008 plan.  Do you
7  see that?
8     A.  I see it.
9     Q.  And is this reflective of the exercise
10  that you had done to bring these community business
11  centers into more of a business focus?
12    A.  Absolutely.
13    Q.  And was this a part of your cost-cutting
14  initiative as a result of moving from more of a
15  lobbying arm to a more business-focused mission for
16  these community business centers?
17    A.  This is absolutely what we did and, yes,
18  this was my plan.
19    Q.  And do you have a recollection of a move
20  of eliminating virtually half of the budget from
21  these CBCs from 2007 to 2008?
22    A.  I do have recollection of that.

Page 410

1     Q.  And you talked about interviewing -- you
2  set up new interviews for all these people.  Can you
3  explain to the arbitrator how that process went?
4     A.  The interview process involved, I took the
5  business leaders in every business and put them on a
6  panel.  Every interviewee had to be interviewed by
7  the business leaders to pass the panel.
8        So all of the CBC people who got hired
9  subsequently had been -- I had the head of the single
10  family business, I had the head of multifamily.  I
11  had people that ran the businesses as part of the
12  screening process, so if you got through that
13  screening, you were pretty good.
14    Q.  So it would be fair to say you were
15  confident, then, that the people who were in the
16  field -- because I assume this is the field, right?
17    A.  Exactly.
18    Q.  It would be fair to say that you were
19  confident, then, that the people in the field had the
20  business acumen to be able to support the various
21  businesses that you had?
22    A.  I'm absolutely confident of that, yes.

Page 411

1     Q.  And that would have been as of 2008, those
2  folks would have been in the field?
3     A.  Yes.
4     Q.  And did that include being able to support
5  the loan products of the Public Entities Loan team,
6  Community Express and Modernization Express?
7     A.  That indeed included that, that's correct.
8     Q.  And to your knowledge, individuals in the
9  field had been supporting the Community Express and
10  Modernization Express loan products?
11    A.  Absolutely, that's correct.
12       MR. STEWART:  We would move for admission
13  of Exhibit 16.
14       MR. WACHTEL:  I'm going to object, just
15  lack of foundation.  There is no foundation for who
16  wrote it or that he received it.  You produced it as
17  if it was referred to in his direct but I don't
18  believe it was.
19  BY MR. STEWART:
20    Q.  Do you recall receiving what is Exhibit 16
21  on or around July 18, 2008?
22    A.  I do recall an update, yes.

Page 412

1    ARBITRATOR ROSCOE:  It's in.
2        (Respondent's Exhibit No. 16
3        was received in evidence.)
4    BY MR. STEWART:
5    Q.   Now, on direct, you had talked about there
6  being no comparison between Ms. Zukoff and
7  Mr. Brannum.  Do you recall that?
8    A.   Yes, I do.
9    Q.   Can you explain what you meant by there
10  being no comparison between the two of them?
11    A.   When you look at the total value of a
12  resource, it's can they survive and bring value no
13  matter what the circumstance is.  If that's your
14  discussion or that's your premise, I would say
15  Ms. Zukoff could do -- the number of things she could
16  do far outweigh the number of things Mr. Brannum
17  could do.
18        Mr. Brannum has very good quantitative
19  skills.  He is a CFA.  That is a distinct
20  accomplishment that not many people have.  He is a
21  really good numbers guy.  I would not say he's really
22  good with relationships.  I would not say he's really

Page 413

1  good with managing people.  I don't think he's ever
2  managed anyone.  I would not say that he understand
3  public policy.  That is not something that I would
4  say about him.  That is something I would say about
5  Lisa.
6    Q.   Now, let's talk about this.  Managing
7  people, understanding public policy -- what was the
8  third?
9    A.   Relationship manager.
10    Q.   Relationship management.  What did you
11  know as of January 2009 about Ms. Zukoff's skills and
12  abilities under those three areas?
13    A.   So Ms. Zukoff, by virtue of the fact that
14  managed an agency in West Virginia, by virtue of the
15  fact of having managed people before, could manage.
16  I did not know if Mr. Brannum had any management
17  abilities, experience or skills, so I would say there
18  is a difference there.
19        The other thing I would note is, as it
20  relates to the relationship management skills and
21  that is the ability to get people convinced of your
22  ideas to the point that they're persuaded to do

Page 414

1  business with you, I did not believe that was a
2  distinct skill of Mr. Brannum's.  I did believe it
3  was a distinct skill of Ms. Zukoff's.  So if I had to
4  rate them both on that, I would say that there is a
5  difference.
6        Just from a public policy respect and
7  stature point of view, if I showed up with Lisa at
8  one of the trade groups, everybody at the trade group
9  knew her.  Everyone.  There is an affordable housing
10  trade group, NAHRO, and I remember going to the
11  conference with her and not being able to talk to her
12  because everyone was stopping her in the halls,
13  whatever, and really, she commanded that kind of
14  respect.  I don't want her head to get too big but
15  that's really what it is.  And I don't ever remember
16  Steven having that kind of stature.
17    Q.   Do you know what NAHRO stands for?
18    A.   National Association of Housing -- I knew
19  you would ask me this -- and Redevelopment
20  Organizations or something like that.
21    Q.   And who are the members of NAHRO?
22    A.   The members of NAHRO are mostly public

Page 415

1  entities, mostly housing authorities who would have
2  been our customers on Modernization Express, some
3  housing finance authorities, who are our customers on
4  Community Express.  So the members are really
5  affordable housing types who are our customers for
6  that business.
7    Q.   So those are PHAs and some HFAs?
8    A.   Correct.
9    Q.   And those are your customers?
10    A.   Those are our customers.
11    Q.   And did you know that Ms. Zukoff had been
12  in a relationship with this organization in or around
13  January or on or before January 2009?
14    A.   I knew Ms. Zukoff had a relationship
15  because, again, I was out with her at one of these
16  conferences and saw her be accosted.
17    Q.   In a good way?
18    A.   In a good way.
19    Q.   Now, you also mentioned that Ms. Zukoff
20  had been the director of a PHA?
21    A.   That's correct.
22    Q.   And you understood that on or before

37 (Pages 412 to 415)

Arbitration Day 2                                                    October 25, 2011
                        Washington, DC

Page 416

1   January 2009?
2       A.   Yes, I knew that.
3       Q.   How if at all did Ms. Zukoff's position as
4   a director of a PHA factor into your decision that
5   she was qualified to manage the Public Entities Loan
6   team moving forward from January of 2009?
7       A.   Ms. Zukoff had management experience and
8   we were asking her to take a management job that had
9   been quantified in the job sheet ad before.  She knew
10  our product and knew how to structure it and sell it
11  so she could do it herself and she could also advise
12  and coach others to do it.  So I felt like all that
13  together meant that she was ready to take that
14  responsibility.
15      Q.   Now, would you turn back to Exhibit 3?
16  And I'm at the second page of the document, FM 66.
17  And under the recommendation section, midway down the
18  first recommendation, we start talking about Lisa
19  Zukoff.  Do you see that?
20      A.   Yes.
21      Q.   And the sentence is, "Lisa Zukoff,
22  currently a director in PE (Public Entities) will be

Page 417

1   retained because she is already located in the field
2   and her skills are needed to lead the work flow
3   activities of the CBC PE Account.  She brings strong
4   leadership skills to the team as reflected in her L
5   plus rating on her 2008 year end performance review."
6   Do you see that?
7       A.   Yes, I see it.
8       Q.   And you received -- well, you had this
9   document -- you stated that Mr. Riedy authored the
10  document.
11      A.   Yes.
12      Q.   But you had an understanding that
13  Ms. Zukoff was going to receive an L plus rating on
14  her 2008 review on or around January 9, 2009, is that
15  right?
16      A.   That's correct.
17      Q.   And what does that L designation stand
18  for?
19      A.   The L designation is one's ability to
20  lead, so an L would be that you adequately met the
21  standard and L plus would mean that you exceed the
22  standard.

Page 418

1       Q.   And the L for leadership, is that a part
2   of the performance review?
3       A.   That's right.  It's part -- part of it's
4   results, part of it's leadership.  So this was the
5   leadership section and it was -- the grade of L plus
6   is someone who can lead, manage and strategize to get
7   people to do their best job.
8       Q.   Would you turn to Exhibit 1, please?  And
9   on the second page of the document, we're at FM 61,
10  and this is an organizational chart for your
11  organization as of September 30th, 2008.  Do you see
12  that?
13      A.   Yes, I see it.
14      Q.   You have an individual there on the fourth
15  line down, fourth row, second one in, Diego Losada.
16  Do you see that?
17      A.   Yes.
18      Q.   Can you explain, who was Mr. Losada and
19  what was his role in your organization?
20      A.   Diego was responsible for all pricing of
21  all the businesses that were in Community Lending.
22  He was our pricing guy.

Page 419

1       Q.   Including pricing of deals done in the
2   Public Entities team under Carl?
3       A.   Every deal, any channel that we had, all
4   the pricing was Diego's responsibility.
5       Q.   And why did you have a pricing person
6   within your organization when the company had a
7   separate credit organization to do that same type of
8   work?
9       A.   Well, pricing and credit were separated.
10  So you had credit that did not report to me, and that
11  is credit set the standards for what you could buy
12  and how you bought it.  Pricing was how you priced
13  what you bought.  And pricing was part of the
14  business and credit was part of another -- and it was
15  kind of a check and balance.
16          Credit was to make sure we didn't let
17  stuff in the door we shouldn't, and pricing it was to
18  try to make as much money as you could make, but that
19  was the business decision.
20      Q.   And what was Mr. Losada's role, then, for
21  pricing?  Explain that.
22      A.   So my transaction, once it was structured

Alderson Reporting Company
1-800-FOR-DEPO

Page 420

1    and before it was finally priced, the price that we
2    put on it was Mr. Losada's responsibility.
3        Q.   So any deal that was going to come out of
4    anywhere within your organization had to go through
5    Mr. Losada?
6        A.   He had to agree to the pricing or else we
7    weren't going to do it.
8        Q.   Now, in sort of the sequence of events,
9    the deal comes in for any of your teams.  Can you
10   walk me through how the deal comes in and eventually
11   how the pricing gets set, where Mr. Losada comes in
12   and when, if at all, credit takes a look at the deal?
13       A.   As I remember it, we would have initial
14   review, so the deal would come in, we would look at
15   it initially.  We discussed before we
16   did initial review.  At least it would have a
17   preliminary structure on it.
18           Once we structured it, then Diego would
19   kind of give an indicative price and the transaction
20   would go through.  If the transaction changed, he
21   would put a new price on it.  And then finally before
22   we closed it, he would be the person who would issue

Page 421

1    the final price.  This is our price, this is what
2    we're doing.
3        Q.   Explain then the sequence between when
4    credit gets involved in whatever the deal is and
5    issuing the final price.
6        A.   So once we brought the deal through
7    initial review and then you start collecting your
8    documents and doing your due diligence and all of
9    that, and you would show credit a preview of the deal
10   you were going to do and then you got all the
11   information and the price and the exhibits and then
12   finally you would submit it to them for underwriting
13   and they would underwrite and approve it and then we
14   would place a price on it.
15           And this isn't really sequenced.  It's
16   really kind of you do it all together.
17       Q.   And what was Mr. Losada's race?
18       A.   Mr. Losada is Hispanic.
19       Q.   On direct you talked a little bit about
20   the credit calls that Mr. Brannum was running?
21       A.   Yes.
22       Q.   And you had asked him to take on that

Page 422

1    responsibility?
2        A.   Yes.
3        Q.   And you had talked a little bit about his
4    preparation.  And can you just explain what your
5    feelings were in terms of the degree of preparation
6    he had done to handle that responsibility for the
7    credit call?
8        A.   So let me contrast.  Dave Burgess, who
9    used to do pricing for me before he left the company,
10   was the first person who did the calls with me.  He
11   was flawlessly prepared every day.  Just flawlessly
12   prepared.  I would come in in the morning; on my desk
13   was, here's what I'm going to talk about, blah, blah,
14   blah.  Because these calls were 8:00 a.m. every day.
15   Here's what I'm talking about, all kind of laid out
16   in a nice little outline.  And then when we got in on
17   the call, he never hesitated.  Stand -- written on it
18   -- he was just gone.
19           Steve, it was uneven how prepared he was.
20   I didn't have the same thing I had when I had Dave.
21   So there was a difference in the quality of the
22   preparation.  In the presentation, David was much

Page 423

1    more articulate, much smoother than what Steven was.
2            He struggled a little bit more with the
3    presentation of it.  Just not -- you know, not his
4    strength, not his skill, having command and
5    presentation skills.
6            Well, when you're doing a call like that
7    with a lot of people, the more clear you can be with
8    your messages, the more effective you can be.
9        Q.   Now, this skill set about the presentation
10   that Mr. Brannum was doing on the credit calls, is
11   that the same skill set you needed to be a
12   salesperson on the Public Entities Loan team?
13       A.   The part about presentation skills,
14   influencing people with your ideas, being able to
15   sell it, those are some of the same skills you need
16   for relationships.  So yes, they are -- the two
17   skills are connected.
18       Q.   And you had an understanding of
19   Mr. Brannum's skill set on presentation on or before
20   January 2009 when you were involved in these
21   discussions and deciding who to retain on the Public
22   Entities Loan team?

39 (Pages 420 to 423)

Page 424

1    A.   I knew Steve's presentation skills and
2  what they were before January 2009 because of the
3  experience we had on the credit calls, yes.
4    Q.   Did you have any another experiences with
5  Mr. Brannum's influencing skills prior to January
6  2009?
7    A.   I specifically remember that we -- part of
8  our call every week would be -- we would talk about a
9  number of things and I called him out a couple of
10 times because he couldn't close this one deal.  And
11 he hadn't closed anything that I could remember in a
12 long time and this one deal, which was a fairly large
13 deal, it just stayed in the pipeline.  We had
14 approved the credit so we were okay with it, but he
15 had not gotten the thing closed.  And I called him
16 out in front of everybody and said, when is this
17 thing going to be done?
18        And I was struck by the fact that he was
19 in the office -- never saw him to say, well, I'm on
20 my way up to L.A. to try to get this thing closed.  I
21 don't know when he ever went out that way.  But the
22 thing wasn't closed and I was, you know, out of

Page 425

1  frustration, calling him out in front of everybody.
2    Q.   This was for Los Angeles County?
3    A.   Yes, it was.
4    Q.   And did Mr. Brannum give you an
5  understanding of why the deal wasn't going to close?
6    A.   He gave me some excuses as to why it
7  wasn't closed and frankly, my view was, the reason
8  why we have you, what you're supposed to do is go
9  close these deals.  If not, if we have a bunch of
10 excuses, then what are we doing here?
11   Q.   Do you recall Mr. Brannum indicating that
12 the customer had tied the deal that he had been
13 working on with another deal that Fannie Mae was
14 working on with the customer?
15   A.   I remember Steve saying that the two deals
16 were tied and here's what my view of that was.  My
17 view was, this is influencing skills.  So you had a
18 deal here, you had your deal approved, you couldn't
19 get your deal closed, yet your customer changed
20 everything on you and linked it to another deal and
21 you couldn't influence him to be able to get the deal
22 closed.

Page 426

1        My view of it is, that's your job.  If
2  your job is to close deals, you're supposed to get it
3  done.  You didn't get it done.
4    Q.   And so in short order, then, did you
5  consider the, in your words, the excuse that
6  Mr. Brannum gave to you to be a valid excuse?
7    A.   In my view, it was not.  Again, it was
8  approved so it had gotten through the credit
9  gauntlet.  Not an easy thing.  It was approved.  Yet
10 you didn't get it closed.
11   Q.   Do you recall Mr. Brannum going on an
12 assignment in Pasadena?
13   A.   I forget the time frame but at one point,
14 we had been having some issues, and this us not in a
15 CBC.  This is in our regional office in California.
16        In our regional office in California, we
17 were having some issues out there with getting people
18 to understand what they need to do to get in
19 compliance with Washington.  And we sent Steve out
20 there figuring he could influence them to kind of get
21 their act together.
22   Q.   Was he successful in that?

Page 427

1    A.   No.  He was out there for six months.  I
2  think his boss at that time, it might have been Julie
3  Gould, I'm not sure who his boss was, said it's time
4  for him to come back and we really didn't get what we
5  wanted.
6    Q.   So he was unsuccessful in influencing
7  folks in the Pasadena office?
8    A.   Exactly.
9    Q.   And you understood that on or around
10 January of 2009?
11   A.   Yes.  That was history that we understood.
12   Q.   And so given your various experiences with
13 Mr. Brannum's skill set in influencing others and
14 presentation in comparison to Ms. Zukoff's, did that
15 play into your estimation that there was, quote, "no
16 comparison between the two?"
17   A.   Yes.  Yes.
18   Q.   Would you turn to Exhibit 25?
19   A.   Yes, I'm here.
20   Q.   Now, you talked in direct -- and let me
21 direct you to the second page of the document, FM
22 1116, of Exhibit 25.  And you talked about the seven

Arbitration Day 2                                            October 25, 2011
Washington, DC

Page 428

1    individuals who were on the field team in around
2    February/March of 2009.  So this is after the
3    reorganization occurs?
4        A.   Yes.
5        Q.   And you talked about -- you received some
6    questions as to whether you were familiar with these
7    individuals having, in addition to their sales
8    skills, but their sort of structuring skills.  Do you
9    recall that discussion?
10       A.   Yes, I do.
11       Q.   Now, looking at the individuals who were
12   on the field team at the time, can you give us an
13   understanding of what you understood to be who these
14   folks were and whether or not they had structuring
15   skills as of this time?
16       A.   So my point of reference would have been
17   from Carl, since that was really his business to run,
18   so in my view, I relied on him to make the judgment
19   that these people could do the structuring necessary
20   to do the job.  So if you ask me if I had run them
21   through the routines of structuring myself, I had not
22   done that.  But I relied on what Carl told me.

Page 429

1        Q.   But you also testified in arriving at the
2    January 9, 2009 justification for termination which
3    is at Exhibit 31, that you had discussions with
4    Mr. Riedy.  Did you also have discussions with
5    Ms. Wilbourn?
6        A.   I think I had some discussions with
7    Ms. Wilbourn.
8        Q.   And if you go back then to the Exhibit 25,
9    these individuals who are listed in the community
10   development team, these are individuals who reported
11   up through Ms. Wilbourn, is that correct?
12       A.   Yes, although Bill Picotte, as I remember,
13   reported to Bob Simpson.
14       Q.   In determining -- let's look at Exhibit
15   31.  And counsel had directed you to two sentences
16   and let's just go with the first one.  The third
17   paragraph, I believe the sentence is, "Many of the
18   CBC PE Account members have developed a level of
19   expertise equivalent to the PE team members.  The CBC
20   team members have also taken on a much larger role in
21   identifying leads, making marketing calls, following
22   up with customers, structuring deals and analyzing

Page 430

1    due diligence."  Do you see that?
2        A.   Yes, I do.
3        Q.   Now, the conclusions that are here in the
4    document that Mr. Riedy had prepared for you, you had
5    had these discussions with Ms. Wilbourn as well as to
6    the skill set that these individuals had, is that
7    correct?
8        A.   I would think the feedback here is Bob and
9    Beverly knew these people.  They were their people.
10   They thought, as well as Carl, that they could do
11   this work.  So there wasn't something where Bob or
12   Beverly said to me, I don't think you ought to put
13   people in this role, I don't think they can do it.
14   The contrary.
15       Q.   And Ms. Wilbourn's assessment that the
16   individuals on her team could do this work, that was
17   something that you valued?
18       A.   Yes.  Just like I value Carl's opinion, I
19   value Bob's opinion and Beverly's opinion.
20            MR. WACHTEL:  While you're doing that, is
21   the lawyer cross-examining entitled to lead if it's
22   their own witness versus the call is adverse?

Page 431

1            ARBITRATOR ROSCOE:  Do you have an
2    objection?
3            MR. WACHTEL:  I do if I'm entitled to make
4    one, yes.
5            ARBITRATOR ROSCOE:  And it's what?
6            MR. WACHTEL:  It's that he's leading.
7    He's leading an employee of the defendant.
8            MR. STEWART:  It's cross.
9            ARBITRATOR ROSCOE:  The objection is to
10   the pending question?
11           MR. WACHTEL:  There isn't a pending
12   question.  He's just finished the pending question.
13           ARBITRATOR ROSCOE:  Well, let's just take
14   that into consideration in crafting questions.
15           MR. STEWART:  Sure.
16   BY MR. STEWART:
17       Q.   Mr. Hayward, in your discussions with
18   Mr. Riedy or Ms. Neely, had you had any discussions
19   with either of them about Mr. Brannum's traveling and
20   doing marketing calls to potential customers?
21       A.   What I remember on occasion -- I think
22   this is more from Carl than it was from Eileen, but

Alderson Reporting Company
1-800-FOR-DEPO

Page 432

1  what I remember is Carl's frustration, and this is
2  after I mentioned the L.A. issue, Carl's frustration
3  with even after being called out in front of
4  everybody, Steve never left the office to go to L.A.
5      I think that was -- or I don't think Carl
6  felt that Steve was out trying to get business
7  enough.
8      Q.   Whether it was L.A. or any other place?
9      A.   Or any other place. I think Carl's
10 dissatisfaction was, as he mentioned it to me, was he
11 would be in the office and he was like, he can't
12 possibly be out selling. He's in the office every
13 day.
14     Q.   Why if at all is it important to be out
15 selling? When you say out selling, I assume that's
16 on the road?
17     A.   Exactly.
18     Q.   Why if at all is it important to be on the
19 road marketing the Community Express and
20 Modernization products?
21     A.   Save the District of Columbia, in the
22 State of Maryland, which you can get to by driving

Page 433

1  to, all the rest of the customers are someplace else.
2  So you've got to go -- I mean, you can't get business
3  from customers unless you actually go see them. I
4  mean, videoconference is helpful but not a sales
5  tool.
6      Q.   And does it relate in any way to sort of
7  what we call relationship building?
8      A.   Yes. To build a relationship, you need to
9  be talking to somebody other than on the phone. Over
10 my career -- and I've managed a lot of sales
11 organizations over my career -- there is no
12 substitute for personal relationships. There just is
13 not, in business.
14     Q.   Did you have an understanding of whether
15 Lisa Zukoff had traveled frequently to meet with
16 customers?
17     A.   As I understood it, Lisa did travel
18 frequently to meet with customers and was out
19 building relationships. In my own experience, having
20 been with her around a lot of customers, she had
21 relationships. I mean, I could see. It was very
22 clear to me.

Page 434

1      Q.   And was that a part of your calculus in
2  determining whether to retain Ms. Zukoff for the
3  position to lead the public entity loan team after
4  the reorganization?
5      A.   The combination of her management skills
6  and the fact that she was not D.C.-based, which was
7  our strategy, led us down the path of Lisa was the
8  right person for the job.
9      Q.   Mr. Hayward, you talked about this HFA
10 initiative. Can you describe what the HFA initiative
11 was?
12     A.   As part of the TARP initiative that had
13 gotten passed by Congress, one of the things that was
14 in it was help for cities and housing finance
15 authorities. The HFA initiative was really a play to
16 get more capital into the single family and
17 multifamily finance business.
18         So the initiative was, how can we -- we
19 being Freddie Mac, Fannie Mae, HFA and Treasury --
20 how can we get more capital into these states so they
21 can do things to make housing recover? That's what
22 the initiative was about.

Page 435

1          We did that through the issuance of bonds
2  and the granting of loans. The whole strategy for
3  how that got done -- I'm very proud -- our team
4  really led that. And that was Carl, that was Jim
5  Peffley, that was a lot of people that were on our
6  HFA team who really, in that venue, if you ask
7  anybody by any measure, were the leaders in the
8  network, as I said, for over $20 billion of new
9  financing for single family housing in the country.
10 Really big stuff.
11     Q.   Did Mr. Brannum ever reach out to you to
12 request to join that initiative and support that
13 work?
14     A.   I think that the initiative probably
15 started while he was still there. I don't remember
16 Mr. Brannum ever coming to me asking if he could help
17 do anything, let alone that.
18     Q.   Now, you described Ms. Miller, Shelia
19 Miller's role on that project?
20     A.   I sure did.
21     Q.   And I believe you described it as
22 administrative in nature. Can you just -- can you

42 (Pages 432 to 435)

Page 436

1   elaborate on that for us?

2      A.   While we were doing -- again, this was a

3   very high profile project.  This is something that we

4   used to send the CEO daily updates on.  Shelia's job

5   was she kept every one of the minutes for the

6   meetings we did.  So every day we sent a note at the

7   end of the evening to the CEO on where we stood with

8   getting this project done, making sure that all the

9   meetings and everything happened on time, making sure

10  that the resources that were needed if we were doing

11  a bunch of calculations and needed models -- and, you

12  know, we had to cooperate with Freddie Mac -- making

13  sure all the collaborations that were necessary were

14  happening, that was really more Shelia's role.

15      Coordinating, facilitating, administrative

16  expense, updates, that was really what her role was.

17      Q.   A part of the function that Ms. Miller

18  had, did that involve project management?

19      A.   If you think about that, when I say

20  administrative, part of it is it was one big project

21  so, yes, it's project management.  And she had a

22  counterpart in Freddie Mac who did the same thing on

Page 437

1   their side.

2      Q.   Now, to execute on the business

3   justification that was dated January 9, 2009, could

4   Mr. Riedy have executed on that plan without your

5   approval?

6      A.   No, he could not.

7      Q.   And did you have any question that

8   Mr. Riedy's motivation in recommending the

9   elimination of the three public entity loan team

10  members, Maria Day-Marshall, Russell Atta-Safoh and

11  Mr. Brannum, was on the basis of race?

12      A.   No indication of that at all.

13      Q.   And that didn't come into your calculus

14  for eliminating those three positions?

15      A.   Absolutely not.

16      MR. STEWART:  I have no further questions.

17      ARBITRATOR ROSCOE:  Thanks.  Mr. Wachtel?

18      MR. WACHTEL:  May we have five minutes?

19      ARBITRATOR ROSCOE:  Whatever you need, of

20  course.  You mean a five-minute break?

21      MR. WACHTEL:  Yes.

22      ARBITRATOR ROSCOE:  Sure.  Is that all

Page 438

1   right?

2      MR. STEWART:  That's fine.

3      (Recess.)

4   EXAMINATION BY COUNSEL FOR COMPLAINANT

5      BY MR. WACHTEL:

6      Q.   Good afternoon, Mr. Hayward.  You

7   testified under examination from Fannie Mae's counsel

8   that there was a plan to bring consultants in if

9   necessary to work on asset management and structuring

10  deals, is that right?

11      A.   What I testified was we already had the

12  consulting group do an asset management prior to any

13  of the reorganization so we were using them for that

14  work already.  Part of the plan was, as a

15  contingency, if we needed to have these guys do

16  structuring, they could do it, and that was part of

17  it, that they could be a backup and do structuring

18  for us.

19      Q.   But wasn't the plan primarily that the

20  people in the CD Account in the field were going to

21  be able to do structuring?

22      A.   Yes, it was.

Page 439

1      Q.   Now, you testified that the collateral --

2   the increased collateral requirement decreased

3   Community Express business, is that right?

4      A.   I did do that.

5      Q.   And did you believe that the decrease in

6   Community Express -- that the increased collateral

7   requirement was permanent or it was something that

8   could be subject to change?

9      A.   I didn't know what -- again, the credit

10  people made this decision, and it was in the midst of

11  the credit crisis, so the duration of how long that

12  requirement would be there I couldn't make a guess

13  at.

14      If you go back, this is 2008.  The world

15  is falling apart from a credit perspective.  You

16  know, they put this thing in and we just had the

17  deal.

18      Q.   At the start of each year, the Public

19  Entities channel set volume goals for their business,

20  correct?

21      A.   Yes.

22      Q.   Did you play a role in the volume goal

43 (Pages 436 to 439)

Page 440

1   setting process?
2       A.   The role I would play is, it would start
3   out with whoever the business leader was, whether it
4   was Public Entities or any other business I was
5   running. The person running it would set their goals
6   for the year, I would approve what those goals are.
7   So they would come to me and say, here's my plan,
8   this is how much business I think we can do and I
9   would either say yea, nay, or we have a discussion
10  about changing it.
11      Q.   And if you disapproved a goal, I take it
12  the organization would change the goal, correct?
13      A.   If I disapproved of a goal or said it
14  needed to be modified, it would be modified.
15      Q.   Can you turn to Exhibit 106, please?  This
16  is a Public Entities Loan team pipeline January 5th,
17  2009. Can you turn to page 758, please?  And it
18  should be headed Volume Highlights, is that right?
19      A.   Yes, it is.
20      Q.   And doesn't that show that the Community
21  Express goal for 2009 was volume goal of
22  $300 million?

Page 441

1       A.   That's what it shows.
2       Q.   And that's a volume goal that you
3   approved?
4       A.   Yes, it is.
5       Q.   And that would have been significantly
6   more Community Express business than had ever been
7   done in the past, right?
8       A.   That's correct.
9       Q.   And so you believed it was possible that
10  Community Express could have that much business in
11  2009?
12      A.   One of the things that -- reasons why I
13  believed we could, as we got into the crisis, some of
14  the HFAs were running into a credit crunch and could
15  use the additional crash, and so I thought we might
16  get more business from the HFAs for Community
17  Express. So yes, I thought this was a reasonable
18  goal at the outset because of that. Again, go back
19  to when we had all -- this was crisis city.
20      Q.   Let's go to Exhibit 109, please. This is
21  a Public Entities Loan team pipeline for January
22  26th, 2009 so just a couple of days after the

Page 442

1   reduction in force that we're here about.
2           Page 775, that shows a volume goal still
3   of $300 million for Community Express, correct?
4       A.   Yes, it does.
5       Q.   So that shows, doesn't it, that as of the
6   time of the reduction in force in this case, you
7   thought it was possible that Community Express could
8   produce $300 million volume for the year?
9       A.   Yes, we did think that.
10      Q.   When did you conduct -- ask it a different
11  way. You came to what was then the American
12  Communities Fund in 2004, is that right?
13      A.   Yes, I did.
14      Q.   When did you conduct the reductions in
15  force that affected the community development area?
16      A.   That was in 2008.
17      Q.   It was in 2008?
18      A.   That was in 2008. What I don't
19  remember -- I'll make sure I -- is the first time I
20  took over, I think we did get a reduction of like
21  20 people or something like that. So it depends on
22  when I took -- I remember I had it twice.

Page 443

1       Q.   And when you took over the community
2   development area, those offices had been partnership
3   offices, correct?
4       A.   Yes.
5       Q.   And the partnership offices had a number
6   of people that were really lobbyists, correct?
7       A.   Yes.
8       Q.   So was the reduction in force to eliminate
9   the positions of the lobbyists, or was the 2008
10  reduction in force in community development something
11  other than that?
12      A.   The real core value of the reduction in
13  force was so you could put utility business people in
14  these business centers to do the business of the
15  company. That's the real value of doing that
16  reorganization. So if you were exclusively
17  political, you would not end up there because we
18  didn't need that. What we needed was business
19  people.
20      Q.   And the exclusively political people,
21  their jobs were eliminated in 2005 or 2008?
22      A.   Well, we had two rounds. We used to have

Page 444

1    these people who were called -- they were part of
2    communications.  They were called something.  And the
3    first time I took over, we eliminated 20 positions
4    and those were communications and political people
5    and some of them were in the offices and some of them
6    were not.  That was the first time I took over.
7        Q.   And then in 2008, it was a different
8    reduction in force?
9        A.   It was a different reduction in force.
10       Q.   Now, Exhibit 31, the January 9th, 2009
11   memorandum in your name we were looking at, it states
12   that Ms. Zukoff -- I want to get the wording right.
13   It states that she brings strong leadership skills to
14   the team as reflected in her L plus rating in the
15   2008 year end performance review.  Do you see that?
16       A.   Yes.
17       Q.   But can you turn to Exhibit 140, please?
18   That may be the other binder.  For me, it is.
19   Exhibit 140 is Ms. Zukoff's actual year end review,
20   correct, for 2008?
21       A.   Looks like it, yes.
22       Q.   And Exhibit 140, was that issued by the

Page 445

1    time of the January 9th, 2009 memo?
2        A.   What would have happened -- I think that
3    the review itself was probably not new because there
4    was a whole process around that.
5             Typically what happened is you would do a
6    calibration session.  The calibration would be all
7    directors in a certain area or all level 5s in a
8    certain area and you would kind of rate them.  So you
9    might come up with your initial ratings before you
10   actually had to sit down and write the review.
11            So as a boss, you would know, I'm going to
12   give -- in December, you would probably know I'm
13   going to give this person an L plus because that's
14   what they earned in that year and then later on, you
15   would get the right to review.  That's just how the
16   process works.
17       Q.   So at the time the January 9th, 2009 memo
18   came out, Ms. Zukoff's 2008 rating really hadn't
19   issued yet?
20       A.   The review had not been written yet.  I am
21   sure that Mr. Riedy knew exactly what her rating was
22   going to be because everybody else, for every

Page 446

1    employee at that point, January 9th, you would have
2    known what their rating was going to be.
3        Q.   Moving on to the credit calls, did you
4    have any conversations with Mr. Brannum where you
5    told him that he needed to improve the presentation
6    of the calls?
7        A.   No, I never had a conversation with him --
8        Q.   About that?
9        A.   No, I didn't.  About that particularly,
10   no, I did not have a conversation with him.
11       Q.   Can you open up to Exhibit 2, please?
12       A.   Which exhibit?  I'm sorry.
13       Q.   Exhibit 2.
14       A.   2?
15       Q.   Yes.
16       A.   Sure.
17       Q.   Now, do you know how many times
18   Mr. Brannum went to Los Angeles in 2008?
19       A.   No, I do not.
20       Q.   Can you turn to Exhibit 2, page 427 in
21   Exhibit 2?  The sixth row in that table shows
22   Mr. Brannum in Los Angeles to meet the housing

Page 447

1    authority, doesn't it?
2        A.   Yes.
3        Q.   Can you turn to page 433, please?  The
4    third row on that table shows you, Ms. Neely,
5    Ms. Wilbourn, Mr. Riedy, meeting with the housing
6    authority in Los Angeles, correct?
7        A.   Yes.
8        Q.   And that refers to discussing existing CE
9    loan, that would be Community Express loan?
10       A.   Yes.
11       Q.   Would that be the loan Mr. Brannum was
12   working on?
13       A.   I think it would have been, yes.
14       Q.   And also REO acquisitions?
15       A.   Yes.
16       Q.   That's a different issue?
17       A.   Yes.  REO acquisitions would be them
18   buying REO from us.
19       Q.   So you had direct conversation with the
20   housing authority about the Community Express loan
21   Mr. Brannum was working on?
22       A.   In that meeting, that would have been Carl

Page 452

1    Q.    But how was Beverly involved in the
2    conversation over whether the CBC team members were
3    taking larger roles in structuring deals?
4    A.    So Beverly and Carl who worked together as
5    a team on this particular would have had many
6    conversations about this, and the conversations would
7    have been probably routine.
8    Q.    Are you telling me you remember a
9    particular conversation with Beverly Wilbourn in
10   which she said that the CBC team members were taking
11   a larger role in structuring deals?
12   A.    I remember having a conversation when this
13   reorg was started where Beverly said, I think these
14   people are ready to do more and can do more.  I
15   remember her specifically telling me that.
16   Q.    And so when would that conversation have
17   taken place in terms of months?
18   A.    I don't have the date.  Sometime between
19   October and January.  I just don't have the specific
20   date.
21         MR. WACHTEL:  Thank you.  Nothing further.
22         ARBITRATOR ROSCOE:  Do you want to ask

Page 453

1    anything more?
2          MR. STEWART:  Just a few follow-ups.
3          EXAMINATION BY COUNSEL FOR RESPONDENT
4          BY MR. STEWART:
5    Q.    Exhibit 2, FM 416, the eighth row down, do
6    you see that?
7    A.    Yes.
8    Q.    There is a date for late April of 2007.
9    The opportunity is for the Los Angeles Housing
10   Department, identifies Mr. Brannum, Ms. Daniele and
11   the potential is for $35 million Community Express
12   deal.  Do you see that?
13   A.    I see it.
14   Q.    Is that the same deal that counsel had
15   just been questioning you about on redirect?
16   A.    I think it's the same deal, yes.
17   Q.    And given now the date is April of 2007,
18   Mr. Brannum had started or was working on this deal.
19   Given that it didn't close and Mr. Brannum was let go
20   in January 2009, in your view, had he done sufficient
21   work to try to get this deal closed?
22   A.    In my view, he had over a year to close

Page 454

1    this transaction.  It did not close.  The outcome
2    says that enough wasn't done.
3    Q.    Would you turn to Exhibit 109?  Let me
4    know when you're there.  It's in volume 2.
5    A.    Got it.
6    Q.    And this is a January 26, 2009 pipeline
7    report?
8    A.    Yes.
9    Q.    So this is post the reorganization.  And
10   counsel had directed you to a revenue -- I'm sorry,
11   not a revenue but a volume goal for the Community
12   Express product of $300,000.  Do you see that?
13   A.    300 million.
14   Q.    That's at FM 775.
15   A.    Yes.
16   Q.    Now, would you turn to the following page
17   at FM 776?
18   A.    Yes.
19   Q.    And that indicates in the first few lines
20   there, under Opportunity Names, various
21   organizations.  Are these HFAs?  Are you familiar
22   with these organizations?

Page 455

1    A.    Yes.  Quite a few of them are HFAs.
2    Q.    And this is for the Community Express
3    product?
4    A.    That's correct.
5    Q.    So these deals were in the pipeline as of
6    January 26, 2009?
7    A.    That's correct.
8    Q.    And to what extent if any did the deals
9    that were in the pipeline contribute to the volume
10   goal that is expressed on FM 775, the $300 million
11   volume goal?
12   A.    They are directly connected.  As I said,
13   during this point in the crisis, a bunch of the large
14   HFAs and some of the small ones had liquidity
15   problems and so we thought that some of these
16   transactions would close when we have helped them
17   with their liquidity.
18         California, we had a big -- didn't know we
19   would get 500 million, which is what's on this
20   pipeline but we knew they had a liquidity need and we
21   had an opportunity to do some business because they
22   had those needs.

47 (Pages 452 to 455)

# NEELY

# TRANSCRIPT

```
 1                    JAMS ARBITRATION

 2    - - - - - - - - - - - - -    X

 3    STEVEN BRANNUM,                 :

 4         Claimant,                  :

 5              v.                    :   Reference No.

 6    FEDERAL NATIONAL MORTGAGE       :   1410005474

 7    ASSOCIATION (FANNIE MAE),       :

 8         Respondent.                :

 9    - - - - - - - - - - - - - -    X

10                         Washington, D.C.

11                         Thursday, October 27, 2011

12              Arbitration before ARBITRATOR JERRY ROSCOE

13    in the above-entitled matter, the witnesses being

14    duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15    in and for the District of Columbia, taken at the

16    offices of JAMS, 555 13th Street, N.W., Washington,

17    D.C., at 9:22 a.m., Thursday, October 27, 2011, and

18    the proceedings being taken down by Stenotype by MARY

19    GRACE CASTLEBERRY, RPR, and transcribed under her

20    direction.

21

22
```

## Page 1003

1     loans didn't close, they would have just volunteered

2     their time to see that there was no market for this.

