UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
STEVEN BRANNUM,                     )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    Civil Action No. 12-0305 (EGS)
                                    )
FEDERAL NATIONAL MORTGAGE           )
ASSOCIATION,                        )
                                    )
        Defendant.                  )
_____ )

**MEMORANDUM OPINION**

Plaintiff sues his former employer, the Federal National Mortgage Association ("Fannie Mae") under 42 U.S.C. § 1981.[1] He alleges that his termination on January 23, 2009, as part of a reduction-in-force ("RIF") was due to race discrimination. Compl. at 1-2. Pending before the Court is Fannie Mae's Motion for Summary Judgment, brought pursuant to Fed. R. Civ. P. 56 [Dkt. # 10]. Plaintiff has filed an opposition, Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Dkt. # 16], and defendant has replied, Fannie Mae's Reply Mem. in Support of its Mot. for Summ. J. [Dkt. # 17]. Upon consideration of the parties' submissions and the entire record, the Court will grant defendant's motion and enter judgment accordingly.

---

[1] As a "private, shareholder-owned company chartered by Congress under the Federal National Mortgage Association Charter Act," Def.'s Statement of Undisputed Facts in Supp. of Summ. J. ¶ 1, Fannie Mae is subject to suit under 42 U.S.C. § 1981 for race discrimination. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 n.1 (D.C. Cir. 2013) (noting differences between section 1981's proscription of race discrimination only and Title VII's proscription of discrimination based on race and other listed classifications) (citing 41 U.S.C. § 2000e)).

1

## I. BACKGROUND

The relevant documented facts are as follows. Plaintiff, an African American man, worked for Fannie Mae for approximately seven years as a Senior Business Manager. Compl. ¶ 3. At the time of his termination in January 2009, plaintiff was assigned to the D.C. Loan Team (or Public Entities "PE" Loan Team) "managed by director Eileen Neely (White), who reported to Vice President Carl Riedy (White), [who, in turn,] reported to [Senior Vice President of the Community Development Division Jeffrey] Hayward (African American)." Fannie Mae's Statement of Undisputed Facts ("Def.'s Facts") ¶ 17; *see id*. ¶ 4.

In 2007, Mr. Hayward hired two Vice Presidents, Beverly Wilbourn, who is African American, and Bob Simpson, who is Caucasian, to lead a network of Community Business Centers that "functioned as localized sales forces to market the products offered by all of Fannie Mae's lines of business." *Id*. ¶¶ 5-6. Ms. Wilbourn led the "Urban and Homeless Initiatives," and Mr. Simpson led the "Rural Initiatives." *Id*. ¶ 6. The D.C. Loan Team was primarily responsible for "sourcing and closing direct loan deals made to public entities across the country," and it "marketed two loan products: Modernization Express and Community Express." *Id*. ¶ 17. Plaintiff focused on Community Express loans, *id*. ¶¶ 26, 33 n.2; Pl.'s Opp'n at 3, which "were generally small, averaging $3.3 million." Def.'s Facts ¶ 18.

As a result of Fannie Mae's "well-publicized financial instability associated with the nation's housing crisis" in 2008 and the ensuing Conservatorship by its regulator, the Federal Housing Finance Agency, *id*. ¶ 2, then-new Chief Executive Officer Herb Allison "directed senior management to cut expenses and reduce inefficiencies;" Mr. Hayward conveyed this directive to his managers, including Mr. Riedy. *Id*. ¶ 65. Mr. Riedy proposed "to cut the D.C. Loan Team and shift full responsibility for Community Express and Modernization Express to

2

the field teams in the Community Business Centers with additional assistance from the outside consultants," *id*. ¶ 66, and Ms. Wilbourne supported this proposal. *Id*. ¶ 69. Mr. Hayward approved the plan, *id*. ¶ 70, since it would alleviate what he viewed as the " 'most glaring' redundancy in his entire organization because the field teams performed the same work as the D.C. Loan Team and he considered the field teams more valuable because they were closer to the customer and had the local contacts." *Id*. ¶ 71 (quoting Hayward Arbitration Tr. [Dkt. # 10-6, ECF pp. 50-88]).

On January 23, 2009, Mr. Riedy informed plaintiff that his position was being eliminated due to a company-wide RIF. As a result of the RIF, "all four positions on the D.C. Loan Team were eliminated from Mr. Riedy's cost center, and the only staff retained were [director Lisa] Zukoff," a Caucasian woman who resided in the field in West Virginia and was the Team's highest-producing seller, and Katrina Yancey, an African American woman who was Mr. Riedy's administrative assistant. *Id*. ¶¶ 75-76. Ms. Zukoff was the only member of the D.C. Loan Team not "based at corporate headquarters in Washington, D.C." *Id*. ¶ 24. On that same day, Fannie Mae announced that 380 employees were terminated as a result of the company-wide RIF. *Id*. ¶ 77. "Mr. Hayward realized a savings of over $300,000 – related to the reduction in personnel costs attributed to Mr. Riedy's budget." *Id*. ¶ 85.