3     They solidly believed there was a market as well so

4     that became my first team.

5          But at the same time, I had met Lisa

6     Zukoff who was at the West Virginia partnership

7     office of Fannie Mae and prior to that, she had been

8     the executive director of the Wheeling, West Virginia

9     Housing Authority.  And I'm not even sure where we

10    met or how we met but I quickly engaged her to help

11    me in this endeavor as well.

12         Some of the things that she brought that I

13    didn't have is the knowledge of housing authorities

14    and how they're governed and how the people who work

15    at the housing authorities really think, how to open

16    the doors.

17         And so she became my first sort of

18    volunteer labor.  So I recognized that I wouldn't be

19    allowed to hire staff so I looked through the field

20    to the partnership offices and started to identify

21    some partnership offices who could help me in the

22    marketing of the product.  So it was all sort of

## Page 1004

1     volunteer, unpaid until the closing for the

2     consultants, and then partnership offices who worked

3     for Fannie Mae but I didn't have to pay out of my

4     budget or Wayne didn't have to pay out of his budget

5     or Phil didn't have to pay out of his budget.

6     Q.    And at that point, Ms. Zukoff was within

7     some other organization within Fannie Mae, is that

8     correct?

9     A.    Yes.  The partnership offices at that time

10    were separate from the American Communities Fund.

11    They reported up through another -- so ultimately we

12    had the same executive vice president, different

13    senior vice presidents and different directors.

14    So --

15     Q.    Were there other individuals like

16    Ms. Zukoff who were resident in these partnership

17    offices who you used as labor to market the

18    Modernization Express product?

19     A.    Oh, absolutely.  There were varied ones

20    throughout the country.

21     Q.    Do you recall a woman named Lisa Tarter?

22     A.    Yes.

## Page 1005

1     Q.    Was she one of those individuals?

2     A.    She was one of those individuals.

3     Q.    Do you recall where she was in the

4     organization and where then in the country?

5     A.    She was the deputy director of the Ohio

6     partnership offices and physically she was located in

7     Cincinnati even though her director was located in

8     Columbus, Ohio.

9     Q.    Now, at some point Mr. Brannum,

10    Ms. Day-Marshall and Mr. Russell Atta-Safoh joined

11    your team, is that correct?

12     A.    That's correct.

13     Q.    Do you recall the circumstances of

14    Mr. Brannum joining your team?

15     A.    Yes.  Steve had been on rotation in

16    California and Jeff Hayward came to me and said, we

17    need to bring Steve back, he's floundering out there,

18    he's growing roots, we need to make him productive

19    again, would he be useful on your team.  And I said,

20    yes, absolutely.

21     Q.    Did anything else occur in that

22    conversation with Mr. Hayward?

## Page 1006

1     A.    I don't recall.  I think that happened

2     over multiple conversations.

3     Q.    Were you familiar with Mr. Brannum at that

4     point where Mr. Hayward talked to you about him?

5     A.    Yes.  We had worked in the same group.

6     Remember when I said that -- and this is where -- how

7     the structure was officially is fuzzy, but when I

8     worked for Wayne, Steve was also working for Wayne at

9     the same time.  So we had interactions there.

10     Q.    What did you know about Mr. Brannum's

11    performance at the point where Mr. Hayward identified

12    him as possibility to join your team?

13     A.    I had been very impressed with his

14    quantitative skills.  He had reported to a manager

15    and director who I certainly would not have

16    flourished under if I had reported to her.  She was

17    sort of impossible, I would say, to work for.  But in

18    the instances I had worked with Steve, I had been

19    very impressed with his analytical skills.

20     Q.    Now, when Mr. Brannum joined your team,

21    what was the nature of that job?  If you could

22    summarize what the position's responsibilities were

Arbitration Day 4                                                    October 27, 2011
                        Washington, DC

Page 1007

1  to do, how would you describe them?
2      A.  So prior, when he was working for Wayne
3  earlier, one of the things that he did was really
4  solidify the underwriting criteria for the Community
5  Express.  So the woman he worked for was responsible
6  for the Community Express municipalities, so
7  basically working with municipalities.
8          So I was on the development and the target
9  markets and Steve and his boss were working on below
10  AAA or below investment grade bond purchases and
11  Community Express.  And so he really worked to help
12  solidify the underwriting criteria for that to
13  move -- and pricing methodology for that to really
14  move toward consistency in that product.
15     Q.  And what time frame was this?
16     A.  I don't remember.
17     Q.  Did he have any other responsibilities
18  when he joined your team?
19     A.  When he joined my team.  So that was prior
20  to him joining my team.
21     Q.  Let me be clear.  What were your
22  expectations of him when he joined your team?

Page 1008

1      A.  That he would sort of bring that
2  consistency and professionalize the Community Express
3  product.  It had happened earlier and then when he
4  moved, the consistency of the Community Express had
5  dropped again, so I was given the responsibility for
6  Community Express and Modernization Express at that
7  time.
8          Steve's former boss had left and I brought
9  him back to basically grow the modernization and
10  Community Express -- help grow, because he was part
11  of a team, those, but with a special focus on the
12  Community Express.  And at that time it was being
13  marketed by multiple people in the field, not just
14  our team and not those who we eventually then sort of
15  officially partnered with, but anyone in the field
16  structure of Community Lending.
17          So Steve really helped to oversee the
18  consistency and make sure that when the deals came
19  in, they met the criteria.
20     Q.  Let's bring you up to January of 2009.
21     A.  Okay.
22     Q.  And take a look at Exhibit 4.

Page 1009

1      A.  So this is 2008.
2      Q.  This is January 8 through 9, 2008.  Take a
3  look at the document and make sure you're familiar
4  with it.
5      A.  Uh-huh.
6      Q.  And I would like you to take a look at FM
7  16.  Second page from the end.  Do you see at the
8  bottom there is a list of CL mentor assignments?  Do
9  you see that?
10     A.  Uh-huh.
11     Q.  And it lists various individuals who were
12  on the community development team?
13     A.  Right.
14     Q.  Paired with individuals who were on the
15  public entity loan team who were under you, correct?
16     A.  Right.
17     Q.  Can you explain what this mentor
18  assignments was and what was going on at this point
19  in time?
20     A.  At this stage, we were solidifying a
21  partnership that had been informal basically since
22  the day that Lisa and I worked together when she was

Page 1010

1  still in the West Virginia partnership office, but
2  several things were happening at this same time.
3          One was Jeff Hayward was questioning the
4  value of the partnership offices or Community
5  Business Centers or whatever their name was at that
6  time.  Because of the whole accounting stuff, the
7  political side of their business was no longer talked
8  about and allowed to do, so what were they going to
9  do?
10          And there was conversations happening and
11  lots of rumors swirling around Fannie Mae that they
12  were going to get rid of them all, they were going to
13  get rid of some, they were going to find some that
14  were capable of doing other businesses and assigning
15  them.  So proactively my team decided to identify
16  which ones we wanted to be assigned to us and take
17  them on before others sort of got to divvy them out.
18          Because if they were already doing our
19  business, they already knew our business when they
20  were officially assigned to a business, we knew we
21  would get the ones we want.  So this was formalizing
22  what had already been happening.  And at the same

Alderson Reporting Company
1-800-FOR-DEPO

Page 1011

1  time, my team was getting a lot of pressure to grow
2  our business even more, and recognizing that I
3  couldn't grow my team, the only way to grow my
4  business or our business was to get the people in the
5  CBCs more engaged in our business.
6       And so recognizing that the people in the
7  CBCs didn't know the products as well as my team, we
8  buddied them up so we didn't make anybody go in to
9  visit a customer blindly or without the solid
10  knowledge.  And so these were assigning the mentors
11  who would help the CBCs not only get up to speed but
12  throw ideas off of them and work together.
13       Q.   Is that why they were referred to as
14  mentors?
15       A.   Yes.
16       Q.   Now, initially, was there a division of
17  responsibility among the mentors and the mentees for
18  sourcing potential deals, underwriting, structuring,
19  et cetera?
20       A.   Yes.  And I would say it was -- depending
21  on the partnership or the mentor/mentee relationship,
22  those responsibilities were not consistent across but

Page 1012

1  the message was, ultimately the volume goals and the
2  revenue goals were the responsibility of my team, so
3  the better you teach your mentee how to go out and
4  source business and structure business, the better
5  you can be.  But ultimately the volume goals and
6  revenue goals were the responsibility of Steve,
7  Maria, Russell, Lisa.
8       Q.   Now, given --
9       A.   Lisa Zukoff.
10       Q.   Given that the revenue goals were the
11  responsibility of the members of your team, the D.C.
12  Public Entities team, what responsibility if any did
13  they have for sourcing transactions?
14       A.   That was very essential.  I would say that
15  was probably -- going out and seeking leads and
16  identifying which leads were real and turning them
17  into deals was all -- if you couldn't do any part of
18  that, you weren't successful.
19       Q.   You mentioned going out.  What do you mean
20  by going out?
21       A.   The only way that you can really get a
22  sense of what a public entity is doing is to go out

Page 1013

1  and talk to them face to face.  A phone call is
2  little bit helpful but to go out and see what they're
3  doing and really get a sense of who they are and what
4  they want to do is really important.
5       Q.   And how do you know that?
6       A.   I tried in the beginning, when it was just
7  me and the two consulting firms and Lisa, we were
8  obviously very limited and so we really worked the
9  conference circuit.  So we went out and did
10  presentations on our product and then followed up
11  with people that we got cards from, but it was almost
12  all by phone because we couldn't be everywhere at
13  once.
14       And in late 2006, I was at a conference
15  and I met the development director from the Portland
16  Housing Authority in Oregon and they had just
17  selected to do a bond transaction instead of doing a
18  Fannie Mae Modernization Express loan.  So I knew who
19  this guy was and so when I -- I didn't know him by
20  face but as soon as he told me who he was, I
21  proceeded to tell him that I think he made a mistake
22  by choosing his investment banker over Fannie Mae.

Page 1014

1  And he said, well, why do you think that?  And I
2  proceeded to tell him all his deal points and what
3  they would have been if he had gone with Fannie Mae.
4       And he said, wow, you know more about my
5  deal than I do.  And I said, well, I don't lose many
6  deals and so it's my job to be able to figure out
7  where I went wrong.  And he said, well, you didn't
8  come visit me.  And that conversation even five years
9  later really resonates with how important those
10  relationships were in our business, and that set the
11  strategy for marketing in the Public Entities team
12  for the next three years.
13       Q.   And did you convey the notion that
14  individuals on your team needed to establish
15  relationships and go out and meet with the potential
16  customers face to face, that that was one of your
17  expectations?
18       A.   Yes.  I think I've told that story 40
19  times.  I'm sure my team got tired of hearing about
20  it.
21       Q.   And you told that story to Mr. Brannum?
22       A.   I think so.

61 (Pages 1011 to 1014)

Arbitration Day 4                                      October 27, 2011
Washington, DC

## Page 1015

1    Q.   Was it then your expectation that the
2  individuals on your team would be making customer
3  visits?
4    A.   Yes.
5    Q.   And did you keep any sort of a log or
6  recordation of the visits that the individuals on
7  your team made?
8    A.   Yes.
9    Q.   Would you take a look at Exhibit 2 in that
10 document?  And this is a document stating customer
11 visits and it has, on the left-hand side, a number of
12 dates starting with January of 2007 and it ends in
13 December of 2008.  Do you see that?
14   A.   Uh-huh.
15   Q.   Is this the log that you were referring
16 to?
17   A.   Yes.
18   Q.   Now, prior to the implementation of the
19 buddy system, this is before the CD account team
20 starts.  You have a more formal relationship with
21 them in marketing the product.  Who was responsible
22 for making entries to this log?

## Page 1016

1    A.   My team.
2    Q.   And how did you convey that to your team?
3  What directions if any did you give them?
4    A.   I don't know.
5    Q.   Your expectation was that the members of
6  your team would make notations of the visits that
7  they were making?
8    A.   Yes.
9    Q.   And had you advised them at all that you
10 would be looking at this to have an understanding of
11 what marketing activities they would be doing?
12   A.   Yes.
13   Q.   Were you aware of any strategy that
14 Mr. Brannum had employed not to go on customer visits
15 unless the deal was over $10 million?
16   A.   No.
17   Q.   Would that have been an acceptable
18 strategy in your estimation?
19   A.   No.
20   Q.   Why not?
21   A.   Very few of our deals were over
22 $10 million.  If we didn't visit for the

## Page 1017

1  10 million -- except for $10 million, we may have
2  done three deals the whole time I was there.
3    Q.   Are you familiar with a deal that
4  Mr. Brannum worked on with the City of Los Angeles?
5    A.   Yes.
6    Q.   And you're aware that that deal was valued
7  at some point at 35 million, at some point at
8  $30 million?
9    A.   Yes.
10   Q.   And it was for a Community Express loan?
11   A.   Yes.
12   Q.   Do you understand whether or not that deal
13 closed?
14   A.   That deal never closed.
15   Q.   Do you understand why that deal didn't
16 close?
17   A.   Yes.
18   Q.   Can you explain that for the arbitrator?
19   A.   The deal ultimately didn't close because
20 the City of L.A. could not or would not give us full
21 recourse, and that was one of the standard criteria
22 of the Community Express, and as we moved closer to

## Page 1018

1  the end of my tenure, that was never waived.
2    Q.   And when did it become apparent that the
3  City of Los Angeles could not give full recourse, do
4  you recall?
5    A.   I don't know.  I do know that in -- can I
6  look at the visit sheet?
7    Q.   Absolutely.  Let me direct your attention
8  to FM 416.  And it's the third page in.  And there is
9  an entry for late April of 2007.  Do you see that?
10   A.   Uh-huh.
11   Q.   The Los Angeles Housing Department,
12 indicates Mr. Brannum and the potential $35 million
13 Community Express deal?
14   A.   Yes.  It was not clear at that point,
15 though.  The deal went through a lot of iterations
16 with issues throughout its lifetime but what
17 ultimately killed it was later.
18        And I'm just going to give you -- it was
19 still alive with that potential at a date and it was
20 because I was in L.A. in, I wanted to say it was -- I
21 can't find the --
22   Q.   Would it be an entry where you were

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4                                                                October 27, 2011
Washington, DC

Page 1019

1    present?
2        A.   Yes.
3        Q.   Why don't you take a look at FM 434.
4        A.   Yes.
5        Q.   Which is April 16, 2008.  Do you see that?
6        A.   Yes.  So the California HFA conference,
7    the first entry on 4/21/2008, the deal almost died at
8    that point, but life was breathed back into it within
9    the next few weeks.
10       Q.   Can you describe what happened, how the
11   deal was falling apart and how life was breathed back
12   into it?
13       A.   Sure.  The loan to the City of Los Angeles
14   was going to be used to provide first loss on a loan
15   fund that other investors were investing in, so we
16   were loaning money to the City of L.A. that they
17   would then use to provide first loss into the -- so
18   that was a public entity, Steve's City of L.A. deal.
19           Separately, also within Community Lending,
20   though, the community channel was investing in that
21   loan fund.  Right about that time, our revenue
22   requirements that deals had to be profitable became

Page 1020

1    gospel within Community Lending and that piece of it,
2    the investment into loan fund, was not profitable
3    based on our revenue profitability model.  And so the
4    word was given to the loan fund that Fannie Mae
5    wasn't going to invest in the loan fund.
6            So separately, the head of the housing
7    department at the City of L.A. said, if you're not
8    investing in the loan fund, we don't need to borrow
9    money from you.  And so Patrick Murcia, who was the
10   director of the San Francisco partnership office and
11   the lead director for all of the western CBCs, came
12   up with a strategy to run the profitability model
13   using both of these transactions together, similar to
14   the way a corporation would do with a loss leader.
15   And the profitability on the City of L.A. loan was so
16   high, had it closed, that it offset the investment
17   into the loan fund.
18           So then we together had to sell that to
19   Credit and not really ultimately Credit but the
20   pricing people, portfolio, and it went up to Ken
21   Bacon, the executive vice president.  So we got the
22   go-ahead, okay, as long as these things both happen

Page 1021

1    together, we can do it.
2            So at that point, which was April, was
3    when it almost fell apart, probably went back to --
4    got back together and got confirmation that we could
5    do it.  About three months later, the deal -- it
6    still wasn't clear that the city would not or could
7    not give us full recourse.
8        Q.   Now, that's April of 2008 that you and
9    Mr. Murcia and perhaps some others tried to breathe
10   life back into this deal.  The deal had been in your
11   pipeline since late April of 2007, is that correct?
12       A.   Yes.
13       Q.   Did you think that Mr. Brannum had made
14   sufficient efforts to get the deal closed prior to
15   April of 2008?
16       A.   I don't know how to answer that.  Did he
17   make sufficient efforts?  Because these two deals
18   were so tied together, closing that deal wasn't
19   solely in his hands, but I did think he did not make
20   sufficient efforts to get both of them closed and
21   over the finish line.
22       Q.   And can you explain that?

Page 1022

1        A.   Well, exactly the point that I made why
2    the loan to the City of L.A. almost died was because
3    we hadn't closed into the loan fund.  So instead of
4    just saying, I can't close mine until you close
5    yours, a more proactive person would have said, I am
6    going to carry yours over the finish line too so I
7    can get mine done.  And so that's -- so it has to be
8    a joint, did he do enough jointly to get them closed.
9        Q.   And when you say recourse was one of the
10   issues, can you explain what that meant?
11       A.   Sure.  Full recourse is basically --
12           ARBITRATOR ROSCOE:  I think we've got that
13   concept.
14           BY MR. STEWART:
15       Q.   As it relates to this deal.
16       A.   As it relates to this deal, the city just
17   said, legally we can't do it.  But --
18       Q.   When did the city say that?
19       A.   Ultimately they didn't -- they must have
20   done it between April and when I left.  I'm not sure
21   when it actually officially died its final death.
22       Q.   Would you turn to Exhibit 123?  This is a

63 (Pages 1019 to 1022)

Page 1023

1  2006 performance evaluation for Mr. Brannum and it
2  indicates you are the manager at the time.
3      A.  I was.
4      Q.  And there are comments on this performance
5  evaluation related to certain goals that Mr. Brannum
6  had, is that correct?
7      A.  Yes.
8      Q.  If you would take a look at FM 112.
9      A.  Okay.
10     Q.  And there are comments regarding -- the
11  first description concerns underwriting and closing
12  six quality Community Channel deals.  And you provide
13  some comments for this goal.  Do you see that?
14     A.  Yes.
15     Q.  Can you explain what your comments were
16  intended to mean?
17     A.  So in the first paragraph, I say it wasn't
18  a very difficult goal and it was technically met but
19  there were extenuating circumstances.  Steve
20  inherited several deals that were just ready to close
21  but he inherited from a woman who went on maternity
22  leave, so he got credit foreclosing those deals but

Page 1024

1  the sourcing, structuring, underwriting really
2  guiding them through the whole process wasn't his.
3      In addition, two of the deals were CDs and
4  this was just us making a decision to buy a CD from a
5  mostly community banker local minority-owned bank.
6      Q.  And what is a CD?
7      A.  Certificate of deposit.  So just like the
8  one that anybody can buy by walking into --
9      ARBITRATOR ROSCOE:  The ones we used to
10  buy.
11     THE WITNESS:  Exactly, before they were at
12  a point --
13     ARBITRATOR ROSCOE:  Before we switched to
14  Fannie Mae stock.
15     THE WITNESS:  Yes.  And then another one
16  was a very small deal, $50,000, that was
17  overstructured and overanalyzed.  So basically out of
18  the 10 deals, I think it was 10 that he said he did,
19  once you discount sort of the ones you inherited, the
20  ones that were just, you know, fill out this form and
21  say, yeah, we should invest, there was only two
22  deals.  And I didn't know a lot about the Greystone

Page 1025

1  deal because it was before he worked for me.
2      But in Cocoa Housing Authority, Steve did
3  really quality work.  It was a very difficult deal to
4  get approved and to get closed but he really got to
5  know the deal and sold it well.
6  BY MR. STEWART:
7      Q.  In this review, you make some distinctions
8  between instances where Mr. Brannum displayed a sense
9  of urgency and was sharp in his analysis and in other
10  instances where his analysis was inconclusive and he
11  was not quite as sharp in his approach to the goals.
12  And I would direct you to the next description where
13  you talk about a particular project where, in your
14  estimation, Mr. Brannum did a lot of work initially
15  but didn't bring the project home.  Can you describe
16  what occurred here?
17     A.  So this was analysis about our
18  continuation of investing in CDARS.  So CDARS are
19  like CDs except CDs, in order to be federally
20  insured, at that time could only be $100,000.  In
21  order to make larger investments, a CDAR was -- I
22  don't even know what it stands for, but it was a

Page 1026

1  group of CDs that were brought together enabling one
2  company or individual to invest in CDs with one
3  investment vehicle but still get the federal
4  insurance.
5      And there were questions when
6  profitability really became the driving force, were
7  we actually making any money on these CDs once we
8  actually accounted for capital requirements, et
9  cetera?  And so because of Steve's quantitative and
10  analytical background, he was part of this analysis
11  team.
12     So the analysis on what are the capital
13  requirements and what is the profitability, Steve was
14  on, and that's his forte, the analysis.  But it was a
15  controversial project because there were certain
16  people who -- and high-up people who believed that we
17  should be doing this and there is value and then
18  there were others who were just as equally adamant as
19  we shouldn't be doing this and it's throwing money
20  away and we have limited capital so should we -- so
21  basically I think everybody was looking for the team
22  to make a recommendation and when the analysis was

64 (Pages 1023 to 1026)

## Page 1027

1 done, the answer was, it's inconclusive.

2          To me, that's not done. So it said either

3 you're not willing to make a recommendation and step

4 up and stand behind the analysis or more work needs

5 to be done. And either way, it was incomplete. So

6 again, Steve got 80 percent there and was really

7 solid and then sort of lost steam. And I don't know

8 why it didn't sort of get carried over the finish

9 line.

10     Q.   Did you have a conversation with

11 Mr. Brannum about the comments you provided to him on

12 this performance review?

13     A.   Yes.

14     Q.   Do you recall what took place in that

15 conversation?

16     A.   I don't.

17     Q.   Now, in the next section, it talks about

18 Mr. Brannum's work on the Community Express business

19 plan. Do you see that?

20     A.   You mean two sections down?

21     Q.   Two sections down, I'm sorry.

22     A.   Yes.

## Page 1028

1     Q.   And you talk about his being engaged in

2 the remediation activities and then not so engaged on

3 his business plan. Can you describe what occurred

4 here?

5     A.   What what him?

6     Q.   What occurred here and why you were

7 providing him with these comments and feedback.

8     A.   Oh. In early 2006, Community Lending got

9 an audit and I think -- I don't know if it was from

10 the regulator or who it was from, but basically we

11 were told that we had to clean certain things up for

12 all our products and until we did, we had to cease

13 doing business.

14          So that was remediation. So clean these

15 things up, make sure everything is in line and then

16 get authority to go back into business. And

17 throughout the remediation, there was a lot of

18 analysis. Are these profitable, was the underwriting

19 done well, do we have clear methodologies to

20 underwrite.

21          Steve was very engaged in that. But at

22 the same time, in anticipation that we were coming

## Page 1029

1 out of remediation, we were to be developing a

2 business plan. And he just never engaged in the

3 development of the business plan.

4     Q.   When you were Mr. Brannum's manager, did

5 you have any frustrations with his performance?

6     A.   Yes.

7     Q.   And can you describe that for the

8 arbitrator?

9     A.   It was mostly about motivation and

10 urgency. When Steve had a project that he was

11 interested in, felt like he had impact or that it was

12 important -- and that was a big one; he had to feel

13 like it was important -- he would be very, very

14 engaged and solidly on it.

15          But there were a lot of other times when

16 trying to light a fire under Steve was difficult and

17 something that I never really figured out how to do.

18          ARBITRATOR ROSCOE:  We are getting close

19 to the end of the planned day. Do you want to keep

20 going?

21          MR. STEWART:  We have quite a bit more.

22          (Discussion off the record.)

## Page 1030

1          (Recess.)

2 BY MR. STEWART:

3     Q.   Prior to the break, I had asked you about

4 the frustrations you had had with Mr. Brannum's

5 performance. Could you give us some specificity as

6 to what frustrations you had?

7     A.   Going back to the L.A. deal, it's why

8 hasn't this closed, why hasn't this closed, I think

9 that was a big one. And it was also, as the rest of

10 my team were constantly getting on planes going to

11 visit potential customers, despite the fact that I

12 had that conversation with Steve multiple times, it

13 just never seemed to happen.

14     Q.   What conversations did you have with

15 Mr. Brannum about traveling?

16     A.   Get on the plane, go visit customers.

17     Q.   Did you emphasize to him that that was

18 your expectation and perhaps why you expected him to

19 do that?

20     A.   Yes. And -- yes.

21     Q.   And how clear did you make it to him?

22     A.   I think and I hope I was very clear. When

65 (Pages 1027 to 1030)

Arbitration Day 4

Washington, DC

October 27, 2011

Page 1031

1  we talked about upcoming trips, there was almost
2  always the conversation, okay, Steve, where are you
3  visiting?  Who are you visiting?  And it just didn't
4  happen very often.
5      Q.   And how did he respond when you were
6  asking him to make more customer visits?
7      A.   Zeeda's handling it, Zeeda's making the
8  connections, I would say that was the most common
9  one.
10     Q.   And Zeeda was his assigned buddy?
11     A.   Yes.
12     Q.   Did he respond any other way?
13     A.   Not that I recall.  I don't know.  I'm
14  sure he did but I don't recall any specifics.
15     Q.   I want to take you to towards the end of
16  2008.  When did you submit your resignation to Fannie
17  Mae?
18     A.   Early January 2009.
19     Q.   Early January 2009.  And how did you do
20  that?  Who did you inform that you were going to
21  resign?
22     A.   I first went to Carl Riedy.

Page 1032

1      Q.   And did you have discussions with
2  Mr. Riedy about a potential reduction in force --
3      ARBITRATOR ROSCOE:  Did you have, or had
4  you had at that point?
5      BY MR. STEWART:
6      Q.   Did you have any conversations with
7  Mr. Riedy about a potential reduction in force of
8  members of the Public Entities loan team?
9      A.   Yes.
10     Q.   When did you have those conversations?
11     A.   Definitely in the fourth quarter of 2008.
12     Q.   And can you describe what took place in
13  those conversations?  What were you talking about?
14     A.   Well, it originally started as speculation
15  when there was -- again, it's sort of budget season,
16  rumors out there, nothing concrete, but there was
17  clear need to cut in Fannie Mae generally, and at the
18  same time, things were tightening up in credit within
19  Community Lending so there was obviously a need to
20  tighten up with Community Lending.
21         So even prior to any explicit, you need to
22  make cuts, Carl and I discussed making cuts to the

Page 1033

1  team.
2      Q.   And was it the proposal to eliminate the
3  members of the D.C. Public Entities loan team?
4      A.   I don't know what you mean.
5      Q.   Three individuals were displaced in early
6  January of 2009.  Are you aware of that?
7      A.   Uh-huh.
8      Q.   And that was would be Mr. Atta-Safoh,
9  Ms. Day-Marshall and Mr. Brannum?
10     A.   Yes.
11     Q.   Did you have discussions with Mr. Riedy
12  about each member of the team?
13     A.   Yes.
14     Q.   What discussions did you have with
15  Mr. Riedy about Mr. Brannum staying on or being
16  displaced?
17     A.   We weighed the pros and cons of keeping
18  and letting everyone go, and as things progressed
19  through my time running the Public Entities team, the
20  beginning of it, the team itself was responsible for
21  everything, sourcing, structuring, underwriting,
22  pricing, closing and often follow-up after closing.

Page 1034

1  And then pricing was handled by first portfolio
2  management and then the pricing group within
3  Community Lending.  So that became a lesser part of
4  our job.
5      Q.   Was that Diego Losada?
6      A.   Yes.  And credit, I would say my team did
7  a very good job training the Community Lending credit
8  team to understand our customers and our products, so
9  the need for us to do our own underwriting and then
10  sort of hand it off to credit in order for them to
11  reach the same conclusion that we wanted them to
12  reach sort of was lessened, so our need to actually
13  underwrite the deal became less important.
14         So the emphasis was on customer management
15  from sourcing to pushing everybody through to
16  actually get the deal closed.  So when we talked
17  about strengths and weaknesses of Mr. Brannum, his
18  strengths, the pricing and the underwriting, were
19  less and less important, and his weaknesses, the
20  sourcing and staying on top of everybody involved in
21  closing, including the lawyers, the customer,
22  portfolio management, everybody who had to do

66 (Pages 1031 to 1034)

Page 1035

1  something to get the deal closed, was also another
2  weakness. So given that, he was actually at the top
3  of the list of people to go.
4      Q.  Was there discussion about keeping
5  Ms. Zukoff on?
6      A.  Yes.
7      Q.  And what took place in those discussions?
8      A.  It was a very similar conversation about
9  strengths and weaknesses. What were Lisa's
10  weaknesses. Analytics, pricing, you know, the
11  quantitative stuff. Well, that wasn't as important.
12  And what were her strengths? She is a bulldog when
13  it comes to getting things done, so really riding
14  herd on lawyers and portfolio management to get deals
15  done, and her knowledge of our primary customer,
16  which at that point was becoming increasingly public
17  housing authorities.
18          She knew what they did, she knew how they
19  thought and she knew so many people in the industry,
20  that she was sort of recognized within the industry
21  as an industry leader.
22      Q.  To what extent if any did Ms. Zukoff's

Page 1036

1  experience as a manager of people come into play in
2  your discussions with Mr. Riedy?
3      A.  It actually didn't that much because in
4  early conversations, I was going to stay. So in
5  terms of managing, it was going to be who was going
6  to be my -- who is going to be left on the team and
7  so early conversations prior to me giving my notice,
8  there was no management conversations that were had.
9      Q.  And did that change at some point?
10      A.  About once or twice after I gave notice,
11  we did have conversations, Carl and I, but then Carl
12  removed me from conversations about what would happen
13  to the team.
14      Q.  Had you discussed with Mr. Riedy that
15  Ms. Zukoff would be a good successor to lead the
16  newly reconstituted public entity loan team?
17      A.  Yes. I actually had a conversation with
18  Carl about Lisa being a good leader before I
19  officially became the director of the public entity
20  team. I had been a director and then I took a step
21  down to business manager and when the public entity
22  team grew, I kept saying, and others said to Carl

Page 1037

1  often, we need a director in our channel, just like
2  the other two channels have, and he said, just say
3  the word and we'll have a director. And I said, no,
4  I don't want to be it. I think Lisa should be it.
5          So at that point, he did not know Lisa
6  very well. You know, she was in the field, he didn't
7  see her, they didn't have much interaction and so
8  when I indicated that I wasn't that interested, he
9  basically strong-armed me into doing it anyway.
10          So it was at that point -- and I think
11  that was in 2007 that I had conversations about
12  Lisa's management abilities and the fact that she ran
13  the housing authority in Wheeling, overseeing a very
14  large staff, that it would be easy for her to take
15  over as manager.
16      Q.  Did you have conversations with Mr. Riedy
17  about members of the CD account team who would then
18  be responsible for marketing the two products?
19      A.  Yes. That happened prior to the official
20  assignments of the buddy/mentor relationships. So
21  that was in early 2008 so those conversations
22  happened throughout the second half of 2007.

Page 1038

1          Again, sort of the writing went on the
2  wall that there was going to be layoffs within the CD
3  team and I wanted to make sure that the ones that I
4  wanted that were already helping unofficially,
5  helping the public entity team -- you can see them on
6  the pipeline or the visit report who was already
7  active -- to make sure that they made it through the
8  cut so I still had my team, my unofficial team
9  intact.
10      Q.  Who was strong, in your estimation, at
11  that point?
12      A.  Who was strong? Lisa Tarter was really
13  strong. Richard Staples was excellent. Evett
14  Francis, were all at the top of the list.
15      Q.  And how did you come to know their
16  abilities, Lisa Tarter, Richard Staples and Evett
17  Francis?
18      A.  Actually, three different ways. So with
19  Lisa Tarter, Lisa Tarter actually was instrumental in
20  bringing in and selling to internally the very first
21  Community Express loan that was done in American
22  Communities Fund back in 2001, I believe, and that

Page 1039

1    was to the Cincinnati Metropolitan Housing Authority
2    and it started out as a $4 million loan and she had
3    to do a lot of education internally about what is a
4    housing authority and why they're good credit even
5    though that wasn't her job because she knew, in order
6    to get things done in Cincinnati, she needed that
7    loan for her own sort of success within the
8    Cincinnati market.
9            Because of that, she had stayed very, very
10   close, in close touch with the Cincinnati housing
11   authority through that entire time, and then she sort
12   of expanded that knowledge to reach out within her
13   market.  So that was Lisa.
14           Richard, once he heard about the product,
15   the Modernization Express product, at a meeting among
16   all of Housing and Community Development, he came up
17   with the idea of pulling together all the executive
18   directors of all the housing authorities in Rhode
19   Island -- not a huge state, not that hard to do --
20   because he saw immediately the value of Modernization
21   Express.
22           So he was really one of the people who got

Page 1040

1    into my mind:  Group meetings, get a lot of people
2    together at one time, cost-effective.
3            And then Evett had been in the American
4    Communities Fund prior to her joining the partnership
5    office in Florida, so I knew that she already had an
6    understanding of the product, at least Community
7    Express, knowledgeable about underwriting.  So that's
8    how I got to know those three and that's how I tagged
9    those three originally.
10   Q.   Now, towards the end of 2008, did you have
11   any discussions with Mr. Riedy about the CD account
12   team members taking over responsibility for marketing
13   and structuring, taking over the responsibilities for
14   the loan products?
15   A.   No.  It was always to supplement my team
16   and never to supplant.  Ultimately the
17   responsibilities for volume and profitability,
18   revenue goals were my team's.
19   Q.   And you resigned from Fannie Mae in early
20   January 2009?
21   A.   Yes.
22   Q.   What were the factors that you were

Page 1041

1    considering at the time when you resigned from Fannie
2    Mae?
3    A.   Throughout my time at Fannie Mae, one of
4    the things that some people used to call my super
5    power was my ability to get things done even though
6    there was always a lot of resistance, creating the
7    Modernization Express, getting that approved,
8    bringing pricing out of portfolio management into our
9    group with them just sort of checking a box, okay?
10           There was a lot -- getting some really odd
11   deals done when I was in target markets.  But I knew
12   how to get things done.  So in mid-2008, the new
13   regulator came in and they were my Kryptonite.  I
14   could not get things done anymore.  I didn't know how
15   to navigate the new Fannie Mae and I valued -- what's
16   most important to me in a job is actually making a
17   difference and if I can't get loans done, if I can't
18   help communities, I may as well go somewhere else.
19   So I started having conversations externally at that
20   point.
21   Q.   Were there any issues, to your
22   recollection, that impacted the public entity loan

Page 1042

1    team's ability to market the Community Express
2    product?
3    A.   There were a lot.  Credit really tightened
4    down.  And by the time I left, we had a requirement
5    for 100 percent collateral.  That was the nail in the
6    coffin of Community Express, in my opinion.  And if I
7    didn't have Community Express -- and at the same time
8    we were starting to get push-back on some of the
9    aspects of Modernization Express too, but that was
10   the biggy.
11   Q.   And that's Community Express as it related
12   to public housing authorities, correct?
13   A.   Uh-huh.
14   Q.   To your recollection, was the Community
15   Express product also marketed to housing finance
16   agencies?
17   A.   Yes.
18   Q.   And were a part of that initiative?
19   A.   I wasn't part of the initiative to market.
20   I was part of the initiative to work with the HFA
21   team to help them understand our product and see how
22   it matched the needs of the HFAs that they understood

68 (Pages 1039 to 1042)

```
 1                      JAMS ARBITRATION

 2     - - - - - - - - - - - - - - - X

 3     STEVEN BRANNUM,                 :

 4         Claimant,                   :

 5             v.                      :   Reference No.

 6     FEDERAL NATIONAL MORTGAGE       :   1410005474

 7     ASSOCIATION (FANNIE MAE),       :

 8         Respondent.                 :

 9     - - - - - - - - - - - - - - - X

10                         Washington, D.C.

11                         Friday, October 28, 2011

12             Arbitration before ARBITRATOR JERRY ROSCOE

13     in the above-entitled matter, the witnesses being

14     duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15     in and for the District of Columbia, taken at the

16     offices of JAMS, 555 13th Street, N.W., Washington,

17     D.C., at 9:19 a.m., Friday, October 28, 2011, and the

18     proceedings being taken down by Stenotype by MARY

19     GRACE CASTLEBERRY, RPR, and transcribed under her

20     direction.

21

22
```

Page 1050

1   there is no longer an HCD group at Fannie Mae and our
2   team, our Public Entities team moved over to Single
3   Family, so I'm currently in the Single Family
4   division of Community Engagement in the Business
5   Development unit of Fannie Mae.
6       Q.   Would you describe your educational
7   history since high school?
8       A.   Yes. I have a bachelor's degree in
9   political science from West Virginia University and I
10  am currently working on a master's in educational
11  leadership through Wheeling Jesuit University.
12      Q.   And can you --
13      A.   I also have several certifications in the
14  public housing arena. I am a certified public
15  housing manager, a certified manager of Section 8,
16  I'm a certified compliance person for the tax Credit
17  program, a certified manager of maintenance for
18  public housing, and I also have a certificate program
19  I completed from Rutgers University on a public
20  housing training session. That included finance,
21  redevelopment, management, legal issues and several
22  other items that I can't recall at this time.