Plaintiff rejected Fannie Mae's severance offer of "a one-time, lump sum cash payment in exchange for a waiver and other promises," and filed a discrimination charge with the D.C. Office of Human Rights ("OHR") on July 13, 2009. *Id*. ¶¶ 80, 95. Following an investigation, OHR issued a "no probable cause" letter on March 4, 2010, *id*. ¶ 95, and the Director denied plaintiff's request for reconsideration on October 8, 2010, *id*. ¶ 96.

3

On January 5, 2011, plaintiff requested nonbinding arbitration under defendant's Dispute Resolution Policy on the basis that his termination resulted from intentional race discrimination in violation of § 1981. Following "a full evidentiary hearing . . . over the course of six days in October 2011," the neutral arbitrator entered a Final Award on December 30, 2011, "finding that Plaintiff failed to establish that he was terminated because of his race." *Id.* ¶ 97. Plaintiff initiated this civil action on February 24, 2012.

## II. LEGAL STANDARD

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ .P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *See Celotex*, 477 U.S. at 323. In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Keyes v. Dist. of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials; it must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. In addition, "although summary judgment must be

approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Adair v. Solis*, 742 F. Supp. 2d 40, 50 (D.D.C. 2010), *aff'd*, 473 Fed. Appx. 1 (D.C. Cir. 2012) (internal quotation marks and citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

Where, as here, a plaintiff is proceeding *pro se*, "the Court must take particular care to construe the plaintiff's filings liberally, for such [filings] are held 'to less stringent standards than formal pleadings drafted by lawyers.' " *Cheeks v. Fort Myer Constr. Co.*, 722 F. Supp. 2d 93, 107 (D.D.C.2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). But this liberal reading requirement does not relieve plaintiff of his obligations on summary judgment about which he was advised in the Order of September 10, 2012 [Dkt. # 11].

### III. DISCUSSION

Plaintiff brings this action solely under Section 1981 of the Civil Rights Act of 1866 (as amended). Compl. at 1. Section 1981 states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981 "can be violated only by purposeful [or intentional] discrimination," *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982), and it "can encompass employment discrimination . . . claims." *Olatunji v. District of Columbia*, No. 10-1693, --- F. Supp. 2d ---, 2013 WL 3766905, at *3 (D.D.C. July 19, 2013)

5

(citing *Rivers v. Roadway Express*, 511 U.S. 298, 302 (1994); *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459 (1975)) (other citation omitted); *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) ("Section 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment.") (quoting 42 U.S.C. § 1981(b)). "Under extant precedent[,] purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences' . . . . It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ashcroft v. Iqbal* 556 U.S. 662, 676-77 (2009) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (brackets in original).

Section 1981 claims based on employment decisions are analyzed in substantially the same manner as employment discrimination claims brought under Title VII of the Civil Rights Act. *Ayissi-Etoh*, 712 F.3d at 576. Thus, when, as here, the record contains no direct evidence of discrimination and the defendant has provided a legitimate nondiscriminatory explanation for the challenged adverse action (plaintiff's termination), the only question is whether plaintiff has in rebuttal produced sufficient evidence from which a reasonable jury could find that defendant's business rationale "was mere pretext for race discrimination" and infer intentional discrimination. *Primas v. District of Columbia*, 719 F.3d 693, 697 (D.C. Cir. 2013); *see Davis v. Joseph J. Magnolia, Inc.*, 815 F. Supp. 2d 270, 275-76 (D.D.C. 2011) (discussing the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Pretext may be shown "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981),

or is "false."  *Primas*, 719 F.3d at 697 (quoting *Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007)).

As defendant has aptly shown in its reply, plaintiff has produced no evidence from which a reasonable jury can find that either the RIF or the elimination of the D.C. Loan Team was a pretext for race discrimination.  *See* Def.'s Reply at 2-4.  In his opposition, plaintiff focuses first on his credentials to support the argument that he is "well qualified" for other positions within Fannie Mae.  Pl.'s Opp'n at 2-3.  But "courts are not super-personnel departments that reexamine an entity's business decisions" beyond the realm of the anti-discrimination laws.  *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003) (citation, internal quotation marks and alterations omitted); *see id*. (deferring "to the Government's decision of what nondiscriminatory qualities it will seek in filling [vacant] position"); *Fishbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive' ") (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Plaintiff argues next that Fannie Mae's reasons "for laying off the PE Loan Team are a Pretext for Discrimination."  Pl.'s Opp'n at 3-12.  He does not dispute the legitimate business justification for the nationwide RIF in the wake of Fannie Mae's well-known financial collapse.  Nor has plaintiff attributed any racial animus to Mr. Hayward, who testified that he was the decision-maker solely responsible for plaintiff's termination.  Def.'s Facts ¶ 78.  Ordinarily, this would end the Court's inquiry and entitle defendant to summary judgment.  *See Globus v. Skinner*, 721 F. Supp. 329, 336 (D.D.C. 1989) (concluding that "agency established a solid and undiscredited rationale for the decision to abolish the plaintiff's position in the RIF . . . [where] . . . the plaintiff was a valued worker, [but] most of her job functions either could be done by other