Page 1051

1       Q.   Can you describe your employment history
2   since college and up through the point where you
3   joined Fannie Mae in 2004?
4       A.   Sure. I graduated from college in 1984
5   and started working for a local real estate
6   construction company that did both single family and
7   multifamily housing developments. At the time it was
8   Farmers Home Administration, a 515 program. It's now
9   under rural development, but it's affordable rental
10  housing in rural areas of the country and it's
11  subsidized, much like public housing is subsidized.
12  And they also have several Section 8 new construction
13  units. That's really where I started my field in
14  housing. I worked there for two years.
15      Q.   What was the name of that company?
16      A.   Chaplin Construction and Real Estate.
17      Q.   And what was your position there?
18      A.   Executive assistant to the president of
19  the company.
20      Q.   And you were there from 1984, you said two
21  years so that would have been through 1986?
22      A.   1986. And when I left there, I went to

Page 1052

1   work for an architect and engineering firm, mostly
2   doing work on construction specifications, and I was
3   there for a year. And I left there in 1987 and went
4   to the Benwood and McMechen Housing Authority, two
5   public housing agencies, two separate agencies but
6   they were run under one administrative body. I went
7   there as the leasing officer for the public housing
8   program and in 1989, the executive director there
9   left to go to work for the governor and I became the
10  executive director.
11      Q.   And where is this housing authority for
12  Benwood and McMechen?
13      A.   It's located in the northern panhandle of
14  West Virginia. Just to give you approximate
15  locations --
16          ARBITRATOR ROSCOE:  That's okay.
17          THE WITNESS:  That's okay?  All right.
18          BY MR. STEWART:
19      Q.   And what were your responsibilities as the
20  executive director of the Benwood and McMechen
21  housing authority?
22      A.   I managed all aspects of the public

Page 1053

1   housing authority from management, the occupancy
2   issues, the maintenance, the renovations. We did an
3   extensive renovation while I was there, over a
4   million dollars worth of renovation, what was then
5   called the CIAP program where it was competitive.
6   For smaller housing authorities, it was called the
7   capital grant program.
8          For larger housing authorities, if you had
9   250 units, you automatically got money from HUD. If
10  it was under 250 units, it was a competitive process.
11  I was there as the executive director for almost 10
12  years. I left in 1997 and I went to work at the
13  Wheeling Housing Authority which is an adjacent
14  community further north where --
15      Q.   In West Virginia?
16      A.   In West Virginia, where I managed
17  approximately 1,300 public housing and Section 8
18  units. And in that capacity, I did obviously many of
19  the same things I did in Benwood and McMechen but it
20  was on a much larger scope with a much larger staff.
21      Q.   How large a staff did you have as the
22  Wheeling, West Virginia housing authority director?

Page 1054

1       A.    Depending on what we had going in
2  construction, it could be as many as 50 to 60 people.
3  And I probably had about six direct reports that
4  reported directly to me, which would have been like
5  the director of operations, the director of public
6  housing, director of finance, director of our human
7  resources and our programs for resident programs.
8       And while I was in Wheeling, I also did a
9  lot of redevelopment work through -- we applied for a
10 HOPE VI grant in 1998. We weren't successful. It
11 was a highly competitive program. In 1999, we
12 re-applied and were awarded about $17.1 million,
13 which we leveraged with other financing, home funds,
14 tax credit equity, affordable housing money from the
15 Federal Home Loan Bank of Pittsburgh and CDBG funds
16 from our city for infrastructure work, and also
17 resident training programs with local organizations
18 including a step-up program to the Department of
19 Labor. And we leveraged that $17.1 million into a
20 $40 million redevelopment project.
21      Interestingly enough, that's where I -- at
22 Wheeling, I received my first -- the first

Page 1055

1  relationships that I had with Fannie Mae. Evett
2  Francis and Frank Losada from the ACF group came to
3  visit me at the housing authority and we actually had
4  a Community Express loan at the Wheeling housing
5  authority for predevelopment funds. That was my
6  first introduction to Fannie Mae. I believe it was
7  late 2002 or early 2003.
8       Q.   And so you used a Community Express loan
9  at that time?
10      A.   Yes.
11      Q.   And how long were you at the Wheeling,
12 West Virginia housing authority?
13      A.   From 1997 until January of 2004.
14      Q.   Are you a member of any trade
15 associations?
16      A.   Yes. In my capacity as executive director
17 of the Wheeling housing authority, I was also the
18 president of the West Virginia Association of Housing
19 Agencies. I was a member of the executive committee
20 of the southeastern regional conference of NAHRO,
21 which are the 10 southeast states of the
22 United States.

Page 1056

1       Q.   And what is NAHRO?
2       A.   National Association of Housing and
3  Redevelopment Officials. I was also very active in
4  several local housing boards, One Wheeling, which I
5  was appointed by my county to serve as one of the
6  board members to decide how allocation of home funds
7  for our jurisdiction would be assigned out in the
8  community. And I was also very active in the
9  Wheeling Chamber of Commerce, where I co-led the
10 youth leadership Wheeling program for several years.
11 I was also -- the last several years that I was in
12 Wheeling, I was appointed as a national trustee to
13 the Public Housing Authority Directors Association.
14 The acronym for that group is PHADA.
15      Q.   And what were your responsibilities as the
16 trustee for PHADA?
17      A.   As a trustee for PHADA, we worked together
18 with the leadership of the organization. I was also
19 involved in the professional development committee as
20 part of that responsibility. Trustees were expected
21 to take an active role in the organization. I did
22 many training sessions at PHADA. That's also through

Page 1057

1  the PHADA organization where I went through Rutgers
2  University public housing directors program. I
3  presented testimony before the appropriations
4  committee in Congress for that, for the budget for. I
5  think it was 2002.
6       Q.   This testimony was before the U.S.
7  Congress?
8       A.   Yes. Well, that was one of the times.
9  The other time, I actually testified before the House
10 Financial Services Committee, the housing group on
11 the HOPE VI program. When the administrations
12 changed from Clinton to Bush, they were trying to
13 eliminate the HOPE VI program, and NAHRO asked me to
14 be on the panel with several other housing
15 authorities across the country to present testimony
16 to that committee regarding the HOPE VI program.
17      Q.   Can you describe how you came to Fannie
18 Mae?
19      A.   Yes. Fannie Mae decided to open an
20 office, a partnership office at that time in West
21 Virginia in Charleston in 2003 and I received calls
22 from both Frank Losada and Evett Francis asking me to

4 (Pages 1054 to 1057)

Arbitration Day 5                                              October 28, 2011
Washington, DC

Page 1138

1      ARBITRATOR ROSCOE:  She can correct the
2  time frame. I think the witness knows.
3  BY MR. WACHTEL:
4      Q.   Is your job ending in May 2010?
5      A.   No.  It will end December 31st, 2011.
6      Q.   Oh, I completely misheard that.  I'm
7  sorry.  The job ends December 31st, 2011?
8      A.   Yes.
9      Q.   Are the duties you're doing now a
10  carry-over from your PE Loan team director job?
11      A.   A little bit, because I'm involved if any
12  issues come up on -- some of them overlap.  If there
13  are asset management issues with our Modernization
14  Express or Community Express, there is no one else to
15  call but me, which is one of the reasons they asked
16  me to stay on.
17      And I'm also working in conjunction with
18  the pricing team under -- I work with Diego Losada.
19  The two of us are working on the divestment of the
20  Modernization Express loan portfolio.  Specific
21  responsibilities around that involve developing an
22  RFP for investment banking services and then working

Page 1139

1  with investors that came in through the investment
2  bank to actually sell the portfolio.  I've been
3  working with HUD.  So I'm continuing but the majority
4  of my work is around the sale of the Modernization
5  Express portfolio.
6      Q.   And are those substantially all of your
7  duties or do you have other duties beyond that?
8      A.   I am a member of Jim Peffley's team under
9  Single Family as far as responsibility or the
10  organizational chart goes.  I have been asked by
11  Single Family specifically to do some project
12  management duties around several projects that they
13  had on Single Family including a prospecting,
14  developing a prospecting team and also working on a
15  training project with Mr. Peffley.
16      Q.   When did you become part of Mr. Peffley's
17  team?
18      A.   When Carl Riedy left the company in March
19  of 2010. No, 2011.
20      Q.   Mr. Riedy left this year, right?
21      A.   Yes, March of 2011.
22      Q.   I have one question I forgot.  It actually

Page 1140

1  relates to something we were talking about earlier.
2  You mentioned that Ms. Neely would take a capital
3  allocation from HUD, analyze it and create a
4  spreadsheet to determine which housing authorities
5  could borrow?
6      A.   No.  I said that there was a spreadsheet
7  that had been developed early on by Eileen and I
8  believe Doug Turner and it was an Excel spreadsheet
9  that we had in our shared drive.  We would simply
10  plug in the information from the housing authority's
11  HUD number and the information would automatically
12  populate with the capital fund allocation from the
13  information on the HUD website and we would use those
14  sheets that came out as a result of that spreadsheet
15  to do our marketing with.  And we did those
16  individually.  We didn't have Ms. Neely do those for
17  us.
18      Q.   So Ms. Neely basically developed the
19  spreadsheet but then it did not have to be changed,
20  altered, modified?
21      A.   It was changed on a yearly basis when the
22  new capital fund allocations came in so that the new

Page 1141

1  numbers were there to pull into the spreadsheet.
2      Q.   Who would do those changes?
3      A.   Eileen did that and I believe Doug Turner
4  did that at one of the consultants after Eileen left.
5      Q.   And was that something you had to do after
6  you took over Eileen's duties?
7      A.   No.
8      MR. WACHTEL:  Thank you.  I don't have
9  anything further.
10      ARBITRATOR ROSCOE:  Redirect?
11      MR. STEWART:  Yes.
12      EXAMINATION BY COUNSEL FOR RESPONDENT
13      BY MR. STEWART:
14      Q.   Ms. Zukoff, you testified that you had had
15  a number of different operations responsibilities as
16  the executive director of three public housing
17  authorities?
18      A.   That's correct.
19      Q.   And in connection with your
20  responsibilities over personnel matters, did you take
21  any training, any sort of management training?
22      A.   Absolutely.  As an association, we trained

25 (Pages 1138 to 1141)

Page 1142

1  annually on employment law updates.  A critical part
2  of our job so that our agencies didn't get sued,
3  understanding employment law requirements.
4      Q.   Any other kind of training?
5      A.   I also took personnel training through
6  Rutgers University as part of my public housing
7  director's training.
8      Q.   And of the operational responsibilities
9  you had, it included personnel and I heard finance --
10     A.   Operations, occupancy and resident
11 services.
12     Q.   Now, in 2009, there was a portion of the
13 time where Modernization Express -- you were no
14 longer marketing Modernization Express?
15     A.   Correct.
16     Q.   How long a period was that?
17     A.   Probably about two months.  We were what I
18 called in a holding pattern.
19     Q.   And you talked about getting the approval
20 of the Tribal Express loan product in 2009?
21     A.   We were still working -- we were working
22 on that in 2009.  We had received -- we were still

Page 1143

1  working on approval in 2010 when the products were
2  shut down.
3      Q.   And in order to gain approval for the
4  product, can you explain how that process worked?
5      A.   There was an internal team.  We had to
6  fill out a pretty detailed, probably 10, 15-page of
7  information about the product.  It had to go to an
8  internal team within Fannie Mae that would review
9  that and determine whether you could proceed.
10     Q.   And this internal team that had the
11 determination of whether you could proceed, where did
12 that team come from?  What division?
13     A.   I believe it was under Credit, under David
14 Worley.  Mike Hernandez had the ultimate
15 responsibility and I believe he was like in policy,
16 Credit Policy.
17     Q.   Was that the same organizational structure
18 that you were in, the management chain?
19     A.   No.  Well, I was in HCD and Credit was one
20 of the silos of -- well, Community Lending.
21     Q.   And in order to gain the approval for the
22 tribal -- was the product ultimately approved?

Page 1144

1      A.   We were close.  We had received approval
2  for the Replacement Housing express.
3      Q.   From?
4      A.   From the same folks.  By the time the
5  products were shut down, we were getting ready to
6  roll out the marketing effort.
7      Q.   Was this in March of 2010 when FHFA --
8      A.   This was May when FHFA came in.
9      Q.   And they shut down the Tribal Express
10 product as well?
11     A.   And Replacement Housing.  It shut down all
12 products that I was responsible for.
13     Q.   Now, in order to gain the approval of the
14 Credit folks, to what extent if any did you have to
15 use your influencing skills or project management
16 skills to guide the product through the approval
17 process?
18     A.   I had to use those skills quite frequently
19 and we had regular meetings with the folks that were
20 involved in the process and as a result of Credit
21 tightening up, I did a lot of work with Paul Gower
22 who was the director of the Credit team that I

Page 1145

1  specifically -- he was under Lisa Carlson.  And I
2  worked with him a lot to make sure we got through
3  those issues.
4      Q.   And in terms of getting those two products
5  approved through the Credit individuals, can you give
6  me sort of a rough breakdown of the amount of time it
7  took in order to get that approval?  Was it your use
8  of quantitative financial analysis versus project
9  management, interpersonal communication skills?
10     A.   I would say that was probably 10 percent
11 quantitative and 90 percent interpersonal and more
12 writing, general writing, persuasion.
13     Q.   And did the Credit division that had to
14 give approval to the Tribal Express loan product, is
15 that the same group of individuals, same organization
16 that has established 100 percent collateral
17 requirement applying to the Community Express
18 product?
19     A.   Yes.
20     Q.   Now, at Exhibit 25, I believe this is the
21 map where Megan Peppel is listed as the team liaison
22 for pricing?

26 (Pages 1142 to 1145)

Page 1158

1   and structuring deals, closing specific loans, he had
2   additional responsibilities for special projects, is
3   that right?
4       A.   Yes.  As did all of the staff.  It was no
5   different.
6       Q.   And among his special projects, he created
7   policies for the Community Express product?
8       A.   That was prior to him reporting to me.
9   And they weren't policies.  They were criteria for
10  underwriting.
11      Q.   So he created the criteria for
12  underwriting in Community Express?
13      A.   He worked with Monica Gardner to help
14  create those.
15      Q.   He also worked with Legal to create form
16  documents for the Community Express products, isn't
17  that correct?
18      A.   Possibly.
19      Q.   And he created methodology for the pricing
20  of the Community Express loans?
21      A.   Yes.
22      Q.   And he created and maintained the pricing

Page 1159

1   matrix for the Community Express product?
2       A.   Until the very end when Russell Atta-Safoh
3   took over putting the matrix together.  But yes, he
4   created it and ran it for multiple years.
5       Q.   And he also created a risk rating grid for
6   the Community Express product as well as HFAs, PHAs
7   and municipalities?
8       A.   I don't think -- I wouldn't characterize
9   it as him creating it.  Paul Gower, Danielle Hammann
10  were ultimately responsible.  He did work closely
11  with them, as did Maria on the HFAs, Maria
12  Day-Marshall, and Lisa Zukoff on the housing
13  authorities.
14      Q.   And he did a substantial amount of work on
15  that project?
16      A.   Yes.  Can you repeat the question?
17  Because there's -- I may be mixing up --
18          ARBITRATOR ROSCOE:  The question about the
19  grid?
20          THE WITNESS:  Yes.
21          ARBITRATOR ROSCOE:  Do you want to repeat
22  that last question about the grid?

Page 1160

1   BY MS. LOVELESS:
2       Q.   Sure.  He helped create the risk rating
3   grid for Community Express, HFAs, PHAs and
4   municipalities?
5       A.   My answer stands.
6       Q.   And he also worked with the modeling team
7   to create the profitability model?
8       A.   Yes.
9       Q.   And he worked on a variable rate
10  methodology.  Do you recall that?
11      A.   That was the same as the Community Express
12  pricing methodology.  That was a variable rate
13  methodology.
14      Q.   And he also worked on the remediation?
15      A.   Yes.
16      Q.   And these all require strong financial
17  analytical skills?
18      A.   Yes.
19      Q.   Now, you also testified yesterday about
20  Mr. Brannum's job performance.  Now, do you recall
21  any specific direction you gave him with regard to
22  customer visits?

Page 1161

1       A.   Yes.
2       Q.   And you felt strongly about that.  I think
3   you relayed a story about where you spoke to a
4   potential borrower and explained the deal points and
5   he said if you had explained it in person, perhaps
6   the deal would have happened?
7           MR. STEWART:  Objection to the
8   characterization.
9           THE WITNESS:  That's not what I said.
10          ARBITRATOR ROSCOE:  You can ask a
11  question.
12  BY MS. LOVELESS:
13      Q.   And what do you mean by the deal points?
14      A.   For that particular borrower, I compared
15  what our pricing was versus what the bond pricing
16  was.  I compared what our interest reserve was versus
17  what the bond reserve requirement was.  I described
18  our prepayment requirements versus what the bond
19  required and our -- now I don't remember the name of
20  it.
21          They had -- with a bond, they had negative
22  arbitrage issues.  On our deal, they wouldn't have.

Arbitration Day 5
Washington, DC
October 28, 2011

Page 1190

1   So it depends on what aspects of it you're talking
2   about.
3      Q.   Aside from you, didn't Mr. Brannum and
4   Ms. Day-Marshall have the most experience structuring
5   PE Loan deals?
6      A.   No.  Steve probably had the most
7   experience because he had been on the team longer but
8   I wouldn't say that really translated into, at the
9   end, doing it any better or any worse than anyone
10  else on the team.
11     Q.   I'm not sure if you testified as to your
12  current position.
13     A.   I did not.
14     Q.   And what is your current position?
15     A.   I am the director of strategic planning at
16  the District of Columbia Housing Authority.
17     Q.   And what are your job responsibilities in
18  that position?
19     A.   I'm still trying to figure that out.  I've
20  been there for less than six months but I am helping
21  the housing authority be more innovative.  We have a
22  designation called Moving to Work which is, only 35

Page 1191

1   housing authorities in the country have that
2   designation so through that designation, we get to
3   waive HUD requirements and, in some cases,
4   congressional requirements on how we run our programs
5   so we get to really design our own programs locally.
6      So I am beefing up how the housing
7   authority uses that designation but in addition, I am
8   working on a new strategic plan because we have a new
9   executive director and a new board, and then I'm also
10  involved in some development, real estate development
11  that the housing authority is working on.
12     So it's sort of -- my whole job is almost
13  other duties as assigned.  So anything that's
14  innovative that's happening at the housing authority
15  I sort of get pulled into.
16     Q.   And do you still have the potential to
17  work with Fannie Mae, in your current position?
18     A.   In what way?
19     Q.   In any way.
20     A.   No.  I mean, unless I went back to work
21  for them?  But you mean is the housing authority
22  working with the --

Page 1192

1      Q.   Maybe not currently but have the potential
2   to work with Fannie Mae?
3      A.   No.
4      ARBITRATOR ROSCOE:  You mean as an
5   employee I think was her confusion.
6   BY MS. LOVELESS:
7      Q.   I don't necessarily mean do you have the
8   potential to go back to Fannie Mae as an employee,
9   because obviously there is always that remote
10  possibility.
11     A.   So is there a possibility that the D.C.
12  housing authority will do business with Fannie Mae?
13     Q.   Yes.
14     A.   The only thing that I could even remotely
15  think, and it would be so far removed, would be that
16  we're doing real estate development.  Chances are
17  we're going to do most of our permanent loans as
18  tax-exempt bonds so Fannie Mae would not be
19  interested.
20     But if for some bizarre reason we decide,
21  if we get 9 percent tax credits and do our permanent
22  debt as a taxable loan, Fannie Mae might be the

Page 1193

1   ultimate buyer of that loan but we would still work
2   with our primary banker and then they would figure
3   out what they would do in the secondary market.  So
4   it would be at least once removed, so I don't think
5   so.
6      Q.   And going back to the late 2008, early
7   2009 time period, when did you first hear that
8   Mr. Riedy was considering laying off members of the
9   PE Loan team?
10     A.   I can't testify to a specific date but as
11  soon as rumors started within Fannie Mae, I'm sure
12  Carl was starting to talk about it.
13     Q.   And did he talk about it with you?
14     A.   Yes.
15     Q.   And your opinion was that the -- did you
16  provide him with your opinion?
17     A.   Yes.
18     Q.   And was your opinion based in part on the
19  fact that some of the people in the field or the
20  people in the field could substantially do the duties
21  of the PE Loan team?
22     A.   I think it's more complicated than that.

38 (Pages 1190 to 1193)

Arbitration Day 5                                        October 28, 2011
Washington, DC

## Page 1194

1  I think there was the combination of our business had
2  clearly changed over the time frame.  Some of the
3  responsibilities of the loan team had been taken up
4  by sort of the more proper places, like Pricing and
5  Underwriting, so there was that aspect of it.
6        There was also the aspect of the changing
7  credit environment with tighter and tighter credit,
8  with stricter and stricter pricing.  I had really at
9  one point, and I don't know when it happened but
10 certainly by the time I left, I had really viewed the
11 Community Express as probably dead even though
12 technically we were still allowed to do it at that
13 time.
14       So it was sort of is this a viable product
15 in this environment?  If it is, what are the skill
16 sets needed to continue it?  So it was more
17 complicated.  So I think it had less to do with the
18 people in the field and more to do with the viability
19 of our products.
20    Q.   Did you ever see a business justification
21 memo regarding the layoffs?
22    A.   I did not.

## Page 1195

1    Q.   Were you ever shown -- while speaking with
2  Mr. Riedy, did he ever show you a copy of the
3  business justification memo?
4        MR. STEWART:  Objection, asked and
5  answered.
6        ARBITRATOR ROSCOE:  She can answer it
7  twice.
8        THE WITNESS:  No.
9  BY MS. LOVELESS:
10   Q.   Did you and Mr. Riedy have any e-mail
11 conversations about the proposed layoffs?
12   A.   I doubt it.
13   Q.   And as of March 10th, 2008, Mr. Brannum
14 was in a mentor/mentee relationship with Zeeda
15 Daniele, a member of the CD account team, is that
16 correct?
17   A.   Yes.
18   Q.   And do you know, after the March 10th,
19 2008 meeting, did the mentees receive any formal
20 training?
21   A.   No.  Oh, training.
22   Q.   Or was it more on-the-job training?

## Page 1196

1    A.   I would say it's more on-the-job training.
2  We did have a meeting probably in July of that year
3  where all the members of my team as well as the
4  mentees, the buddies, all got together.  Was that
5  training or was it -- I think there was training
6  aspects to that, but I think it was --
7    Q.   But the primary training was on the job?
8    A.   Yes.
9    Q.   And even at the end of your tenure there,
10 you don't think that the CD account team members had
11 the same expertise on structuring loans that the PE
12 Loan team did?
13   A.   There were some of them who were currently
14 close and then others who were not even -- weren't
15 even in the same ballpark.
16       MS. LOVELESS:  I don't have anything
17 further.
18       ARBITRATOR ROSCOE:  Do you have one or two
19 redirect?
20       MR. STEWART:  We do.  Can we just confer
21 for seconds?
22       ARBITRATOR ROSCOE:  Sure.

## Page 1197

1        (Discussion off the record.)
2        ARBITRATOR ROSCOE:  You may proceed.
3        EXAMINATION BY COUNSEL FOR RESPONDENT
4  BY MR. STEWART:
5    Q.   Ms. Neely, why were you less confident to
6  respond affirmatively that Ms. Day-Marshall, that her
7  performance ratings were positive?
8    A.   Because as I recall, her performance was
9  not as solid certainly as Russell's.
10   Q.   And in what aspect?
11   A.   Getting deals closed.  I would say
12 primarily getting the deals closed.  Recognizing
13 the -- Maria was very, very good at sourcing deals.
14 She was great about getting in front of the
15 customers.  The customers really liked her.
16       She wasn't good about really assessing, is
17 this really a deal, is it viable, will it close, will
18 it meet all the criteria, will it get through Credit
19 and can I get it closed.  So I would say that was her
20 weakness.
21   Q.   And how important was it to get deals
22 closed?

39 (Pages 1194 to 1197)

Alderson Reporting Company
1-800-FOR-DEPO

## Page 1198

1     A.   That was it.  If you didn't close a deal,
2   it didn't matter.  Any other aspect of it didn't
3   matter if the deal didn't close.
4     Q.   And who if anyone on your team had that
5   capacity to get deals closed?
6     A.   Lisa did.
7     Q.   Lisa Zukoff?
8     A.   Lisa Zukoff, yes.
9     Q.   I would like you to turn to Exhibit 123.
10  And you had testified about not being Mr. Brannum's
11  supervisor for a portion of this year and this is the
12  2006 performance rating?
13    A.   Yes.
14    Q.   And this is the comment under the middle
15  of the page, comments by Eileen Neely, under the
16  CDFI, CDARS, essential quality deals objective.  Do
17  you see that?
18    A.   Yes.
19    Q.   What was the point that you were
20  attempting to convey in the first paragraph of this
21  document?
22    A.   I guess the point was that -- so there was

## Page 1199

1   the goal, which was six deals, and technically there
2   were six deals that could be listed as his.  There
3   was this weird thing at Fannie Mae at the time which
4   was who do you give credit for a deal?
5         And we were really about volume and
6   revenues and it -- I'm not a sports fan but I'm going
7   to use a sports analogy.  If I run the ball for 99
8   yards and then sort of -- I played rugby so I'm going
9   to use a rugby analogy -- and pass it on to somebody
10  else and they cross the goal line, they get credit
11  for the goal.  And that's how Fannie Mae was as well.
12        And so it didn't matter who made the first
13  customer touch, it didn't matter necessarily who
14  underwrote it.  If you closed the deal, if you were
15  the owner of the deal at the time it closed, you got
16  credit.  And so my point on this was, when I looked
17  at the deals, knowing what other colleagues had been
18  doing throughout the year, the only two that I could
19  say were Steve's from start to finish were Greystone
20  and Cocoa.
21        He may have been involved but like the
22  last one about the construction participations, four

## Page 1200

1   deals were listed separately but they were really
2   only one underwriting.  They were sort of all lumped
3   together.  So that's the point.
4     Q.   And notwithstanding the fact that you were
5   not Mr. Brannum's -- for the full year, you had the
6   understanding that he may have contributed to the
7   deal but --
8     A.   Yes.  We met on a weekly basis within
9   Community Lending -- I don't know what our name was
10  at the time -- for initial review and final review
11  and so we all had some concept of some indication of
12  whose deal was whose at which time in the process.
13        So there would have been -- I would have
14  had direct knowledge at the time about who brought
15  the deal in to initial review, who brought the deal
16  into final review.
17    Q.   Now, the next paragraph talks about a
18  Cocoa deal?
19    A.   Yes.
20    Q.   Did that deal later default?
21    A.   Yes.
22    Q.   And Mr. Brannum's initial analysis was

## Page 1201

1   that that borrower had the ability to repay on that
2   loan?
3     A.   Yes.  And that had nothing to do with
4   Steve's performance.  There was fraud involved with
5   the borrower.  So, yes, it defaulted but it wasn't --
6   had nothing to do with the quality of the
7   underwriting, the quality of the deal.
8     Q.   Would you turn the next page at FM 113
9   also in Exhibit 123?
10    A.   Yes.
11    Q.   And direct your attention to the second
12  paragraph from the top that starts, "On projects like
13  this" --
14    A.   Yes.
15    Q.   -- "Steve needs to work on closure."
16    A.   Yes.
17    Q.   Can you just read that paragraph to
18  yourself and then give us a sense of what you're
19  trying to convey here?
20    A.   This is really getting to the point of
21  paralysis through analysis.  So carry it over the
22  finish line.  Stop, you know, molding it another

Page 1202

1   time, adding another -- it's, okay, this is good
2   enough, make a recommendation and move on.  There are
3   some times where you just have to say, I have enough
4   information, I'm going to finish.  And that happened
5   often.
6       Q.   Did you say that happened often?
7       A.   Often is probably an overstatement.  It
8   happened -- if you look in just these written
9   documents, there was no closure there, there was --
10  similar with the Community Express marketing or the
11  business plan, it was that last 10 percent, 20
12  percent.  And I think somewhere else I used that --
13  you know, he was great on 20 percent of the deal --
14  somewhere else.  Oh, that was that same project.
15      But just sort of accepting that you can
16  make your case with this data and make the case.
17      Q.   Would you turn to Exhibit 124?
18      A.   Yes.
19      Q.   And would you turn to the second page of
20  the document?  This is for the objective to grow
21  revenue and the status was not on course.  And your
22  comments are at the top of the page.  Do you see

Page 1203

1   that?
2       A.   Okay.
3       Q.   And I believe you had looked at the first
4   paragraph.  I want you to focus now on the second
5   paragraph?
6       A.   Yes.
7       Q.   And read that one to yourself and then can
8   you just explain for us what you're conveying at this
9   point?
10      A.   It was exactly the same as in the last
11  project.  Although that was a special project, this
12  was with deals, was the same thing.  You have a deal,
13  you have a borrower who is ready, you've done the
14  analysis.  Just sort of, okay, wrap it up, put a bow
15  on it and get it over the finish line.
16      And there were two pieces to that.  One
17  is, get the deal approved, so that meant finish the
18  analysis.  But then the harder part was get the deal
19  closed.  So it was really being the -- it was in some
20  cases herding cats.
21      It was getting the borrower in line,
22  understanding what the borrower had to do to get to

Page 1204

1   closing, what were their requirements in terms of
2   board or city council approval and then getting the
3   lawyers involved and sometimes -- often we would get
4   comments -- no offense to the lawyers in town -- from
5   the lawyers that were really business points as
6   opposed to legal points, and to understand the
7   difference and be ready to, when appropriate, say to
8   the lawyers, thank you for your advice, I've heard
9   your concerns, this is a deal point and this is
10  the -- and we're making this decision on the deal
11  point, business point.
12      And then also it's sometimes having to
13  teach our Fannie Mae attorneys what the borrower
14  legally could and couldn't do, and so it was managing
15  our attorneys, managing the borrower, managing the
16  borrower's attorneys and then also managing the
17  internal processes in terms of all the people who had
18  to have all the things in line to have portfolio
19  administration say, yes, I have all the closing due
20  diligence and it's in place and then for the
21  Modernization Express, it was then also sort of
22  staying on top of HUD.  So there was that piece of

Page 1205

1   it.
2       Q.   And internally, would that also include
3   Credit?
4       A.   Post-approval -- not very often but
5   occasionally, if, when we got down to the documents,
6   the borrower all of a sudden said, wait, I can't
7   agree to this; if it was a credit term, it may
8   require going back to Credit.
9       Q.   And what is the skill set that's necessary
10  to guide the project through completion as you've
11  described it?  You described it as herding cats but
12  that's getting the borrowers in line, lawyers, Fannie
13  Mae attorneys and the internal process.  What skill
14  set is necessary for that?
15      A.   I think a lot of it is project management,
16  understanding what steps need to happen in order to
17  get things closed.  It was people management in a way
18  to -- influencing is the word that Fannie Mae used.
19  How to get people to do things for you when it's
20  not -- where you don't have any official authority
21  over them.  It's relationships, sort of negotiating
22  skills.

41 (Pages 1202 to 1205)

Page 1206

1      Sometimes it's just saying, okay, you're
2  not going to go do this? I'm going to do it myself
3  and sort of give people the answers. So often -- so
4  one example is we would get comments back from
5  borrower's attorney and I wouldn't wait for our
6  attorneys to review them and give comments back.
7      You look at them and say, we're okay with
8  this, we're okay with this, we're okay with this, and
9  that way you could give -- I would give the attorneys
10 the answer that they needed to sort of then tell me
11 it was okay to -- because so many of the comments we
12 had seen, deal after deal after deal.
13     ARBITRATOR ROSCOE: Anything else within
14 the scope of cross?
15     MR. STEWART: Yes.
16 BY MR. STEWART:
17     Q.   If you would go down to under cultural
18 goals, 2.1, you have some comment there about the
19 responsiveness?
20     A.   Yes.
21     Q.   And what were you articulating there?
22     A.   It was -- we have customers both

Page 1207

1  internally and externally and the need to be
2  responsive was part and parcel to our jobs and I had
3  a lot of feedback from both internal customers and
4  external customers, and I mean internal customers
5  ranging from Credit to the buddies to -- and at this
6  time, they weren't official buddies but other people
7  on the PE team, people in asset management about
8  Steve's inconsistent responsiveness.
9      Q.   And is that problem solely within the 2006
10 calendar year or did that carry forward?
11     A.   No, that carried forward.
12     Q.   Now, if you would look at Exhibit 119.
13 And specifically at page FM 107.
14     A.   Yes.
15     Q.   Now, this is a document that counsel had
16 shown you and this was Monica Gardner's rating of
17 Mr. Brannum. Do you see that?
18     A.   Yes.
19     ARBITRATOR ROSCOE: Did she use this on
20 cross?
21     MR. STEWART: She did.
22     THE WITNESS: Yes.

Page 1208

1      MS. LOVELESS: Only to establish the time
2  period that he worked for Ms. Gardner.
3      ARBITRATOR ROSCOE: That's all right. Go
4  ahead.
5  BY MR. STEWART:
6      Q.   And if you would look at the areas for
7  suggestions for development.
8      A.   Yes.
9      Q.   And do you see the first one involves
10 customer service and communication skills?
11     A.   Yes.
12     Q.   The second one involves transaction
13 management, project management skills?
14     A.   Yes.
15     Q.   The fourth, if you turn the page, develop
16 sales/marketing skills, attend marketing/sales
17 courses?
18     A.   Yes.
19     Q.   And if you look at the overall performance
20 summary and if you would just read that second
21 sentence to yourself?
22     MS. LOVELESS: I'm sorry, where are you?

Page 1209

1      MR. STEWART: The overall performance
2  summary on FM 108. And the second sentence
3  specifically.
4  BY MR. STEWART:
5      Q.   Do you see that?
6      A.   Yes.
7      Q.   Now, having reviewed this document and
8  those specific sections, are the issues and concerns
9  that Ms. Gardner is expressing on the 2002
10 performance review the same concerns that you had
11 with Mr. Brannum's performance for 2006?
12     ARBITRATOR ROSCOE: To the extent that
13 that influenced your review of this party in the
14 second half of the year when he came under your
15 management, because she can't interpret Gardner's
16 comments.
17     MR. STEWART: No, I understand.
18     ARBITRATOR ROSCOE: If this was a
19 foundation for her opinion in the second half of the
20 review, then it's relevant as to the conclusions she
21 drew for that review. But she can't interpret what
22 Gardner meant.

42 (Pages 1206 to 1209)

Page 1210

1         THE WITNESS:  So I don't understand --
2         ARBITRATOR ROSCOE:  He's going to ask you
3    the question again.
4         THE WITNESS:  Okay.  Good.
5         ARBITRATOR ROSCOE:  Thank you.  I assume.
6    BY MR. STEWART:
7    Q.    Ms. Gardner identifies on Exhibit 119 that
8    Mr. Brannum had issues or areas for development for
9    communication skills.
10        MS. LOVELESS:  Objection.
11        ARBITRATOR ROSCOE:  What are you
12   specifying to?
13        MR. STEWART:  Suggestions for development,
14   FM 107.
15   BY MR. STEWART:
16   Q.    Were communication skills an issue of
17   concern that you had with Mr. Brannum's performance
18   in 2006?
19   A.    Yes.
20   Q.    Was project management an issue that you
21   had concern with for Mr. Brannum's performance in
22   2006?

Page 1211

1    A.    Yes.
2    Q.    And did that continue through his tenure
3    under your supervision?
4    A.    Yes.
5         MR. STEWART:  We move for admission of
6    Exhibit 124.
7         MS. LOVELESS:  No objection.
8         ARBITRATOR ROSCOE:  124 is admitted.
9         (Respondent's Exhibit No. 124
10             was received in evidence.)
11   BY MR. STEWART:
12   Q.    Now, Ms. Neely, you reviewed Exhibit 126.
13   This is Mr. Brannum's 2007 year end review?
14   A.    Yes.
15   Q.    For the record, when you gave your
16   electronic signature to this document, it looks like
17   in or around June 13, 2008, by signing this document,
18   are you agreeing to Mr. Brannum's assessment of his
19   performance for the year 2007?  The specific
20   assessment that he is rating for himself?
21   A.    Can you repeat that question?
22   Q.    By end signing the document, at least

Page 1212

1    electronically on June 13, 2008, were you -- and I
2    just want to clear the record.  Were you agreeing to
3    the specific assessments, each of the specific
4    assessments that Mr. Brannum articulated for his 2007
5    year end performance?
6    A.    No, not necessarily.
7    Q.    When did you articulate to Mr. Brannum
8    that he needed to do customer visits?
9    A.    Do you want an exact date?
10   Q.    Not date but generally.  If you have an
11   exact date, fine.  But if you don't --
12   A.    No, I don't have an exact date.  That's
13   why I hesitated.  From the moment -- I mean, not
14   exact, very first moment but continually throughout
15   the time he worked for me.
16   Q.    Would this be in meetings?
17   A.    Meetings, one-on-ones, informally.
18   Q.    There was some testimony about the
19   variable rate methodology and the risk rating grid
20   that Mr. Brannum worked on?
21   A.    Yes.
22   Q.    When was that work completed?

Page 1213

1    A.    Well, the variable rate methodology was
2    completed in 2006.  That's in his review.  The risk
3    rating methodology -- the one that I remember very
4    intensely was done in, it had to be early 2008.
5    Q.    And there was some testimony about the
6    pricing methodology matrix and at some point
7    Mr. Atta-Safoh worked on that?
8    A.    Yes.
9    Q.    When did Mr. Atta-Safoh take over the
10   pricing methodology?
11   A.    I don't know.
12   Q.    Was that in 2008, 2007?
13   A.    My best guess would be 2008.
14   Q.    You testified that you had stated that
15   Mr. Riedy treated the Public Entities team as a
16   stepchild, is that right?
17   A.    Yes.
18   Q.    And did that include yourself?
19   A.    Yes.
20   Q.    Did that include Ms. Zukoff?
21   A.    Yes.
22   Q.    And you had asked Mr. Riedy to have

43 (Pages 1210 to 1213)

# RIEDY TRANSCRIPT

```
 1                      JAMS ARBITRATION

 2     - - - - - - - - - - - - - -    X

 3     STEVEN BRANNUM,               :

 4         Claimant,                 :

 5              v.                   :   Reference No.

 6     FEDERAL NATIONAL MORTGAGE     :   1410005474

 7     ASSOCIATION (FANNIE MAE),     :

 8         Respondent.               :

 9     - - - - - - - - - - - - - - - X

10                          Washington, D.C.

11                          Thursday, October 27, 2011

12              Arbitration before ARBITRATOR JERRY ROSCOE

13     in the above-entitled matter, the witnesses being

14     duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15     in and for the District of Columbia, taken at the

16     offices of JAMS, 555 13th Street, N.W., Washington,

17     D.C., at 9:22 a.m., Thursday, October 27, 2011, and

18     the proceedings being taken down by Stenotype by MARY

19     GRACE CASTLEBERRY, RPR, and transcribed under her

20     direction.

21

22
```

Page 827

1     (Recess.)

2     EXAMINATION BY COUNSEL FOR RESPONDENT (RESUMED)

3     BY MR. STEWART:

4     Q.  We're back on the record, Mr. Riedy.

5     A.  Thanks.

6     Q.  Damien Stewart from Fannie Mae.  I've got

7  a few questions following your direct examination

8  from yesterday.  Would you briefly describe your

9  employment background up until you joined Fannie Mae?