persons or were decreasing in importance as [] functions changed"). Plaintiff, however, has advanced a "cat's paw" theory, *Staub v. Proctor Hosp.*, --- U.S. ---, 131 S.Ct. 1186, 1190 (2011), which the Court addresses next.

Plaintiff theorizes that Mr. Hayward merely accepted Mr. Riedy's proposal without any independent knowledge or investigation of the circumstances and, thus, that Mr. Riedy, with racial animus, "proximately caused the PE Loan Team's lay off." Pl.'s Opp'n at 4 (citing *Staub*). Plaintiff's conjecture is belied by Mr. Hayward's testimony, which reveals his reasoned appraisal of the value of the field teams versus the D.C. Loan Team and why he determined from the "stark" redundancies that the D.C. Loan Team should be cut with or without the RIF. Def.'s Facts ¶¶ 71-72. In addition, Mr. Hayward's testimony reveals his first-hand knowledge about plaintiff's work, which is not particularly flattering. *See id*. ¶¶ 39-45 (summarizing Mr. Hayward's testimony about his selection of plaintiff to a high-profile position and his subsequent dissatisfaction with plaintiff's performance).

Even if plaintiff could prove Mr. Riedy's influence, he has not proffered any evidence from which a reasonable jury, considering the evidence below, could infer intentional discrimination from Mr. Riedy's proposal to eliminate the D.C. Loan Team.

**Mr. Riedy's Legitimate Business Rationale**

Just eight months before the Conservatorship in September 2008, Mr. Riedy, in cooperation with Ms. Wilbourn, established a "buddy system" on the premise in part that "the field teams would need the guidance and expertise of the D.C. Loan Team" with regard to "sourcing deals" for the Community Express and Modernization Express loan programs. Def.'s Facts ¶¶ 53, 56. Mr. Riedy subsequently realized that Ms. Wilbourn's field staff had developed such a level of expertise that the work became "duplicative" and "the D.C. Loan Team members

took on a more secondary 'troubleshooter' role."[2] *Id.* ¶ 56. Thus, when Mr. Hayward instructed Mr. Riedy and his other "direct reports . . . to reduce expenses and improve efficiencies within their organizations," *id.* ¶ 65, Mr. Riedy reasonably proposed "to cut the D.C. Loan Team and shift full responsibility for Community Express and Modernization Express to the field teams in the Community Business Centers with additional assistance from the outside consultants" utilized since 2005. *Id.* ¶¶ 66, 67.

Furthermore, in December 2008, Fannie Mae's Credit Department imposed a new rule that essentially "ended the viability of the Community Express [loan] product" -- the primary focus of plaintiff's efforts -- by requiring customers to provide 100% collateral for the loan instead of the previous 25% collateral. *Id.* ¶¶ 58-64. Hence, Mr. Riedy was reasonably motivated also by the realization that "the only remaining work on Community Express was to service existing loans," which could be achieved with the outside consultants to "reduce [the] high fixed personnel costs" of retaining two sales forces in the District and in the field. *Id.* ¶¶ 67-68.

**Plaintiff's Rebuttal**

To demonstrate Mr. Riedy's racial animus, plaintiff makes two arguments. First, he points to the fact that all three of the laid off employees (plaintiff, Maria Day-Marshall, and Russell Atta-Safoh) were African American. Pl.'s Opp'n at 4; Def.'s Facts ¶ 75. Plaintiff ignores the fact that the other retained employee, administrative assistant Katrina Yancey, is African American. Def.'s Facts ¶ 76. Regardless, the assertion "that members of [plaintiff's]

---

[2] Plaintiff was paired with two African Americans in the field: Zeeda Danielle, who covered the West Coast, and Evett Francis, who lived in Miami and covered the Carolinas, Georgia and Florida. Def.'s Facts ¶ 55. He admitted that "he 'had a heavy reliance' on the field staff for sourcing his deals." *Id.* Mr. Hayward also was aware of the field staff's proficiency, "particularly [that of] Plaintiff's 'buddy' Ms. Evett Francis." *Id.* ¶ 57. Both Francis and Danielle survived the RIF and were "unilaterally reassigned" by Ms. Wilbourn "to assist with the urgent foreclosure prevention effort." *Id.* ¶ 83.

protected class[] were treated worse during the reorganization [is], as a general matter, [an] unpersuasive" argument. *Primas*, 719 F.3d at 697.