10    A.  Certainly.  I appreciate everyone's

11 patience.  As I stated yesterday morning, my

12 background has largely been in the area of affordable

13 housing.  It goes clear back to the decade of the

14 '70s when I worked at the U.S. Conference of Mayors

15 and represented Mayor Coleman Young, the then

16 African-American mayor of the City of Detroit, as one

17 of his Washington lobbyists.

18     In 1976, the fall of '76, beginning of

19 '77, I was on President Carter's transition team.  I

20 was a political appointee at the Department of

21 Housing and Urban Development selected by the late

22 Secretary Patricia Roberts Harris.  After my tenure

Page 828

1  at the Department of Housing and Urban Development in

2  1979-1980, the end of a four-year term, I joined a

3  development company headquartered in Cleveland, Ohio

4  that developed both low income housing, labeled in

5  those days as Section 8 housing, and nursing homes.

6  I did the first nursing home development for that

7  company.

8     After that, I actually ran a trade

9  association here in Washington known as the National

10 Council of State Housing Agencies.  That is the trade

11 association for the HFAs, as we've labeled them over

12 the last day.  Ran that trade association from 1985

13 through 1989, at which time I joined then-First

14 Boston, now known as CS First Boston, as a housing

15 investment banker where I did relationship banking

16 with, again, those same housing finance agencies or

17 HFAs.

18     From that position, I was hired by Freddie

19 Mac as their first vice president for affordable

20 housing.  I had a several-year tenure there and went

21 back to First Boston at First Boston's request to be

22 both a housing group banker and an infrastructure

Page 829

1  group banker with the housing finance agencies as

2  clients or customers along with a number of cities,

3  states and public bodies.

4     After First Boston, at one point in time,

5  and it would have been in the '90s, early '90s, first

6  half -- mid-'90s, shut down their entire public

7  finance department, it was a corporate decision, all

8  public finance bankers were let go.

9     I was let go.  And then did some

10 initial -- I was then employed by Legg Mason which is

11 a smaller regional investment banking firm doing the

12 same work headquartered in Baltimore.  After that

13 tenure, I began to do some consulting, actually with

14 public housing authorities.  I was consulting to the

15 Atlanta Housing Authority, to the Cuyahoga

16 Metropolitan Housing Authority.  I was advising them

17 on development transactions largely around a federal

18 program known as HOPE VI and worked to some degree

19 with the D.C. housing agency as well, but not for

20 pay.

21     And then I was hired by Fannie Mae.  So

22 it's a career that's grounded in affordable housing,

Page 830

1  grounded in particular with housing finance agencies

2  and various kinds of development, particularly rental

3  multifamily.

4     Q.  Now, you talked about in your background

5  you worked -- and represented HFAs, housing finance

6  agencies, and PHAs, public housing authorities.

7  Those are acronyms that we've been using throughout

8  this hearing.  Can you give us an explanation of the

9  differences between these two public entities?

10    A.  I'll do my best.  Housing finance agencies

11 are generally state chartered, quasi-public/private

12 entities.  They're generally -- again, general.

13 There is over 50 of them, so part of this is -- there

14 is always the anomaly to what I'm going to say, but

15 as a general rule, they are self-sustaining entities,

16 again, state chartered and with their own boards.

17     They play two primary roles in the

18 affordable housing finance delivery system.  One role

19 is to raise capital, historically through the

20 municipal public finance tax-exempt bond market.  And

21 they take that capital and allocate it to lenders,

22 because they don't originate mortgages, and those

Page 831

1   lenders use that capital to originate either single
2   family loans or multifamily loans.
3        Because they raise that capital through
4   the tax-exempt statute, which is an IRS code, there
5   is certain targeting that goes along with those
6   statutes so they generally, almost exclusively fund
7   low and moderate income multifamily housing and first
8   time home buyer loans.
9        So someone like myself could not use HFA,
10  could not go to Bank of America and get a tax-exempt
11  loan, either at my income or because it would not be
12  my first home that I owned.  Potentially one of my
13  kids could but not me.
14       And so they, one, raise capital in the
15  system and the other thing they do is they manage a
16  variety of federal and state programs.  Federal
17  programs are either the low income housing tax credit
18  which again is a part of the code or programs like
19  HOPE and CDBG -- excuse the acronyms -- that are HUD
20  programs.  And states also fund certain programs that
21  they run, also supporting their mission, which is
22  affordable housing.

Page 832

1        Public housing authorities, on the other
2   hand, are generally local in nature.  They have a
3   history going back to when public housing was one of
4   the initial forms of affordable housing in this
5   country.  So their primary purpose is to manage
6   public housing, which is very, very low income
7   housing.  Generally, average income is 30 percent of
8   median or below in those housing units.
9        They were largely asset managers as
10  opposed to capital creators up until the last five or
11  six years.  So their primary goal through most of
12  their history was to manage these assets that the
13  federal government funded initially called public
14  housing.  Well, the last five, six, seven, eight
15  years, their capacity has increased, their ability
16  to, in some of the larger, more sophisticated PHAs,
17  begun to finance redevelopment of housing.
18       So again, state chartered, largely
19  self-sustaining, raisers of capital, managing
20  programs are the HFAs.  The PHAs are asset managers,
21  receive most of their funding from federal sources,
22  operating subsidies and capital subsidies.

Page 833

1        And just to close this, although I'm sure
2   there will be other ways to do it, the Modernization
3   Express that's been referred to often here, I want to
4   be clear so that we understand what that did given
5   the incredible purpose that it had.
6        So public housing authorities historically
7   received an annual amount of money from the federal
8   government that they in turn could use to
9   rehabilitate these older units where these very low
10  income people reside.  Often because they only
11  received a certain amount of money annually, and the
12  revenue stream was so minimal, they couldn't raise
13  debt and, therefore, these particular units would
14  deteriorate, whether it's the roof, whether it's the
15  heating systems, whether it's the windows or more.
16       And there was a point in time when HUD,
17  the U.S. Department of Housing and Urban Development,
18  allowed the housing authorities to look at those
19  annual appropriations over time and allowed them to
20  net present value money forward, in order to
21  undertake a more extensive rehabilitation project of
22  those units.

Page 834

1   Q.   And when did HUD allow them that
2   flexibility?
3   A.   In the early 2000s.
4   Q.   So this is what you're referring to about
5   five or six years ago, when their capacity increased?
6   A.   Exactly.  So some of the public housing
7   authorities, larger ones, went to Wall Street
8   investment bankers to raise that capital.  Fannie
9   Mae, because of its mission orientation, back in the
10  mid-2000s, decided that they would offer a direct
11  loan.  So instead of having to go into the capital
12  markets to raise that money, Fannie would look at a
13  public housing authority as a borrower and lend money
14  to them on the same kind of principles.
15       You would look at a 10-year, 20-year
16  stream of capital, you would discount it, you would
17  do some credit requirements and you would lend them a
18  significant amount of money.
19  Q.   Now, you talked about the Modernization
20  Express product.  How if at all did this factor into
21  the Modernization Express product and what uses could
22  Modernization Express be used for by the PHAs?

Arbitration Day 4                                          October 27, 2011

Washington, DC

Page 835

1    A.   Well, Modernization Express was almost
2  singularly dedicated to the rehabilitation of
3  existing public housing stock.  That would be a
4  general comment.  Lisa and Eileen would be able to
5  answer that in greater detail.  And so we basically
6  mirrored what Wall Street was doing and did it
7  directly rather than going into the capital markets,
8  and our loan was more efficient as a result and was
9  valuable to smaller PHAs because they couldn't enter
10  the capital markets because they didn't have enough
11  size.
12    Q.   Now, what if any education had to be done
13  with the PHAs to educate them on Modernization
14  Express?
15    A.   That was largely done in Wayne's group
16  when Wayne had the Modernization Express program
17  before the switch in the end of 2005.  And I know
18  that Wayne and Eileen Neely were out there talking to
19  individual public housing authorities and their trade
20  associations, National Association of Housing and
21  Redevelopment Officials in particular, about Fannie
22  Mae's capability to loan directly to the PHAs.  And

Page 836

1  so we -- basically a marketing campaign by Wayne's
2  group at the time.
3    Q.   Now, the public entities team also had a
4  loan product called Community Express, is that right?
5    A.   We went through a long evolution and it
6  finally came to us, I believe I said yesterday at the
7  beginning of 2007.
8    Q.   And when it came to you in 2007, can you
9  describe how if at all the Community Express product
10  is different and could be used for different things
11  than Modernization Express?
12    A.   Sure.  The Modernization Express product
13  is a loan product.  Community Express is a loan
14  product.  Modernization Express used one revenue
15  stream as the source of repayment, and that source of
16  repayment was the Department of Housing and Urban
17  Development's capital program.
18    Community Express was a balance sheet loan
19  so it wasn't -- it might have been -- it might have
20  had developments as a recourse, but largely the
21  Community Express product would -- a city would say
22  they wanted to do some housing-related or community

Page 837

1  development-related rehabilitation, new construction,
2  et cetera, and it could be on any type of product,
3  any type of development as long as there was an
4  affordable bent to it, as opposed to the
5  Modernization Express which was solely applied to
6  public housing units.
7    And Fannie Mae and the team that owned the
8  product at whatever time in its evolution would
9  basically analyze whether or not the city or the
10  county or the public housing authority had outside
11  sources of revenue so that if we lent them a million
12  dollars, we could, with some assurance, based on
13  credit approval and terms at the time, be paid.
14    So again, different end uses.  Largely
15  affordable end uses more exclusively on Modernization
16  Express to public housing, broader for Community
17  Express but still around affordable housing and
18  community development, and not to finance -- the
19  support was from revenue streams, not from the
20  project necessarily itself.
21    Q.   Now, you testified that there were
22  approximately 50 or so housing finance agencies,

Page 838

1  state housing finance agencies across the country.
2  Approximately how many public housing authorities
3  would there be across the country?
4    A.   Oh, gosh.  Lisa is looking at me and so is
5  Steve.  I'll say 3,000 plus but I'm not 100 percent
6  sure but Eileen and Lisa would know for sure.
7    Q.   And these can be small --
8    A.   They're very, very small throughout the
9  country.  They're in cities, rural towns, et cetera.
10    Q.   You testified yesterday about a time when
11  Mr. Hayward, your supervisor, switched your
12  responsibilities with those of Wayne Curtis.  Do you
13  recall that testimony?
14    A.   Yes, I do.
15    Q.   Did you have an understanding of why
16  Mr. Hayward made that decision?
17    A.   In full disclosure, after the fact, yes.
18    MR. WACHTEL:  I want to object to the form
19  in that it calls for speculation.
20    ARBITRATOR ROSCOE:  Well, he asked him if
21  he knew.
22    MR. STEWART:  His understanding.

17  (Pages 835 to 838)

Arbitration Day 4                                                    October 27, 2011

Washington, DC

Page 839

1    ARBITRATOR ROSCOE:  And he said yes.  And
2  actually if he had an opinion was I think the
3  question.
4    MR. STEWART:  Did he have an understanding
5  why that happened.
6    ARBITRATOR ROSCOE:  He can answer that.
7    THE WITNESS:  I was frankly -- I was
8  surprised by the switch.  Jeff did this without
9  consultation with either Wayne or me.  Both of us, on
10  the day that it happened, were caught frankly by
11  surprise.
12    I went in and, after some advice from
13  other mentors, went in and spoke to Jeff directly and
14  asked him the question why, because frankly I was
15  surprised and not necessarily satisfied.  And Jeff
16  said the following.  You have a long-standing history
17  with housing finance agencies.  You understand the
18  public sector and we believe there is better
19  opportunities with the housing finance agencies than
20  this company has realized to date, and I want you to
21  identify those opportunities with me and then go make
22  them real.

Page 840

1    And so his was a -- I don't know what he
2  said to Wayne as to why he moved, to Wayne, but he
3  was very clear that he was moving me into public
4  entities because of my background with the state
5  housing finance agencies, which I just went through
6  with you, Counselor, and then my overall appreciation
7  of public entities.
8    BY MR. STEWART:
9    Q.  Now, I want to get to the point you just
10  made about Mr. Hayward's direction to make those
11  opportunities real, but I want to touch upon another
12  issue before we get to that.  You testified a few
13  minutes ago about the housing finance agencies
14  issuing bonds.  Do you recall that testimony?
15    A.  Yes.
16    Q.  And was there a time that you can recall
17  when you were at Fannie Mae when Fannie Mae was
18  purchasing bonds from the housing finance agencies?
19    A.  Yes, sir.  Fannie Mae, in its effort to
20  support affordable housing, became one of the largest
21  investor purchasers of tax-exempt housing bonds in
22  the country.  At its peak, the portfolio was probably

Page 841

1  in the range of 18 to $21 billion.  And they were
2  specifically purchasing -- specifically; they were
3  generally purchasing -- excuse the technical
4  language.  I'll try to make it simpler -- the long
5  end of the bonds.
6    So a bond structure, because of the length
7  of the collateral, 30-year loans, would generally
8  have bond offerings to investors ranging from under,
9  a year out to 20-plus years.  And much worse today
10  but historically, it was always harder to find
11  investors at the longer end because they were taking
12  that long-end interest rate risk.
13    Fannie Mae was willing to do that to
14  advance their mission, as was Freddie Mac.  So Fannie
15  Mae and Freddie Mac became the significant investors
16  in the long-term housing tax-exempt bonds.  Now,
17  Fannie Mae also bought it not only to support their
18  mission but when they first did it, they were making
19  a lot of money.  So they were enjoying the tax free
20  yield from those investments.
21    If you took the yield from those tax
22  exempts and did the calculation for taxable returns,

Page 842

1  they were very strong returns relative to what they
2  could have received from the taxable marketplace.  So
3  they had their own personal corporate reasons to grow
4  their revenue through the tax-exempt code and also to
5  support affordable housing.
6    And the one other thing they did with the
7  state housing finance agencies, again to meet their
8  mission and to grow their relationship with those
9  agencies, was to purchase low income housing tax
10  credit equity, which was a particular product
11  statutorily created that I actually was involved in
12  creating when I ran NCSHA, that basically is sold to
13  investors and that capital then is used as equity to
14  do a multifamily development on the affordable side.
15    So the debt on the multifamily deal would
16  be 60 or 70 percent of the total cost, if not less.
17  Equity would be another 20 to 30 percent, and then
18  soft money coming in, because it was affordable in
19  nature, from federal and state programs would make up
20  100 percent of the cost to do that deal.
21    So Fannie, in its early days -- again, low
22  income housing tax credit received a lot of benefits

18  (Pages 839 to 842)

Arbitration Day 4                                                    October 27, 2011

Washington, DC

Page 843

1   from buying that equity, and the bonds was -- two
2   primary roles.  They were meeting the mission, and
3   two distinct roles that they were performing in
4   relationship to the state housing finance agencies.
5          In 2005, I believe, either in 2005 or --
6   I'm sorry, either in -- let me just get my thoughts
7   together for a minute.
8          I was switched in 2005.  So either in late
9   2005, some period in 2005 or 2006, the regulator,
10  then known as OFHEO -- not FHFA, new name today --
11  OFHEO was looking at capital market acquisitions, and
12  I forget the specific product that caused them some
13  concern, but they stopped Fannie Mae from purchasing
14  that product anymore until they put in better
15  policies, procedures, operating constraints and
16  quality control.
17         When that happened, Fannie Mae, either of
18  their own volition, and I'm not sure because I wasn't
19  running public entities at the time or if I was, my
20  memory doesn't serve me correctly -- either of their
21  own volition or at the direction of OFHEO, also
22  stopped the acquisition of tax-exempt housing bonds.

Page 844

1          And when I took over the public entities
2   team and the HFA team and the -- then-only Mod
3   Express product, we spent most of 2006 recreating the
4   policies and the procedures and the risk mitigants
5   and the credit parameters and the quality control to
6   re-enter that business.
7          It was called the municipal asset policy
8   process, MAPP, something like that, municipal asset
9   team.  And it was a multidiscipline team, included
10  capital markets, included risk, included the HFA
11  business team.  And I was the business lead in that
12  space.
13         By the time we made all those improvements
14  and basically internally thought we had to go to buy
15  again -- again, speaking to the points I was making
16  yesterday, about the peak and the valleys that Fannie
17  Mae has gone through in the 11 years while I was
18  there -- we no longer were making the income to
19  warrant purchasing the tax-exempt bonds.
20         So sometime in 2005 through today, there
21  has been -- I'm not going to say no, because I don't
22  know if there might be an anomaly or an exception

Page 845

1   here.  But as a rule of being a major investor and a
2   primary provider of purchasing particularly the
3   long-term bonds, Fannie Mae did not do.
4          Q.  Now, when the company was purchasing bonds
5   and you said post the reorg where you took over the
6   functions of the public entities team --
7          A.  No, I think it was stopped at that point
8   in time.  I don't think they were purchasing bonds at
9   that point in time.
10         Q.  Let me ask you a couple of questions.  Do
11  you know Mike Rylant?
12         A.  Yes.
13         Q.  And Jim Beachler?
14         A.  I know them both and I knew them before
15  they joined Fannie Mae.  Long history with them.
16         Q.  Now, at some point, did Mr. Rylant and/or
17  Mr. Beachler, did they report to you?
18             ARBITRATOR ROSCOE:  I'm sorry, at some
19  point did they, Mr. Rylant --
20             MR. STEWART:  Report to you.
21             ARBITRATOR ROSCOE:  Thank you.
22             THE WITNESS:  When the switch was made,

Page 846

1   they in effect were -- I shouldn't say in effect.
2   They were both reporting to me at the time of -- they
3   were part of Wayne's time that migrated to me.
4             BY MR. STEWART:
5          Q.  And were the responsibilities that
6   Mr. Rylant and/or Mr. Beachler had, did -- what
7   involvement did they have in the purchasing of these
8   tax-exempt bonds from HFAs?
9          A.  They were the two primary individuals
10  involved in the purchasing of the tax-exempt
11  portfolio from the business side.  Capital markets
12  would buy them, but Mike and Jim would find the
13  opportunities through their network in the HFAs and
14  with their network in investment bankers.
15         The investment bankers knew that Fannie
16  Mae had an appetite.  When a deal was structured,
17  they would be sure to have an opportunity to analyze
18  those deals and price them to see if they wanted to
19  purchase any of those bonds when the bond deal was
20  put out to market for sale.
21         Q.  And you said you knew one or both of them
22  prior to your role at Fannie Mae?

19 (Pages 843 to 846)

Arbitration Day 4                                    October 27, 2011
Washington, DC

Page 847

1    A.   Both of them worked at -- Mike Rylant was
2    the chief financial officer of the Rhode Island
3    Housing Finance Agency.  Jim Beachler was the head of
4    multifamily at the Rhode Island Housing Finance
5    Agency.
6         At one point in time the director of the
7    Rhode Island Housing Finance Agency was a man named
8    Nick Retsinas and he had me join his strategic
9    planning team or kitchen advisors, kitchen cabinet
10   for part of his strategic plan.  And I knew both Jim
11   and Mike through that process.  And then when I was
12   at First Boston, CS First Boston, I often went to
13   Rhode Island trying to do business, not as
14   successfully as I would have liked, but nonetheless I
15   was trying.
16        Q.   And you testified that at some point, I
17   believe you said in '05, OFHEO issued a directive to
18   Fannie Mae not to purchase these tax-exempt bonds
19   from the HFAs?
20        A.   I'm not 100 percent sure of the date and I
21   don't know if Fannie Mae did it their own volition
22   or if OFHEO directed them but it was caught up in

Page 848

1    this larger acquisition of products by capital market
2    where FHFA coming in and auditing the process was not
3    comfortable with the level of due diligence and
4    quality control in our capital markets acquisition
5    efforts.  And "our" being Fannie Mae's acquisitions.
6        Q.   And Fannie Mae's response was we were no
7    longer purchasing these tax-exempt bonds from the
8    FHAs?
9        A.   There was a freeze put on the purchases of
10   tax-exempt bonds until the necessary remediation was
11   undertaken and completed.
12        Q.   And what if any effect did that have on
13   the positions held by Mr. Rylant and/or Mr. Beachler?
14        A.   Because there was no more tax-exempt
15   purchases of the bonds, the positions became marginal
16   at best, and conversations with Mr. Rylant and
17   Mr. Beachler about their future ensued.  If my memory
18   serves me correctly, Mr. Rylant left before
19   Mr. Beachler.
20        In those days, again, the better days of
21   Fannie Mae, there were much more discussions about
22   job positions not being continued, resignations and

Page 849

1    packages were much more congenial and generous than
2    they were today, and Mike ultimately left because the
3    position was closed.
4         Going back to the remediation process --
5        Q.   Before we go to the remediation process,
6    did you eliminate Mr. Rylant's position at Fannie
7    Mae?
8        A.   Mr. Rylant's position was not continued
9    and he was reporting to me.
10        Q.   Mr. Beachler?  You talked about the
11   remediation process.
12        A.   Mr. Beachler frankly wanted to stay longer
13   and we needed him to stay longer to provide us advice
14   and counsel on this remediation process because of
15   his familiarity with a number of the bonds that were
16   purchased in the overall bond process.  So
17   Mr. Beachler stayed on through 2006 and through parts
18   of 2006.  Again, I don't know his final date.  But he
19   stayed on for a certain period acting as an advisor,
20   as a full-time employee but with the primary
21   responsibility of participating in and advancing the
22   remediation process.

Page 850

1         And then there was a specific point in
2    time where, because his position had no future and in
3    fact he was directed to begin to look at other
4    opportunities in the company if he chose, I'm pretty
5    confident that he did seek a couple of openings and
6    was not successful.  And at some point at the end of
7    that process, time ran out, his position was
8    eliminated and Jim left.
9        Q.   So it would be fair to say that you had to
10   terminate the employment of both Mr. Beachler and
11   Mr. Rylant?
12        A.   I think that's fair to say.
13        Q.   Now, I want to go back to the point that
14   you talked about earlier where Mr. Hayward -- this is
15   post the switch with you and Mr. Curtis -- and I
16   believe you testified that Mr. Hayward indicated to
17   you that there may be better opportunities with the
18   HFAs and he wanted you to make those real.  Can you
19   explain -- did he give you any further direction or
20   what actions did you undertake from that point
21   forward?
22        A.   Jeff Hayward was a senior vice president

20  (Pages 847 to 850)

Page 851

1   in one of the large business units in Single Family
2   prior to joining Community Lending. That business
3   unit in Single Family was called the National
4   Business Center, I think, NBC. And part of his
5   customer group were the credit unions and the smaller
6   banking entities. So instead of having the large
7   lenders, he had small lenders and we ran it out of a
8   business center in Chicago.
9           And one of the things during Jeff's tenure
10  in Single Family that he created and accomplished was
11  something called affinity agreements or alliance
12  agreements. So if you were a large lender, a
13  Countrywide or a Wells or a Citi in those days, you
14  had the ability to negotiate directly with Fannie Mae
15  on the types of mortgages you could deliver and the
16  pricing, the guarantee fees that were charged for
17  that. And they often received better benefits than
18  if you were a credit union or a small bank coming
19  into Fannie Mae. You would never get them because
20  you would never get the time and you didn't have the
21  scale, frankly. Okay.
22          So what Jeff did was amalgamate those

Page 852

1   groups into a larger group. So he would say to the
2   credit unions, if you act as a group through their
3   national trade association, we'll deliver better
4   pricing and better terms to you in return for market
5   share. So he had accomplished that with other lender
6   types.
7           He came to me and said, I've done this,
8   I'll tell you how it works, you go accomplish that
9   with the housing finance agencies.
10          Now, why did we need the housing finance
11  agency loans in that period, 2006, 2007, 2008?
12  Fannie Mae was under great scrutiny from the
13  Department of Housing and Urban Development as part
14  of the statute requirement to meet housing goals.
15  Okay? We never got credit for housing goals for
16  buying tax-exempt bonds, nor did we get credit for
17  buying low income tax credit equity. You got credit
18  for buying loans.
19          So my responsibility was to create an
20  affinity agreement, an alliance agreement, with the
21  National Council of State Housing Agencies --
22          ARBITRATOR ROSCOE: State?

Page 853

1           THE WITNESS: The National Council of
2   State Housing Agencies. It was that trade group that
3   I ran from '85 to '98, and then I banked their
4   members when I was at CS First Boston, to basically
5   see if I could negotiate an affinity agreement with
6   the trade association and their members.
7           The quick story is I did. We gave them
8   preferred pricing. We gave them preferred -- not
9   necessarily preferred terms at that point in time,
10  because our underwriting standards were pretty
11  liberal at that point in time. Our FICA scores were
12  pretty liberal. We would allow 100 percent down
13  payment -- you know, no-down-payment loans, et
14  cetera. All 30-year fixed in this instance, the
15  products that we delivered, and all fairly prudent
16  but nonetheless aggressive by today's standards.
17          But the pricing was the big issue because
18  we were competing at the time against FHA and Ginnie
19  Mae. And FHA's g-fee was 9 or 9 and a half. And the
20  HFAs looking at this business couldn't rationalize
21  doing business with us when they could do it so much
22  more advantageously with Ginnie Mae. Because when

Page 854

1   they did a bond deal, some of that would be returned
2   to them in the spread or money to them for their
3   agency.
4           So basically we were allowed -- and this
5   was a decision made at the senior management level of
6   the company, the CEO and then chief business officer,
7   Rob Levin, made a decision to allow us to go to 9 and
8   a half on our g-fee.
9           ARBITRATOR ROSCOE: 9 and a half --
10          THE WITNESS: 9 and a half basis for our
11  guarantee fee for state agency business. And again,
12  I want to be clear that state agencies don't
13  originate mortgages. They would issue bonds now that
14  we didn't buy. They would give that capital to a
15  bank, mortgage company. They would originate a
16  mortgage. Instead of it being an FHA mortgage, it
17  would be a Fannie Mae mortgage.
18          And the GIFI would allow them to do that
19  and the GIFI was so advantageous at the time, we
20  basically completely moved the dial. We moved the
21  dial from 400 million to -- 400, 700 million to a
22  billion plus to 2.8 plus to 4 billion over about a

21 (Pages 851 to 854)

Arbitration Day 4                                                    October 27, 2011

Washington, DC

Page 855

1    three and a half year period.
2         BY MR. STEWART:
3         Q.   And what time frame are we talking about
4    here, this three and a half year period?
5         A.   That would have been '06, '07, '08 and
6    then of course we imploded and FHA began to be the
7    primary lender again like they were X number of
8    decades ago.  So we moved the dial considerably; 26
9    states, 28 states actually of the 50 delivered to us.
10   48 of them signed it.  But for other reasons that are
11   very complicated in the way they're organized, it
12   wasn't as beneficial.  But that was a tremendous
13   amount of work, took a lot of time and required a lot
14   of my attention along with my HFA team as opposed to
15   the loan team to focus on to accomplish.
16        The other quick thing, if I could,
17   Counselor, is say this.  Goals were so hard to meet
18   in those days, which is part of the reason why Fannie
19   Mae bought Alt-A and had some of the credit problems
20   that they had, and why Freddie Mac bought subprime
21   which is part of the reason they had such a -- their
22   balance sheets are in such terrible shape.

Page 856

1         Fannie Mae was watching -- tracking goals
2    on a weekly basis at a meeting with the chief
3    business of4icer.  So this was not something done
4    haphazardly.  This was not something that wasn't
5    managed and monitored at the highest levels.  So our
6    goals were clear.  We were under great scrutiny and
7    under considerable amount of pressure to deliver that
8    HFA business.
9         And in fact, in December of, I want to say
10   '07, we also purchased some loans from the California
11   Housing Finance Agency around December 15th and it
12   was that last transaction that allowed the numbers
13   for certain of the criteria and the goals to be met.
14        Q.   What involvement, if any, did Mr. Brannum
15   or other members of the public entity loan team
16   contribute towards the establishment of these
17   affinity agreements with state housing finance
18   agencies?
19        A.   None.
20        Q.   And is it your testimony that this was
21   work you had done in conjunction with the HFA team
22   under your direction?

Page 857

1         A.   This is work I did in conjunction with the
2    HFA team.
3         Q.   Now, the work toward establishing these
4    affinity agreements with the HFAs, is that the same
5    or different from the work that Mr. Beachler and
6    Mr. Rylant had been doing, purchasing tax-exempt
7    bonds from the HFAs?
8         A.   It's significantly different.  One is
9    buying bonds, which is generally a relationship
10   between the business and capital markets, and
11   basically purchasing loans, either through our
12   mortgage backed security program or directly, which
13   was more of a relationship from the work in my business unit
14   and Single Family as opposed to Capital Markets.
15        Q.   Now, were you aware that Mr. Brannum had
16   participated and assisted either Mr. Rylant or
17   Mr. Beachler in the pricing of the bond transactions?
18        A.   Only in the last couple of days.
19        Q.   You were not aware of that as of January
20   9, 2009?
21        A.   No.  Not to my memory.
22        Q.   Would you turn to Exhibit 4, please?  And

Page 858

1    I want to direct your attention to FM 00016.  Let me
2    know when you're there.
3         A.   I'm here.
4         Q.   Yesterday there was some questioning from
5    counsel on direct about whether there had been any
6    change to the working relationship between the
7    members of the D.C. public entities loan team and the
8    community development team.  This is with the
9    implementation of the buddy system or after the
10   implementation of the buddy system in or around
11   January of 2008.  Do you recall that exchange?
12        A.   Yes.
13        Q.   And I want to direct your attention
14   towards the fourth bullet from the bottom of the page
15   and there is a percentage there.
16        A.   Yes.
17        Q.   Do you see that?  And it states,
18   "Percentage of time" and within quotes, "At least 50
19   percent/number of people."  Do you see that?
20        A.   Uh-huh.
21        Q.   Does this refresh your recollection about
22   whether there had been any change in the relationship

22 (Pages 855 to 858)

Arbitration Day 4                                                    October 27, 2011

Washington, DC

Page 859

1   between the members of the community development team
2   and the members of the public entity loan team?
3       A.   It does.  I think yesterday I testified
4   that part of it was the creation of the mentor/mentee
5   system itself.  This is -- I'll use a word that we
6   used yesterday, a metric.  And in discussions with
7   Beverly in 2007, I'm not quite sure how much time
8   we've got from the CBCs but this was a formalization
9   that the members of the team should contribute at
10  least 50 percent of their time toward the public
11  entity loan team efforts in Modernization Express and
12  Community Express.
13      Q.   You had conversations with Ms. Wilbourn
14  about the establishment of commitment from her, that
15  the members of her team would contribute at least 50
16  of their time towards the marketing of public entity
17  loan team products?
18      A.   Exactly, yes, sir.  Can I make one other
19  comment here, having just looked at this piece of
20  paper?
21      Q.   Yes.
22      A.   I made a comment that was discussed

Page 860

1   yesterday to the investigator that Steve Brannum's
2   assignments went to Evett, I believe, or something to
3   that effect.
4       Q.   Yes.
5       A.   While it's not exactly on point, I do want
6   to show that under the CL mentor assignments on that
7   page, Evett's mentor assignments was Lisa Z and
8   Steve.
9       Q.   And was that what you were thinking about
10  when --
11      A.   I don't know what I was thinking about.  I
12  just happened to look at the bottom of the page and
13  I'm encouraged that my mind had some recollection
14  about something.
15      Q.   Would you turn to Exhibit 6 which is also
16  in your binder?
17      A.   I'm on it.
18      Q.   And while you have that, I want you to put
19  your finger there and also turn to Exhibit 31.
20      A.   Yes, sir.
21      Q.   Not 31.  It was 33.  I'm sorry.  I
22  apologize.

Page 861

1       A.   33?
2       Q.   Yes.
3       A.   Got it.
4       Q.   And on 33, I want you to look at FM 1011.
5       A.   Yes, sir.
6       Q.   Which is the second page of the document.
7       A.   Uh-huh.
8       Q.   Now, on Exhibit 33, counsel had directed
9   you yesterday to the second paragraph from the bottom
10  that starts with the incumbent lead business manager?
11      A.   Yes, sir.
12      Q.   Do you see that?
13      A.   Yes, sir.
14      Q.   And could you identify who you were
15  referring to as the incumbent lead business manager?
16      A.   I would have to go back and have the
17  reporter read the testimony but I believe I said that
18  the lead business manager for purposes of this memo
19  was Lisa Tarter and that I wasn't quite sure about
20  the use of the word incumbent in it, if my memory
21  serves me correctly.
22      Q.   If you would turn back, then, to Exhibit

Page 862

1   6.
2       A.   Yes.
3       Q.   Have you seen this document before?  Could
4   you identify what it is?
5       A.   I can identify what it is.  I don't
6   remember whether or not I ever saw this.
7       Q.   What is it?
8       A.   It's the CD account team prepared by Lisa
9   Tarter and Ralph Perrey January 31 of '08, which I
10  believe was after the strategy session that's --
11  agenda of which is in Exhibit 5.
12      Q.   And the date on that Exhibit 5 --
13      A.   January 8 and 9, I believe.
14      Q.   Of 2008, correct?
15      A.   Correct.
16      Q.   Now, if you go to Exhibit 6 and under
17  Targeted Markets, do you see that column?
18      A.   Yes, I do.
19      Q.   And if you go across, there is a CD
20  account team member.  Do you see that?
21      A.   Uh-huh.
22      Q.   Now, the CD account team members, it goes

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4                                              October 27, 2011

Washington, DC

Page 863

1  down as Ralph Perrey, Byron Turner, Pattye Green,
2  Lisa Tarter, Richard Staples, Evett Francis and Zeeda
3  Daniele and a TBD in the Pacific Northwest.  Do you
4  see that?
5      A.   Yes.
6      Q.   These individuals whose names I just
7  identified, were these individuals on your team?
8      A.   No.  Those individuals were on Beverly
9  Wilbourn's team.  And Lisa Tarter and Ralph Perrey,
10  the authors of it, were also on Beverly Wilbourn's
11  team.
12      Q.   And if you look at Mr. Perrey's name and
13  you go across to the left, it states "rural lead."
14  Do you see that?
15      A.   Yes.
16      Q.   And if you look at Lisa Tarter's name,
17  you'll see "urban lead."  Do you see that?
18      A.   Yes.
19      Q.   Now, having reviewed Exhibit 6 where
20  Ms. Tarter's name is identified as the urban lead,
21  does that refresh your recollection as to why you or
22  who you understood the incumbent lead business

Page 864

1  manager to be in Exhibit 33, which is the memorandum
2  you had drafted as of January 23rd, 2009?
3      A.   I would answer it this way.  It further
4  makes the case why she was the lead business manager
5  after discussions with Beverly, or why Beverly might
6  have chosen her back in 2008 because of her history.
7          I think in one of the presentations
8  yesterday when we looked at a deal, of was this an
9  example of a deal underneath the program, there was
10  also a slide about Cincinnati and a Community Express
11  loan that we had with Cincinnati and that was Lisa
12  Tarter's work.
13          She had established a good knowledge of
14  the product, she had established a certain amount of
15  respect about her knowledge and her ability to sell
16  and source with Eileen Neely and with Lisa Zukoff,
17  and she was certainly given that role in this
18  instance by giving the largest part of the business,
19  the urban business, with the PHAs.
20      Q.   And the assignment of Ms. Tarter to the
21  lead for the urban business, was that a Carl Riedy
22  decision or a Beverly Wilbourn decision?

Page 865

1      A.   That's Beverly Wilbourn's decision, in
2  conversation with me certainly.
3      Q.   A little bit more on this point.  Would
4  you turn to Exhibit 10?
5      A.   Yes.
6      Q.   And I want to direct your attention to
7  FM 22 which I believe is the second page in this
8  document.  This is the -- for the record, this is the
9  March 10, 2008 Public Entity Team Express, People,
10  Places and Products presentation.
11      A.   Right.  Page 022?
12      Q.   Yes, FM 00022.  And the third bullet point
13  which states integration of PE/CD account team, do
14  you see that?
15      A.   Yes.
16      Q.   And the first subheading under that
17  section talks about another percentage of time
18  allocation.  Do you see that?
19      A.   Yes, I do.
20      Q.   Can you explain what that line means?
21      A.   Well, going back to the earlier exhibit
22  that I reviewed, it restates the first point which is

Page 866

1  that if you were a member of the CD account team,
2  Beverly Wilbourn's CD account team that worked in
3  conjunction with our loan team, you were expected to
4  allocate 50 percent of your time.
5          It also then has a comma and says, the
6  leads.  That would be Ralph Perrey and Lisa Tarter.
7  Because they were helping drive the business as
8  leads, the sourcing side of the business would
9  dedicate 75 percent of their time.
10          I do want to make -- if I could,
11  Counselor, I do, just for clarification purposes for
12  everyone, back to 964 --
13      Q.   This is Exhibit 6?
14      A.   Yes, Exhibit 6.  Back to page 964.  There
15  is one other lead mentioned and to prevent any
16  confusion, Maria Day-Marshall is identified as a lead
17  for all trade associations, and she's underneath the
18  CD account member team but Maria Day-Marshall was a
19  member, as everyone is well aware of, of my team and
20  we were not working the trade associations in
21  Washington as effectively as we could and as Maria
22  expanded her knowledge and was put in the situation

24  (Pages 863 to 866)

Arbitration Day 4                                            October 27, 2011

Washington, DC

Page 867

1  of sourcing business and growing the business, she
2  was also given the additional responsibility besides
3  some of the field to work closely with the trade
4  associations.
5      Q.  Who gave Ms. Day-Marshall that assignment?
6      A.  I think Eileen did in consultation with
7  me.
8      Q.  And were you supportive of assigning
9  Ms. Day-Marshall in that position?
10     A.  I was, and she did a very, very good job,
11 both on her outreach in the field as well as with the
12 trade associations.
13     Q.  Now, can you describe for me your
14 conversations with Ms. Wilbourn where you got a
15 commitment from her for a time allocation to
16 individuals on her team?  Was that a tough
17 conversation?
18     A.  No.  I think -- a little bit of history
19 here.  I think I testified yesterday that prior to
20 formalizing this structure with the CD teams, we had
21 formalized a similar structure with the CD teams
22 around the HFA affinity agreement.  So in the

Page 868

1  affinity agreement, which I just recently
2  addressed/described, in order to get 28 states to
3  deliver to us and to get 48 states to sign, we worked
4  with the CBCs and we actually identified a select
5  number of individuals to support that marketing and
6  sales effort.
7      At that time, the company was also going
8  through a change in the priority of those business
9  offices.  Again, I think I said yesterday that the
10 partnership offices, their earlier name, identified
11 opportunities but were generally the face of Fannie
12 Mae or the local CEO for Fannie Mae and were more
13 political, small P, than they were business.  Their
14 job was to develop as strong a network as possible
15 for political fights around legislation and
16 positioning in Washington.
17     As time passed and in this time frame,
18 when Jeff took over Community Lending, there was a
19 formal shift around the future -- there was a
20 corporate level discussion around the future of those
21 partnership offices.  Some people believed they
22 should be abolished in total.  Some people wanted to

Page 869

1  keep them and some people wanted to re-focus their
2  priorities.
3      The final decision was to re-focus
4  their -- to keep them, ultimately to downsize them.
5  Jeff did significant reorganization and downsizing in
6  his leadership role.  But there was a clear movement
7  approved by senior management to have those
8  partnership -- those now Community Business Centers
9  become business centers as opposed to small P
10 political networking centers.
11     And as that started, it aligned with the
12 HFA effort and the following loan team effort that's
13 part of this document, and I think Beverly Wilbourn
14 said on more than one occasion that the public entity
15 team was helping her lead and make this transition
16 because we were the first to do it, to form a
17 specific product business relationship with stated
18 amount of time and dedication amongst her members or
19 her staff in the field.
20     MR. STEWART:  Could we just go off the
21 record for a quick second?
22     (Discussion off the record.)