Second, plaintiff argues that "Mr. Riedy consistently made decisions that benefited Caucasian employees to the detriment of African-American Employees." Pl.'s Opp'n at 5. Plaintiff provides two concrete examples. He asserts (1) that "Riedy selected Lisa Zukoff (Caucasian) to lead the PE Loan Team . . . .," and (2) that Mr. Riedy "chose not to put Brannum, or either of his colleagues, in the position Michael Lohmeier was leaving on the HFA team." Pl.'s Opp'n at 5. The latter example is not probative of Mr. Riedy's intent since it is undisputed that plaintiff neither applied for the HFA team position nor expressed an interest in it. Def.'s Facts ¶ 12. Moreover, Mr. Riedy hired an African American to fill the vacancy, *id*. ¶ 14, and "a replacement within the same protected class cuts strongly against any inference of discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (citation omitted).

As to the retention of Ms. Zukoff, defendant has produced overwhelming evidence that Ms. Zukoff was better qualified to lead the PE Loan Team, and her selection was consistent with defendant's nondiscriminatory business rationale. *See generally* Def.'s Reply at 9-12. Notably, Ms. Zukoff was already at the director level at the time of the RIF, had management experience, was residing and working in the field in West Virginia where she had developed significant business connections, and had been the D.C. Loan Team's top producer. Def.'s Facts ¶¶ 24, 36, 87-90; *see id*. ¶ 66 ("Mr. Riedy made that proposal because he did not believe it made good sense to retain all of Ms. Neely's D.C. Loan Team staff when the Company already had capable personnel in the field . . . who had connections to, and were in close proximity to many of the public entity customers across the nation") (citing, *inter alia*, Arbitration Tr. of Riedy, Neely and Wilbourn). In addition, the record evidence strongly suggests that plaintiff did not have a

penchant for traveling and meeting personally with customers, which was viewed as "essential" to the loan team positions. *Id.* ¶¶ 32-35.

Plaintiff admits that "numbers" were his strength and that he "was a leader with regard to the [fading] Community Express product." Pl.'s Opp'n at 3. He does not dispute that Ms. Zukoff "had strong relationships with borrowers" but asserts that "she did not have the quantitative background or skill that [he] had." *Id.* at 6. The fact that defendant valued – reasonably so -- Ms. Zukoff's concededly superior communication and marketing skills, Def.'s Facts ¶¶ 86-87, over plaintiff's "valued" quantitative skills, *id.* ¶¶ 30-35, to fill a sales/marketing position is not evidence of pretext but rather is the very type of personnel decision that is beyond the ken of the courts. *See id.* ¶ 87 (Mr. Hayward "saw 'no comparison'" between plaintiff and Zukoff in the areas of business development and selling, which were the "focus for the new director position"); *Smith v. Chamber of Commerce of the U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986) ("[P]laintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the decisionmaker which is relevant.").

Furthermore, as defendant correctly observes, plaintiff has not disputed that Mr. Riedy was "never [] the subject of any other internal or external [discrimination] complaint," Def.'s Facts ¶ 82, and that Mr. Riedy generally had good working relationships with his African American colleagues and supervisees. *See* Reply at 2-3 (citing undisputed facts). In addition, plaintiff does not dispute that Mr. Riedy had laid off both black and white employees during his tenure. *See* Def.'s Facts ¶ 29 (recounting Mr. Riedy's termination of two white managers in 2006). He counters that "the [white] people affected were treated differently" because they were allowed "to remain at [Fannie Mae] for some time after the decision to abolish the job" while he and his laid off colleagues "were expected to pack and leave the same day." Pl.'s Opp'n at 7-8.

11

Plaintiff has not suggested, let alone shown, that the circumstances surrounding the previous terminations were in any way similar to the RIF in 2009 and, therefore, has provided no probative evidence from which a reasonable jury could infer unequal treatment from this example.

Finally, Ms. Wilbourn and Mr. Hayward, both of whom are African American, have testified that they agreed wholeheartedly with Mr. Riedy's proposal to close the D.C. Loan Team office as a cost-reduction measure, were aware that plaintiff is African American, knew that plaintiff's position (and those of two other African American employees) would not survive the RIF, and did not believe or suspect that Mr. Riedy acted with any racial bias. *Id.* ¶¶ 69-70.

## CONCLUSION

For the foregoing reasons, the Court finds from the evidence in the record that no reasonable jury could render a verdict for plaintiff on his discrimination claim and that defendant is entitled to judgment as a matter of law. A separate Order accompanies this Memorandum Opinion.

DATE: September 26, 2013      SIGNED:    EMMET G. SULLIVAN
                                                    UNITED STATES DISTRICT JUDGE