Page 870

1      BY MR. STEWART:
2      Q.  Mr. Riedy, would you take a look at
3  Exhibit 8?
4      A.  Yes.
5      Q.  Have you seen Exhibit 8 before?
6      A.  I don't remember seeing it.
7      Q.  Take a moment to take a look at the
8  document.  I just want to ask you a few questions
9  about it.
10     A.  Got it.  I mean, I have a sense of what it
11 is.
12     Q.  I want to direct your attention to the far
13 right corner, far right on the topside.  It says
14 business unit leads.  Do you see that?
15     A.  Yes.
16     Q.  And if you go midway through the page, it
17 identifies two people, Eileen Neely and Maureen Rude.
18 Do you see that?
19     A.  That's correct.  Yes, I do.
20     Q.  And can you identify for the record who
21 Ms. Neely was and who Ms. Rude was, on or around
22 February 11, 2008, the date of the document?

25 (Pages 867 to 870)

Page 871

1      A.   They were both directors reporting to me.
2  I believe Eileen was a director at the time.
3  Definitively, Eileen Neely was the head of the loan
4  side of the PE team, of the public entity team; and
5  Maureen Rude, who I'm confident was a director at the
6  time, was the head of the HFA team reporting directly
7  to me.
8      Q.   Now, if you go across the people, it
9  identifies the CD accounts and you'll see there a
10  public entity account and an HFA account.  Are those
11  the two accounts that reported to you?
12      A.   Yes.
13      Q.   And then the team leads are Ralph Perrey
14  and Lisa Tarter and we've identified them from
15  Exhibit 6.
16      A.   Correct.
17      Q.   Do you know a Shalley Horn and a Sandra
18  Almanzan?
19      A.   I know them both, yes.
20      Q.   And they're identified as team leads for
21  the HFA team, is that right?
22      A.   Correct, yes.

Page 872

1      Q.   And then it lists the individuals who were
2  assigned as team members were the public entity team.
3  Those are the same people we've talked about earlier,
4  Francis, Zeeda Daniele, Byron Turner, Richard Staples
5  and Pattye Green.
6      A.   Uh-huh.
7      Q.   And then it identifies a number of
8  individuals as team members for the HFA account team.
9  Do you see that?
10      A.   Yes, I do.
11      Q.   And is this document, and specifically
12  these two sections that identify the team lead and
13  the account team on the CD account team, reflective
14  of your earlier testimony that Ms. Wilbourn had
15  assigned team members to work in concert with members
16  of your two teams?
17      A.   It does.  And because of all the other
18  products and accounts mentioned on the document, it
19  affirms this transition that Beverly was charged with
20  by Jeff to move the local offices, the Community
21  Business Centers from -- again, I'll use the word
22  small P, political, and networking offices to

Page 873

1  business offices.
2      MR. STEWART:  We move for admission of
3  Exhibits 6 and 8.
4      MR. WACHTEL:  No objections.
5      ARBITRATOR ROSCOE:  So admitted, 6 and 8.
6  Thank you.
7      (Respondent's Exhibits Nos. 6 and 8
8      were received in evidence.)
9      MR. STEWART:  And if Exhibit 4 is not in,
10  we move for admission of Exhibit 4.
11      MR. WACHTEL:  I believe 4 is.  We wouldn't
12  object if it wasn't.
13      ARBITRATOR ROSCOE:  4 is in.  On the first
14  day, it was item number 4.  Do you need a two-minute
15  break?
16      MR. STEWART:  No.  Do you need a --
17      THE WITNESS:  I don't need a break.
18      MR. STEWART:  Maybe in a couple of
19  minutes.
20      THE WITNESS:  For the record, can I make
21  one other comment about Exhibit 6?  No, I'm sorry,
22  Exhibit 8.  At the bottom of that page, there is a

Page 874

1  line that reads note, colon:  Teams may change as
2  market needs change.
3      BY MR. STEWART:
4      Q.   Was that a determination that would have
5  been you could make those changes?
6      A.   No, Beverly would have made those changes
7  and I just want to go back to some of the documents
8  we looked at yesterday where Zeeda Daniele no longer
9  appears and someone else appears.  And that was
10  always done in discussion with us, but it was around
11  this charge described in this one line, teams may
12  change as market needs change.
13      So Zeeda was in L.A.; REOs were becoming a
14  big deal.  Beverly was trying to find a way to have
15  the local offices more engaged in REO-related
16  solutions and it was appropriate to transition Zeeda
17  from this function to that function.
18      Q.   You jumped a little bit ahead of me.  I
19  was going to get to that.
20      A.   I'm sorry.
21      Q.   But we're here now.  Why don't we talk
22  about it.  Let's go to Exhibit 10.  And at FM 24 of

Page 875

1    Exhibit 10.
2        A.   Yes.
3        Q.   Exhibit 25.
4        A.   Exhibit 25?
5        Q.   Yes, FM 1116.  So keep your thumb on
6    Exhibit 10 at FM 24 and I want you to turn to Exhibit
7    25 and at FM 1116.
8        A.   25 is not in the --
9        Q.   Oh, 25, we took it out?
10       A.   -- binder.
11           MR. STEWART:  Why don't we just take a
12   couple of minutes now.
13           ARBITRATOR ROSCOE:  To get the documents?
14           MR. STEWART:  To get the documents.
15           ARBITRATOR ROSCOE:  All right.
16           (Recess.)
17           BY MR. STEWART:
18       Q.   After an extended break, we're back on the
19   record, Mr. Riedy.  Thank you for your patience.
20           Before we broke, you had made a comment
21   about the changes that had been made on the CD
22   account team and I had directed you to Exhibit 10 and

Page 876

1    specifically at page FM 24.  With Exhibit 25,
2    specifically at FM 1116, and I had asked you to open
3    those two pages up.
4        A.   Got 'em.
5        Q.   Exhibit 10 reflects members of the CD
6    account team as of March 10, 2008.  Do you see that?
7        A.   Uh-huh.
8        Q.   And the individuals are Ralph Perrey,
9    Zeeda Daniele, Byron Turner, Pattye Green, Richard
10   Staples, Lisa Tarter and Evett Francis.
11       A.   Yes.
12       Q.   And if you turn to Exhibit 25, there are
13   several members of the CD account team now under the
14   direction of Lisa Zukoff at least as of March 12,
15   2009 who were not members of the CD account team back
16   in 2008.  Do you see that?
17           And specifically I direct your attention
18   to, on the left side, Bill Picotte, Jessie Smith,
19   Warren Harris.  Do you see that?
20       A.   Uh-huh.
21       Q.   Now, you made a comment on Exhibit 6 about
22   changes in the market may require changes to the

Page 877

1    team.  Do you recall that testimony?
2        A.   Yes, I do.
3        Q.   Now, assigning Mr. Picotte, Mr. Smith and
4    Mr. Parish to the CD account team, were those
5    decisions that Carl Riedy made or someone else, to
6    your knowledge?
7        A.   Those were decisions that Beverly Wilbourn
8    in her role as the head of CD, Community Business
9    Centers, the CBCs, would have made in consultation
10   with me and the leadership of my team.
11       Q.   And at this point, in or around March of
12   2009, who would have been on the leadership of your
13   team?
14       A.   March of 2009, Lisa Zukoff would have been
15   the only member of my public entity loan team.
16       Q.   Do you recall any specific discussions
17   with Ms. Wilbourn about assigning Mr. Picotte Smith
18   or Harris to the CD account team?
19       A.   I know we had some conversations because
20   we also had conversations around the percentage of
21   time in 2009.  That 2008 number, 50 went up to 80 or
22   90 percent.  I think the documents provide that

Page 878

1    evidence somewhere along here.
2            But I know that Lisa and I had
3    conversations about it as Lisa was informing me about
4    the changes and I'm pretty confident that in order to
5    get the clearance -- to get Beverly to agree on the
6    amount of time allocated, we would have talked about
7    the level of commitment in the individuals.
8        Q.   And you talked about changes in market
9    conditions.  At least that was what was referenced on
10   the note.  Are you aware of any changes, whether at
11   Fannie Mae or in the markets, that would have
12   necessitated any changes to the assignment of
13   personnel on the CD account team?
14       A.   Well, I know that the Zeeda Daniele,
15   Warren Harris -- I'm pretty confident that the change
16   from Zeeda Daniele to Warren Harris had to do with
17   the expanded focus of the Community Business Centers
18   on the REO-related issues, and L.A. was such an
19   important hot spot at the time, that was done.  I'm
20   not quite sure why.
21           I'm also -- I know that Bill Picotte is a
22   Native American and someone who had done business

27 (Pages 875 to 878)

Arbitration Day 4                                                    October 27, 2011

Washington, DC

Page 879

1  with Native Americans.  We also had another product
2  that we were trying to gain some traction on which
3  was similar to the Modernization Express but it was
4  for Native American reservations.
5      Q.   What was the name of that product?
6      A.   I can't remember, frankly.  But I believe
7  he was chosen to do that as a way for him to learn
8  the loan team business and give us some credentials
9  back into that particular community of customers.
10     Q.   To your recollection, was that the product
11 specifically for Native Americans, was that called
12 Tribal Express?
13     A.   It has the word express in it so it's
14 probably right.
15     Q.   Let's go to Exhibit 150.
16     A.   150.
17     Q.   If you would turn to the third page of the
18 document which is at FM 141.
19     A.   We're in 150?
20     Q.   150.
21     A.   Thank you.
22     Q.   FM 141.

Page 880

1      A.   Yes, sir.
2      Q.   You recall on direct there have been some
3  discussions about the volume of business that the PE
4  loan team did with the Community Express and
5  Modernization Express loan products in 2007?  Do you
6  recall that exchange?
7      A.   I do.
8      Q.   I want to direct your attention to the
9  last assessment that you made on this page and the
10 first sentence talks about the impact of a voluntary
11 remediation.  Do you see that, on the last full
12 paragraph on the page?
13     A.   Yes, I'm just reading it.  Yes, I see
14 that.
15     Q.   And it talks about a revising of the goals
16 of the loan products in 2007 based on the impact of
17 the voluntary remediation.  Do you see that?
18     A.   Yes.
19     Q.   Can you explain for the arbitrator what
20 the voluntary remediation was and what impact it
21 caused?
22     A.   Voluntary remediation was -- because of

Page 881

1  concerns that were expressed by our regulator, OFHEO,
2  around the way we were -- the level of policies,
3  procedures, monitoring, quality control, et cetera,
4  that was being expressed by OFHEO on different
5  occasions, in order to be sure that this product was
6  up to the new benchmarks or expectations or standards
7  that were in mind from the regulator's perspective,
8  we decided to stop marketing and doing this business
9  until we brought these two products voluntarily up to
10 speed.
11     So we were looking -- we were trying to
12 lead in the space, not be told sooner or later by the
13 regulators, you have to stop doing this business
14 because you're not doing it with the appropriate
15 controls and policies and procedures, so we undertook
16 that.  It became a much more arduous process than was
17 originally anticipated as far as time and effort that
18 was required.
19     Q.   Do you recall approximately how much time
20 Fannie Mae suspended the marketing of the Community
21 Express and Modernization Express loan products?
22     A.   I honestly don't know how much time.  I

Page 882

1  know it was a lot of time.  I know that Steve
2  actually was very supportive in that role, if my
3  memory serves me correctly.  But I know -- I'll say
4  months.  I don't know if it took over a year but I
5  know it took a lot of months.
6      Q.   I want to talk now about the -- going back
7  to the January 9th, 2008 time frame and the
8  implementation of the buddy system.
9      A.   Gotcha.
10     Q.   To what extent if any was your vision for
11 going towards this buddy system going towards a
12 desire to increase business?
13     A.   Well, a couple of things.  One, overall
14 corporate priority, Community Business Centers become
15 more business oriented.  We looked at some of those
16 documents.  That corporate priority went directly to
17 Jeff as the overseer of the units and then to
18 Beverly.
19     So one was to basically leverage or take
20 advantage of that opportunity, because I could
21 increase in 2008 the number of individuals committed
22 to marketing and working with our product outside of

28 (Pages 879 to 882)

Arbitration Day 4                                            October 27, 2011
Washington, DC

Page 883

1  the cost center.  So I forget what the numbers were
2  but we had X and we added a comparable amount from
3  the CBC, which expanded our breadth and scope in
4  marketing our products.
5      Q.  Let me ask you this.  The question I'm
6  asking is, when you signed and thought about the
7  vision of utilizing the folks on the CD account team,
8  was that with an understanding at that point in
9  January of 2008 that you wanted to replace the
10  members of the public entity loan team who were in
11  your cost center?
12     A.  No, it was not.  It was instead to expand
13  the team in the expectation or hope that our products
14  would grow, we would be able to keep the core public
15  entity team in place and that the CBCs -- the CD
16  account teams would be assisting us in that growth
17  which was part of their core responsibility.
18     Q.  Would you turn now to Exhibit 152?  And
19  I'm going to direct your attention to the first page
20  of the document and it has a number of Fannie Mae
21  corporate priorities for 2008.  Do you see that?
22     A.  Yes, I do.

Page 884

1      Q.  And the fifth bullet point is for results.
2  Do you see that?
3      A.  Uh-huh.
4      Q.  And it states, "Drive profitability and
5  mission to growth and operational discipline."  Do
6  you see that?
7      A.  Yes, I do.
8      Q.  How if, at all, was your implementation of
9  the buddy system, in your discussions with
10  Ms. Wilbourn about going in that direction, how if at
11  all was that related to this corporate priority of
12  driving results?
13     A.  Well, I would say certainly on the mission
14  side, because both of the loan products -- this was
15  the HFA -- was clearly mission -- in the sweet spot
16  of mission for the company.  So my team was tasked
17  with driving mission, okay?  Through growth.  We
18  certainly didn't want to be stagnant in the area.
19         So we did not any -- I want to be careful
20  what I say here.  The team, both the CD account team
21  members were in place and the CD -- I mean, and the
22  public entity team was in place.  By adding more

Page 885

1  directly 50 percent of their time and identifying
2  specific individuals, we certainly created a bigger
3  team to go out and market and try to sell this
4  business, thereby hopefully adding to our growth and
5  adding to our profitability without sacrificing
6  operational discipline, frankly, which is a different
7  discussion.
8      Q.  Just for the record, these corporate
9  priorities, as an officer of the corporation, what if
10  any relationship did these corporate priorities have
11  for your goals for 2008?
12     A.  Well, the corporate priorities cascaded
13  down through the officer core.  So they cascaded down
14  from senior management and the board to the executive
15  vice presidents, in this instance Ken Bacon, to the
16  senior vice president, in this instance Jeff Hayward,
17  to me as the business leader, officer, VP.  That's
18  one answer.
19         And I think the other answer that we
20  should say here or that I would like to say is that
21  we were not in the core part of the company.  So the
22  core part of the company, I think I spoke to this

Page 886

1  yesterday, was Capital Markets, Single Family and
2  Multifamily.  And whenever you could find a corporate
3  priority that you could directly respond to and
4  execute, that was a very good thing.
5          So this particular goal would have meant a
6  lot to Jeff's team because it was inside the larger
7  board, senior management, and at that point in time,
8  regulator's view of our priorities.
9      Q.  Now, there comes a time later in 2008, and
10  I believe you testified the fall of 2008, where you
11  would engage if discussions with Mr. Hayward about
12  potential reductions in force on your team and
13  specifically with respect to the public entity loan
14  team members, correct?
15     A.  Correct.
16     Q.  What changes either within the company or
17  within the market influenced your decision that you
18  needed to change your focus from growing the business
19  to the use of the CBC team members and your public
20  entity loan team, D.C.-based team to moving solely
21  towards the CD team as being the face of the sales
22  team for these two loan products?

Arbitration Day 4                                                    October 27, 2011

Washington, DC

Page 887

1    A.   Internally, on the same page 161 of this
2    particular Exhibit 152, the first bullet,
3    "effectively conserve and allocate capital by
4    managing expenses and operating the business
5    efficiently."  That over the year became -- a part of
6    that goal became -- I'll say this differently.  Let
7    me say this more thoughtfully.
8         As the year progressed, particularly in
9    the last quarter, and we went through the Ken Bacon
10   memo and we have the January 9th memo as well -- the
11   Ken Bacon e-mail, excuse me -- there became a clearer
12   and clearer appreciation by the officer core that a
13   personnel reduction in force would be forthcoming.
14        So that's one thing that happened.
15        The second thing that happened was -- and
16   I think I mentioned this yesterday as well.  There is
17   core fundamental functions in the loan team business.
18   One was sourcing, one was underwriting, one is credit
19   approval, one is due diligence, one is pricing and
20   one is coordinating the loan closings.
21        During 2008, the infrastructure for
22   underwriting credit approval and pricing moved to

Page 888

1    other parts of the organization rather than the PE
2    team's direct responsibilities.
3         So underwriting and credit approval was
4    done clearly in the credit construct of our company,
5    and of the housing and community division, the
6    Community Lending subunit or business unit, business
7    channels.
8         Q.   Was that a Carl Riedy decision?
9         A.   No, that was a corporate -- that was
10   actually an FHFA delivered -- that was an FHFA
11   directive that was implemented by senior management
12   to separate credit from businesses and create a
13   Chinese wall between the two organizationally.
14        So they took over the underwriting and
15   they took over the credit and then Jeff had -- I'm
16   not going to say earlier -- Jeff began to develop an
17   infrastructure on pricing and it was originally
18   headed by David Burgess.  David Burgess left the
19   company.  Eileen Neely was chosen as the interim and
20   then Diego Losada was hired and Diego had two
21   individuals that reported to him.
22        And Jeff had more products than just the

Page 889

1    loan products that needed to be priced so he began to
2    rely extensively on Diego's judgment and Diego's
3    expertise to price the products in his business, in
4    his overall business.
5         I do want to say that Steve played a very
6    vital role.  That was a skill set that clearly he had
7    that was in the sweet spot, and in the earlier
8    generations of Community Express and Mod Express, he
9    played that role and he played that role admirably
10   and very well.
11        Q.   To your knowledge, did Mr. Brannum apply
12   for the position that Mr. Losada eventually received?
13        A.   Not to my knowledge.  But I think to
14   finish, so there was the large corporate messaging,
15   there was a change in the way we were running our
16   business, and then it became incumbent upon me as the
17   officer to discuss with Jeff the relationship between
18   that goal, the staff that was in my cost center,
19   which was the PE loan team, and whether or not those
20   individual disciplines or business functions could be
21   performed reasonably well so that we could stay in
22   the business in 2009 and continue to try to grow the

Page 890

1    business.
2         Q.   And did you have discussions with
3    Ms. Wilbourn and/or Mr. Hayward about that very
4    notion?
5         ARBITRATOR ROSCOE:  When you say that very
6    notion, please express what you're talking about.
7         BY MR. STEWART:
8         Q.   The continuing to do the business of the
9    public entity loan team solely through members of the
10   CD account team.
11        A.   Yes, absolutely.  I think the other issue
12   that I want to bring up which I should have raised as
13   part of the corporate dynamic -- and again, Lisa can
14   affirm this -- but in 2008, the Community Express
15   loan product came under greater and greater scrutiny
16   from credit and -- well, actually both.
17        Mod Express and Community Express both
18   came under great scrutiny from risk and credit and we
19   spent a great deal of time in discussions on the
20   Modernization Express product educating our risk team
21   at the senior level, the number 2 risk officer for
22   the company, Michael Shaw, and ultimately got to the

30 (Pages 887 to 890)

Page 891

1   point where he was comfortable, after meetings with
2   the Department of Housing and Urban Development and
3   numerous PowerPoints and discussions, to allow us to
4   continue that product.
5       Community Express went through the same
6   scrutiny. And while we were, in quotes, "allowed to
7   stay in the business," the new requirement on the
8   business was 100 percent collateral from the
9   borrower. And that significantly constrained 2009
10  opportunities because it happened in late 2008. It
11  significantly constrained 2009 business opportunities
12  because most local governments and/or public housing
13  authorities could not afford to produce a dollar in
14  order to receive a dollar. And so as we entered
15  2009, that was also a dynamic that was impacting our
16  business.
17      Q.   Now, you said that most borrowers, and I
18  assuming you're talking about the PHAs and
19  municipalities, could not afford the dollar for
20  dollar that would be required from the 100 percent
21  collateral requirement. Is that right?
22      A.   That's correct.

Page 892

1       Q.   Now, the 100 percent collateral
2   requirement, was that a directive or edict from the
3   regulator or was that --
4       A.   No, that was an internal risk decision
5   made by the chief risk officer, Ken Phelan I believe
6   was the chief risk officer at the time. And I'm sure
7   it was done by Mike Shaw, the number 2 risk officer.
8       Q.   Did either Mr. Shaw or Mr. Phelan report
9   to Mr. Hayward?
10      A.   No. Mr. Phelan reported to the CEO at the
11  time. I don't know if it was Dan or Mike. And I
12  think Mike Shaw in that organizational construct
13  reported to Ken Phelan.
14      Q.   And the decision to move to 100 percent
15  collateral requirement for the Community Express loan
16  product, was that a decision that was supported by
17  you or Mr. Hayward?
18      A.   No. We advocated and fought over months
19  to prevent that from happening, and lost.
20      Q.   Now, you testified that the 100 percent
21  collateral requirement severely restricted the
22  ability from -- I'm just going to use the term

Page 893

1   severely restricted; you can agree with me or not --
2   the ability of the public housing authorities and
3   municipalities to use the Community Express loan
4   product, is that correct?
5       A.   That's correct.
6       Q.   What if any market did housing finance
7   agencies have for the Community Express loan product
8   as you understood it in late December 2008/early
9   January 2009?
10      A.   I think I testified to this to some degree
11  yesterday in answers from counsel. The HFAs were
12  significantly impacted by the financial meltdown.
13  Their source for capital tax-exempt bonds had shrunk,
14  their source for liquidity for warehouse lines and
15  other types of capital needs had been severely
16  limited because of constraints the banks were under,
17  et cetera. And there was a real -- they were looking
18  for other sources of capital.
19      And the combination of their need and our
20  understanding of those particular customers, given
21  our history with them and our relationships with
22  them, we began to have conversations with them about

Page 894

1   balance sheet lending underneath the Community
2   Express program to support their immediate needs.
3       That pipeline is in one of these reports.
4   It was significant. And because some of those
5   agencies have moderate to significant balance sheets,
6   if we believed for a while that even a 100 percent
7   collateral requirement, in order to have another
8   lender in the space, they would meet for the short
9   term, in order to be sure they had source of capital.
10      Q.   I want to direct your attention to Exhibit
11  13. It's a document dated December 4th, 2008 from
12  Carl Riedy to Chuck Greener, senior vice president
13  and Lorraine Voles, senior vice president. The
14  subject is Change to Community Lending's Community
15  Express Loan Product. Do you see that?
16      A.   Yes, I do.
17      Q.   Are you familiar with this document?
18      A.   Yes, I am. I'm familiar with it.
19      Q.   Can you explain for the arbitrator what
20  the purpose of this document was?
21      A.   One purpose of the memo was to summarize,
22  both historically and currently, the state of

31 (Pages 891 to 894)

Arbitration Day 4                                           October 27, 2011

Washington, DC

Page 899

1  you meant by that line?
2      A.   What I meant was that our most common
3  borrower types, municipalities, public housing
4  authorities and comparables, would not be able to
5  meet the collateral requirements and, from our
6  perspective in December of 2008, there was some
7  opportunity still -- and I think my goals for 2009,
8  I'm not 100 percent sure but I think that there was a
9  Community Express goal.  But that was a goal that we
10  were relying on the housing finance agencies to help
11  us meet as opposed to the more common borrower types.
12      Q.   So you understood, as of December of 2008,
13  that it would be unlikely that most of the historical
14  borrowers for the Community Express loan product
15  would be able to utilize that loan product into some
16  point into the future, correct?
17      A.   Exactly.  Certainly in the near term.
18      Q.   How if at all did that understanding play
19  into your decision to lay off members of the public
20  entity loan team?
21      A.   Since there has been conversations here
22  about what was the primary reason for the RIF, I

Page 900

1  don't want to suggest that this was either the
2  primary reason or the reason that created the initial
3  conversation.  But it was a rationale that was
4  considered by Jeff and me and Eileen before she
5  announced her resignation.
6          I also want to connect that with the
7  reality that we had built some infrastructure.  The
8  HFA team became knowledgeable about this product.
9  Eileen Neely at one point in time and then later Lisa
10  Zukoff could have supported them in any particular
11  meeting with any HFA if the product -- if a
12  transaction opportunity became a reality.
13          And that we had the consultants -- another
14  memo that's in the binder -- prepared to support that
15  activity.  And we had Underwriting and Credit ready
16  to do their job, Legal to do their job and Diego
17  Losada to do his job for pricing.  So the
18  infrastructure was there in order to continue the
19  business from my perspective as the business leader.
20      Q.   So given your explanation, there were
21  multiple factors that went into the decision to lay
22  off members of the public entity loan team, correct?

Page 901

1      A.   Correct.
2      Q.   Why don't you just give us, to the extent
3  you can, briefly, what those reasons were.
4      A.   Well, again, those reasons were a
5  corporate objective to reduce expenses, a
6  corporate-wide effort that was undertaken to reduce
7  force in early 2009 as a single event.  The construct
8  that had been built both consciously between Beverly
9  and me around building over several years, the
10  competency and the formal organizational construct of
11  the CD account teams, the reorganizations internally
12  to provide other support around the primary
13  functions -- again, Underwriting, Credit, Pricing --
14  and another conversation that was taking place was to
15  utilize the consultants to provide some additional
16  support.
17          And I want to underline that the
18  consultants were paid only on -- had a baseline but
19  their real compensation was based on deals that were
20  closed, so it wasn't overhead in the traditional
21  sense.  It was success-based fee.
22          And all those things together along with a

Page 902

1  conscious understanding that I believed that the
2  business team, as did Jeff, should continue to reside
3  with the business, the products, and that would have
4  been the PE team and that I wasn't going to run that
5  by myself, that I needed a business lead and that
6  lead ended up being Lisa Zukoff, that would
7  coordinate with the CD account teams and keep me
8  apprised and to be sure that she was providing the
9  business leadership to both the consultants, frankly,
10  as well as to the CD account teams.
11      Q.   And I take it that the changing -- Fannie
12  Mae's change in requiring 100 percent collateral for
13  Community Express also factored into your decision,
14  is that correct?
15      A.   Yes.  The Mod Express product was still,
16  at that time, alive and kicking and Community Express
17  was significantly hampered, so yes.  And again, the
18  goals in 2009 reflect Community Express but also
19  speak pretty directly that that's an HFA pipeline,
20  which is these memos that we've looked at recently.
21      Q.   Now, you've talked about your goals in
22  2009 reflecting a movement towards trying to obtain

33 (Pages 899 to 902)

Arbitration Day 4                                                October 27, 2011

Washington, DC

Page 903

1    commitment from the HFAs to do the Community Express
2    loan product and you talked a little bit about that
3    yesterday on direct. I want to direct you to Exhibit
4    12.
5        A.  I have it.
6        Q.  And this is a document dated November
7    24th, 2008. It's a 2008 HFA Community Express deal
8    team meeting minutes. Do you see that?
9        A.  I do.
10       Q.  Are you familiar with this document?
11       A.  Frankly, no. I would have to read it.
12       Q.  Why don't you take a moment to read it.
13       A.  It brings back fond memories.
14       Q.  If you could look under the key points
15   section in the document. And the lead indicates
16   Riedy. I assume that's you?
17       A.  Yes.
18       Q.  The key points, first bullet is moving
19   forward with review of six HFA Community Express
20   deals and $500 million incremental pipeline with a
21   strong commitment to risk analysis across company
22   buy-in. Do you see that?

Page 904

1        A.  Yes.
2        Q.  Is that reflective of what you just
3    testified to, potential deals in the pipeline in 2009
4    for Community Express loan products marketed to HFAs?
5        A.  Yes.
6        Q.  If you turn to the second page of the
7    document, under Alaska and Arkansas, do you see that
8    first bullet there?
9        A.  Yes, I do.
10       Q.  It talks about 100 percent collateral
11   requirement. Can you explain what's being discussed
12   here?
13           ARBITRATOR ROSCOE: Is this the same as
14   the 100 percent collateral requirement we've already
15   gone through?
16           MR. STEWART: Yes.
17           BY MR. STEWART:
18       Q.  Let me just direct your attention,
19   Mr. Riedy. There are a number of attendees at the
20   bottom. Do you see that?
21       A.  I do.
22       Q.  And Mr. Brannum's name is not among them?

Page 905

1        A.  No, it is not.
2        Q.  And to your recollection, was Mr. Brannum
3    a member of the HFA Community Express deal team?
4        A.  I know that I relied on Eileen Neely as
5    the leader of the team, still at this date of these
6    minutes -- to support the HFA team's ability to
7    attempt to secure this business. Whether or not
8    Eileen Neely turned to other members of her team to
9    support her, I'm not aware. And in fact, Eileen was
10   at this meeting and other members of my -- Michael
11   Lohmeier, who had the lead on the HFA team, and
12   myself also attended the meeting.
13       Q.  To your knowledge, is Fannie Mae currently
14   marketing the Modernization Express or Community
15   Express loan products?
16       A.  No, they are not. Those two products, in
17   early 2010, were eliminated by the regulator, now
18   called FHFA. For several years prior to that, there
19   was an ongoing concern expressed by the regulator
20   that these particular loan products went beyond our
21   charter, from a strict review of our charter.
22           At one point in time Legal had outside

Page 906

1    counsel prepare an opinion suggesting that it was
2    within certain provisions of our statute. Over a
3    year past, at which time the regulator came back and
4    killed both products and we advocated a change in
5    that decision, lost that and the products have been
6    shut down ever since.
7        Q.  Now, we talked about the reduction in
8    force. I want to ask you about the selection for a
9    director to lead the newly reconstituted loan team.
10           ARBITRATOR ROSCOE: Before you make that
11   transition, if you would, please, when you use the
12   term reduction in force, are you speaking of the
13   three members or others of this team? Or is it a
14   different meaning that you want the arbitrator to
15   understand?
16           MR. STEWART: Specifically just the
17   members of this team.
18           ARBITRATOR ROSCOE: And how many are you
19   referring to, then, just in terms of number? I mean,
20   I've got Daniele, Turner, Green. Rylant and Beachler
21   I know are gone and Rylant and Beachler are slightly
22   different, but I just don't always know when you

34 (Pages 903 to 906)

Arbitration Day 4                                    October 27, 2011

Washington, DC

Page 907

1    refer to that.
2          BY MR. STEWART:
3       Q.   Specifically the reduction in force of the
4    public entity loan team members, the DC based public
5    entity loan team members --
6       A.   If I might interrupt, which would have
7    been Maria, Steve and Russell.
8       Q.   Correct.  Ultimately you selected Lisa
9    Zukoff to lead that group, correct?
10      A.   Correct.
11      Q.   Did you consider whether Mr. Brannum could
12   have led that group?
13      A.   No, I never thought he was a legitimate
14   candidate to lead that group.
15      Q.   And what characteristics, what factors
16   played into your decision?
17      A.   One, Lisa Zukoff's performance and resume,
18   if you go back through the pipelines, you will see
19   that she was the number one contributor both in
20   sourcing and closing transactions on both -- I
21   believe on both the Mod Express and Community Express
22   side.

Page 908

1          She was an executive director of a public
2    housing authority in West Virginia so on the
3    Modernization Express side, she not only knew the
4    business but she had run an authority and all that
5    that means from the P&L and understanding the
6    programs and the operations and the asset management
7    and the property management and all those other
8    activities that are part and parcel to running a
9    public housing authority.
10         She actually was the first housing
11   authority to receive -- I believe the first; I know
12   she received the Hope VI, which was that new
13   financing tool to revitalize public housing projects.
14   She received a Hope VI from the department when she
15   ran the public housing authority.
16         She had done a great job as the head of
17   the partnership office in West Virginia.  Her
18   performance was always highly regarded by the CBC
19   teams as well as by Eileen and her team and she was
20   frankly, once I heard about Eileen Neely's
21   resignation, after several conversations with Jeff
22   and Eileen, she was by far the best candidate from

Page 909

1    the current team.
2       Q.   And by comparison, how did Mr. Brannum
3    measure to Ms. Zukoff?
4       A.   Steve had significant analytical and
5    pricing skills that were used by the team frequently.
6    He also helped assist, in his mentoring capacity,
7    other people with their structuring and underwriting
8    as that evolved from the PE team to the credit team.
9          His primary responsibility at the end of
10   the day was to source and market business and I don't
11   think that he did a very good job of sourcing and
12   marketing the business.  If you go back and look at
13   the amount of effort that Russell and Maria did
14   comparably, in terms of outreach to customers, in
15   terms of travel, et cetera, I would argue that they
16   excelled, out-excelled him as a comparable.
17         But again, neither of them were, in my
18   mind, once Eileen resigned and Lisa Zukoff was an
19   actual candidate, none of them compared to Lisa
20   Zukoff.
21      Q.   In terms of the way they could sell the
22   product?

Page 910

1       A.   In terms -- well, an overall understanding
2    of the product, in selling the product, in being a
3    manager and in being a higher performer across the
4    board.
5       Q.   To your knowledge, had Mr. Brannum managed
6    employees on or before January of 2009?
7       A.   I know he mentored employees.  I don't
8    remember him, at least in his time, in the business
9    that I led, managing employees.
10      Q.   And at some point Mr. Lohmeier resigned
11   from your HFA team.  I believe the parties have
12   stipulated that that was on or around December 22nd
13   or 23rd of 2008.
14      A.   Correct.
15      Q.   At any point did you consider Mr. Brannum
16   as a replacement for Mr. Lohmeier's position?
17      A.   No, I did not.
18      Q.   And if not, why?
19      A.   I had no sense, in my experience with
20   Steve, that he knew or understood -- I'm not saying
21   he didn't but I had no knowledge that he knew or
22   understood anything about the multifamily loan side

Alderson Reporting Company
1-800-FOR-DEPO

Page 911

1  of the business.
2        Again, earlier we talked about new
3  knowledge to me, that he supported Wayne's -- I'll
4  call them an FHA team, I don't know what they were
5  called at the time, Mike Rylant and Jim Beachler, on
6  helping to price the acquisition of the bonds.  I
7  think I've tried to differentiate the acquisition of
8  the bonds from the purchase of loans in the single
9  family space.
10       Multifamily is exactly the same.  Michael
11 Lohmeier, when he came to the company, had worked at
12 the Illinois Housing Development Agency and at that
13 time, except for me, I never worked specifically at
14 an HFA as to running their trade association.
15 Maureen Rude had run Montana, Jim Peffley was the
16 deputy CFO for Delaware and ran multifamily and some
17 single family at some point in his career in
18 Delaware.
19       Mark Vanderlinden had worked in the New
20 Mexico Housing Finance Agency.  Michael Lohmeier came
21 from the Illinois Housing Development Agency and in
22 multifamily.  And after his tenure at IHDA, he was

Page 912

1  the multifamily acquisition investment officer for
2  the United Methodist Pension Fund.  So his
3  credentials were quite strong.
4        So when I went into -- with Jim Peffley
5  trying to find a replacement for Michael Lohmeier, we
6  were moving toward -- it would have been natural for
7  us first to look for someone who knew HFAs and,
8  secondly and equally, for someone who understood the
9  multifamily side of the business.
10    Q.    When Mr. Lohmeier announced that he was
11 resigning from Fannie Mae, did Mr. Brannum express to
12 you his interest in replacing Mr. Lohmeier?
13    A.    No, he did not, and the position was open
14 to external candidates.
15    Q.    And who ultimately filled that position?
16    A.    A gentleman -- external gentleman by the
17 name of Tabare Borbon.
18    Q.    Can you explain briefly how Mr. Borbon
19 came to Fannie Mae and assumed that position?
20    A.    It was an open discussion.  I mean, it was
21 an open posting.
22    Q.    What is a posting?

Page 913

1    A.    Posting means that --
2        ARBITRATOR ROSCOE:  I know what it is.
3        THE WITNESS:  So in part of our -- in part
4  to the respondents to that, I don't know how many
5  there were, we were separately seeking potential
6  candidates from outside.  I specifically went to an
7  individual who used to be in the group in my
8  housing -- not my but in the housing group that I
9  also was in at CS First Boston, a gentleman by the
10 name of Bob Foggio who was then a lead investment
11 banker at Goldman in the housing group but he had let
12 go by Goldman.
13       So my initial external outreach was to Bob
14 Foggio, because I knew him, because I knew he
15 understood multifamily, I knew what kind of respect
16 he had in the FHFA community.
17       Bob ended up taking another investment
18 banking job with either Morgan Stanley or JP Morgan
19 Chase -- I think Morgan Stanley.  That doesn't really
20 matter for these purposes.  But he made a decision,
21 if -- he was going to continue his career as a
22 housing investment banker.  He in turn said another

Page 914

1  person that was led go by Goldman was Tabare Borbon,
2  you ought to look at him.
3        We looked at him, we looked at the other
4  candidates and we hired Tabare Borbon.
5  BY MR. STEWART:
6    Q.    What is Mr. Foggio's race?
7    A.    Bob Foggio is white.
8    Q.    And Mr. Barbon's race?
9    A.    He's a minority.  And I'm never quite
10 sure.
11    Q.    What's his skin color?  Is it black, dark?
12    A.    I made such a mistake yesterday.  It's
13 dark.
14    Q.    Ms. Neely had resigned from Fannie Mae, is
15 that correct?
16    A.    She did resign.
17    Q.    Did you backfill her position?
18    A.    We did not backfill her position.
19    Q.    And Ms. Lester had resigned from Fannie
20 Mae earlier in 2008, correct?
21    A.    In the middle summer -- her last day was
22 in late summer of --

36  (Pages 911 to 914)

Page 923

1  different from 2009 in terms of the way that Fannie
2  Mae handled separations.  Is that the gist of your
3  testimony on that subject?
4      A.   Yes.
5      Q.   And was there some policy or document
6  you're referring to that suggests that in 2009,
7  Fannie Mae would not allow employees to have advanced
8  notice of a termination?
9      A.   There was a process that was undertaken on
10  that reduction in force, at least as it relates to my
11  reduction in force, that terminated employees on a
12  date certain.
13      Q.   Did you receive any particular directive
14  from above, from up your chain of command, stating
15  that you could not tell people who were going to be
16  reduced in force that they might look for other jobs?
17      A.   Restate the question.  I wasn't sure if
18  you're stating it in the positive or the negative.  I
19  apologize.
20      Q.   Let me do it this way.  Did Mr. Hayward
21  tell you not to let the people who were going to be
22  affected by the reduction in force know in advance of

Page 924

1  January 23rd that they were going to be terminated?
2      A.   Yes, he did.
3      Q.   And how did he do that?
4      A.   It was over time as part of the process
5  that was in place for the reduction in force.
6      ARBITRATOR ROSCOE:  You asked how, but I
7  heard when.
8      THE WITNESS:  Well, it was in --
9      ARBITRATOR ROSCOE:  I'm sorry, I'm talking
10  to counsel.
11      THE WITNESS:  I'm sorry.
12      BY MR. WACHTEL:
13      Q.   How?  Was that verbal or written?
14      ARBITRATOR ROSCOE:  You mean by what
15  means?
16      MR. WACHTEL:  Right, by what means.
17      THE WITNESS:  As far as I remember,
18  verbally.
19      ARBITRATOR ROSCOE:  In the interest of
20  time, we don't need to repeat what the witness
21  testified to yesterday or today.  Just go right with
22  the question.

Page 925

1      MR. WACHTEL:  Sometimes as a brief
2  reminder, I'm trying --
3      ARBITRATOR ROSCOE:  If it's substantive in
4  nature, then I'll defer to your discretion.
5      BY MR. WACHTEL:
6      Q.   Again, concerning Mr. Beachler and
7  Mr. Rylant, did you consider Mr. Brannum's past
8  qualifications and performance before -- did you
9  consider Mr. Brannum's qualifications and performance
10  at the time of the layoff?
11      A.   Yes.
12      Q.   And did you look at any documents in order
13  to do that?
14      A.   I knew that he was highly certified, I
15  knew that he had degrees from good schools and I knew
16  what his performance was over time.
17      Q.   So in answer to my question, you did not
18  look at any documents concerning Mr. Brannum at the
19  time of the determination for reduction in force?
20      A.   I was reviewing pipelines and production
21  and performance with Eileen Neely routinely.
22      Q.   Did you look at any personnel documents

Page 926

1  such as performance reviews concerning Mr. Brannum?
2      A.   No, I did not go back and look at those
3  reviews.  I knew what -- Eileen would always tell me
4  how she was reviewing her people at midyear and final
5  year but I did not go back and review those documents
6  from that year or previous years.
7      Q.   And I take it you didn't have a
8  conversation with him about his qualifications for
9  other areas of the company that he might work in?
10      A.   I believe that there was a point in time
11  when there was a position open in either business
12  analytics or in pricing where, given Steve's strong
13  suit, I suggested that he look at it.  I don't know
14  if he did anything or not but that's my memory.
15  That's the only time.
16      Q.   And when was that?
17      A.   Counselor, sometime probably in 2008 but
18  I'm not sure when.
19      Q.   Was it before or after you determined that
20  he would lose his job as a result of reduction in
21  force?
22      A.   It was -- I'm not sure but my assumption

Page 927

1  would be it was before, because the decisions weren't
2  formalized and I wasn't in a position to telegraph
3  any kind of decision-making that was taking place at
4  that time.
5      Q.  When did Lisa Tarter join Fannie Mae?
6      A.  I'm not sure, Counselor.
7      Q.  When did she start working on public
8  entities loan?
9      A.  Prior to -- if my memory serves me
10 correctly, prior to 2007 when we went through those
11 organizational constructs because she was helping to
12 do Community Express business in Ohio at the time.
13     Q.  Now, you looked at a PowerPoint slide
14 representing a Community Express loan in Cincinnati.
15 When was that loan first made?
16     A.  It was made -- I'm not sure when it was
17 made.  I know it was revolved several times so it was
18 in our portfolio for a while.
19     Q.  And do you know whether the loan was made
20 before or after Ms. Tarter started working on Public
21 Entities Loans?
22     A.  I'm pretty confident it was made when she

Page 928

1  was at the company and she played a key role in
2  helping that opportunity come about.
3      Q.  I want to ask you to flip to Exhibit 31,
4  please.  Can you look at page FM 67?
5      A.  Yes.
6      Q.  This chart shows dotted lines running from
7  business development director to the members of the
8  CBC account team for the Northwest, Southwest and
9  Central West.  Do you see that?
10     A.  I do.
11     Q.  And the chart also shows dotted lines
12 running from the lead business manager to the
13 Northeast, Southwest and Central East.  Do you see
14 that?
15     A.  I do.
16     Q.  Can you turn to Exhibit 33, please?
17     A.  Yes.
18     Q.  Can you look at FM 1011, please?
19     A.  Yes, sir.
20     Q.  Do you see that the paragraph that begins,
21 "The incumbent lead business manager" states in the
22 second sentence -- I'm sorry, can you see the

Page 929

1  paragraph that begins, "The incumbent director"?
2      A.  Yes.
3      Q.  And the second sentence states,
4  "Additionally, the director will be directly
5  responsible for managing one of the regional CBC
6  account teams and the Native American CBC account
7  team member."  Do you see that?
8      A.  I do.
9      Q.  And do you see the paragraph below
10 beginning incumbent lead business manager states,
11 "Additionally, the lead business manager will be
12 directly responsible for managing one of the regional
13 CBC account teams," correct?
14     A.  Correct.
15     Q.  Flipping back to the chart on page 31, was
16 the plan put in place by this January 9th, 2009 memo
17 that Lisa Tarter would supervise one account team
18 consisting of three members of the CBC account team,
19 Lisa Zukoff would supervise the other three members
20 of the CBC account team at the top plus the Native
21 American member?
22          MR. STEWART:  Objection.  You may want the

Page 930

1  witness to step out.
2          ARBITRATOR ROSCOE:  Sure.  You may be
3  excused for the moment, Mr. Riedy.
4          (Witness exits arbitration room.)
5          MR. STEWART:  The implication is that
6  there are different reporting relationships based on
7  the dotted lines in the chart that appears at FM 67
8  and I'm not certain that they're dotted lines on a --
9  appears to be some sort of organizational chart would
10 reflect the supervisory relationship.
11         ARBITRATOR ROSCOE:  Well, that may be an
12 argument for weight but what's the objection?
13         MR. STEWART:  That is the argument.  I'm
14 not sure where counsel is going with that.
15         ARBITRATOR ROSCOE:  I think I know where
16 counsel is headed, though, so I think he's permitted
17 to continue.
18         MR. WACHTEL:  It strikes me as a question
19 and he can answer yes or no, however he wants to.
20         ARBITRATOR ROSCOE:  I'm with you.  And I'm
21 not trying to rush you.  We'll stay with this as long
22 as we need to but I can't keep him here.  I'm not

# SEMBER

# TRANSCRIPT

1                          JAMS ARBITRATION

2      - - - - - - - - - - - - -     X

3    STEVEN BRANNUM,                  :

4         Claimant,                   :

5              v.                     :    Reference No.

6    FEDERAL NATIONAL MORTGAGE        :    1410005474

7    ASSOCIATION (FANNIE MAE),        :

8         Respondent.                 :

9      - - - - - - - - - - - - - -    X

10                            Washington, D.C.

11                            Thursday, October 27, 2011

12              Arbitration before ARBITRATOR JERRY ROSCOE

13   in the above-entitled matter, the witnesses being

14   duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15   in and for the District of Columbia, taken at the

16   offices of JAMS, 555 13th Street, N.W., Washington,

17   D.C., at 9:22 a.m., Thursday, October 27, 2011, and

18   the proceedings being taken down by Stenotype by MARY

19   GRACE CASTLEBERRY, RPR, and transcribed under her

20   direction.

21

22

Arbitration Day 4                                                    October 27, 2011
                              Washington, DC

Page 951

1   examined and testified as follows:
2       EXAMINATION BY COUNSEL FOR RESPONDENT
3       BY MR. STEWART:
4       Q.   Good afternoon, Ms. Sember.  My name is
5   Damien Stewart.  I'm counsel for Fannie Mae.  Can you
6   state your name for the record?
7       A.   Cheryl Sember.
8       Q.   And how do you spell that name for the
9   record?
10      A.   Cheryl is C-h-e-r-y-l.  Sember,
11  S-e-m-b-e-r.
12      Q.   Where are you currently employed?
13      A.   Fannie Mae.
14      Q.   And how long have you been at Fannie Mae?
15      A.   A little over five years.
16      Q.   And what is your current position?
17      A.   Vice president, human resources business
18  partners.
19      Q.   And how long have you held the position of
20  vice president, human resources business partners?
21      A.   A little over a year.
22      Q.   And prior -- so that would be 2010, is

Page 952

1   that correct?
2       A.   Yes.  Sometime around July 2010, I was
3   promoted.
4       Q.   And prior to that time, what position did
5   you hold at Fannie Mae?
6       A.   Director, HR business partners.
7       Q.   I want to direct your attention to in or
8   around late December 2008, January 2009 time frame,
9   okay?
10      A.   Uh-huh.
11      Q.   What position did you hold at Fannie Mae
12  at that time?
13      A.   Director, HR business partners.
14      Q.   And as the director of HR business
15  partners, can you describe for the arbitrator what
16  your role and responsibilities were?
17      A.   So I managed a team of HR business
18  partners supporting a particular client area, primary
19  focus on employee relations, performance management,
20  work force planning, organizational design, building
21  out new organizations, downsizing organizations,
22  things like that.

Page 953

1       Q.   What divisions or units of Fannie Mae did
2   you support in late December 2008, early January
3   2009?
4       A.   So I would have supported the Finance
5   Division, Treasury, Strategy and Execution, Housing
6   and Community Development, and Business Analytics
7   Development, BA&D.
8       Q.   Did you support any divisions or
9   organization headed by Jeff Hayward and/or Carl Riedy
10  at that time?
11      A.   Yes.
12      Q.   And which division of Fannie Mae would
13  they have reported into?
14      A.   Housing and community development.
15      Q.   And who was the head of housing and
16  community development at that time?
17      A.   Ken Bacon.
18      ARBITRATOR ROSCOE:  Because the witness
19  appears to be about 22 years of age, could you just
20  give me two questions on background, please?
21      THE WITNESS:  Bless you.
22      MR. STEWART:  Sure.

Page 954

1       THE WITNESS:  Good hair color job.
2       BY MR. STEWART:
3       Q.   Ms. Sember, can you describe your
4   educational background starting with college?
5       A.   Sure.  So I attended George Mason
6   University.  My freshman year was 1985.  I studied
7   sociology.  I have a certification in human resource
8   management from George Mason University.
9       Q.   And can you briefly describe your
10  employment history to the point you got to Fannie
11  Mae?
12      A.   I started my career in retail sales
13  working in management, district sales manager, went
14  into training from there in retail and then worked my
15  way into human resources through doing recruiting,
16  doing training and then in a generalist type role,
17  which is very similar to the business partner
18  position that I hold today.
19      ARBITRATOR ROSCOE:  Thank you.
20      BY MR. STEWART:
21      Q.   Now, were you aware of any reduction in
22  force that took place at Fannie Mae in late January

46 (Pages 951 to 954)

Arbitration Day 4
Washington, DC
October 27, 2011

---

**Page 955**

1 2009?

2    A.  Yes.

3    Q.  Now, was that reduction in force localized

4 to an organization run by Mr. Bacon?

5    A.  Was it --

6    Q.  Did it just take place, did it just affect

7 employees in the HCD division?

8    A.  No. That was a company-wide activity.

9    Q.  And did it affect employees with any of

10 the groups that you were responsible for supporting?

11    A.  Yes.

12    ARBITRATOR ROSCOE:  And by company-wide

13 activity, the word activity, you mean the reduction

14 in force?

15    THE WITNESS: Yes.

16    ARBITRATOR ROSCOE:  Thank you.

17    BY MR. STEWART:

18    Q.  Approximately how many employees were

19 displaced in that reduction in force in January of

20 2009?

21    A.  380.

22    Q.  And were you aware of any reductions that

---

**Page 956**

1 took place in Mr. Riedy's organization?

2    A.  Yes.

3    Q.  And how were you aware of that?

4    A.  I would have had a conversation with them

5 about the business rationale for it.

6    Q.  Do you recall when you had that

7 conversation?

8    A.  It probably would have been sometime in

9 December of 2008.

10    Q.  Do you recall speaking to Mr. Hayward or

11 Mr. Riedy about the planned reduction?

12    A.  I know I had a conversation with Jeff

13 Hayward about it. I believe that Carl Riedy was not

14 present. I'm not 100 percent certain.

15    Q.  Can you describe for the arbitrator what

16 took place in your conversation with Mr. Hayward and

17 possibly Mr. Riedy?

18    A.  Yes. So I had a high-level conversation

19 with Jeff Hayward about their business rationale, for

20 how they determined -- what the ultimate business

21 rationale was for how they determined which group of

22 folks were being impacted in this activity. They had

---

**Page 957**

1 two components that according to him did very similar

2 work, had similar expertise. One component was in

3 the -- the employees were in the CBCs, the Community

4 Business Centers, and then there was a group directly

5 reporting to Carl Riedy, Public Entities, that worked

6 here in Washington, D.C.

7    So his business rationale was really

8 around the fact that there was redundancy in the jobs

9 and his opinion was that it would be better to keep

10 the folks that worked in the CBCs because they were

11 on the ground, front and center with the clients

12 there in the community. So being as they're working

13 on the streets in those communities, they had a

14 better sense real time of what was going on and what

15 the issues were.

16    Q.  Now, in the organizational reduction in

17 force, not just in Mr. Hayward's organization but

18 sort of on the corporate level, were there any -- to

19 your knowledge, were there any reasons to go for a

20 reduction in force in January of 2009?

21    A.  Were there any reasons to do a reduction

22 in force.

---

**Page 958**

1    ARBITRATOR ROSCOE:  If you understand the

2 question. If you don't understand the question, then

3 ask counsel to rephrase it.

4    THE WITNESS:  Okay. Can you rephrase it?

5    BY MR. STEWART:

6    Q.  Do you understand why the company reduced

7 its head count in January of 2009?

8    A.  Yes.

9    Q.  What do you understand of those reasons?

10    A.  Well, we had just gone into

11 conservatorship in September of 2008. We had very

12 clear directive to be financially responsible, that

13 we needed to fund the jobs in our credit space, which

14 was really to manage kind of that bad book of

15 business that we had, and there was an enormous

16 amount of growth that was needed there. So the

17 company was really challenged to look at areas to

18 gain operational efficiencies, to mitigate any risk

19 with key person dependencies, to eliminate

20 redundancies so that we would be able to budget and

21 fund the appropriate jobs in the right places.

22    Q.  Now, you just spoke about increasing

---

Alderson Reporting Company
1-800-FOR-DEPO

Page 959

1    operational efficiencies and eliminating
2    redundancies.  To what extent if any were those two
3    directives reflected in the business justification
4    that Mr. Hayward related to you in or around December
5    of 2008?
6        A.   I would say they both were, because we
7    definitely talked about the fact that there were
8    redundancies in the job and when you think of that,
9    if you have extra layers in an organizational
10   structure or design, that tends to lead to
11   inefficiencies, poor communication, so I think based
12   off my conversation with him and his business
13   rationale, that it would impact both of those areas.
14       Q.   In December of 2008, there was an opening
15   on Mr. Riedy's HFA team.  Are you familiar with
16   Mr. Riedy's HFA team?
17       A.   Not intimately.  Somewhat.
18       Q.   A position was filled by Mr. Tabare
19   Borbon.  Are you familiar with Mr. Borbon?
20       A.   No.
21       Q.   Open the second volume to Exhibit 165.
22   Let me know when you have it.

Page 960

1        A.   Okay, I have it.
2        Q.   This is a position description for a
3    senior national account manager position.  The
4    requisition number is 23110.  Do you see that?
5        A.   Yes.
6        Q.   Take a moment to review the document.  Let
7    me know once you've done it.
8        A.   Okay.
9        Q.   Now, if you look at the document, it has a
10   status of being open.  Do you see that at the top
11   left?
12       A.   Yes.
13       Q.   And the status details indicate that it is
14   posted.  Do you see that?
15       A.   Yes.
16       Q.   And do you have an understanding of
17   whether this requisition for senior national account
18   manager was posted both internally and/or externally?
19       A.   I believe it was posted both internally
20   and externally.
21       Q.   Would you turn back into the first volume
22   and I want to direct your attention to Exhibit 34.

Page 961

1    Are you at Exhibit 34?
2        A.   Yes.
3        Q.   And if you would look at the first
4    document in this exhibit.  It's FM 970.  That's the
5    Bates numbers in the bottom right corner.  Do you see
6    that?
7        A.   Yes.
8        Q.   The top of the document indicates it's key
9    points for communication with staff after
10   conversation with affected employee.  Do you see
11   that?
12       A.   Yes.
13       Q.   And can you identify for the arbitrator
14   what this document represents?
15       A.   Yes.  This would have been the talking
16   points that our communications department put
17   together for the displacements.
18       Q.   These are the displacements that occurred
19   in January of 2009?
20       A.   Yes.
21       Q.   The corporate-wide displacements?
22       A.   Yes.

Page 962

1        Q.   And these are talking points for whom?
2        A.   So this document, 970, would have been for
3    leadership to have conversations with their retained
4    staff after impacted employees or affected employees
5    had been notified.
6        Q.   So this is for communications to employees
7    who were not impacted by the reduction in force?
8        A.   Correct.
9        Q.   Turn to the second page of the document,
10   FM 971.  And would you review this document and then
11   when you've done that, would you let us know what
12   this document is?
13       A.   Yes.  So this is the talking points that,
14   again, communications would have put this together
15   for the activity in January, and this would have been
16   for actually the managers that had impacted
17   employees, the notifying managers, this would have
18   been their script that Communications put together
19   for them to follow when they were actually having the
20   conversation with that impacted employee.
21       Q.   So these are a script for managers to give
22   to employees who are affected by the reduction in

Page 963

1  force, correct?
2      A.   Correct.  Yes.  And this is for an
3  in-person meeting, meaning I am sitting with this
4  person in my office.
5          ARBITRATOR ROSCOE:  When you say give, you
6  don't mean give physically this document.
7          MR. STEWART:  Give.
8          ARBITRATOR ROSCOE:  You said these are for
9  the leaders to give the employees.
10         MR. STEWART:  No, the talking points, the
11  script, to discuss.
12         THE WITNESS:  No, they would not have
13  given them this actual sheet, an actual sheet of
14  paper.
15     BY MR. STEWART:
16     Q.   And if you look at the bullet points, the
17  sixth from the bottom, it discusses asking for badge,
18  VPN and TREO, do you see that?
19     A.   Yes.
20     Q.   Was it expected that managers would ask
21  the affected employees to turn in their electronic
22  equipment?

Page 964

1      A.   Yes.  And actually, we had worked with a
2  particular point of contact in our infrastructure
3  organization to get an inventory asset list on every
4  employee that was affected, and that asset inventory
5  list would have been given to the announcing manager
6  for their affected employees so that they could
7  literally -- they would know as they were meeting
8  with the person that this person would be somebody
9  that would have a VPN token or a Blackberry, et
10  cetera, to make sure that they had gotten all of the
11  technical assets.
12     Q.   If you look two bullet points below that,
13  there is a bullet that talks about giving employees,
14  impacted employees, 30 minutes to an hour to pack
15  their belongings.  Do you see that?
16     A.   Yes.
17     Q.   And does this reflect that there was a --
18  that the managers were directed to give employees
19  some time to collect their belongings?
20     A.   Yes.
21     Q.   Do you recall how that actually
22  practically took place, employees were taking their

Page 965

1  belongings with them?
2      A.   So the expectation would be, if you were
3  an announcing manager, that you would walk the person
4  back to their desk, let them have some time to get
5  their stuff together.  You would then come back to
6  them, and it was the expectation of that announcing
7  manager that they go through that box and ensure that
8  there was no nonpublic information or any proprietary
9  or confidential company information that they would
10  be taking with them.
11     Q.   Now, why were these security measures put
12  in place, to your understanding?
13     A.   So it's my understanding that the company
14  had significant concerns about information leaving
15  the company when we impacted employees.  We had had
16  some issues in the past with some bad things
17  happening, especially with people even in technical
18  positions that could have the ability and scope such
19  that -- to take systems down, things like that.
20         So there were programs like this put in
21  place to ensure that that didn't happen.  It was not
22  always like this but it was like this after

Page 966

1  conservatorship.
2      Q.   Would you turn to Exhibit 35?
3      A.   Okay.
4      Q.   Would you take a moment to review this
5  document and let me know when you've done so?
6      A.   Okay.
7      Q.   What is Exhibit 35?
8      A.   So this would have been what we in HR
9  called the severance memo that would have gone in all
10  the severance packages for any impacted employees.
11     Q.   And the document is dated January 23rd,
12  2009 and it's addressed from Christine Wolf.  Do you
13  see that?
14     A.   Yes.
15     Q.   Who is Ms. Wolf?
16     A.   She was the head of HR at the time.
17     Q.   Ms. Sember, you testified that you
18  supported other organizations including, I believe
19  you said finance and some others, correct?
20     A.   Yes.
21     Q.   Were there other organizations other than
22  HCD who also displaced employees on January 23rd,

49 (Pages 963 to 966)

# WILBOURN

# TRANSCRIPT

Arbitration Day 6                                                October 31, 2011
                          Washington, DC

```
 1                        JAMS ARBITRATION

 2     - - - - - - - - - - - - -    X

 3     STEVEN BRANNUM,                    :

 4          Claimant,                     :

 5               v.                       :    Reference No.

 6     FEDERAL NATIONAL MORTGAGE          :    1410005474

 7     ASSOCIATION (FANNIE MAE),          :

 8          Respondent.                   :

 9     - - - - - - - - - - - - - -   X

10                              Washington, D.C.

11                              Monday, October 31, 2011

12               Telephonic hearing before ARBITRATOR JERRY

13     ROSCOE in the above-entitled matter, the witnesses

14     being duly sworn by MARY GRACE CASTLEBERRY, a Notary

15     Public in and for the District of Columbia, at

16     9:30 a.m., Monday, October 31, 2011, and the

17     proceedings being taken down by Stenotype by MARY

18     GRACE CASTLEBERRY, RPR, and transcribed under her

19     direction.

20

21

22
```

Page 1232

1    expertise was multifamily housing, specifically our
2    subsidized housing, our portfolio that was insured by
3    the federal government and other subsidized housing
4    efforts.
5             While I was at Fannie Mae, I was with
6    legal counsel for about -- I think it's three or four
7    years. I'm not certain. I then joined the business
8    unit as the director for community development. I
9    think at that time, it was called housing impact, the
10   initial housing impact team that was developed to
11   focus on affordable housing for Fannie Mae. I was
12   one of the initial directors and I went to
13   Philadelphia in that position.
14            I left the company after about two or
15   three years. It was a total of about five or six
16   years I was with Fannie Mae initially. I left the
17   company and started my own practice, Curry &
18   Wilbourn, and in that practice, I represented various
19   private sector and public sector in real estate and
20   business matters, specifically housing issues.
21            I returned to Fannie Mae as the director
22   of community development for Washington, D.C.,

Page 1233

1    Maryland and Virginia. So I led the community --
2    what became the community business center for that
3    region, and then I was promoted to the vice president
4    for community development at Fannie Mae.
5       Q.    And did you hold the position of vice
6    president of community development in late 2008?
7       A.    Yes.
8             ARBITRATOR ROSCOE: Mr. Stewart?
9             MR. STEWART: Yes.
10            ARBITRATOR ROSCOE: Just for disclosure,
11   Ms. Wilbourn, I have just now realized that in your
12   affiliation with Curry & Wilbourn, probably 8 to 10
13   years ago, I did do work as a mediator where your
14   firm represented one of the parties. I think it was
15   your partner, Devariest Curry. I just want to
16   disclose that for the record. It has no bearing on
17   the case, but that's what I would like to share.
18            MR. STEWART: Okay.
19            THE WITNESS: Okay.
20            BY MR. STEWART:
21      Q.    Ms. Wilbourn, in late 2008, who was your
22   supervisor?

Page 1234

1       A.    Jeff Hayward.
2       Q.    Now, in late 2008, did either Mr. Hayward
3    or Mr. Riedy come to you with a plan to designate the
4    community development team to be the sales force for
5    public entities loan products?
6       A.    Yes.
7       Q.    And what did you understand about that
8    plan?
9       A.    When I became the vice president for
10   community development, it was pursuant to a
11   reorganization of community development and I was
12   selected as the VP for urban and homelessness. Part
13   of that reorganization was to have community
14   development become more aligned with the business
15   divisions of Fannie Mae. And our public entities was
16   one of the areas in which we had an alignment already
17   that we really wanted to expand.
18            And that alignment for community
19   development with a business unit involved having a
20   designated -- an account team on the community
21   development side, a select number of folks so that
22   you didn't have to deal with the entire field, but

Page 1235

1    you would have a designated team that worked directly
2    with the business unit. That business unit then
3    would agree on what the product line would be that
4    had a real impact in communities. And not every
5    product did.
6             So we already would say, what's the menu
7    that this business unit wants to really push as a
8    community development effort? And we would have
9    goals, we would have roles and responsibilities. So
10   we would already assign what the account team would
11   do for that business unit in the field.
12            So at the time, the community express and
13   modernization express of the public entities loan
14   team, we were already in that alignment. And so this
15   proposal was expanding that alignment so that the
16   community development field team, the account team,
17   would become the sole sales force for those products.
18      Q.    And the community development account
19   team, those individuals reported to you?
20      A.    They did.
21      Q.    And did you have an understanding that
22   members of Mr. Riedy's public entities loan team who

Page 1236

1   were based in Washington, D.C. would be losing their
2   positions?
3       A.   When this proposal was made, Carl did
4   indicate that he would be laying off his public --
5   some of the folks in his public entities team.
6       Q.   And did you understand that Mr. Steven
7   Brannum would be laid off in that reduction in force?
8       A.   I did.
9       Q.   And were you aware that Mr. Brannum is
10  African-American?
11      A.   Yes.
12      Q.   And did you have any concern that
13  Mr. Riedy's plan to lay off Mr. Brannum was motivated
14  by racial discrimination?
15      A.   No.
16      Q.   And for the record, what is your race,
17  Ms. Wilbourn?
18      A.   I'm African-American.
19      Q.   If you would turn to Exhibit 1.  This is
20  Beverly Wilbourn 1.
21      A.   Just a moment.
22      Q.   The Bates number is FM 1070.  That's the

Page 1237

1   little writing in the right side at the bottom of the
2   document.  Let us know when you have it.
3       A.   I'm sorry, I had them out of order.  I've
4   got them back in order.  Okay.
5       Q.   And this is a one-page document and it's
6   an e-mail.  The original e-mail is from Mr. Ken Bacon
7   to you and Mr. Hayward on February 7, 2008 and then
8   you respond later that day.  Do you see that?
9       A.   I do.
10      Q.   And have you seen this document before?
11      A.   I'm sorry?
12      Q.   Have you seen this document before?
13      A.   Yes, I've reviewed it.
14      Q.   Now, in the below e-mail, Mr. Bacon is
15  referring to an instance where he's talked to someone
16  who -- Merilyn Rovira about working with Chris
17  Redmond on the, quote, AD&C stuff, and in the next
18  sentence he says, "This is what the offices are
19  supposed to be doing.  Do y'all have any other
20  examples?"  And then you respond at the top with your
21  response there.  Do you see that?
22      A.   Yes.

Page 1238

1       Q.   And can you explain what you were
2   conveying to Mr. Bacon and Mr. Hayward in your
3   response?
4       A.   The response was to convey that in all
5   instances, community development was doing the work
6   of the business unit.  That's the full integration.
7   That we were not out just listening to local problems
8   but that we were working within our business units in
9   an alignment to bring those solutions that the
10  business units already sanctioned to local
11  communities.  So those examples that he cited, Ken
12  Bacon cited, were absolutely what everybody was doing
13  in every office.
14      Q.   And for the record, can you just identify
15  who Mr. Bacon was and his relationship to you in
16  Fannie Mae's organizational structure?
17      A.   Ken Bacon was the executive vice president
18  for, at that time, I think it was still housing and
19  community development.  It was now multifamily.  And
20  Jeff Hayward reported to Ken Bacon, so he was my skip
21  manager.
22      Q.   Thank you.  Would you now turn to Exhibit

Page 1239

1   2?  This is the document labeled CD account teams,
2   updated on February 11, 2008.
3       A.   Yes.
4       Q.   And can you just identify what this
5   document represents?
6       A.   As we had this account team structure,
7   this document identifies which account teams at that
8   date that we were working with.  And in each
9   instance, you had a set of community development
10  teams -- that's the team members -- we had the team
11  lead for community development, and then we had a
12  business unit lead.  This was the organizational
13  structure that we put in place after the reorg for
14  community development.
15      Q.   And on this document, the team leads
16  indicates, for the public entity, CE, Lisa Tarter and
17  Ralph Perrey.  Do you see that?
18      A.   Correct.
19      Q.   Who had assigned Lisa Tarter and Ralph
20  Perrey as team leads for the public entity team?
21      A.   Myself and Bob Simpson.  Bob Simpson was
22  the other half of community development.  I had urban

4 (Pages 1236 to 1239)

Page 1240

1   and homelessness.  Simpson led, as a VP, rural and
2   Gulf Coast recovery, I believe it was called, at the
3   time.
4   And so Ralph Perrey worked for Bob Simpson
5   and Lisa Tarter worked for my organization, so we
6   jointly identified both of these folks to be the team
7   lead based on the fact that they already had the
8   relationship on the account teams, they had already
9   been working with Riedy, we got feedback from Riedy
10  and his team lead, Eileen Neely, and that's how those
11  folks were selected.
12  Q.   And did you have an understanding of
13  whether or not Ms. Tarter was familiar with the
14  public entities loan products?
15  A.   She was.  I mean, she had been working on
16  those products and that's -- you know, she had
17  already been a part of that whole effort.  She had
18  done well.  It really is a matter of the folks doing
19  the work, you then are saying, I want to make sure we
20  have a one-person lead or, in this instance, two
21  people, because we had both rural and urban.  Most
22  products, you don't.

Page 1241

1   So we wanted to have strong leads and
2   leads that the business unit lead, Eileen Neely,
3   respected and worked with well.  And so that's how
4   that came about.  So yes, it was based on her
5   knowledge of the product and her ability to get the
6   work done.
7   Q.   Would you now turn to Exhibit 5?
8   A.   Okay.  Hold on.  I have it.
9   Q.   This is a document that's entitled public
10  entity team express and it has some handwriting on
11  it.  Do you see that?
12  A.   Correct.
13  Q.   Can you identify this document?
14  A.   Yes.  This is a document with -- and
15  that's my handwriting.  This was a call, as I recall,
16  either a call or an all-hands, but I think it was a
17  call where we had the public entity business unit and
18  the account team, the CD account team, go over the
19  public entities effort for the entire CD team.
20  Q.   And if you would turn to the second page
21  of the document, and for the record, it's Bates
22  numbered FM 1198, and at the top, it says, team

Page 1242

1   express driven by business generation.  Do you see
2   that?
3   A.   Right.  Yes.
4   Q.   Under the last bullet point, which is
5   entitled integration of PE/CD account team, it has a
6   certain percentage allocation there.  Can you explain
7   what that is?
8   A.   The idea for the account team and the sale
9   to the business units was that rather than work with
10  the entire community development team in the field,
11  that you would have a dedicated team and those
12  dedicated team members would spend a significant
13  amount of their time to sell those products for the
14  business unit.
15  So in this instance, the team members for
16  the account team for community development committed
17  to 50 percent of their time on the public entities
18  products and the team leads, Ralph and Lisa, dedicate
19  75 percent of their time.  This was to make clear
20  that they would put in the time and the focus to make
21  sure these products moved and that they understood
22  those products and that they would not be pulled off

Page 1243

1   on a lot of other different efforts along the way.
2   Q.   And to what extent, if any, was there
3   discussion with Mr. Riedy or Ms. Neely about the
4   percentage of time allocations the team members and
5   the team leads would provide to marketing public
6   entities loan products?
7   A.   We had that conversation because we needed
8   the business unit, in this instance and other
9   instances, to be comfortable that the people assigned
10  to do their work were going to be dedicated to doing
11  their work, and that they would have time to get any
12  training that they needed.  They would have time to
13  follow up on leads, they would have time to really
14  drill down into the product.
15  So this was our commitment to them and
16  this was why it's written that -- you know, they
17  didn't want accounts to hear that community
18  development team members didn't have the time to do
19  their work.  So we were making clear that in their
20  goals and everything, they would be judged with 50
21  percent of their time allocated to this activity.
22  Q.   If you would turn to the following page.

Page 1244

1    A.   Okay.

2    Q.   This is at FM 1199.  This looks like two
3  charts and at the bottom of the page, it states,
4  "Together we bring in the business."  Under the
5  public entity BU -- and I take it that BU is business
6  unit?

7    A.   Correct.

8    Q.   And it has four bullet points.  It says
9  business direction and objectives, leads by example,
10  owns product and initiatives and trains and mentors.
11  Do you see that?

12    A.   Yes.

13    Q.   And did you have an understanding of what
14  this slide is to represent?

15    A.   Yes.  This was the roles and
16  responsibilities of a team that was going to jointly
17  deliver a product.  So if you're going to have two
18  teams working together reporting to different
19  managers, you need to be clear on the roles and
20  responsibilities of each team.  And so that's what
21  this was trying to lay out, so that everybody
22  understood -- the audience being the entire community

Page 1245

1  development team -- everybody understood the roles
2  and responsibilities of each party.

3    Q.   If you would now turn to Exhibit 6.

4    A.   Okay.  I have it.

5    Q.   And this is a document, CD account team
6  session, public entity loan team, community
7  development all hands meeting.  Looks like the
8  presenters are Ralph Perrey and Lisa Tarter.

9    A.   Right.

10    Q.   February of 2009.  Have you seen this
11  document before?

12    A.   Yes, I did review it.

13    Q.   And can you just explain what this
14  document is?

15    A.   At our all hands for community
16  development, that is, all of community development
17  across the field, which I'm in, and we would have a
18  couple of day session so that we could start to make
19  sure everybody understood our goals and how the
20  business unit and account teams related to the
21  business unit.

22         So each account team that we had a

Page 1246

1  relationship with, each business unit and account
2  team we had a relationship with, they would get up
3  and make a quick two-page, three-page presentation to
4  the rest of community development about here's what
5  the account team's structure is, here's what we do
6  and here's how you relate to us so that everybody in
7  community development had the lay of the land on how
8  to access this product line.

9         The idea is, once you got this process in
10  place, this is the way in which everyone has to
11  access this product.  You could not then just go off
12  on your own, you're not on the account team and you
13  just started selling a product.  It didn't work that
14  way.  So this was the lay of the land, this is how
15  you get this business done in public entities.

16    Q.   And if you would turn the page to the
17  second page of the document.

18    A.   Yes.

19    Q.   And in the third bullet from the bottom,
20  there is another percentage allocation of time.  Can
21  you explain how that time allocation came to pass?

22    A.   This 90 percent?

Page 1247

1    Q.   Yes.

2    A.   The 90 percent was the change over from
3  the 50 percent.  It was when community development
4  and Carl -- based on the proposal that Carl Riedy
5  made that community development would become the full
6  sales force for the public entities loan product.
7  Then it would have to increase the time commitment
8  for that sales force and we took it to 90 percent.
9  We saved the 10 percent out for community development
10  local market expertise.

11         The specific skill that community
12  development brought to the company was knowing this
13  local market, knowing the housing issues in their
14  local markets, the regional markets, participating on
15  task forces, being a local market expert in housing
16  and being Fannie Mae's representative as a local
17  market expert.

18         So they needed to maintain that profile in
19  their communities, but because we were going to
20  become the full sales force, they needed to have a
21  greater allocation of time.  And again, this was a
22  public written allocation of time so that, again,

                              6 (Pages 1244 to 1247)

Page 1248

1  Carl and his team could be confident that he had a
2  dedicated staff even if they didn't report to him,
3  they reported to me, but that I had made the
4  commitment that they would have the time to do the
5  work.
6      Q.   Now, in the next bullet point, it talks
7  about, responsible to source, structure and close
8  loans and ongoing customer relationship management.
9  Do you see that?
10     A.   Yes.
11     Q.   Were you confident that the members of the
12 CD account team had the ability to fulfill those
13 responsibilities?
14     A.   Yes.
15     Q.   Now, you talked about the 10 percent and
16 the need to have the CD account team members focusing
17 on local housing issues.  Can you explain how
18 difficult, if at all, it would be to do that from
19 Washington, D.C.?
20     A.   Well, it is very difficult to know who the
21 players are.  Let me go back and say it this way.
22 Real estate is local.  Housing issues, any community

Page 1249

1  has a set of folks that have developed a career on
2  addressing local housing issues.  They are in the
3  public housing agencies, they are sometimes elected
4  officials, they are in the community banks, the
5  credit unions, the nonprofits, the counseling
6  agencies.  These are folks that may have a small view
7  of an aspect of housing, but invariably they are the
8  group that comes together for housing issues,
9  whatever they might be.
10     So you get this information from serving
11 with folks on task forces and on committees and board
12 members on the nonprofits.  You get this information
13 from keeping tabs on the news as it comes out on the
14 allocation of grant funds, where the city or
15 municipality is trying to put their CDBG money.  You
16 really have to sort of hone in on what are the
17 priorities as this community sees them.
18     Is it affordability?  Is it the
19 foreclosure issue?  Is it rental housing?  And who
20 are the core players?  What are they doing?  What's
21 their signature thing that they're trying to get
22 accomplished?  That's what community development was

Page 1250

1  always to have the expertise in and make it available
2  to the entire company.
3      Q.   Now, there are a couple of people on this
4  list -- actually, if you turn to the last page of
5  Exhibit 6, this is a chart that lists the public
6  entities loan team?
7      A.   Yes.
8      Q.   Do you see that?  And it says Lisa Zukoff
9  is the director.  Do you see that?
10     A.   Yes.
11     Q.   Now, was Ms. Zukoff a member of your
12 organization?
13     A.   At one time -- no, she is not.  This is
14 Carl Riedy's director.
15     Q.   And then the other individuals who are
16 listed here, were they members of your organization
17 or Mr. Riedy's organization?
18     A.   My organization.  The rest of them were my
19 organization.
20     Q.   And do you see Lisa Tarter identified as a
21 team co-lead?
22     A.   Correct.

Page 1251

1      Q.   Did she report to you -- let me ask you
2  this.  Do you recall when she began reporting to you?
3      A.   Lisa Tarter -- when I -- Lisa Tarter
4  reports to a director and the director reports to me.
5  Lisa Tarter was in that -- when we did the
6  reorganization for community development, all the
7  community development staff had to reapply for their
8  jobs.  Lisa Tarter was hired in that process at that
9  time.
10     And I think it was in 2007 or something
11 like that when I became the vice president.  We had
12 to interview for all the community development slots
13 at that point and she hired on at that time.  That's
14 my recollection at least.
15     Q.   If you would keep the last page of Exhibit
16 6 open and then turn to the fourth page of Exhibit 5.
17     A.   Hold on.  Okay.  Does that fourth page say
18 team express people?
19     Q.   Yes.  And it has a list of the business
20 unit mentors and the CD account team mentees.
21     A.   Yes.
22     Q.   Now, I just want to talk about some of the

7 (Pages 1248 to 1251)

Page 1252

1   differences in the names that were identified of the
2   community development team members from the March
3   2008 document to Exhibit 6, which is the February
4   2009 document.
5       A.   Okay.
6       Q.   Now, under the CD account team members on
7   Exhibit 5, there is a Zeeda Daniele.  Do you see
8   that?
9       A.   Yes.
10      Q.   And she is not listed on the public entity
11  loan team in February of 2009.  Can you give us an
12  explanation of why she was removed from the CD
13  account team?
14      A.   Yes.  We had -- at the same time all this
15  was occurring, obviously the mortgage crisis was
16  beginning to hit in a major way and foreclosure
17  prevention and sale of REO or the real estate owned
18  by Fannie Mae, the foreclosed properties that we
19  owned, began to be the pre-eminent issue in most
20  urban communities almost without exception,
21  especially -- which was true especially in
22  California, where we had a very large seriously

Page 1253

1   delinquent loan pool and a large number of foreclosed
2   properties as well as in some of the other
3   jurisdictions as well.
4       Zeeda was very well-known and had been
5   with the company for many years in community
6   development and was very well-known in her region for
7   housing expertise working for Fannie Mae.  We needed
8   to get our community development folks who were best
9   known in those communities, had the relationships,
10  worked with nonprofits, had been on nonprofit boards,
11  to get back involved actively with the foreclosure
12  prevention and sale of REO because those were the
13  folks -- and the nonprofits, the counseling agencies,
14  the city governments.  Those were the folks who were
15  coming together to respond to the mortgage crisis.
16      And so Zeeda was really needed in that
17  capacity.  But I had made a commitment to Carl that I
18  would make that coverage available, that I would not
19  just say, oh, here's a new hot thing, let me move
20  this person and leave Carl exposed.  That's always
21  the concern.
22      And so I spoke with Carl on providing

Page 1254

1   coverage for the West Coast, additional coverage,
2   even though I needed to substitute Zeeda out.  So we
3   brought in Warren Harris and we also added Jessie
4   Smith and a person not identified but supporting this
5   was my director, Patrick Murcia, who was in San
6   Francisco.  So we wanted to beef up our West Coast
7   for Carl while at the same time responding to the
8   overwhelming need of foreclosure prevention and REO
9   sales.
10      Q.   Now, was Mr. Harris to replace Zeeda
11  Daniele?
12      A.   On the team.  He was already a member of
13  community development so he replaced Zeeda Daniele on
14  the public entities team.
15      Q.   So he was a member of community
16  development prior to being assigned to this group?
17      A.   He was.  He had come on sometime after
18  this group had formed, but he was hired on thereafter
19  in community development.  When we needed to move
20  Zeeda off of public entities into foreclosure
21  prevention and REO sales, we substituted in Warren
22  Harris.

Page 1255

1       Q.   What was Mr. Harris' background in
2   relationship to the type of work that he would be
3   doing on the public entity loan team?
4       A.   Mr. Harris had background, as I recall,
5   and it's been a while since I looked at his
6   background, but he had a background with lending.
7   But more importantly, he had worked with public
8   entities.  He wasn't part of the account team but the
9   entire community development group, as we saw from
10  that training session, all of them would know, here
11  are the products that public entities have, and they
12  would be responsible to help source deals or identify
13  potential opportunities.
14      And Warren had performed particularly well
15  with being able to identify opportunities.  And when
16  we talked about how to move folks around.  He really
17  served us as someone that could come into public
18  entities and do the job well.  And I discussed this
19  with Carl.  I first talked to my director and said I
20  need to free up Zeeda, we need to free up Zeeda, we
21  need to go backfill it, and make sure that the work
22  is going to get done.

8  (Pages 1252 to 1255)

Page 1256

1    And my director was a -- he led a loan
2  fund for enterprise, and he was the lead underwriter
3  for the west. So we had the bench strength and I
4  said to him, I need to put in Warren, I need you to
5  stay close and we need to make sure we cover the west
6  for Carl Riedy's group as well as cover REO and
7  foreclosure prevention.
8      Q.   Now, the director that you identified as
9  the lead underwriter for the rest, was that
10 Mr. Murcia?
11     A.   Yes.
12     Q.   And what's Mr. Murcia's race?
13     A.   He's white.
14     Q.   And also the other name was a Jessie
15 Smith. What was Mr. Smith's background to work on
16 the public entity loan products?
17     A.   Mr. Smith had worked with public agencies
18 and I don't know if he was directly employed or had
19 worked for a nonprofit that worked for the public
20 entities and he was located in Portland.
21     And he was hired on by Patrick Murcia and
22 I want to say Patrick Murcia may be Hispanic, but I'm

Page 1257

1  not real certain of that. But Patrick Murcia hired
2  both Jessie and Warren Harris, and so we needed the
3  coverage in the west. So we talked about who on his
4  team we could bring in to bolster the west coverage
5  for public entities, which appeared to be a growing
6  opportunity. So even though we were moving out
7  Zeeda, we really were trying to give him, Carl,
8  additional strength, we gave, you know, both Jessie
9  and Warren Harris.
10     Q.   And was Evett Francis, was she also moved
11 out from the public entities loan team?
12     A.   She was. Ultimately Florida was not only
13 heavy hit by the foreclosures, but Fannie Mae decided
14 to look at one particular state just to give us a
15 different view, to look at a state and use it as the
16 prototype on how we could improve our response to the
17 crisis. And Florida was that state.
18     So we put in a great deal of additional
19 focus and resources to figure out what could Fannie
20 Mae do differently to manage our portfolio. And
21 again, Evett had long ties to the community players
22 in that entire region and we needed her to really

Page 1258

1  work on foreclosure prevention, in particular some
2  REO sales, but foreclosure prevention in particular.
3      So again, we had Florida and California,
4  two of our hardest hit states at the height of the
5  crisis, we needed to have community development, the
6  face of Fannie Mae folks really working on that very
7  pressing issue, but we wanted to backfill and make
8  sure that we did not shortchange Carl.
9      Q.   Are you familiar with an individual named
10 Sheila Miller?
11     A.   Yes.
12     Q.   And what is her race?
13     A.   Sheila is African-American.
14     MR. STEWART:  We move for admission of
15 Exhibit 1.
16     ARBITRATOR ROSCOE:  Any objection?
17     MR. WACHTEL:  Did you say only 1?
18     MR. STEWART:  I'll just go through all of
19 them. Exhibit 1, Exhibit 2, Exhibit 5, Exhibit 6.
20     MR. WACHTEL:  No objections.
21     ARBITRATOR ROSCOE:  So admitted.
22     (Exhibit Nos. 1, 2, 5 and 6

Page 1259

1      were received in evidence.)
2  BY MR. STEWART:
3      Q.   Ms. Wilbourn, has Mr. Brannum contacted
4  you about employment opportunities since he left
5  Fannie Mae?
6      A.   No, not to my knowledge.
7      MR. STEWART:  I have no further questions.
8      ARBITRATOR ROSCOE:  Thank you.
9  Mr. Wachtel? Ms. Loveless?
10     EXAMINATION BY COUNSEL FOR CLAIMANT
11 BY MR. WACHTEL:
12     Q.   Good morning, Ms. Wilbourn. I'm David
13 Wachtel. I'm representing Mr. Brannum. It's going
14 to take me a minute to get to the right page in my
15 notes. I'll have a question for you shortly.
16     A.   Okay.
17     Q.   Can you pull out Exhibit 4 from your
18 packet, please?
19     A.   Just one moment.
20     Q.   Sure.
21     A.   Yes, I have it.
22     Q.   What is Exhibit 4?

9 (Pages 1256 to 1259)

Page 1296

1    Q.   And let me ask you a similar question.  In
2  2008, did you form any general impression from your
3  conversations with Eileen Neely about Zeeda Daniele's
4  performance with the public entities loan team work?
5    A.   Less so, although the general comments
6  that I received, and I received these comments
7  overall in a lot of capacities, but it was that she
8  had very deep ties to customers.  Customers knew and
9  trusted her, that she was good at sourcing deals,
10  good at pushing the deals forward.  That was sort of
11  the general -- that's the general feedback that I
12  would sum up for her.
13    Q.   And how important was that to the work
14  that was being performed by the public entities loan
15  team?
16    A.   It was very critical.  For us to win back
17  customers, one of the things that happened sometimes
18  was that Fannie Mae would get a reputation with some
19  group of customers and so wouldn't trust us, that we
20  were a big entity that didn't really care about the
21  smaller loans and smaller deals.  And much of this
22  type of work is a high touch, high trust factor.

Page 1297

1    While they're small projects for us, they
2  are critical for these organizations.  And they have
3  to believe that we're not going to just lose them in
4  the shuffle.  So having customers trust you and come
5  to you and work with you was very important to us
6  getting the work done and changing our reputation in
7  the field for being a company that could be
8  responsive on a local market basis and not just
9  responsive to big deals.
10    Q.   Similar question.  In 2008, did you form
11  any impression from your conversations with Eileen
12  Neely about Evett Francis' work on the public entity
13  loan team?
14    A.   Less so.  I don't recall having as much --
15  having a conversation with Eileen on Evett.  Eileen
16  was very focused on building up our West Coast
17  business, when I spoke with her.
18    Q.   And did you say that Mr. Harris had
19  performed work on the public entities product in
20  2008?
21    A.   He was not on the team, but he did some
22  referrals, was my recollection.  He did do referrals

Page 1298

1  and he was receiving, as I said, a shout-out that he
2  was helpful in that arena.
3    Q.   And did that shout-out come from Ms. Neely
4  or Ms. Zukoff?
5    A.   I don't recall.  It would have been on a
6  team call kind of -- what I recall is a team call
7  where you are acknowledging some work getting done
8  and folks outside of the account teams who are
9  helping to get that work done.
10    Q.   Do you recall having any conversations
11  with Ms. Neely in 2008 concerning Richard Staples'
12  work with the public entities loan team?
13    A.   I do not.
14    Q.   Now, following the reorganization or the
15  reduction in force, rather, do you recall having any
16  conversations with Ms. Zukoff about Mr. Staples' work
17  with the newly reconstituted public entities loan
18  team?
19    A.   During our evaluation period, when I would
20  get the feedback, she spoke highly of Richard Staples
21  and so we would go through and any issues that she
22  wanted to raise, she would start by saying, they're

Page 1299

1  doing a great job, you know, they're doing the work
2  well, you know, maybe the product is having this
3  problem or that problem, but we're really pushing
4  through it.
5    So it was first generally saying the team
6  is doing a great job and then if there were any
7  issues -- and she would start to go through the
8  people and say this one is, you know, doing well,
9  follow-through, I have no problems and they would
10  really get the work done.  She would have this
11  conversation with Bob Simpson and I on the entire
12  account team, Lisa Zukoff.  So it was that kind of
13  general feedback that we received.
14    Q.   And Ms. Wilbourn, following that
15  restructuring in 2009 and in view of what was going
16  on in the company and in the market, what was your
17  impression as to whether or not it made sense to have
18  a D.C. based public entities loan team as well as a
19  field team based public entities loan team?
20    A.   When the proposal was made to me to have
21  the field take on the responsibility, it was under
22  the understanding that we needed cost savings and

Page 1300

1  streamlining where we could company-wide, and that my
2  team could do the work if they were given the time,
3  you know, the time allocation, that it would be a
4  cost savings. We could get the work done. We did
5  not have to have two sales teams essentially. That
6  the business unit work could go to the field if the
7  field were given the time allocation.
8      And that's really what it was coming to me
9  for. Would I allocate the time and would I commit to
10 it and not back out of it later down the road. And
11 the answer was yes, I would commit the time and that
12 they could do the work. There was no need for the
13 redundancy.
14     Q.  And was it your impression that that was
15 the primary role of the community development team
16 members to function as a sales team force?
17     A.  Yes.
18     MR. STEWART:  I have no further questions.
19     ARBITRATOR ROSCOE:  Mr. Wachtel, do you
20 have any follow-up to that?
21     MR. WACHTEL:  Yes.
22     EXAMINATION BY COUNSEL FOR CLAIMANT

Page 1301

1      BY MR. WACHTEL:
2      Q.  Ms. Wilbourn, did Ms. Neely say anything
3  to you that you recall regarding Ms. Tarter's ability
4  to structure deals?
5      A.  I don't recall a direct statement
6  regarding deal structuring.
7      Q.  Do you recall a direct statement from
8  Ms. Neely regarding Ms. Tarter's work on due
9  diligence for PE loan transactions?
10     A.  Yes, that she was thorough, that she --
11 that they trusted her work, that customers trusted
12 that she gave them the correct information, the
13 correct requirements. So it was clear to me that
14 they felt she was very thorough with due diligence
15 and meeting the requirements and the standards that
16 were set out.
17     Q.  When Ms. Neely said that Ms. Tarter was
18 thorough, did she say to you she was thorough
19 regarding due diligence or just that she was
20 thorough?
21     A.  I don't recall it clear enough, so I
22 couldn't say she said there was due diligence. I

Page 1302

1  don't recall those exact words.
2      Q.  In connection with the shout-out that
3  Mr. Harris earned, did he go on a borrower visit
4  related to PE loan products?
5      A.  I don't know. I don't know that answer.
6      Q.  You testified about feedback you got from
7  Eileen Neely and Lisa Zukoff concerning the CD
8  account team. At least that's how I understood it.
9  Was there a difference between Ms. Neely and
10 Ms. Zukoff in the way that they would give you
11 feedback on this CD account team?
12     A.  I think by the time Lisa Zukoff came on
13 board, you know, we had done it a few times so she
14 would have her notes, I think, and we would have the
15 same conversation and it would be a call with myself,
16 Bob Simpson, Carl, Lisa and she would go through,
17 here's my feedback. And so it just became more, I
18 guess, structured because we had done that a few
19 times. So that would be the only difference.
20     Q.  When Eileen Neely was director of the PE
21 loan team, would she have calls with you, Bob Simpson
22 and Carl to discuss the work of CD account teams?

Page 1303

1      A.  I don't recall that, no.
2      MR. WACHTEL:  Thank you. I have nothing
3  further.
4      ARBITRATOR ROSCOE:  Ms. Wilbourn, I think
5  that's pretty much it. Counsel, anything else?
6      MR. WACHTEL:  Not from us, thank you.
7      MR. STEWART:  Not from us.
8      ARBITRATOR ROSCOE:  Again, thank you for
9  making yourself available and we apologize for any
10 convenience.
11     THE WITNESS:  No problem. Thank you very
12 much.
13     ARBITRATOR ROSCOE:  You are excused and so
14 you may hang up. Counsel, anything else?
15     MR. WACHTEL:  I didn't hear you.
16     ARBITRATOR ROSCOE:  Anything else this
17 morning? Any other business?
18     MR. WACHTEL:  We are still reviewing the
19 privilege log that we got late in the day on Friday.
20 There is no other business anticipated from us.
21     ARBITRATOR ROSCOE:  Mr. Stewart?
22     MR. STEWART:  Nothing else.

20 (Pages 1300 to 1303)

Page 1236

1   were based in Washington, D.C. would be losing their
2   positions?
3       A.   When this proposal was made, Carl did
4   indicate that he would be laying off his public --
5   some of the folks in his public entities team.
6       Q.   And did you understand that Mr. Steven
7   Brannum would be laid off in that reduction in force?
8       A.   I did.
9       Q.   And were you aware that Mr. Brannum is
10  African-American?
11      A.   Yes.
12      Q.   And did you have any concern that
13  Mr. Riedy's plan to lay off Mr. Brannum was motivated
14  by racial discrimination?
15      A.   No.
16      Q.   And for the record, what is your race,
17  Ms. Wilbourn?
18      A.   I'm African-American.
19      Q.   If you would turn to Exhibit 1. This is
20  Beverly Wilbourn 1.
21      A.   Just a moment.
22      Q.   The Bates number is FM 1070. That's the

Page 1237

1   little writing in the right side at the bottom of the
2   document. Let us know when you have it.
3       A.   I'm sorry, I had them out of order. I've
4   got them back in order. Okay.
5       Q.   And this is a one-page document and it's
6   an e-mail. The original e-mail is from Mr. Ken Bacon
7   to you and Mr. Hayward on February 7, 2008 and then
8   you respond later that day. Do you see that?
9       A.   I do.
10      Q.   And have you seen this document before?
11      A.   I'm sorry?
12      Q.   Have you seen this document before?
13      A.   Yes, I've reviewed it.
14      Q.   Now, in the below e-mail, Mr. Bacon is
15  referring to an instance where he's talked to someone
16  who -- Merilyn Rovira about working with Chris
17  Redmond on the, quote, AD&C stuff, and in the next
18  sentence he says, "This is what the offices are
19  supposed to be doing. Do y'all have any other
20  examples?" And then you respond at the top with your
21  response there. Do you see that?
22      A.   Yes.

Page 1238

1       Q.   And can you explain what you were
2   conveying to Mr. Bacon and Mr. Hayward in your
3   response?
4       A.   The response was to convey that in all
5   instances, community development was doing the work
6   of the business unit. That's the full integration.
7   That we were not out just listening to local problems
8   but that we were working within our business units in
9   an alignment to bring those solutions that the
10  business units already sanctioned to local
11  communities. So those examples that he cited, Ken
12  Bacon cited, were absolutely what everybody was doing
13  in every office.
14      Q.   And for the record, can you just identify
15  who Mr. Bacon was and his relationship to you in
16  Fannie Mae's organizational structure?
17      A.   Ken Bacon was the executive vice president
18  for, at that time, I think it was still housing and
19  community development. It was now multifamily. And
20  Jeff Hayward reported to Ken Bacon, so he was my skip
21  manager.
22      Q.   Thank you. Would you now turn to Exhibit

Page 1239

1   2? This is the document labeled CD account teams,
2   updated on February 11, 2008.
3       A.   Yes.
4       Q.   And can you just identify what this
5   document represents?
6       A.   As we had this account team structure,
7   this document identifies which account teams at that
8   date that we were working with. And in each
9   instance, you had a set of community development
10  teams -- that's the team members -- we had the team
11  lead for community development, and then we had a
12  business unit lead. This was the organizational
13  structure that we put in place after the reorg for
14  community development.
15      Q.   And on this document, the team leads
16  indicates, for the public entity, CE, Lisa Tarter and
17  Ralph Perrey. Do you see that?
18      A.   Correct.
19      Q.   Who had assigned Lisa Tarter and Ralph
20  Perrey as team leads for the public entity team?
21      A.   Myself and Bob Simpson. Bob Simpson was
22  the other half of community development. I had urban

4 (Pages 1236 to 1239)

# ZUKOFF

# TRANSCRIPT

```
 1                      JAMS ARBITRATION

 2      - - - - - - - - - - - - - - - X

 3      STEVEN BRANNUM,                 :

 4          Claimant,                   :

 5              v.                      :   Reference No.

 6      FEDERAL NATIONAL MORTGAGE       :   1410005474

 7      ASSOCIATION (FANNIE MAE),       :

 8          Respondent.                 :

 9      - - - - - - - - - - - - - - - X

10                          Washington, D.C.

11                          Friday, October 28, 2011

12              Arbitration before ARBITRATOR JERRY ROSCOE

13      in the above-entitled matter, the witnesses being

14      duly sworn by MARY GRACE CASTLEBERRY, a Notary Public

15      in and for the District of Columbia, taken at the

16      offices of JAMS, 555 13th Street, N.W., Washington,

17      D.C., at 9:19 a.m., Friday, October 28, 2011, and the

18      proceedings being taken down by Stenotype by MARY

19      GRACE CASTLEBERRY, RPR, and transcribed under her

20      direction.

21

22
```

## Page 1050

1   there is no longer an HCD group at Fannie Mae and our
2   team, our Public Entities team moved over to Single
3   Family, so I'm currently in the Single Family
4   division of Community Engagement in the Business
5   Development unit of Fannie Mae.
6       Q.   Would you describe your educational
7   history since high school?
8       A.   Yes.  I have a bachelor's degree in
9   political science from West Virginia University and I
10  am currently working on a master's in educational
11  leadership through Wheeling Jesuit University.
12      Q.   And can you --
13      A.   I also have several certifications in the
14  public housing arena.  I am a certified public
15  housing manager, a certified manager of Section 8,
16  I'm a certified compliance person for the tax Credit
17  program, a certified manager of maintenance for
18  public housing, and I also have a certificate program
19  I completed from Rutgers University on a public
20  housing training session.  That included finance,
21  redevelopment, management, legal issues and several
22  other items that I can't recall at this time.

## Page 1051

1       Q.   Can you describe your employment history
2   since college and up through the point where you
3   joined Fannie Mae in 2004?
4       A.   Sure.  I graduated from college in 1984
5   and started working for a local real estate
6   construction company that did both single family and
7   multifamily housing developments.  At the time it was
8   Farmers Home Administration, a 515 program.  It's now
9   under rural development, but it's affordable rental
10  housing in rural areas of the country and it's
11  subsidized, much like public housing is subsidized.
12  And they also have several Section 8 new construction
13  units.  That's really where I started my field in
14  housing.  I worked there for two years.
15      Q.   What was the name of that company?
16      A.   Chaplin Construction and Real Estate.
17      Q.   And what was your position there?
18      A.   Executive assistant to the president of
19  the company.
20      Q.   And you were there from 1984, you said two
21  years so that would have been through 1986?
22      A.   1986.  And when I left there, I went to

## Page 1052

1   work for an architect and engineering firm, mostly
2   doing work on construction specifications, and I was
3   there for a year.  And I left there in 1987 and went
4   to the Benwood and McMechen Housing Authority, two
5   public housing agencies, two separate agencies but
6   they were run under one administrative body.  I went
7   there as the leasing officer for the public housing
8   program and in 1989, the executive director there
9   left to go to work for the governor and I became the
10  executive director.
11      Q.   And where is this housing authority for
12  Benwood and McMechen?
13      A.   It's located in the northern panhandle of
14  West Virginia.  Just to give you approximate
15  locations --
16          ARBITRATOR ROSCOE:  That's okay.
17          THE WITNESS:  That's okay?  All right.
18          BY MR. STEWART:
19      Q.   And what were your responsibilities as the
20  executive director of the Benwood and McMechen
21  housing authority?
22      A.   I managed all aspects of the public

## Page 1053

1   housing authority from management, the occupancy
2   issues, the maintenance, the renovations.  We did an
3   extensive renovation while I was there, over a
4   million dollars worth of renovation, what was then
5   called the CIAP program where it was competitive.
6   For smaller housing authorities, it was called the
7   capital grant program.
8       For larger housing authorities, if you had
9   250 units, you automatically got money from HUD.  If
10  it was under 250 units, it was a competitive process.
11  I was there as the executive director for almost 10
12  years.  I left in 1997 and I went to work at the
13  Wheeling Housing Authority which is an adjacent
14  community further north where --
15      Q.   In West Virginia?
16      A.   In West Virginia, where I managed
17  approximately 1,300 public housing and Section 8
18  units.  And in that capacity, I did obviously many of
19  the same things I did in Benwood and McMechen but it
20  was on a much larger scope with a much larger staff.
21      Q.   How large a staff did you have as the
22  Wheeling, West Virginia housing authority director?

3 (Pages 1050 to 1053)

Arbitration Day 5                                          October 28, 2011
Washington, DC

Page 1054

1    A.   Depending on what we had going on in
2    construction, it could be as many as 50 to 60 people.
3    And I probably had about six direct reports that
4    reported directly to me, which would have been like
5    the director of operations, the director of public
6    housing, director of finance, director of our human
7    resources and our programs for resident programs.
8         And while I was in Wheeling, I also did a
9    lot of redevelopment work through -- we applied for a
10   HOPE VI grant in 1998.  We weren't successful.  It
11   was a highly competitive program.  In 1999, we
12   re-applied and were awarded about $17.1 million,
13   which we leveraged with other financing, home funds,
14   tax credit equity, affordable housing money from the
15   Federal Home Loan Bank of Pittsburgh and CDBG funds
16   from our city for infrastructure work, and also
17   resident training programs with local organizations
18   including a step-up program to the Department of
19   Labor.  And we leveraged that $17.1 million into a
20   $40 million redevelopment project.
21        Interestingly enough, that's where I -- at
22   Wheeling, I received my first -- the first

Page 1055

1    relationships that I had with Fannie Mae.  Evett
2    Francis and Frank Losada from the ACF group came to
3    visit me at the housing authority and we actually had
4    a Community Express loan at the Wheeling housing
5    authority for predevelopment funds.  That was my
6    first introduction to Fannie Mae.  I believe it was
7    late 2002 or early 2003.
8         Q.   And so you used a Community Express loan
9    at that time?
10        A.   Yes.
11        Q.   And how long were you at the Wheeling,
12   West Virginia housing authority?
13        A.   From 1997 until January of 2004.
14        Q.   Are you a member of any trade
15   associations?
16        A.   Yes.  In my capacity as executive director
17   of the Wheeling housing authority, I was also the
18   president of the West Virginia Association of Housing
19   Agencies.  I was a member of the executive committee
20   of the southeastern regional conference of NAHRO,
21   which are the 10 southeast states of the
22   United States.

Page 1056

1         Q.   And what is NAHRO?
2         A.   National Association of Housing and
3    Redevelopment Officials.  I was also very active in
4    several local housing boards, One Wheeling, which I
5    was appointed by my county to serve as one of the
6    board members to decide how allocation of home funds
7    for our jurisdiction would be assigned out in the
8    community.  And I was also very active in the
9    Wheeling Chamber of Commerce, where I co-led the
10   youth leadership Wheeling program for several years.
11   I was also -- the last several years that I was in
12   Wheeling, I was appointed as a national trustee to
13   the Public Housing Authority Directors Association.
14   The acronym for that group is PHADA.
15        Q.   And what were your responsibilities as the
16   trustee for PHADA?
17        A.   As a trustee for PHADA, we worked together
18   with the leadership of the organization.  I was also
19   involved in the professional development committee as
20   part of that responsibility.  Trustees were expected
21   to take an active role in the organization.  I did
22   many training sessions at PHADA.  That's also through

Page 1057

1    the PHADA organization where I went through Rutgers
2    University public housing directors program.  I
3    presented testimony before the appropriations
4    committee in Congress for that, for the budget for, I
5    think it was 2002.
6         Q.   This testimony was before the U.S.
7    Congress?
8         A.   Yes.  Well, that was one of the times.
9    The other time, I actually testified before the House
10   Financial Services Committee, the housing group on
11   the HOPE VI program.  When the administrations
12   changed from Clinton to Bush, they were trying to
13   eliminate the HOPE VI program, and NAHRO asked me to
14   be on the panel with several other housing
15   authorities across the country to present testimony
16   to that committee regarding the HOPE VI program.
17        Q.   Can you describe how you came to Fannie
18   Mae?
19        A.   Yes.  Fannie Mae decided to open an
20   office, a partnership office at that time in West
21   Virginia in Charleston in 2003 and I received calls
22   from both Frank Losada and Evett Francis asking me to

4 (Pages 1054 to 1057)

Page 1058

1    apply for the position because of the work that they
2    had done with me at the housing authority.
3        Q.    And you applied for a position with Fannie
4    Mae?
5        A.    I did.  I applied for the director of the
6    West Virginia partnership office.
7        Q.    And is that the position you assumed?
8        A.    Yes.
9        Q.    And what were your responsibilities as a
10   director of the West Virginia partnership office?
11       A.    My responsibility as the director of the
12   West Virginia partnership office was to build
13   relationships for Fannie Mae across the state of West
14   Virginia and also, we had the responsibility of
15   working -- I had the responsibility of working with
16   the directors in Kentucky and Tennessee on a Central
17   Appalachian Initiative, an under-served market that
18   the company had identified, to work with partners in
19   that area to help bring funds for affordable housing
20   in the Central Appalachian Initiative.
21       I built relationships, I went across the
22   state and did a lot with workforce housing.  I

Page 1059

1    also -- as has been mentioned previously today, our
2    role was also to source or to identify business
3    opportunities that could assist the company within my
4    market.
5        Q.    And did you do that?
6        A.    I did.  I actually worked with Kells
7    Carroll who was -- the region of Fannie Mae that I
8    was working at in that time was the Atlanta region,
9    one of the five regions that the PO had at that time,
10   and we had -- our business manager, I'm not sure if
11   that's the correct title, but that was in essence
12   what he did, was Kells Carroll.  I worked with him to
13   source a predevelopment loan with a Charleston
14   nonprofit on CE and I also worked --
15       Q.    By CE, you mean Community Express?
16       A.    Community Express, yes.  And I also then
17   met and we convened congressional roundtables where
18   Fannie Mae hosted an event.  We didn't -- actually,
19   we did the introduction and we hosted the event where
20   we would bring housing providers together to meet
21   with members of Congress to discuss issues regarding
22   affordable housing in their district.  So we also had

Page 1060

1    a political role in that job as well.  As time went
2    on --
3        ARBITRATOR ROSCOE:  Okay.  Next question,
4    please.  You answered it when you said, I did.
5        BY MR. STEWART:
6        Q.    How many people did you manage as the
7    director of the West Virginia Community Business
8    Center?
9        A.    I had a deputy director and an
10   administrative assistant.
11       Q.    And how long did you serve as the
12   executive director of the West Virginia Community
13   Business Center?
14       A.    I served director until September, August
15   or September of 2006.
16       Q.    And from that point, what position did you
17   take?
18       A.    I assumed a position as director in the
19   Public Entities team at Fannie Mae.
20       Q.    And how did that come to pass?
21       A.    I had begun working with Eileen Neely on
22   the Community Express product because of my expertise

Page 1061

1    with public housing authorities in 2005 to the point
2    where 25 percent of my time in the CBC -- well, it
3    became, a community business center was actually
4    allocated to the Public Entities team while I was
5    still the director of the West Virginia CBC, and then
6    in August, Eileen asked me to come over and work full
7    time on her team.
8        Q.    And was that the Public Entities loan
9    team?
10       A.    Yes.
11       Q.    Would you turn to Exhibit 133?
12       A.    Yes.
13       Q.    This appears to be a resume of yours.
14   Could you just identify it for the record?
15       A.    Yes, it is my resume.
16       Q.    And would you look at Exhibit 132?
17       A.    Yes.
18       Q.    This appears to be a profile for you with
19   a pasted resume in the body of the document?
20       A.    Yes.
21       Q.    Have you seen this document before?
22       A.    I believe this -- yes, I've had -- this is

Page 1062

1   when I applied for the position at Fannie Mae
2   initially.
3       ARBITRATOR ROSCOE:  Okay, ma'am.  The
4   court reporter is going to be worn out within
5   minutes.  "Yes" would be fine.
6       THE WITNESS:  Yes.
7       ARBITRATOR ROSCOE:  Just please answer the
8   questions.  I don't want to restrict -- you have so
9   much information to give.  She's just working
10  overtime on just prefatory questions.
11      THE WITNESS:  Yes.
12      MR. STEWART:  We'll move for admission of
13  Exhibits 132 and 133.
14      MR. WACHTEL:  No objection.
15      ARBITRATOR ROSCOE:  So moved, 132 and 133.
16      (Respondent's Exhibits Nos. 132 - 133
17      were received in evidence.)
18  BY MR. STEWART:
19  Q.  Would you turn to Exhibit 134?
20  A.  Yes.
21  Q.  And what is it?
22  A.  This is the job description for my initial

Page 1063

1   work at the West Virginia partnership office.
2       MR. STEWART:  Move for admission of
3   Exhibit 134.
4       MR. WACHTEL:  No objection.
5       ARBITRATOR ROSCOE:  134 so admitted.
6   Thank you.
7       (Respondent's Exhibit No. 134
8       was received in evidence.)
9   BY MR. STEWART:
10  Q.  And when you joined Ms. Neely's team in
11  the Public Entities team, what were your
12  responsibilities at that point?
13  A.  At that point we were working on --
14  basically my work was on the Modernization Express
15  side but we were also working to bring in Community
16  Express business as well.
17  Q.  And when you joined Ms. Neely's team, was
18  Mr. Riedy within your organizational chain?
19  A.  Yes.
20  Q.  You were initially working on Mod Express
21  in the beginnings of bringing in Community Express?
22  A.  Yes.

Page 1064

1   Q.  Now, we've had some testimony about the
2   public housing authorities being granted authority to
3   use the loan products.  Do you recall that?
4   A.  Yes.
5   Q.  Can you describe what if any education you
6   had to give to public housing authorities when you
7   were marketing these products?
8   A.  Sure.  Public housing authorities were not
9   permitted to actually borrow money until 1998 when
10  Congress passed the Housing Quality and Work
11  Responsibility Act.  That Act then gave -- QHWRA,
12  which was the acronym used for that act, gave public
13  housing authorities the actual approval to borrow
14  money for renovation through the capital fund
15  program.
16      ARBITRATOR ROSCOE:  Is that P-A-R-A?  You
17  used an acronym.
18      THE WITNESS:  QHWRA, Quality Work --
19  Quality Housing Work Responsibility Act, QHWRA.
20      ARBITRATOR ROSCOE:  Thank you.  That
21  helps.
22  BY MR. STEWART:

Page 1065

1   Q.  And I take it, did you go on the road to
2   educate --
3   A.  I did, yes.
4   Q.  To what extent did you find that the
5   public housing authorities, these customers, were
6   knowledgeable about the loan products Fannie Mae was
7   marketing?
8   A.  Not very knowledgeable at all.  I would
9   say that the market that we were targeting were folks
10  that could borrow between a million dollars -- this
11  is on Modernization Express -- between a million
12  dollars and $15 million, because at the time, anyone
13  who was going to borrow more than $15 million, which
14  would have been mostly the larger housing authorities
15  across the country, it would have been an easier and
16  cheaper execution for them to use the bond market,
17  tax exempt bonds, to actually complete that work.
18      So we had a targeted market.  So these are
19  housing authorities who, because it was fairly new,
20  it doesn't seem like maybe 2004 would be fairly new
21  but, you know, housing authorities work kind of slow
22  and things were -- the Quality Work Responsibility

6 (Pages 1062 to 1065)

Arbitration Day 5                                             October 28, 2011
Washington, DC

Page 1066

1  Act had a lot of provisions in it, not just this
2  borrowing.  And so many of them weren't aware because
3  they just never had any experience in borrowing
4  before.
5      So we had quite a challenge ahead of us to
6  educate the housing authorities that they did have
7  this option and some of the housing --
8      ARBITRATOR ROSCOE:  Hold on.  You're just
9  going too much too fast for the reporter.
10     THE WITNESS:  I'm sorry.  I'll slow down.
11     ARBITRATOR ROSCOE:  So please listen to
12 the question.  Try to determine what it is counsel is
13 asking and answer that, please.  We're getting to the
14 important parts but -- the court reporter is very
15 competent but even this is challenging.
16 BY MR. STEWART:
17     Q.  So you were --
18     A.  Yes.  We had challenges because the
19 housing authorities simply weren't aware that they
20 had the borrowing capacity.
21     Q.  And what means did you use to educate the
22 housing authorities on your loan products?

Page 1067

1      A.  We traveled -- there were two means.  We
2  traveled to conferences, state, regional and national
3  conferences and we tried -- we gave them information
4  about the Quality and Work Responsibility Act and we
5  also put together a presentation called "So You Want
6  to Build Some Houses," on single family development
7  to talk about -- try to teach them how they could do
8  development, period.
9      And then kind of as a by-product of that,
10 it really wasn't a sales presentation about Fannie
11 Mae, but Community Express could be used to help
12 folks build single family houses and then the housing
13 authorities could repay us with the sales proceeds
14 once the houses were built.  So that was one of -- in
15 addition to the Modernization Express product, we
16 also trained them on the CE product.
17     Q.  On the Community Express?
18     A.  On the Community Express in that manner as
19 well.  And we also did tours with housing authorities
20 where we would go out probably for two or three days
21 and identify housing authorities, in a specific
22 targeted area that were in our sweet spot between 1

Page 1068

1  million and $15 million borrowings and we would meet
2  with them.
3      Q.  And how did you identify the potential
4  customers?
5      A.  We analyzed -- HUD publishes the capital
6  fund allocations that they give every housing
7  authority in the country on their website, and we
8  analyzed the numbers from the allocations that each
9  of them had received and we could identify, through
10 those allocations, which ones could borrow between a
11 million and $15 million.
12     Q.  And when you say we, who are you referring
13 to?
14     A.  The team.  Actually, that was Eileen,
15 would take that information, put it together.  She
16 and Doug Turner had also worked on a spreadsheet
17 where we could fill in the housing authority's HUD
18 number and it would actually pull the information
19 from the spreadsheet, what the capital fund
20 allocation was, and that became a marketing sheet for
21 us because it would calculate how much the housing
22 authority could borrow, and it was fed with the

Page 1069

1  current interest rates at the time that we were
2  working on for indicative pricing.
3      And we would actually take that marketing
4  sheet out with us on the road to explain to the
5  housing authorities how much they could borrow and
6  what the anticipated repayment would be.
7      Q.  At this point in time -- what point in
8  time is this, 2006?
9      A.  It was when I joined the team, yes.
10     Q.  That's 2006?
11     A.  Yes.
12     Q.  And who were the other members of the
13 public entity loan team at that time?
14     A.  When I joined the team, Steve was on the
15 team, Nicole Lester was on the team and Maria
16 Day-Marshall was on the team.  Russell Atta-Safoh was
17 hired probably later in 2006 or maybe early 2007 as
18 an analyst for our team.  I remember because I
19 assisted Eileen in developing the job description for
20 Russell's position.
21     Q.  Now, you spoke about traveling to
22 conferences and marketing tours.

7 (Pages 1066 to 1069)

Arbitration Day 5                                                        October 28, 2011
                              Washington, DC

Page 1070

1   A.  Yes.
2   Q.  Who would accompany you -- first question
3   is, approximately how many conferences did you attend
4   in 2006-2007?
5   A.  I'm not sure.  I would say probably -- I
6   know the last year, like 2008, when I was still on
7   the road, I probably attended more than 15
8   conferences and that would have been state, regional
9   and national conferences.
10  Q.  This is in 2008?
11  A.  Yes.
12  Q.  And of those 15 conferences, approximately
13  how many did Mr. Brannum accompany you on?
14  A.  I don't remember him accompanying me on
15  any of the conferences.  I do remember that he did
16  attend the NAHRO legislative conference reception
17  several times.  Once a year, the housing authorities
18  all come to Washington in March to talk to their
19  elected representatives and we would attend -- a lot
20  of times attend the conference to be -- it was a
21  great way to meet and network with housing
22  authorities to market our products.

Page 1071

1   Q.  And this NAHRO reception was in D.C.?
2   A.  Yes.
3       ARBITRATOR ROSCOE:  Could you spell that
4   acronym, please?
5       MR. STEWART:  N-A-H-R-O.
6       THE WITNESS:  N-A-H-R-O.
7       ARBITRATOR ROSCOE:  Thank you.
8       BY MR. STEWART:
9   Q.  And these 15 conferences that you also
10  spoke of in 2008, were those also held in D.C.?
11  A.  No, they were all around the country.  We
12  would have attended the NAHRO conference in D.C. in
13  March.  And typically our leadership would attend
14  that reception with us as well, Mr. Hayward and
15  Mr. Riedy, although I think Mr. Riedy only attended
16  once that I remember.
17  Q.  Can you turn to Exhibit 2?
18  A.  Yes, I have it.
19  Q.  And can you identify what this Exhibit 2
20  is?
21  A.  This is a customer visit log.
22  Q.  Now, when you were working on the Public

Page 1072

1   Entities loan team in 2006-2007 time frame, to what
2   extent were you working with the members of the
3   community development team in the field?
4   A.  I was working with them extensively.
5   Having been in the CBC world, I understood that part
6   of their responsibility was to have the relationships
7   with everyone that had anything to do with affordable
8   housing in those areas, and I found them a great
9   resource to get us in the door oftentimes because
10  they had those relationships to assist with the
11  marketing tours.  So I used that team extensively in
12  my marketing work.
13  Q.  And do you recall working more often with
14  any particular member of the CBC team?
15  A.  I did.  I actually worked with -- I worked
16  with most of them but I specifically worked more with
17  Lisa Tarter and Evett Francis.
18  Q.  For 2007, this document runs from FM 414
19  through FM 425.  That's from January of 2007 to
20  December of 2007.  Do you see that?
21  A.  Yes.
22  Q.  How was this document maintained at Fannie

Page 1073

1   Mae?
2   A.  Our group had a specific share drive that
3   we used for all of our business activities so any
4   marketing sheets that we -- we actually kept our
5   marketing information on the share drive.
6       This was a lot of other information:  the
7   deal packages, the due diligence for the loan
8   information, but this was one of the items that was
9   kept on the share drive.  And it was our
10  responsibility as business folks to put any travel
11  that we were having out in the field to meet with
12  customers on this report.
13  Q.  And who had access to this customer
14  business log on the share drive?
15  A.  Just our team.
16  Q.  And by the team, you mean --
17  A.  Our D.C. based team.  So it would have
18  been Eileen, myself, Steve, Maria Day-Marshall and
19  Russell Atta-Safoh.
20  Q.  Now, if we start from FM 426 through the
21  end of Exhibit 2 which is at FM 444, which covers the
22  period of January 2008 through December of 2008.

8 (Pages 1070 to 1073)

## Page 1074

1   A.   Okay.
2   Q.   Was there any change in who had access to
3   the customer log, the customer visits log?
4   A.   Yes. I believe at that time, when we had
5   the form -- when we formalized the buddy system that
6   you heard about earlier, you had to go through what's
7   called services on line at Fannie Mae.
8        The share drive had restricted access.
9   When they actually came over to start assisting our
10  team on a more full-time -- you know, on a more
11  regular basis and it was formalized, then those folks
12  were given access to our share drive as well.
13  Q.   And those would be the members of the
14  community development team who were your buddies?
15  A.   Yes.
16  Q.   So let's talk a little bit about the
17  establishment of the buddy system. Do you recall in
18  or around January of 2008 where there was a meeting
19  held on strategy session for the Public Entities loan
20  team?
21  A.   I do.
22  Q.   And what took place during that meeting?

## Page 1075

1   A.   It was a strategy meeting on how we would
2   be bringing in the community development folks in a
3   more formal way to assist with our public entity loan
4   team business.
5   Q.   And what do you recall in terms of any
6   changes in the relationship and how members of the
7   community development team worked with members of the
8   public entity loan team?
9   A.   They were working more closely and we had
10  to find geographies that we were working with, their
11  territories, if you will, and it became a more
12  formalized -- in the sense that we had already been
13  working with the community development folks out in
14  the field, this really became a more formalized
15  process.
16  Q.   Was there assignment of buddies?
17  A.   There were.
18  Q.   And how did that process work or how were
19  those assignments made?
20  A.   I believe that those assignments were made
21  and this would be something, I believe, that a lot of
22  it was around relationships that we already had with

## Page 1076

1   the CD folks in the field and folks that we may have
2   been working with. In my case, I had been working
3   extensively before the formalized process with Lisa
4   Tarter and Evett Francis.
5   Q.   When you joined the Public Entities loan
6   team in 2006, your responsibilities for the deals,
7   for the Community Express/Modernization Express loan
8   products, included sourcing the deals, identifying
9   customers and bringing the deals in, correct?
10  A.   Yes.
11  Q.   Did it also include structuring and
12  underwriting the deal?
13  A.   It included structuring and underwriting
14  the deals as well as sourcing the deals, although at
15  the time that I initially came to the team, I had a
16  learning curve because I hadn't been -- I had been
17  more sourcing and working on customer visits.
18       I was doing some analysis of the public
19  housing financials, not quantitative work but
20  analysis where I could go in and look at the housing
21  authorities, you know, look at their audits, look at
22  their financials, look at the management. Public

## Page 1077

1   Housing has a public housing assessment system. We
2   only worked with standard or high-performing housing
3   authorities. The acronym for that is PHAS, Public
4   Housing Assessment System, so P-H-A-S.
5   Q.   And to what extent did you rely on or seek
6   assistance from Mr. Brannum in order to structure or
7   underwrite transactions?
8   A.   I didn't work with Steve on Modernization
9   Express but there were several deals that I had
10  brought in that I worked with him the first year that
11  I came to the team. Specifically I remember the
12  Huntington, West Virginia Community Express.
13       The housing authority was using some
14  Replacement Housing Factor funds that they had
15  received to rebuild new units, and then they were
16  paying us back with the proceeds of the Replacement
17  Housing Factor funds on a yearly basis for five
18  years. And I worked with Steve, actually brought the
19  customer in and worked with Steve to get the
20  information.
21       I believe I also worked with Steve on a
22  Salisbury housing authority deal which was a similar

9 (Pages 1074 to 1077)

## Page 1078

1  deal that I just discussed as Huntington, from the
2  Salisbury, North Carolina housing authority.
3      Q.   Did you continue to rely on Mr. Brannum
4  for structuring and underlying assistance into 2008?
5      A.   By that time, I had -- there were two
6  other deals that we brought in that were specifically
7  around Escambia County, Florida and St. John's
8  County, Florida that were sourced with Evett Francis,
9  and Evett had worked on the American Communities Fund
10 in the past and she had a great understanding of the
11 municipal structure and county structure for the
12 deals.
13         I didn't have that expertise.  I may have
14 asked for Steve's assistance around questions but I
15 remember specifically that Evett Francis did a lot of
16 the structuring work and working with the county to
17 get around some of the issues that we had.
18     Q.   We were looking at this customer visit
19 log.  Did you recall any discussions in any meetings
20 with Ms. Neely and the rest of the team concerning
21 the need to travel to market the loan products?
22     A.   Yes.  She was very adamant about that in

## Page 1079

1  staff meetings, that in order to bring in the
2  business so that we have something to work on, we
3  needed to get out there and bring the business in.
4      Q.   And do you recall any instance where any
5  members of the team expressed any frustration that
6  Mr. Brannum was not traveling?
7      A.   I do.  Specifically, Nicole Lester, who
8  worked on our team.
9      Q.   What do you recall from that?
10     A.   We were out on the road one time and she
11 made the comment that, you know, here we are out on
12 the road all the time and Steve just sits in the
13 office.
14     Q.   Do you recall any discussions with
15 Ms. Neely about Mr. Brannum traveling?
16     A.   She expressed some frustrations but she
17 also expressed those at our team meeting.  Steve, you
18 need to go on the road.
19     Q.   There was some discussion earlier in the
20 week about Mr. Riedy's interaction with the members
21 of the public entity loan team.  Do you recall that?
22     A.   Yes, I do.

## Page 1080

1      Q.   I believe one of the witnesses had
2  testified that they had felt that they were the
3  stepchild, that Mr. Riedy paid more attention to the
4  HFA team rather than the public entity loan team?
5      A.   Yes.
6      Q.   Did you feel that Mr. Riedy wasn't giving
7  your group the level of attention that had been
8  provided to the other team?
9      A.   I did.
10     Q.   And can you explain?
11     A.   Yes.  I believe that, to my understanding
12 when I came on the team, Carl was, at first, very
13 involved with the affinity agreement with the HFAs,
14 which was fairly new in development, so it was very
15 time-intense.  I also felt, from the meetings that we
16 had where Carl did participate, that he felt that
17 Eileen was a very competent manager and that as long
18 as he had interaction with her, he really didn't have
19 a lot of interaction with our team.
20     Q.   Did you feel a need to interact with
21 Mr. Riedy concerning any of your responsibilities as
22 a member of the public entity loan team?

## Page 1081

1      A.   Never.  I felt very comfortable having
2  Eileen as my director and any questions that I needed
3  to have answered, she could answer.  And I don't
4  believe I even ever asked her to take anything to
5  Carl.
6      Q.   So when the buddy system was established,
7  your mentees were Lisa Tarter and Evett Francis, is
8  that right?
9      A.   Yes.
10     Q.   To what extent if any were your
11 responsibilities including providing any training to
12 either Ms. Tarter or Ms. Francis?
13     A.   That was part of our responsibility, to
14 teach them how to -- to work with them to bring in
15 the business but also teach them -- I mean, I
16 felt, if you're going to do the business, it's
17 important that you know all aspects of the business.
18        So with my mentees, at least, I would
19 provide the write-up if we had one of their
20 customers, that we did the write-up that we did for
21 the underwriting team.  And as Eileen mentioned
22 yesterday, we did that, I think a lot of time,

10 (Pages 1078 to 1081)

Arbitration Day 5                                          October 28, 2011
Washington, DC

Page 1082

1  because if a lot of the underwriter's work was
2  completed by our team, it brought -- you know if they
3  were busy, if they had to do a little bit of work to
4  do for us to get it through underwriting, they took
5  our deals first.
6         So that was really the strategy behind
7  doing some of the write-ups.  And I had the team, the
8  folks that worked for me actually work with --
9  collect the data, put the information in the
10 write-ups, spread the financials, and there was a
11 learning curve for them much like there was for me
12 when I first came to the team, to understand all the
13 background work that had to go into getting a deal
14 into our system and working it through closing.
15 Q.   And by the end of 2008, had they become
16 more proficient in the underwriting?
17 A.   Absolutely.  And Evett was much more
18 familiar from the beginning because she had the
19 experience from her time in ACF, especially on the
20 Community Express side.  She had to do some work to
21 learn the PHA business and the Mod Express write-ups
22 but Lisa Tarter became very proficient.

Page 1083

1         I would also say that even though they
2  weren't my mentees, I did some work with Richard
3  Staples as well as Ralph Perrey on some training
4  around the deal structuring, the underwriting piece,
5  if you will, specifically on Modernization Express.
6  Q.   And by the end of 2008, had Mr. Perrey and
7  Mr. Staples become more proficient in their
8  understanding of the structuring for the
9  Modernization Express product?
10       MR. WACHTEL:  Objection, lack of
11 foundation.
12       ARBITRATOR ROSCOE:  If you understand the
13 question, you can answer it.  Thank you.
14       THE WITNESS:  I know that Ralph Perrey
15 did.  And I had only worked on one deal specifically
16 that year with Richard so I would say Richard had
17 more work to do to become competent but definitely he
18 was on his way.
19 BY MR. STEWART:
20 Q.   At the end of 2008, early 2009, did you
21 become aware that there would be a restructuring of
22 the Public Entities loan team?

Page 1084

1  A.   I became aware of that in January.
2  Q.   And how did you become aware of that?
3  A.   I became aware of it I believe with a
4  meeting with Eileen and Carl by phone once Eileen
5  announced her resignation.
6  Q.   And what took place in that conversation?
7  A.   The conversation, as I recall, was a
8  discussion that there would be a RIF within our team
9  and that I was being asked to stay to -- I was being
10 asked to assume Eileen's position within Carl's
11 organization, and that there would be a
12 reorganization and that the CD team would be playing
13 a more active role in our business, and was I
14 comfortable with assuming those responsibilities.
15 Q.   And to what extent if any in that
16 conversation did you provide any counsel to either
17 Mr. Riedy or Ms. Neely on the members of the
18 community development team who had then begun doing
19 work?
20 A.   They had already worked with Beverly
21 Wilborn on the decisions on who would be on the
22 team.

Page 1085

1         ARBITRATOR ROSCOE:  No, the question was
2  whether you provided any counsel.
3         THE WITNESS:  I did not, no.
4         ARBITRATOR ROSCOE:  Thank you.
5  BY MR. STEWART:
6  Q.   What discussions did you have with either
7  Mr. Riedy or Ms. Neely about members of the CD
8  account team?
9  A.   They specifically told me who those folks
10 were going to be and that the decision had been made
11 in conjunction with CD.  I wasn't asked for my
12 opinion.
13 Q.   You're familiar with the 100 percent
14 collateral requirement?
15 A.   I am.
16 Q.   And to what extent if any did that
17 100 percent collateral requirement have on deals that
18 the public entity loan team had in the pipeline at
19 the time it was established?
20 A.   To my knowledge, it effectively killed the
21 pipeline business that we had for Community Express.
22 Q.   Would you turn to Exhibit 113, please?

11 (Pages 1082 to 1085)

Arbitration Day 5                                                    October 28, 2011
                              Washington, DC

Page 1086

1    A.  Yes, I have it.
2    Q.  This is a November 30th Public Entities
3    loan team pipeline report and I want to concentrate
4    on FM 960.
5    A.  Okay.
6    Q.  This is a 2009 declined CE deals, correct?
7    A.  Yes.
8    Q.  And what does this report represent?
9    A.  This report represents the deals that were
10   taken off of the pipeline or moved from in process in
11   the pipeline as active to declined deals.  We had to
12   inform the customers that were on the pipeline of our
13   100 percent collateral requirement.
14   Q.  And how did the customers respond when you
15   informed them of the 100 percent collateral
16   requirement?
17   A.  Not very well.  As a matter of fact, those
18   calls were very embarrassing to have.  I don't recall
19   comments such as if I have to give you a dollar for
20   every dollar I want to borrow, why would I do that?
21   Q.  Now, if you would turn to page 958 of the
22   same document, do you see that?

Page 1087

1    A.  Yes.
2    Q.  It's labeled Community Express and there
3    is an opportunity named Fayetteville Metropolitan
4    Housing Authority.  Do you see that?
5    A.  Yes.
6    Q.  And the opportunity amount is for
7    $13 million?
8    A.  Yes.
9    Q.  And it suggests as of November 30th that
10   this deal was in underwriting?
11   A.  Yes.
12   Q.  Did this deal in fact close?
13   A.  Yes, it did.
14   Q.  And did you work on this Fayetteville
15   Metropolitan Housing Authority deal?
16   A.  Yes, I did.
17   Q.  When did it close?
18   A.  It closed sometime in December of 2009.
19   Q.  And this was a Community Express deal?
20   A.  Yes.
21   Q.  Can you explain the circumstances of how
22   this Community Express deal closed --

Page 1088

1    A.  Yes.
2    Q.  -- given the 100 percent collateral
3    requirement?
4    A.  Yes.  This housing authority had received
5    a HOPE VI grant and they had also acquired 4 percent
6    tax credits, which is a volume cap allocation from
7    the state agencies.  The requirement for the 4
8    percent tax credits require that in order to use the
9    tax credits, the entity that has the volume cap has
10   to have at least 50 percent of the transaction in
11   tax-exempt debt and they needed the Community Express
12   in order to make that work for them.
13       And we were able to work -- and they were
14   really struggling how would they meet the collateral
15   requirement, but you need to remember, by this time,
16   the markets had just tightened up so much that it was
17   very difficult, the liquidity in the marketplace, to
18   get access to the funds.
19       We worked with HUD and the D.C. office
20   with the HOPE VI office and they allowed the housing
21   authority to pledge their HOPE VI funds to meet the
22   collateral requirements and we were able to get our

Page 1089

1    Credit and underwriting folks comfortable enough with
2    that to make the deal happen.
3    Q.  Would you turn, still in Exhibit 113, to
4    page FM 957?
5    A.  I have it.
6    Q.  And put your thumb there and then open to
7    Exhibit 106, please.  For the record, Exhibit 106 is
8    the January 5th, 2009 pipeline report.  Do you see
9    that?
10   A.  Yes.
11   Q.  And in 106, I would like you to turn to FM
12   758.  This is volume highlights.
13   A.  Okay.
14   Q.  Now, the goal for Community Express in
15   January of 2009 was $300 million.  Do you see that?
16   A.  Yes.
17   Q.  And then if you flip back to Exhibit 113,
18   the volume goal for Community Express was zero?
19   A.  Yes.
20   Q.  Can you describe what caused the change in
21   the volume goal for the Community Express product?
22   A.  Yes.  After much work trying to get the

                                    12 (Pages 1086 to 1089)

Page 1090

1    HFA deals that were in the pipeline for Community
2    Express at the beginning of the year through Credit,
3    as Mr. Riedy mentioned -- the collateral to get
4    through the collateral issue -- we simply weren't
5    able to get over that hurdle and by this time,
6    probably midyear or a little after, the goals were
7    revised to reflect that we weren't having any
8    opportunity to do any business in Community Express
9    that year.
10       Q.   Now, on Exhibit 106, the volume goal for
11   modernization was $45 million in January of 2009?
12       A.   Yes.
13       Q.   And at Exhibit 113, that volume goal looks
14   like it increased to $55 million?
15       A.   We were having a fairly good year
16   and we moved the goal to try to give us a stretch to
17   reach towards.
18       Q.   And it looks like, as of November 30th,
19   the team had brought in $42,444,000 worth of
20   Community Express loans?
21       A.   That's correct.
22       Q.   Now, given your testimony that the

Page 1091

1    $13 million deal for Fayetteville, North Carolina in
2    fact closed by the end of the year, adding that to
3    the 42 million, did you reach your goals for
4    Modernization Express in 2009?
5        A.   Yes, we did.
6        Q.   You were selected to lead the newly
7    reconstituted PE Loan team which consisted of members
8    of the community development team under Beverly
9    Wilbourn's organization, is that right?
10       A.   That's correct.
11       Q.   What were your responsibilities in running
12   that group?
13       A.   My responsibilities were to manage the
14   business aspects and to make sure that people were
15   working effectively.  While I managed the work of the
16   team, I did not have any direct responsibility for
17   the personnel that were in the CD team.  Lisa Tarter
18   was one of the leads and I worked extensively with
19   her but each of the CD members on the team reported
20   up to a lead director within the CD organization and
21   I held monthly calls with those lead directors to
22   provide my feedback on how the team members were

Page 1092

1    doing.  And if we were having specific issues with
2    the team members, then we would have a call with the
3    lead director and that specific person.
4        So while I managed the team, I no longer
5    had the direct personnel responsibility that Eileen
6    had had while she was the director of the Public
7    Entities loan team.
8        Q.   By personnel responsibilities, what do you
9    mean?  Is that hiring and firing?  What do you mean
10   by that?
11       A.   Yes, exactly.  And also perform
12   evaluations, you know, have discussions, participate
13   in calibration sessions with Human Resources to
14   determine -- you know, I had some feedback through
15   Lisa Tarter and the lead directors but I had no
16   direct responsibility.  I had no full-time employees
17   under my purview for personnel matters.
18       Q.   Would you turn to Exhibit 17?
19       A.   I have it.
20       MR. STEWART:  And before we get to that, I
21   move for admission of Exhibit 106 and 113.
22       MR. WACHTEL:  No objection.

Page 1093

1        ARBITRATOR ROSCOE:  106 and 113 are
2    admitted.  Thank you.
3            (Respondent's Exhibits Nos. 106 and
4            113 were received in evidence.)
5        BY MR. STEWART:
6        Q.   Can you identify what is at Exhibit 17 for
7    the record?
8        A.   This is a memo that I put together
9    welcoming the new team to the Public Entities loan
10   team.  And I'm letting them know what their
11   responsibilities would be and what our marketing
12   priorities would be for the year, and also that we
13   would be having a meeting in D.C. to talk about
14   marketing strategy for 2009.
15       Q.   If you would turn to page 968 of Exhibit
16   17.
17       A.   Yes.
18       Q.   Can you identify what this map represents?
19       A.   Yes.  This map represents the members of
20   the community development team and which of the NAHRO
21   regions, National Association of Housing and
22   Redevelopment Officials, that they would be

Arbitration Day 5                                    October 28, 2011
                     Washington, DC

---

Page 1094

1    responsible for.
2           Because our teams were not specifically
3    aligned, the members were at different places in the
4    country, we felt the strategy, best, would be to go
5    with the NAHRO regions of the country.  That way for
6    regional conferences, state meetings, they would know
7    where their responsibilities lie.
8           Q.   Now, there are two members of the team
9    that do not appear on -- that were not original
10   members of the CD account team as of March 10, 2008
11   as reflected in Exhibit 10.  And you can turn to
12   Exhibit 10 to see what I was referring to.
13          MR. WACHTEL:  Objection, mischaracterizes
14   evidence.
15          ARBITRATOR ROSCOE:  Which evidence is
16   that?
17          MR. WACHTEL:  It's three members.  It's
18   not two.
19          ARBITRATOR ROSCOE:  Do you want to
20   rephrase the question?
21          BY MR. STEWART:
22          Q.   There are several members of the public

---

Page 1095

1    entity loan team as reflected in Exhibit 17 who were
2    not original members of the CD account team in March
3    10, 2008?
4           A.   Yes.
5           Q.   Take a look at FM 24.
6           A.   Yes.
7           Q.   And specifically, those three people are
8    Bill Picotte, Jessie Smith and Warren Harris.  Do you
9    see that?
10          A.   Yes.
11          Q.   Do you recall at any time whether
12   Mr. Harris had worked and marketed Community Express,
13   Modernization Express or even Tribal Express at any
14   point in 2008?
15          A.   Not that I recall.
16          Q.   How about Jessie Smith?
17          A.   Jessie had been on a tour in the Pacific
18   Northwest with Russell in 2008.
19          Q.   And Bill Picotte?
20          A.   Bill had, to my knowledge, not been
21   involved in any marketing activities.
22          Q.   Now, when you initially became the

---

Page 1096

1    director for the reconstituted Public Entities loan
2    team, was Ms. Zeeda Daniele -- are you familiar with
3    Zeeda Daniele?
4           A.   Yes.
5           Q.   Was she a member of that team at that
6    time?
7           A.   Yes.
8           Q.   And at some point she was removed or
9    reassigned from the team?
10          A.   Yes.
11          Q.   Do you have an understanding of why or how
12   that happened?
13          A.   I asked the question, when that happened,
14   and I was told that the foreclosure market was
15   heating up in California, and because Zeeda had
16   already been on the ground and done a lot of work
17   with customers in that area, that she was going to be
18   reallocated to the REO business space, the real
19   estate owned; and the foreclosure prevention work
20   that the company was beginning to really -- that was
21   really beginning to heat up with the company.
22          Q.   And to what extent if any did you have in

---

Page 1097

1    the selection of a replacement for Ms. Daniele?
2           A.   I didn't have any responsibility.
3           Q.   Do you have an understanding whether
4    Mr. Riedy was involved in that discussion?
5           A.   I believe he had discussions with
6    Ms. Wilburn about those decisions.
7           Q.   And whose decision was it?
8           A.   Ms. Wilburn's, from my understanding.
9           Q.   And assigning Mr. Smith to the public
10   entity loan team, were you involved in that decision?
11          A.   I was not.
12          Q.   Do you know who made that decision?
13          A.   I would assume Beverly Wilburn.
14          Q.   And Mr. Picotte?
15          A.   That would have been -- I don't know
16   whether the reorganization in the community
17   development group -- at some point, it was divided
18   urban and rural and Beverly Wilburn was responsible
19   for the urban community development folks and Bob
20   Simpson was responsible for the urban -- I mean, the
21   rural community development folks and I'm not sure if
22   that would have been a decision made by Beverly or a

14 (Pages 1094 to 1097)

Page 1098

1  decision made in conjunction with Beverly and Bob
2  Simpson.
3      Q.   And how were you informed that Mr. Picotte
4  would be joining that team?
5      A.   When I got the team member list from Carl,
6  from the work that he and Beverly had completed.
7      Q.   Now, under several of these individuals,
8  it has a notation about file coverage, particularly
9  Mr. Staples, Ms. Francis and Mr. Perrey.  Do you see
10 that?
11     A.   Yes.
12     Q.   Can you give us an understanding of what
13 that notation means on this chart?
14     A.   I do.  Within Community Lending and our
15 group, the Public Entities team, every time a deal
16 closes, we're assigned -- the business manager who
17 helped close the loan is assigned to that loan in
18 what's called the CLCS system at Fannie Mae.  And I
19 don't know what that stands for, but it's recording
20 and billing of the funds that come in to Fannie Mae
21 for payment.
22          And as part of our responsibility on the

Page 1099

1  team, at the time there were monthly watch lists and
2  Credit calls that if one of your loans hadn't made
3  payment or maybe a Community Express payment was
4  coming due, we were responsible for attending those
5  meetings by phone and providing any information.  Or
6  if the portfolio admin folks needed help to assist
7  getting the payment in the door, oftentimes the
8  business people would be tapped upon to help do that
9  work, to help the company bring in any delinquent
10 payments.
11          So because we continued that work with the
12 new CD members and the old team members were no
13 longer there, it was important that we assign new
14 team members to take over the file responsibilities
15 on the loans from the folks who had left the company.
16     Q.   Now, we began by talking about your
17 responsibilities at Fannie Mae currently.
18     A.   Uh-huh.
19     Q.   Did there come a point in time when the
20 Community Express and Modernization Express loan
21 products were no longer marketed by Fannie Mae and
22 particularly by the public entity loan team?

Page 1100

1      A.   Yes.
2      Q.   When was that?
3      A.   May of 2010.
4      Q.   And what happened at that time?
5      A.   There was a letter received by the
6  conservator that effectively told us to cease, desist
7  and divest ourselves of those two loan products.
8      Q.   And what does it mean to divest, for the
9  company to divest itself of the loan products?
10     A.   It means to get them out of your book of
11 business, to sell them and get them out of your book
12 of business.
13     Q.   And what involvement if any do you have in
14 divesting Fannie Mae of those loan products?
15     A.   I was asked by Ken Bacon to stay on with
16 the company to help work through the internal
17 divestment process, to sell the portfolio, the Mod
18 Express portfolio.  The Community Express portfolio,
19 because it was -- we asked for a reprieve to divest
20 of that specific portfolio, because those were much
21 shorter term loans and the last one runs off of
22 Fannie Mae's book, which is the Pittsburgh Housing

Page 1101

1  Authority Community Express, in December of 2013.
2          They had asked us to divest of the
3  portfolios by September 30th of 2013, so we only had
4  to ask for a three-month extension for one loan and
5  those would be off of our books.  So it made no sense
6  to try to go out and obtain a buyer.  And FHFA, our
7  conservator, agreed.
8      Q.   What's the status of Fannie Mae's holdings
9  of these assets at this time?
10     A.   The Community Express loans continue to
11 run off the books.  The Modernization Express product
12 is in discussion with an investor at this time, and
13 the process should -- the purchase and sale agreement
14 is in final negotiation with an investor and should
15 take place before the end of 2011.
16     Q.   And what's the current status of your
17 position at Fannie Mae?
18     A.   I will be finished at Fannie Mae at the
19 end of December, 31st or previously if the sale
20 occurs before that time.
21     Q.   And by ending at Fannie Mae, do you mean
22 that your employment --

15 (Pages 1098 to 1101)

## Page 1102

1     A.   My full-time employment will be gone with
2  the company.
3         MR. STEWART:  I have no further questions.
4         ARBITRATOR ROSCOE:  Thank you.  Why don't
5  we take a 10-minute break before cross.
6         MR. WACHTEL:  Yes, please.
7         ARBITRATOR ROSCOE:  Thank you.
8         (Recess.)
9         EXAMINATION BY COUNSEL FOR CLAIMANT
10        BY MR. WACHTEL:
11     Q.   Good morning, Ms. Zukoff.  I'm David
12  Wachtel.  I'm representing Steve Brannum, as you
13  know.  I wanted to start first by asking you a couple
14  of questions about your responsibilities as director
15  of public housing authorities.  You did that in two
16  cities, correct?
17     A.   Three cities.
18     Q.   McMechen, Wheeling, what's the other?
19     A.   Benwood.
20     Q.   Now, were you a director of a public
21  housing authority in each of those places?
22     A.   Yes.

## Page 1103

1     Q.   And as director, did you have some
2  responsibilities that anyone responsible for housing
3  units, whether public housing or private housing,
4  would have?
5         MR. STEWART:  Objection.
6         THE WITNESS:  I'm not sure what you're
7  asking.
8         MR. STEWART:  Vague as to question.
9         BY MR. WACHTEL:
10     Q.   Did you have responsibilities, among other
11  things, for people making sure that the housing units
12  are painted and that the rents are collected and all
13  those kinds of things?
14     A.   Yes.
15     Q.   And did you also have responsibilities in
16  the other side related to budgets for those housing
17  authorities?
18     A.   Yes.
19     Q.   Finances of those housing authorities?
20     A.   Yes.
21     Q.   So sort of mix of responsibilities?
22     A.   Yes.  Overall the operations, which would

## Page 1104

1  have included all of the items you just mentioned.
2     Q.   When did you start working on Eileen
3  Neely's Public Entities loan team full time?
4     A.   August or September of 2006.
5     Q.   And so responsibilities you had from the
6  position you were in before, that didn't carry over?
7     A.   No.  I was moved -- well, I had been doing
8  some of the work of Eileen's team in my CBC director
9  capacity as well.  25 percent of my time was
10  allocated to Eileen's group in 2006 before I moved
11  over full time to the team.
12     Q.   And I don't know if this was on the record
13  earlier but did you remain in West Virginia when you
14  joined Eileen's team?
15     A.   I remained in -- I started working from my
16  home in West Virginia versus my office in Charleston,
17  West Virginia where the CBC office was located.
18     Q.   How often did you come to Washington, D.C.
19  for purposes of Fannie Mae during the period before
20  you became director of the team?
21     A.   It just depended on what was going on.  If
22  we were having a team meeting that required my

## Page 1105

1  personal attendance, I was there.  I participated by
2  phone on all of the team meetings.  If we had
3  business -- I attended several meetings with Eileen
4  at HUD -- I would come in for those meetings.
5         It just depended on what was going on.  I
6  would say probably maybe once a month would be an
7  average.
8     Q.   And did that balance of your work between
9  West Virginia and Washington, D.C. change once you
10  became the -- once your duties changed around January
11  23rd, 2009?
12     A.   What do you mean?
13     Q.   Did you come to D.C. more after Eileen
14  left the organization?
15     A.   Not really.
16     Q.   Did you refer to 2008 as the last year
17  that you were on the road?
18     A.   I don't think I did.
19     Q.   Was there any change in the extent to
20  which you were on the road meeting potential
21  borrowers in 2009 compared to 2008?
22     A.   Yes.  I didn't do as much traveling in

Page 1146

1     A.   Yes.
2     Q.   Was that an administrative role or a more
3  substantive financial analysis role?
4     A.   It was more of an administrative role.
5     Q.   And could you turn, then, to Exhibit 140?
6     A.   Yes.
7     Q.   This is your 2008 review.
8     A.   Yes, I have it.
9     Q.   At the bottom of the first page of Exhibit
10  140 at FM 335, there is what appears to be a goal,
11  though I don't see what the language of the goal was.
12  It's 1.1.1.  And you provide an assessment.  Do you
13  see that?
14     A.   Yes.
15     Q.   Do you have a recollection of what that
16  goal might have been?
17     A.   I believe it was to -- it would have been
18  to bring in the business, to help the team accomplish
19  our 2008 volume goals.
20     Q.   And under the first assessment, your
21  assessment there.
22     A.   Yes.

Page 1147

1     Q.   You indicate that there were a number of
2  deals that had been closed year to date and two
3  additional goals in the pipeline.  Do you see that?
4     A.   Two additional loans?  Yes.
5     Q.   And under the second assessment, you state
6  that you've exceeded the second part of the goal.
7     A.   Yes.
8     Q.   Do you have an understanding of, when you
9  say you exceeded the second part of the goal, what
10  that was?
11     A.   I probably had a certain number of
12  conferences that I stated I would attend to reach the
13  volume goal.
14     Q.   And then there is an assessment by
15  Ms. Neely of your performance under this particular
16  goal.  Do you see that?
17     A.   Yes.
18     Q.   Did you have a conversation with Ms. Neely
19  about her assessment?
20     A.   Yes.
21     Q.   And what took place in that conversation?
22     A.   She would have reviewed her comments with

Page 1148

1  me and my performance around that specific goal for
2  the year.
3     Q.   Do you remember when that was?
4     A.   I believe Fannie Mae's always behind at
5  year end when they do performance appraisals.  This
6  probably would have taken place sometime in February
7  or March of 2009.
8     Q.   Well, Ms. Neely had resigned in January
9  23rd, 2009, correct, and you had taken over
10  responsibility for the team?
11     A.   Yes.  Well, I guess she must have -- I
12  believe that we had a discussion prior to her
13  leaving, though.  Maybe I met with Carl later.
14     Q.   And I see an assessment by Mr. Riedy as
15  well on the second page of the document at FM 336?
16     A.   Yes.
17     Q.   Do you see that?
18     A.   Yes.
19     Q.   And he indicates that there is strong
20  performance on marketing, did not grow revenue for a
21  number of reasons?
22     A.   Where are you at now?

Page 1149

1     Q.   This is on the top of 336.  Do you see
2  that?
3     A.   Yes, I see that.
4     Q.   Did you have a conversation with Mr. Riedy
5  about your 2008 performance?
6     A.   Yes.
7     Q.   What took place in that conversation?
8     A.   We talked about the problem of the
9  tightening of the credit crunch and that profit and
10  loss will be much more important or will be important
11  and be part of the 2009 regimen.
12     Q.   And you received an overall rating which
13  is reflected at the middle of the page.  Do you see
14  that?
15     A.   Yes.
16     Q.   And it has an FM/R/L plus.  Do you see
17  that?
18     A.   Yes.
19     Q.   What did those ratings and those specific
20  letters indicate?
21     A.   R stands -- I believe fairly met -- fully
22  met expectations is what FM stands for.

Arbitration Day 5                                                    October 28, 2011
Washington, DC

---

**Page 1150**

1    Q.   Okay?

2    A.   And R is for results and L is for

3    leadership.

4    Q.   And you received an L plus rating?

5    A.   I did.

6    Q.   And what does that indicate?

7    A.   That my leadership skills were over and

8    above what was required of my position.

9    Q.   And under that overall rating, there are

10   year end progress comments from Mr. Riedy.  Do you

11   see that?

12   A.   Yes.

13   Q.   And in the first line, it looks like he's

14   writing a note to you, "Lisa, I looked at your 360."

15   A.   Yes.

16   Q.   "Anonymous comments were quite impressive.

17   Let's review together."  Do you see that?

18   A.   Yes.

19   Q.   Do you have an understanding what the 360

20   is?

21   A.   Yes.

22   Q.   Or refers to?  What is that?

---

**Page 1151**

1    A.   Within Fannie Mae, there is a 360 analysis

2    done of every employee by folks that are on their

3    team, folks that are internal customers, which would

4    mean like folks that look at Credit, Portfolio Admin

5    as well as your peers and leadership.  And those

6    folks are -- you submit the folks that you would like

7    to have review you and your boss selects the folks

8    that they would like to have review you, and those

9    are sent out to those people to make comments

10   specifically about your performance for that year.

11   Q.   And does your boss have the flexibility to

12   remove individuals that you, the employee, the

13   subordinate, would place on the list?

14   A.   Yes, they do.

15   Q.   And would you turn, then, to Exhibit 141

16   and 142?  I believe they're slightly different.

17   MR. WACHTEL:  I'm going to object to any

18   questions about the accountability surveys because

19   they're anonymous and therefore don't have the

20   indicia of reliability to survive a hearsay objection

21   or even the loose rules of evidence in an

22   arbitration.

---

**Page 1152**

1    ARBITRATOR ROSCOE:  None are in evidence

2    yet, are they?

3    MR. STEWART:  They are not.

4    ARBITRATOR ROSCOE:  I haven't seen any.

5    MR. WACHTEL:  Well, now you know what's

6    coming.

7    MR. STEWART:  That is what 141 and 142 are

8    and the issue is -- I don't want the -- it doesn't

9    matter.  But the issue is the L plus rating which is

10   reflected in Exhibit 31, which was specifically

11   referenced in the justification for termination

12   memorandum, that is reflected in Exhibit 140, which

13   is the performance review, and then the comments from

14   Mr. Riedy reflect the anonymous comments from the 360

15   review which goes towards the basis for the L plus

16   rating.

17   ARBITRATOR ROSCOE:  They're actually

18   probative to some extent, although weight will be the

19   factor in terms of my decision as to their import.

20   And the reason is the objection is a fair objection,

21   but for the fact that in this witness' performance

22   review, her supervisor, whose state of mind we're

---

**Page 1153**

1    really interested in, took those reviews into account

2    apparently.

3    And so because those reviews have been

4    articulated as forming a basis for her supervisor's

5    opinion and subsequent decisions, then they're

6    relevant, so they get in.  But the real fact that

7    we're all thinking about here is the decision the

8    supervisor made, so really the weight in which

9    they're accorded is minimal.

10   BY MR. STEWART:

11   Q.   Would you turn to Exhibits 141 and 142,

12   please?

13   A.   Yes.

14   Q.   And if you could identify these for the

15   record?

16   A.   These are accountability surveys for

17   individual contributors for Lisa Zukoff's 360 summary

18   report.

19   Q.   Do you recall receiving these documents --

20   A.   Yes.

21   Q.   -- during your employment at Fannie Mae?

22   A.   Yes.

28 (Pages 1150 to 1153)